CARMEN MATTHEWS, IN PRO SE
P. O. Box 232313
San Diego, CA   92193
858-750-9824

FILED

14 JUN -2 PM 1:31

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

'14 CV 1340 MMA BLM

| | |
|---|---|
| CARMEN MATTHEWS, | Case No.: |
| v. | COMPLAINT FOR EMPLOYMENT DISCRIMINATION & WRONGFUL TERMINATION |
| EIRCK K. SHINSKENKI, Secretary, | |
| Department of Veterans Affairs, | |
| Agency. | |

Plaintiff alleges:

The unlawful employment practices below were and are being committed within the Health Administration Division of the San Diego Veterans Affairs Healthcare pursuant to Title VII §703(a).

Plaintiff Carmen Matthews is an African-American, female citizen of the United States with a disability identified by her primary provider, and a resident of San Diego County, California. She was employed by the defendant at all times relevant to the allegations set forth in this complaint and is presently unemployed.

Defendant is an employer organized under the laws of the State of California and doing business in the State of California, including business at a location in San Diego County, California.

Plaintiff Carmen Matthews filed a charge of employment discrimination against the defendant with the District Office of the Equal Employment Opportunity Commission ("EEOC") on November 16, 2012.  The plaintiff learned months after sending a letter to the EEOC, and after plaintiff's Congressman became involved with her complaint, that as a former federal employee, plaintiff did not need to receive a "Right-to-Sue" letter from the EEOC.  And, since this date, plaintiff has been working with her congressional representative to attempt to resolve this complaint.

On information and belief, defendant followed and is following a policy and practice of discrimination, retaliation, wrongful termination against the plaintiff because of her race, gender and need for reasonable accommodation and because the plaintiff's willingness to speak up.  The discriminatory practices and policies include but are not limited to the following:

1.    Informing the plaintiff when plaintiff was a volunteer and had just interviewed for a paid position that she would never receive a paid position because she refused to sleep with her male supervisor, the VA created a sexually hostile environment.

2.   Asking the men on the team, in the presence of the plaintiff, "where is my little worker?  You guys can't have her,"  The VA attempted to subordinate the plaintiff.  This conduct was not welcome by the plaintiff.

3.   Failing to take corrective action for mistreatment of the plaintiff, after the plaintiff reported the sexual discrimination to the manager of the supervisor, while acknowledging in writing that the plaintiff's allegations of sexual harassment and non-selection are true, the VA failed to exercise reasonable care to correct the sexually harassing behavior in a timely manner.

4.   November 2010, one month after the plaintiff reported the sexual harassment and how she was targeted to not be selected for a position that she applied for, qualified for, and favorably interviewed for, the supervisor of the Call Center called the plaintiff, stating, "HR says I have to interview you."  This interview was conducted the next week over the phone without any face-to-face interaction.  And from the first day to the last of employment, the interaction between the plaintiff and the supervisor was hostile.  This supervisor reports to the same manager as the supervisor who sexually harassed the plaintiff.  The following are a sample of many ways this

supervisor and others in leadership at the VA violated

plaintiff's Civil Rights:

a. During the first team meeting after the plaintiff was

hired, the Labor Relations Manager assigned to this

team co-led the team meeting with the team supervisor.

This Labor Relations Manager was involved with, but did

nothing about the sexual harassment complaint the

plaintiff reported. Approximately 20 minutes prior to

the close of this meeting, this Labor Relations Manager

sneered at the plaintiff, the supervisor singled out

the plaintiff, telling her that the casual slacks that

she was wearing were inappropriate for work. This

supervisor failed to point out to any of the men that

their slacks which were identical to those worn by the

plaintiff were unauthorized. Following this meeting,

this supervisor told other women employees that they

could wear casual slacks to work, but this supervisor

never told this to the men on this team. The plaintiff

reported this to the supervisor's manager and later to

both the EEO Manager and the AIB panel.

b. When the plaintiff's supervisor tasked the team to

write a story for the new online HAS newsletter, the

plaintiff was the only team member who wrote a story

for this project. After she emailed it to the team

lead and the supervisor, the plaintiff also asked if she would receive her byline for this.  The lead praised the plaintiff for contribution, which the plaintiff did after hours, during the Martin Luther King Holiday.  The lead also asked the plaintiff to resend this article to the supervisor because the supervisor never acknowledged or responded to this emailed article.  This experience was the continuation of a pattern of hostility that had an adverse impact upon the plaintiff's work.

c. Prior to the lead's promotion and transfer, the lead recommended that plaintiff take the lead's cubicle. And when this was agreed to by the supervisor, the plaintiff had to request telephone, computer and software fixes and setups to the supervisor for approximately 3 weeks.  Due to the supervisor not fixing this problem, the plaintiff was limited in her ability to be productive.  The plaintiff explained to her supervisor and the manager of this supervisor how this problem prevented her from doing her job.  The plaintiff was given answers such as "don't worry about it.  Hasn't Adam fixed that" and "I don't know what the problem possibly could be?"  The position in which the plaintiff was working at that time counted upon

statistical measures of phone and computer usage.  The solution to this problem only came once the plaintiff persistently involved the Information Technology staff.

d. After the team supervisor informed the team in writing and verbally that she welcomes creative tools and ideas from each team member, when the plaintiff created several useful databases for which she emailed to each team member and to the Patient Advocate's Office team members, the plaintiff's supervisor told the plaintiff to only share what she creates with Adam Doyle and to let him evaluate them first.  This was a problem for the plaintiff because Adam Doyle appeared to be sexually involved with this supervisor.  On several occasions by her own words and body language, this supervisor communicated that Adam is "superman" to her and that if the plaintiff continues to outdo him, the supervisor would punish the plaintiff.

e. When the supervisor sent Aaron McDevitt, a team member to ask the plaintiff to get corporate donations in the amount of $45 per team member, including the supervisor, to participate in the Navy Coronado Bridge Run, and the plaintiff refused to do this, McDevitt asked this question several times more to the plaintiff, to include putting a note on the plaintiff's

keyboard regarding this matter. This became an order, and the plaintiff refused to comply.  Thereafter, and many times over the plaintiff has many documented examples of McDevitt seeming to be gunning for the plaintiff.  This was an even more hostile environment for the plaintiff to work in.

f. When the plaintiff received several anonymous calls complimenting her customer service skills team members Aaron McDevitt and April Adams, two applicants for the open leads positions, said in the presence of team members and the plaintiff, "She must be paying them money to call in."  This was also said in the presence of the team supervisor.  And not only was nothing done about this, but these same two team members were promoted to team leads, shortly thereafter.  The plaintiff also applied for and was interviewed for that position.

g. By cornering the plaintiff after the plaintiff met with the EEO manager, who directed the plaintiff to ask her supervisor what day of the week has less of a workload where my being away and talking to the EEO Manager would not take away as much, asking the plaintiff in the presence of the two new leads why she, the

plaintiff was going to the EEO, the supervisor created more work place hostility.

h. During the plaintiff's meeting with the EEO Manager, where the plaintiff reported her how she experienced hostility; being screamed at by the supervisor; sexual favoritism; quid pro quo; supervisor disappearing from everyone for several days at a time, with no accountability; supervisor forcing employees to pay for a department refrigerator; supervisor doing her PhD homework on the job; unauthorized offsite luncheons; non-selections; and more, the EEO Manager wrote on her report that the plaintiff's supervisor was terminated, effective immediately and that the manager of this supervisor was aware of this.

i. After the plaintiff's meeting with EEO Manager, rather than terminating the supervisor, she was transferred to another department from where she continued to frequently contact at least four team members, which created an even more hostile environment.  During team meetings, the newly appointed leads used passive aggressive statements made towards the plaintiff about the supervisor's status.  And months later, when the supervisor was returned to this department, during her first team meeting, she opened it with "Yes.  I am back

and I can fire anyone I want to," as she scanned the
team members present.  At the close of this meeting,
when one team member showed the supervisor some
wonderful resources that the plaintiff created, the
supervisor reacted with, "Eew!  Throw those away."
This was followed with the supervisor telling the
plaintiff to never contact anyone outside of the
department without first getting her permission.

j. Having visited Employee Health, two occupational health
   reports were sent to the plaintiff's supervisor.  The
   supervisor asked the plaintiff what could possibly have
   led to the health problems she was having in during
   work.  Plaintiff told this supervisor that the
   constantly screaming, and otherwise hostile environment
   that she, the plaintiff, had on many occasions told the
   supervisor and leads about had taken a toll on her. The
   supervisor told the plaintiff that she couldn't do
   anything about the screaming, hers or others, and that
   she had already told plaintiff that they were getting
   new cubicles to buffer the noise.  Although this
   discussion was brought up several times by the
   plaintiff prior to this meeting to this supervisor, the
   leads and the manager of this supervisor, neither of
   them sought corrective actions such as reasonable

accommodation.  When the plaintiff presented a letter asserting the plaintiff's need for accommodation, the EEO Manager refused to accept the letter, telling the plaintiff that the plaintiff's primary provider who is a VA provider, is not specific enough.  The EEO Manager insisted that the plaintiff had to get a better letter from her provider.  The supervisor also tried to deny the plaintiff a copy of the occupational health reports, stating that they weren't official until her manager reviews them.  But her manager never reviewed those reports with the plaintiff.  And the plaintiff did get a copy of those reports from her supervisor.

k. Having seen the plaintiff on several occasions talking to a co-employee who has had numerous meetings where the co-employee had to defend herself in reaction to the supervisor having accused her of having said that she is racist, the supervisor criticized the plaintiff for talking to this co-employee.

l. April 2011, during a team meeting which was headed by the supervisor and her manager, the plaintiff politely announced to the team that if they had food in the refrigerator, they needed to get it, because the refrigerator was being moved out of the department. Both the manager and supervisor reacted towards the

plaintiff as though she, the plaintiff, was responsible for this.  Later, this same day, the supervisor emailed all team members that she was buying a new refrigerator and that each member had to pay $20 to her for this, or pay $1.00 each time they used the refrigerator.  This email was followed the phones in the department suddenly not working, then Adam Doyle approaching the plaintiff to ask how to fix the phones.  Moments after the plaintiff did not have an answer, the supervisor stopped everyone from working, and called a meeting re-iterating what she had already said in an email about the refrigerator.  Several team members balked at this, and the supervisor reacted by looking long and hard at the plaintiff, as though the plaintiff was responsible for the team reactions.  This was reported to the EEO Manager, the supervisor's manager and later to the AIB panelists.

m. Plaintiff was one of eight or ten candidates interviewed for two open lead positions.  The interview was conducted by the supervisor along with two other supervisors who were from other VASDH departments.  All questions and comments made to the plaintiff during this interview were from the supervisor.  No questions or comments were made by the other two interviewers.

And the questions were not on any forms, but instead
the supervisor used her Smartphone to record this
interview.  A significant amount of time during
plaintiff's interview was consumed with the supervisor
endlessly praising another applicant (Adam Doyle) whose
interview occurred after the plaintiff's interview,
that same day.  And while emails stated that Aaron
McDevitt and April Adams were awarded the promotions,
documents later, during the investigation part of this
case with EEOC shows Adam Doyle had indeed been
promoted.  Those who had been promoted were promoted
for a mixture of reasons:  retaliation against the
plaintiff; racial pretext; sexual discrimination; and
violation of the Equal Pay Act.

n. May 2011, after the plaintiff called in sick, she was
harassed with inappropriate calls on behalf of her
supervisor.  The calls came from Aaron McDevitt, who
had just been promoted to a lead.  Upon the plaintiff's
return to work, the plaintiff was told by her
supervisor that she had not authorized her to have sick
leave and only authorizes sick leave after staff
directly talks to her, the supervisor.

o. After the supervisor sent plaintiff an email memo
(September 2011) stating alleged wrongs, the supervisor

told the plaintiff in a one-on-one meeting to email a response to her, the plaintiff complied then followed this with by requesting to rescind her original response.  But the supervisor reacted by telling the plaintiff that she was not authorized by her to take time to do this.

p. While this supervisor was transferred, one of the leads, April Adams, approached the plaintiff on more than two occasions speaking to plaintiff in Black English.  Ms. Adams is African-American.  Her statements to the plaintiff as an African-American who does not live in the black community were made with the intent to make the plaintiff question her worthiness.

q. After approaching the team leads, the supervisor and the manager about how one employee's offensive communication on the phone affects her breathing and productivity, both the supervisor and the lead gossiped to team members, which created more hostility.

r. When the supervisor forced the team to go offsite to an unauthorized luncheon, the supervisor insisted that the plaintiff ride along with her, in her car.  During this return to the office, the supervisor revealed to the plaintiff that she gave her old car to the Adam Doyle,

new employee whom the supervisor believes is

"superman."

s. September 28, 2011, after reporting her supervisor, and after the AIB panel found the plaintiff's allegations to be true, the same supervisor terminated the plaintiff without notice of termination; or opportunity to be heard by an objective panel.  This is a violation of the plaintiff's Constitutional and Civil Rights.

t. Prior to being terminated, the EEO Manager sent the plaintiff a message to schedule an arbitration meeting. But EEO delayed this meeting several times, until two months after plaintiff was wrongfully terminated.

u. During the November 2011, post-termination, arbitration meeting, the HAS Manager was present on behalf of the plaintiff's supervisor.  And while the plaintiff presented numerous documented examples of her good work, to include supervisor evaluations, customer letters of appreciations and much more, the manager stated "You have always been a bad employee.  We had to get rid of you.  Anybody who makes EEO complaints is a bad employee."  This was witnessed by every attendee including one former VA Manager/Physician who sat in this meeting, and took written notes, including this statement made by this manager.

v. During the post-termination arbitration meeting, the
   Manager presented a productivity report which she
   stated was made by Adam Doyle, and which she stated
   proves the plaintiff's lack of production.  What this
   revealed was:  Adam Doyle was in the position to
   monitor team members, although he was supposed to not
   have been promoted ahead of others.

The effect of the policies and practices pursued by the
defendant as alleged above has been and continues to limit,
classify and discriminate against the plaintiff in ways which
deprive her of employment opportunities and otherwise
adversely affects her status as an employee because of her
sex, race and disability in violation 42 U.S.C. Section 2000e
et seq.

As a further result of defendant's above-stated actions,
the plaintiff has been and is being deprived of income in the
form of wages and prospective retirement benefits, social
security and other benefits due to her as an employee solely
because of her race, sex, and disability in a sum to be proven
at trial.

Plaintiff has no plain, adequate, or complete remedy at
law to correct the practices described here in, and this suit

for injunctive relief is her only means for securing adequate relief.  Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury from defendant's policies, practices, customs and usage as set forth herein.

Defendant has unlawfully discriminated against the plaintiff by making a sexual quid pro quo offer of employment; denying plaintiff the right to employment for which she was qualified; continuing the sexual discrimination against the plaintiff; denying the plaintiff the right to apply for positions she was qualified for; bullying the plaintiff when she chose to go to the Equal Employment Opportunity Manager; retaliating against the plaintiff; denying the plaintiff the right to be considered for other positions which she was qualified for; sexually and racially discriminating against the plaintiff; failing to remedy discriminatory practices of its supervisory personnel; and, wrongfully terminating the plaintiff's employment, in reaction to her EEO complaints.

Defendant has acted maliciously or with reckless indifference to plaintiff's rights under the Civil Rights Act of 1964.

WHEREFORE, plaintiff respectfully prays this Court to:

1. Grant plaintiff a permanent injunction enjoining defendants from engaging in any employment policy or practice which discriminates against the plaintiff on

the basis of race, sex or need for reasonable
accommodation or is retaliatory against the plaintiff
because of the plaintiff exercising rights afforded to
her under 42 U.S.C section 2000e et seq.;

2. Order defendant to make whole the plaintiff by
   providing appropriate back pay, reimbursement for lost
   pension, social security and other benefits, plus
   prejudgment interest, in an amount to be shown at
   trial; and offering the plaintiff promotion to a
   supervisory position of employment at a rate of pay
   comparable to a strong supervisor.

3. Order defendant to pay plaintiff compensatory damages
   in an amount in excess of $800,000.

4. Order the defendant to be taxed with the cost of this
   action, including expert witness fees and reasonable
   attorney's fees for the plaintiff;

5. Retain jurisdiction over this action to assure
   compliance with the orders of this Court and with 42
   U.S. C. Section 2000e, and require defendant to file
   such reports as the Court may deem necessary to
   evaluate such compliance;

6. Try all issues of fact to a jury; and

7. Grant such additional relief as to the court may seem
   just and proper.

1   This 28th day of May, 2014

2                                          Carmen Matthews, Pro Se
                                               P. O. Box 232313
3                                          San Diego, CA    92193
                                               858-750-9824
4   DATED: June 2, 2014

5

6                                          CARMEN MATTHEWS

7                                          In Pro Per

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28