CARMEN MATTHEWS
P.O. Box 23213
San Diego, CA  92193
(858) 750-9824
vjudo@hotmail.com

Plaintiff, Pro Se

**FILED**

Oct 22 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ valeriem          DEPUTY

NUNC PRO TUNC
10/21/2015

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

CARMEN MATTHEWS,

        Plaintiff,

vs.

ROBERT A. McDONALD,
Secretary, Department of Veterans
Affairs, Agency; and ROES 1
through 19, Inclusive

Defendants.

Case No.: 14cv1340-MMA (BLM)

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTON FOR SUMMARY JUDGMENT**

DATE: October 5, 2015
TIME:  2:30 pm
CTRM:  3A (3rd Floor – Schwartz)
        221 West Broadway

HON. MICHAEL M. ANELLO

NO ORAL ARGUMENT
REQUESTD PER LOCAL RULE

| **PLAINTIFF'S RESPONSE** | |
|---|---|
| Page 1, line 22 - 26 | While working as a volunteer with the Patient Advocate's Office at VASDHS, Plaintiff was tasked to redesign the WE CARE/WE LISTEN Patient Quality Control Surveys.   Plaintiff volunteered |

OCT 2 1 2015
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
**RECEIVED**

| | |
|---|---|
| | to visit 5 competing hospitals to assess their Quality Control Program.  From there, Plaintiff designed, and received sign off from the Patient Advocate Director and the VASDHS Director tri-fold brochures used throughout San Diego County.  (Exhibit 1:  Sample of Brochure with email to track this) |
| Page 1, line 2 & Page 2, line 1-12 | September 2010, Plaintiff transferred from Patient Advocates to Member Services, after speaking to Dulce from Volunteer Services about transferring to another volunteer position, with the purpose to increase Plaintiff's chance to find a paid VA position.  Dulce recommended Robert Ernest, Supervisor of Member Services, based upon his need for help. |
| | Plaintiff interviewed with Mr. Ernest, who asked Plaintiff of her career plans. |

| | |
|---|---|
| | Plaintiff shared with Mr. Ernest that she was applying for GS-5, GS-7 & GS-9 positions.  At the close of that meeting, Plaintiff transferred from Patient Advocates to Member Services. |
| | November 2010, Plaintiff met with both Elizabeth McDonald, who at the time was the Director of Health Administration (HAS), and Sheri Lacro, of Labor Relations.  Each meeting was separate and initiated by Plaintiff.  Ms. McDonald is the direct supervisor of Robert Ernest. |
| | During meetings with both Lacro and McDonald, Plaintiff reported how Robert Ernest had Sexually Harassed Plaintiff (trying to force Plaintiff to go home with Mr. Ernest; sexually innuendoes at the office, on several occasions; statements made by Mr. |

| | |
|---|---|
| | Ernest of Quid Pro Quo; and intervening on Plaintiff's chance of being hired for a position that Plaintiff applied and interviewed for.) |
| | Plaintiff followed up on these meeting with an email to Sheri Lacro and Elizabeth McDonald. |
| | November 2010, Plaintiff received an email from Sheri Lacro, which had been originated by Elizabeth McDonald, where Ms. McDonald expressed that everything that the Plaintiff complained about from Robert Ernest was true and that she was going after Mr. Ernest for what he did. (Exhibit 2:  Email originated by Elizabeth McDonald) |
| | November 2010, Plaintiff received a call from Allison Gill, Supervisor of VASDHS Call Center.  Ms. Gill began |

this conversation with, "HR said I have to interview you. By the tone of this statement made by Gill, Plaintiff took this to mean that Gill didn't want to interview Plaintiff. And although the Plaintiff agreed to be interviewed by Gill over the phone for a GS-5 position, she didn't know that it would be difficult to move to a more appropriate GS level position, using her skills, ability and knowledge more effectively. The Plaintiff was most interested in changing from volunteering to being paid for the value she adds to the VASDHS. They scheduled a telephonic interview for an open Call Center Medical Services Administration position.

December 2010, Plaintiff was interviewed over the phone, and never

| | |
|---|---|
| | in person, by Allison Gill for the open Medical Support Assistant (MSA) position. |
| | December 2010, Plaintiff was contacted by VASDHS HR with an offer for the position which she interviewed with Allison Gill, at the Call Center. |
| | December 2010, Plaintiff called Ms. Gill three times, then HR, because Plaintiff did not know where she needed to go to do her job; and because Plaintiff had just had a major surgery on her right foot, less than 5 days prior to the day Plaintiff was to report to her first day of duty. Plaintiff was on crutches, and there was a rain storm, at that time. Gill never called Plaintiff back, and HR suggested that Plaintiff continue to attempt to contact Ms. Gill. |

| | |
|---|---|
| | December 13, 2010, the first day on the job, after the Employee Orientation, and within the first hour, there was a Call Center team meeting.  This meeting was facilitated by Allison Gill and Sheri Lacro.  The Call Center MSA's were in attendance. |
| | Two events relevant to the Plaintiff's case occurred during this meeting:  1. Sheri Lacro's look at Allison Gill indicated to the Plaintiff that Lacro and Gill had not only spoken of the Plaintiff's complaint against Robert Ernest, but also that they were annoyed and bothered by the complaint. |
| | 2.  Allison Gill, in the presence of the team, pointed out to Plaintiff that blue jean slacks that Plaintiff was wearing were unauthorized, and that Matthews must wear "less casual slacks." |

| | |
|---|---|
| | The Plaintiff noticed that there was a definite difference between how the men and women were dressed, and treated.  The Plaintiff brought this up during the June 2011 Administrative Investigation Board (AIB).  Plaintiff also brought this up in a May 2011 meeting with Marlene Carvajal, VASDHS EEO Manager.  (Exhibit 3). |
| | At the close of this meeting, and as the Plaintiff passed Sheri Lacro in the public restroom, Plaintiff experienced a palpable difference between how Sheri Lacro spoke to Plaintiff before Plaintiff complained about Robert Ernest to how Sheri Lacro treated Plaintiff.  (Exhibit 4). |
| | Friday, January 14, 2011, at 5:00 pm, Plaintiff interviewed for an open position with Harry Klemfuss.  The |

| | |
|---|---|
| | position title was Research Compliance Auditor.  The Job # was GS0303-07. (Exhibit 5) |
| | One week later, Plaintiff followed up on this position with VASDHS HR, and was told that because Plaintiff took the Call Center MSA position, she could not take the position for which she interviewed with Harry Klemfuss. |
| | January 17, 2011, when the VASDHS Call Center Supervisor, Allison Gill, asked, via email, for someone to write a story for the new HAS newsletter, and representing the Call Center, the Plaintiff volunteered to write a communication article.  Plaintiff wrote that article on during the Martin Luther King weekend holiday, and emailed it to Allison Gill.  (Exhibit 6) |

| | |
|---|---|
| 1 | When Plaintiff did not receive |
| 2 | feedback or an acknowledgement of |
| 3 | receipt of that article, Plaintiff asked |
| 4 | Brenda Moore, the VASDHS Call |
| 5 | Center Team Lead. Moore |
| 6 | congratulated Plaintiff for having |
| 7 | written the article. (Exhibit 7: Plaintiff |
| 8 | Deposition, page 132) Moore |
| 9 | suggested that Plaintiff email a copy to |
| 10 | Moore, and email another copy to Gill, |
| 11 | which Plaintiff did. During this same |
| 12 | conversation the Plaintiff asked if she |
| 13 | would be getting her byline for the |
| 14 | article. Moore said she didn't know. |
| 15 | January 23, 2011, the Plaintiff's |
| 16 | supervisor, Allison Gill, insisted that |
| 17 | the Plaintiff crochet a ski cap for Gill. |
| 18 | The Plaintiff took this as an order, even |
| 19 | though it was not within her job |
| 20 | description. On the weekend, Plaintiff |

| | |
|---|---|
| | crocheted a colorful ski cap for Ms. Gill, and presented it to her that Monday.  (Exhibit 7) |
| | January 24, 2011, Plaintiff asked the team lead about the Call Center noise level, and moved her things from one partial cubicle to the next one.  Plaintiff was told by the Call Center Lead and the Supervisor that nothing could be done about the noise.  Plaintiff took their reaction against her speaking about the noise level as though Plaintiff had no right to voice her concerns. |
| | February 2011, Gill ordered all VASDHS Call Center MSA's to attend an offside party in honor of Moore's imminent transfer and promotion.  This was an unauthorized offsite trip that VASDHS Management didn't learn about until the Plaintiff reported this to |

| | |
|---|---|
| | Marlene Carvajal, VASDHS EEO Manager, May 12, 2011.  (Exhibit 8) |
| | While leaving the unauthorized offsite party, Gill ordered the Plaintiff to ride in Gill's car back to the Call Center. (Exhibit 9) |
| | The driver in the car in front of Gill and the Plaintiff was Adam Doyle, another VASDHS Call Center MSA. |
| | Gill, during this drive, started a conversation about dating.  Gill segued this conversation to being about how Gill has gotten the hiring and employment retention system down pack, and that, according to Gill, she could easily form her own consulting firm, to hire people who she wants to hire at the VASDHS.  Plaintiff did not respond to this, but took this as an innuendo. |

| | |
|---|---|
| | Within this same drive back to the Call Center, Gill talked about her relationships with men, and the car that she had owned, that Adam Doyle was driving. (Exhibit 13) |
| | February 5, 2011, when Plaintiff told her supervisor of the Call Center, Allison Gill, that the Plaintiff's phone was not working, Gill said to the Plaintiff, "Don't you know how to fix that!?  Let Adam do it.  Adam is so talented.  He can do anything.  He is Mighty Mouse."  Plaintiff thought this to be an odd message and one of many where Gill was metaphorically sexually stroking Adam Doyle within the presence of the Plaintiff, and within earshot of colleagues.  And when the Plaintiff told Ms. Gill that the phone, which was at a cubicle that the Plaintiff |

had moved to within the Call Center, was not working, again Gill told the Plaintiff, "Let Adam fix it."  This problem, and the response from Gill went from February 2011 to April 2011.  When the Plaintiff followed up with Gill about this problem, and the fact that the software was not working at the Plaintiff's computer, Gill yelled at the Plaintiff.  Plaintiff took this yelling from Gill as though Gill was blaming those problems on the Plaintiff.  As the software and phone problems continued, the Plaintiff not only reached out to her supervisor, Gill, but also to the Plaintiff's second line supervisor, Elizabeth Gill, and to the Information Technology Department, and to the IT Department. (Exhibit 11)

March 8, 2011, Allison Gill, VASDHS Call Center Supervisor, emailed the Call Center team asking who the kudos from a veteran caller belonged to. Plaintiff believed that the answer would have been obvious, because the Plaintiff was the only Call Center Agent without working software that would appropriately track that call. Gill gave credit for that kudo to Cheryl Grey, an African-American, part-time co-employee in the Call Center.  Some MSA's at the Call Center approached the Plaintiff, asking why Gill hadn't given the Plaintiff credit for her kudo. The Plaintiff approached Gill and told her that the kudos she gave to Cheryl Grey really belonged to the Plaintiff. Gill's reaction's reaction was "Oh! Yeah! Opps!"  Gill then sent an email

| | acknowledging the Plaintiff as the one to receive credit for that kudo. (Exhibit 12) |
|---|---|
| | March 10, 2011, Aaron McDevitt, who at the time was a peer of the Plaintiff, having begun working at the VA a month before the Plaintiff was hired, but who had spent many hours sitting in Gill's office when she was in the Call Center, approached the Plaintiff, after just leaving the Gill's office. He asked the Plaintiff to get corporate donations to pay for each Call Center staff, including the supervisor, to attend the annual Coronado Bridge Run. This was after McDevitt had emailed the Call Center team members an email about the Coronado Bridge Run, asking Call Center MSAs to all participate in this event. The admission for this |

| | |
|---|---|
| | event was $45 per attendee. McDevitt told the Plaintiff that the supervisor couldn't afford to pay for this annual fundraiser for local navy families, but wanted to be part of this as a team. The event was scheduled for June 2011. The Plaintiff recognized this request as possibly being part of Gill's knowing what was on the Plaintiff's resume, and trying to force the Plaintiff to perform tasks way beyond the scope of Plaintiff' VA Call Center Position. (Exhibit 13) |
| | March 11, 2011, While in the Call Center break room, with no one but the Plaintiff there, McDevitt said to the Plaintiff, "Man. It would be really nice if you could get that money for everyone, so everyone can be at that run, as a team supporting the navy." |

Plaintiff said, "I signed up as I said in the email I would, and I paid my $45 fee."  McDevitt said, "How did you do that?  None of us has the money, not even Allison."  He went on to say, "If you could get corporate donations so that about 18 people in the Call Center could attend, some of the people can't because of their health, but most of them want to do this.  It would be really good if you could do this."  The Plaintiff responded with, "If I do this, whose gonna pay for me, because I've already paid?"  The Plaintiff was feeling cornered and  felt as though McDevitt was speaking on behalf of our Supervisor.  Also, although McDevitt had started working for the VA just one month before Plaintiff had begun to work there, Plaintiff could see

that his frequent visits into our supervisor's office meant that he was positioning himself to be in a leadership position.  McDevitt responded with "Maybe we can get enough donations to pay you, while we get enough to let others attend."  The Plaintiff responded with "I don't have the contact information.  To secure the corporate support, you would need the: who, what, when, where, why, how and the 501c3, along with the contact person.  And if I do this, it would be on VA time, while at the Call Center."  Plaintiff felt cornered and used.  McDevitt's response was "That would be no problem.  Allison would fully support you in this." After this conversation, which was on the Plaintiff's break time, McDevitt

| | |
|---|---|
| | mentioned this 2 more times to the Plaintiff. And, each time, the Plaintiff ask if he gathered the necessary information. The Plaintiff still felt used and unsure of what to do about this. The Plaintiff believed that this was yet another example of where Gill was using successes and skills from the Plaintiff's resume, successes and skills that were not part of the Plaintiff's required skills, knowledge and abilities, against the Plaintiff. |
| | March 23, 2011, Brenda Moore, the Call Center's former lead, emailed the Plaintiff, asking the Plaintiff to email everyone on the Call Center team. In Moore's message, which the Plaintiff forwarded to the Call Center team, she shared that she wished that she had learned from the Leads in other |

| | |
|---|---|
| | Departments at VASDHS what one could really do with VistA and CPRS (2 important software programs at VASDHS).  Gill reacted with an email to all Call Center team members, and cc'd Moore, stating, "I'm one step ahead of you.  I am working on a cross-training program for us."   The Plaintiff took this email from Gill to mean that she was angry with both Moore and with the Plaintiff.  The Plaintiff also took this as yet another reaction that Gill had against the Plaintiff that would make the Plaintiff's potential at the VA more challenging. |
| | April 4, 2011, Aaron McDevitt, one of the acting Call Center team lead, once again, asked the Plaintiff to use her journalism and caused-related marketing skills to get $45 per Call |

| | |
|---|---|
| | Center employee from corporate sponsors.  And although the Plaintiff asked questions about this, trying to diplomatically find her way out of this, McDevitt started this conversation by asking this of the Plaintiff, then he escalated this into making this an order that he was trying to carry out on behalf of the Call Center Supervisor, Allison Gill.  McDevitt emailed the Naval Coordinator, and cc'd the Plaintiff on this.  This was followed by emails from both McDevitt and Gill to the Call Center team members, trying to get everyone to buy into this event. (Exhibit 14) |
| | April 8, 2011, McDevitt forwarded an email from Kim Hansen, MWR Bridge Run Coordinator.  This email went on to ask for a point of contract to discuss |

| | |
|---|---|
| | logistics.  The Plaintiff responded to McDevitt, in person not in this email, stating, "I don't know how I would be paid for doing this."   McDevitt reacted with a sneer in his entire demeanor, stating, "I didn't know you were trying to get money out of this!" Gill sent a another email to the Call Center staff stating that she was attending this fundraiser and was hoping that everyone else on the team was also attending.  The Plaintiff took this as another level of an order from Gill. Plaintiff also saw the non-compliance by the team as another step in which Gill was scapegoating the Plaintiff for Gill's not having convinced the team to participate in this event. (Exhibit 15) |
| | April 2011, during the VASDHS Call Center April team meeting, Gill |

announced that she was creating two new lead positions since Moore's February 2011 transfer out of the Call Center.  Sara Holmes, one of, if not the longest standing Call Center MSA, asked Gill, "Can anyone of us apply for this?"  There was a palpable pause, as many of the MSAs looked around the room.  Plaintiff noticed that McDevitt and Doyle looked annoyed and troubled.  Gill's response was "Of course."  To the Plaintiff, and based upon both McDevitt's and Doyle's reaction, after Gill said "Of course," it appeared that McDevitt and Doyle had been promised a promotion, and that they wouldn't have any competition. (Exhibit 16)

| | During this same April 2011 team meeting, with all Call Center team mates present, Gill bragged to the |
| | Team that she went from GS-5 to GS-9 in record time. The Plaintiff asked Gill how she did this. Gill didn't answer this question. Plaintiff then said that she had just applied for a GS-9 HAS position, a position that reports to Elizabeth McDonald, Gill's supervisor. Gill responded with, "As long as you are in HAS, you can't get uh, I mean, are you trying to use your education or something to get this position? That won't work. The Plaintiff took those comments from Gill, given the fact that the Plaintiff believed that she was hired by Gill, not because Gill wanted to hire her, but because HR ordered her to do so, in an attempt to cover up how the |

Plaintiff had been discriminated against, to mean that no matter how talented and no matter what contribution that the Plaintiff makes, the Plaintiff will continue to be discriminated against and that this started with the Plaintiff's written complaint about Robert Ernest, who was in a parallel position to Gill, reporting to the same manager, Elizabeth McDonald.  The Plaintiff further took this to mean that McDonald and Lacro had decided that the best that the Plaintiff could have was a GS-5 position, and wouldn't last with that, as long as they had something to say about this.  The Plaintiff was reminded in this circumstance of her volunteer work with Robert Ernest, who had told the

| | |
|---|---|
| | Plaintiff that because she wouldn't comply with his sexual advances, the Plaintiff would never have a paid position at the VA. (Exhibit 17) |
| | April 21, 2011, Allison Gill, Supervisor of the Call Center, emailed the Plaintiff her Mid-term review. That email stated that the Plaintiff's official review would be announced September 2011, but that the Plaintiff was "fully successful at the half way point." (Exhibit 18) |
| | During this same April 21, 2011, team meeting, the Plaintiff asked Gill about the Call Center noise level. The Plaintiff went on to express how the noise level affected the Plaintiff's breathing. Gill told the Plaintiff that this was out of her control. The Plaintiff saw this from several angles: |

| | |
|---|---|
| | This could and should have been an opportunity for Gill to discuss reasonable accommodation (the Plaintiff did not have these exact words in mind at the time, but with research and asking more questions, the Plaintiff eventually had these words in mind); Plaintiff also saw Gill's reactions as Gill having made up her mind that any problems that the Plaintiff has, Gill will not respectfully address, because the Plaintiff made complaints about Robert Ernest's sexual discrimination, and Gill had to hire the Plaintiff after that. (Exhibit 19) |
| | April 25, 2011, Barbara Harvey, RN, and the creator of the VASDHS Call Center, (African-American, and noted by many as having major conflicts with Gill) called the Plaintiff, asking her |

why the nurses hadn't been getting calls that they normally would be getting. The Plaintiff explained as best that she could, and Harvey seemed to need more information. So, out of professional courtesy, the Plaintiff emailed Gill, the Call Center Supervisor, and cc'd that message to Harvey. Despite the Plaintiff's adverse experiences in the Call Center, the Plaintiff was doing her best to uphold her integrity. (Exhibit 20)

April 22, 2011, after Gill announced in a March 30, 2011 email that the Call Center work schedule would change, starting April 25, 2011, and because no one seemed to know where Gill was, the Plaintiff emailed the Call Center team members, asking if there were other changes to our work schedule.

Aaron McDevitt, one of the Acting Team Leads responded to the email with, "I don't know of a change. Do you?" The Plaintiff still didn't know whether or not the work schedule would be affective in three days. And, because Gill often disappeared from the Call Center, leaving many, if not all Call Center MSAs asking where she was, the Plaintiff did not know what to do with this. But the Plaintiff did report this to Marlene Carvajal, during their May 2011 meeting. April 25, 2011, Gill responded to this email with "I do not have a date for shift changes yet, as the redesign team has not given them to me. Once I know, I'll let you know." The problem that the Plaintiff had with this uncertain schedule, and not being able to get an answer from

Gill, was that if the Plaintiff had honored the earlier email, and not questioned whether or not it was to be followed, or if there was a change to it, Plaintiff saw that she would have arrived for work at the wrong time, and she most certainly would have been reprimanded for this.  The Plaintiff saw this experience at the time, coupled with the pattern that dates back to November 2010, when she reported Robert Ernest for his discrimination against the Plaintiff, along with the Plaintiff's association with African-American's in the Call Center who had battles with Gill, as yet another example of how she had been discriminated against and retaliated against.  (Exhibit 21)

April 29, 2011, towards the end of the monthly Call Center meeting, with Elizabeth McDonald facilitating the meeting with Allison Gill, Barbara Harvey, RN, and Call Center Head Nurse, African-American, woman, who seemed unnoticed by most, was there with other nurses to clean out and move the breakroom refrigerator.  A month prior, Harvey had sent an email to everyone, announcing that she would be moving her refrigerator to her new location.  The Plaintiff interrupted the Call Center team meeting, because it was lunch time, and announced that if anyone had things in Barbara's refrigerator, they might want to get them now.  Gill looked troubled, as she asked Plaintiff what she meant.  The Plaintiff reminded Gill of the email that

Harvey had sent and the flyers that were all over the Call Center, warning everyone that she was taking her refrigerator. Once again, Gill sneered at the Plaintiff. The Plaintiff took this as yet another example of how Gill was blaming the Plaintiff for what Gill didn't like. Gill had a horrible work and personal relationship with Harvey. Gill seemed to have assumed that the Plaintiff and Harvey were pals, just because they are both African-American women. Gill immediately asked McDonald if HAS would fund a breakroom refrigerator. McDonald's demeanor said "no," as both Gill and McDonald briskly walked towards the breakroom, and both looking at the Plaintiff as if the Plaintiff caused their pain. The Plaintiff reported this to

| | |
|---|---|
| | Marlene Carvajal, EEO Manager and the Administrative Investigation Board assigned to investigate Allison Gill's conduct.   (Exhibit 22) |
| | April 29, 2011, Gill sent several emails in a matter of minutes, demanding the Plaintiff's attention over why the Plaintiff sent a patient to the hospital. The Plaintiff did not respond immediately to Gill's demands, because she was answering calls.  One of those messages from Gill, at that time, was "When I tell you to come to my office, it's not when you feel like it."  The Plaintiff's response was, "I'm working with a call, right now."  In the end, Gill came to the Plaintiff's workstation, stood less than an inch away from the Plaintiff, while the Plaintiff wrapped up the call with the |

veteran.  Adam Doyle had turned from his cubicle to face the Plaintiff's cubicle.  Plaintiff read from Doyle and Gill's body language that they had just had a conversation about the Plaintiff's calls.  Doyle was someone who the Plaintiff reported to the AIB and to the EEO that Gill had gone out of her way to call "Mighty Mouse," and other sexist names when Gill tried to challenge the Plaintiff to fix things in the Call Center. (Exhibit 23)

May 2, 2011, Gill emailed to the Call Center team a kudos from a veteran who called in to express his appreciation for how helpful the Plaintiff was in the veteran getting his care.  Minutes later, April Adams, one of the Call Center's Acting Team Leads, emailed the Plaintiff "how

much cash are you paying the vets so I can jump on the band wagon?" The Plaintiff's emailed response was "Not worth a true response." Adams responded with, "Come on and tell me. I will not tell." Adams came to the Plaintiff's cubicle, which was in the Call Center, and surrounded by at least 20 other MSAs. Adams said, "What's wrong? I've said this to you other times when you get all of these kudos." The Plaintiff's responded with "Yes. You and Aaron have said that and I'm hoping that this is the last time, because I feel that this is disrespecting me. Please do stop that. I have absolutely no hard feelings." Adams walked away. (Exhibit 24)

| | |
|---|---|
| | May 3, 2011, with a strained voice, the Plaintiff called her supervisor, then emailed her, cc'ing Evelyn Aleman, the Call Center time keeper.  The Plaintiff called in sick. (Exhibit 25) |
| | May 4, 2011, Aaron McDevitt, called the Plaintiff asking if she was still sick. He also asked the Plaintiff:  how she became sick; what she ate; where she ate and how things were going. Plaintiff was shocked by his line of questioning and had reported this to both the EEO Manager on May 12, 20111, and to the AIB Board, June 2011.  McDevitt also stated that Gill wasn't in the office all day, that she hadn't heard from the Plaintiff, and that Evelyn said she hadn't heard from the Plaintiff.  When the Plaintiff insisted that she had emailed Aleman and Gill, |

| | |
|---|---|
| | McDevitt insisted that Aleman hadn't received my message and Gill didn't have access to her email account. The Plaintiff told McDevitt that she expected to return to work, Thursday, May 5, 2011, after her appointment with her VASDHS primary provider, and that that would mean that the Plaintiff would return in the morning at about 11:30 am. McDevitt, said, "Oh no. Allison only approved of your being out until 10:30 am. This surprised the Plaintiff, because contradicted what McDevitt had said moments earlier. If you take longer, you need to call her cell phone. Let me give it to you." |
| | May 5, 2011, McDevitt called the Plaintiff in the morning, prior to her returning to the office, and just after |

the Plaintiff had completed her doctor's appointment.  The Plaintiff arrived at the Call Center, to work, at 10:25 am. Evelyn Aleman, the Call Center timekeeper, told the Plaintiff that she had received her email; and, she asked how she was doing.  Next, the Plaintiff emailed Allison Gill, Call Center Supervisor about her having been out sick and having returned.  Gill emailed the Plaintiff stating "In order to call in sick, you must call me on my mobile phone or send a test and leave me a message.  This email is insufficient and could have led to you being marked as AWOL.  I will allow it this once, but next time, you must follow the instructions you were given when you started here.  Okay?" (Exhibit  26)

May 5, 2011, in response to an email between HAS Management and the physicians, which was sent to all Call Center team members, and to some other VASDHS departments, an email that to the Plaintiff showed that management had a tremendous amount of animosity towards one another, the Plaintiff emailed a response that announced that she was quoted that morning by 98.1 Radio Station Program Director for her empowering quote shared on Facebook.  The Plaintiff chose to share this for four reasons:  1.  98.1 Radio Station is the radio station that is heard in the entrance of the VASDHS; 2.  The Plaintiff wanted to infuse a positive note in that email dialogue; 3.  The Plaintiff was proud to be recognized as

one who is positive; and, 4. Plaintiff saw this as an opportunity to position herself on her own terms, with a positive message, and unexpected message to decision makers, so that she may have the chance to present herself in a better light than how she had been treated by the chain of command in which she was working within. However, Gill emailed the Plaintiff "to not email anyone outside of the Call Center, unless you run it by me first." The Plaintiff took this to mean that Gill was not acting out a business need but instead out of a need to hold the Plaintiff back from her potential. Plaintiff had reported this to Carvajal and to the AIB. (Exhibit 27)

May 5, 2011, Gill emailed everyone in the Call Center that she could buy a

| | |
|---|---|
| | refrigerator if everyone can throw in $20 by the end of the work week. She went on to say in that same email, "but it would have to be every single person chipping in." Gill also said that she would pick up the balance and pay it on her Lowes Credit card. The Plaintiff was shocked by this and had reported this to the EEO Manager and to the AIB. (Exhibit 28) |
| | May 6, 2011, Gill sent April Adams, one of the newly appointed Team Leads, to collect $20 from each MSA in the Call Center. Some MSAs declined participation. Gill then emailed the team that after a new refrigerator was in place, each team member who has not paid for the new refrigerator must pay $1 to Adams, then get a piece of paper that showed |

approval of their use.  Minutes later, the Call Center telephone power went out.  Adam Doyle asked the Plaintiff what she would do to fix the phone problem.  Plaintiff noticed that ask he asked her this question, he looked towards Allison Gill.  And Plaintiff believed that Gill had colluded with Doyle to shut down the phones. Minutes later, Gill came out of her office and into the Call Center, stopping everyone from working.  She announced to the MSAs "Because of my really great charm, I got a good deal on the fridge."  She ended this statement looking to her right at the Plaintiff, as if to say, according to the Plaintiff, "I have better charm than you."  In this presentation, Gill reiterated what she had already put into

| | |
|---|---|
| | an email about the use of the new refrigerator scheduled to be placed into the Call Center.  She closed this presentation letting everyone go to lunch, and upon the MSAs return, the phone were working again.  (Exhibit 29) |
| | May 2011, the Plaintiff applied for and was selected amongst 10 others to interview for the new team lead position.   (Exhibit 30) |
| | May 2011, Plaintiff was called into an interview for the Call Center Team Lead.  The interview panelist were: Allison Gill, Donna Ponds, and Ionarra Gutierrez.  Gill was the only one of the three who spoke.  The other two panelists never spoke to the Plaintiff/interviewee.  During this interview, Gill mentioned more than |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

once her boyfriend, men in general, and Adam Doyle (another MSA who Plaintiff had identified as someone who Gill played gender preferential treatment towards).  Plaintiff noticed from the other two panelists how shocked they seemed to be by Gills' sexist statements during that interview.  The interview was recorded on Gill's cell phone.  And each leadership question that Gill asked the Plaintiff during this interview, Gill seemed, according to the Plaintiff, as though Gill was going to fall out of her chair in her attempts to cover up the talents and skills that the Plaintiff had described that she had.  Gill kept bringing up Doyle and during this interview, and stated to the other panelist that Doyle would be interviewed right after the

Plaintiff.   Gill, in reaction to the
Plaintiff talking about her
communication skills, shared how
shared how she makes her boyfriend do
what she wants him to do.  Gill asked
the Plaintiff what she does with the
many kudos that she gets from the
veterans who call into express their
appreciation for the Plaintiff's work.
The Plaintiff told Gill, "I use them to
network."  The Plaintiff noticed, in
those moments, both panelists smiled,
as Gill once again practically fell out of
her chair as she stated, "Why would
you do that?"  The Plaintiff took this
reaction from Gill to mean that Gill had
a plan for the Plaintiff to be held back
from her potential.  The Plaintiff
believed that from the very beginning,
Gill had decided that the Plaintiff, a

black woman who is willing to speak up and be heard is a threat to be gotten rid of.  The Plaintiff, throughout this interview, was shocked by how much Gill seemed to be just going through the motions to conduct that interview and had no intention to promote the Plaintiff, for three reasons:  the Plaintiff's having reported Robert Ernest for his sexual discrimination; the Plaintiff is intelligent, African-American woman who Gill couldn't control; and, because Gill objected to the Plaintiff's willingness to spend time with the African-American women in the Call Center who Gill had gone against.  Although the Plaintiff went out of her to hang out with several of her co-employees, while at the Call Center, because Plaintiff was trained

| | |
|---|---|
| | by Anita Mitchell, an African-American, long-term Call Center employee, from time to time Plaintiff reached out to Mitchell when Plaintiff had Call Center questions.  Mitchell had experiences with Gill that demonstrated Gill's racism.  The Plaintiff believed and continues to believe that Gill's racist experiences had an adverse impact upon how she treated the Plaintiff.  (Exhibit 31) |
| | May 2011, via email, the Plaintiff received both a non-selection email and an email from HR stating that Plaintiff was not selected for the Call Center Team Lead position that the interviewed for.  (Exhibit 32) |
| | May 5, 2011, the Plaintiff approached the Patient Advocate Director, to seek advice about what to do about her |

| | |
|---|---|
| | discriminatory experiences in the VASDHS Call Center.  He advised the Plaintiff to go to the Union. |
| Page 2, line 13-16 | Plaintiff agrees |
| Page 2, line 17-22 | May 10, 2011, Plaintiff met with a Union Rep, as advised by the Patient Advocate Director.  Plaintiff noticed the Union Rep roll her eyes while the Plaintiff spoke of the problems that she was having with the VASDHS Call Center.  The Union Rep also told the Plaintiff, "Listen.  This is not really my job.  It's just another duty that I agreed to talk on."  And, the Plaintiff interjected with, "That's okay.  I will go to the EEO instead." |
| Page 2, line 17 - 22 | May 10, 2011, the Plaintiff stopped into Marlene Carvajal's office, the VASDHS EEO Manager.  They met for at least a half hour.  Carvajal told |

| | |
|---|---|
| | the Plaintiff that she remembered her from the orientation.  And by her demeanor, the Plaintiff took that Carvajal believed in the Plaintiff.  She also told the Plaintiff she very well knew who Allison Gill was.  The Plaintiff noticed frustration and annoyance on Carvajal's face, when Ms. Carvajal reacted to hearing Gill's name. |
| | When Plaintiff asked Ms. Carvajal if she knew Allison Gill, the Plaintiff's supervisor, Ms. Carvajal's reaction was "Oh yeah!  I know who she is." Carvajal's tone expressed annoyance. |
| | During this impromptu meeting, Ms. Carvajal asked the Plaintiff to ask her supervisor what day would be best for the Plaintiff to meet with Ms. Carvajal, a date where production is lower and |

where the Plaintiff's absence from the Call Center would have the least impact upon the Call Center production. In retrospect, the Plaintiff saw this decision as a problem. Plaintiff emailed this question to Allison Gill, the Call Center supervisor, and told the Supervisor that she would need to meet with Marlene Carvajal, the EEO Manager. Gill emailed back that the Plaintiff could meet with Ms. Carvajal, Thursday, May 12, 2011. Gill, McDonald and others within the Plaintiff's VASDHS chain of command insisted during the VA ORM investigations that they did not know about the Plaintiff's EEO complaints, now about the Plaintiff's having complained about Robert Ernest, until they were pressed by the

| | |
|---|---|
| | Investigators with evidence contrary to their statements during the interviews (Exhibit 33) |
| Page 2, Line 17 - 22 | May 10, 2011, after Plaintiff emailed her supervisor, Allison Gill, requesting time to meet with the EEO Manager, Plaintiff was directed to come into Gill's office where Plaintiff was met with Gill, Aaron McDevitt and April Adams.  McDevitt and Adams had just been promoted to team lead positions in the Call Center, a position that the Plaintiff had also interviewed for, but was not selected. The meeting began with Gill saying to the Plaintiff, "Your two new leads are here.  Can you tell us what is wrong that you need to go to the EEO?  Or, if you can't tell me, can you tell them?" Plaintiff took this as ana insult, because |

to the Plaintiff, Gill was trying to rub her nose into the fact that Plaintiff didn't get promoted, while Gill also was sharing the fact that the Plaintiff was going to EEO.  Plaintiff saw this as Gill's attempt to make the Plaintiff turn against her beliefs.  Plaintiff responded with, "I am not having this conversation."  Gill responded with "Well, you have an attitude in the Call Center.  I can't have you ruining the attitude of this Call Center."  The Plaintiff responded again with "I am not having this conversation," then walked away.  Plaintiff took this experience as Gill retaliating against the Plaintiff and Gill further creating a hostile environment in the Call Center. The next day, May 11, 2011, Plaintiff had to walk past Gill's office, to pick

| | |
|---|---|
| | up documents.  At that time, Gill said to the Plaintiff, "Hey, man."  Plaintiff said, "Excuse me?"   Gill with no one in her office at this time, then said, "Why are you going to EEO?  You have a good attitude.  I didn't know that there was a problem."  Plaintiff walked away to do her job.  Plaintiff reported this to the EEO Manager. (Exhibit 34) |
| Page 3, Line 1-4 | Responded to earlier in this Opposition. |
| Page 3, Line 5-9 | Yes, the May 2011 report written by Plaintiff, and given to the EEO Manager did not reference race.  However, the report was meant to be some of the Plaintiff's talking points, and was not a complete report.  The idea of doing that report of contact came from Michael Hosey, a former |

Call Center employee who is African-American, who had many fights with Gill, and who had been transferred out of the Call Center after reporting his adverse experiences with Gill. During this meeting, Plaintiff did discuss racial discrimination, and Robert Ernest with Marlene Carvajal during their May 12, 2011 meeting, in addition to what is on that report, and more. When racial discrimination and Robert Ernest were brought up by the Plaintiff during this meeting with Carvajal, Carvajal strongly reacted when she asked why the Plaintiff had not come to her earlier. Plaintiff chose at that time to focus more upon her talking points, because the Plaintiff was interested in establishing and maintaining rapport. (Exhibit 35)

| Page 3, Line 10 - 22 | May 12, 2011, Plaintiff, representing herself, without an advocate, lacked the skill to more directly speak of what she was experiencing in a way that fits the elements of EEO-related laws.  But the Plaintiff did report sexual discrimination problems to Elizabeth McDonald, the VA ORM, and to other investigators.  Plaintiff also reported racial discrimination problems as they relate to this case during her ORM investigation, as well as in her deposition/Errata.  There are many issues that Plaintiff needed to address, but was overwhelmed by her belief that she had no chance of being fully heard, and by her overwhelming anxiety attacks.  The Plaintiff took the approach of doing her best to speak up most strongly about the issues that |
|---|---|

| | | |
|---|---|---|
| 1 | | could be heard best by those in the |
| 2 | | position to do something to resolve the |
| 3 | | issues.  Plaintiff also perceived that she |
| 4 | | had been blacklisted by her having |
| 5 | | |
| 6 | | complained at the end of her volunteer |
| 7 | | work about Robert Ernest, to his |
| 8 | | supervisor.  (Exhibit 36) |
| 9 | | |
| 10 | Page 3, Line 10 - 22 | During her meeting with Carvajal, as |
| 11 | | Plaintiff discussed sexual |
| 12 | | discrimination details, unauthorized |
| 13 | | |
| 14 | | offsite meetings, forcing employees to |
| 15 | | pay for a credit card debt Gill incurred, |
| 16 | | and so much more, Carvajal reacted |
| 17 | | |
| 18 | | with, "She is so out of here!"  This was |
| 19 | | referring to the Plaintiff's supervisor, |
| 20 | | Allison Gill.  Carvajal then told |
| 21 | | |
| 22 | | Plaintiff that by the next day, Gill |
| 23 | | would be gone first thing in the |
| 24 | | morning.  Carvajal also wrote on the |
| 25 | | |
| 26 | | back of her notes that Gill was being |
| 27 | | |
| 28 | | |

| | |
|---|---|
| | removed and that Elizabeth McDonald, the supervisor of both Gill and of Ernest was aware of this. (Exhibit 37) |
| Page 3, Line 23 - 27 | Plaintiff's handwritten notes on the cover page of her report to the Carvajal were written long after Plaintiff met with Carvajal. Plaintiff was asked about those notes, during her deposition with AUSA, but at the time could not remember when she wrote those notes, and later, through reflection, realized that those notes were written while Plaintiff was attending Paralegal training (January 2012 – December 2013). (Exhibit 38) |
| Page 4, Lines 5 - 9 | But when pressed for more details, management had to admit that the Plaintiff's EEO complaints existed, and they knew about them. Also, during the mediation meeting November 2011, |

Plaintiff's second level supervisor, Elizabeth McDonald told Plaintiff that she, the Plaintiff, had always been a problem employee; and that Gill was looking for a way to get rid of the Plaintiff.  McDonald further stated during this same mediation meeting, in the presence of Dr. Kwi Bulow, Sue Hollis, a VASDHS HR representative, the Plaintiff, and another witness for the Plaintiff, that "anyone who files these type of complaints is a problem employee to be gotten rid of." Plaintiff took this to mean that McDonald was confirming what the Plaintiff suspected all along. McDonald was retaliating against the Plaintiff for the Plaintiff's having exercised her Civil Rights.  McDonald further stated to the Plaintiff during this

| | |
|---|---|
| | meeting, "If you promise to not sue us, we will agree to change your termination status to your having resigned." (Exhibit 39) |
| Page 4, Line 10 | Whether or not McDonald intended to temporarily detail Gill out of the Call Center is impossible for the Plaintiff to challenge. However, after the Plaintiff was terminated and during the much delayed mediation meeting for the Plaintiff, regarding her position, McDonald said, with a hangdog demeanor, and referring to learning that Gill had considerable contact with the Call Center after she had been transferred out of the Call Center, "She promised that she would not contact anyone at the Call Center while she was removed." (Exhibit 39) |

May 12, 2011, the Patient Advocates Office and Erika Griffith from VASDHS HR emailed the Plaintiff regarding Plaintiff's interest/application for the open GS-7 position in Patient Advocates Office, where Plaintiff had originally volunteered at the VASDHS.  HR asked the Plaintiff to fax another copy of Plaintiff's DD-214.  When Plaintiff fax'd the DD-214, as requested, the Aaron McDevitt, one of the Call Center Leas complained that the Plaintiff didn't get permission from the leads nor the acting supervisor to fax her DD-214.  Plaintiff reported this to Carvajal.  And perceived this to be part of McDevitt's attempt to compile actions against the Plaintiff in retaliation against the Plaintiff on

| | behalf of himself, Gill and McDonald. (Exhibit 40) |
|---|---|
| | May 13, 2011, in an email from Carvajal to the Plaintiff, Carvajal told the Plaintiff that she would do what she could do to expedite the Plaintiff's application for the open Patient Advocate GS-7 position.  In this same email from Carvajal, she expressed to the Plaintiff that retaliation would probably occur from the Call Center. Though the Plaintiff expected some level of retaliation, she also saw that statement as a threat and an attempt to force the Plaintiff to give up on her EEO complaints.  That statement was similar to the statement that Carvajal made to the Plaintiff moments after the Plaintiff was terminated, when Carvajal said to the Plaintiff, "Wow!  You really |

| | |
|---|---|
| | must have done something now.  They don't just fire people for no reason." (Exhibit 41) |
| | May 13, 2011, at about 9:00 a.m. Allison Gill gathered most of her things from the Call Center, as Brenda Moore, the former Team Lead came back to take Gill's place, and as the Call Center staff looked on.  The Plaintiff learned this same day that Gill had not been terminated, but instead was transferred to an administrative position across the street from the Call Center. |
| | May 20, 2011 (approximate date): Brenda Moore, Acting Call Center Supervisor, assigned the Plaintiff as the Morale Team Lead to represent the Call Center in the HAS planning committee events.  This new |

| | |
|---|---|
| | committee was formed in an effort to create a picnic that invited employees and their family to socialize together. Being a member of this planning committee involved meetings twenty minutes away from the Call Center, at the VASDHS La Jolla location and approximately one and a half hours meeting with the team.  (Exhibit 42) |
| | After sitting in a few of those planning meetings, and representing the VASDHS Call Center, the committee members welcomed the Plaintiff's input on marketing the event.  And in this capacity, the Plaintiff emailed the VASDHS Public Relations Manager, cc'ing Elizabeth McDonald, the HAS Manager, and Plaintiff's second level supervisor, requesting visibility on the VASDHS intranet and with stand-up |

posters to be strategically placed at VA La Jolla Hospital. McDonald emailed a reaction back to the Plaintiff, cc'ing the PR Manager, stating that what the Plaintiff asked for regarding this teambuilding event would be inappropriate. Within less than a half of an hour, McDonald sent another email, on the same subject, with different words, reiterating McDonald's insistence that the Plaintiff's ideas and intentions must be squashed. The Plaintiff saw McDonald's reactions in those two emails as examples of more retaliation and discrimination, given the fact that the Plaintiff reported not only her Call Center supervisor, but also Robert Ernest, who both at the time were direct reports to McDonald.

| | |
|---|---|
| | (Exhibit 43) |
| | May 29, 2011 (approximate date). Plaintiff enrolled into and applied for the VA Improvement Incentive Program.  And, because the Call Center Supervisor, Allison Gill, less than 30 days prior, ordered the Plaintiff to not communicate with anyone outside of the Call Center, unless the Plaintiff runs it by Gill, and given that Gill had been removed from the Call Center, the Plaintiff was perplexed as to what to do.  The VA Improvement Incentive Program was announced by Secretary Shinseki, in an email to everyone, Plaintiff tried to reach out to her local chain of command, to ask how she should handle this contradiction. Neither McDonald, nor Lacro responded to the Plaintiff's question. |

Lacro, in the presence of others stopped the Plaintiff from speaking of her involvement with this program at the end of the AIB Hearing.  The Plaintiff felt that once again her discrimination complaints, and her complaints about how the Call Center noise was effecting her breathing was retaliated against the Plaintiff. Plaintiff call Secretary Shinseki's office and spoke to his right hand man, as well as his assistant.  The right hand person told the Plaintiff that the order to reach out to all VA employees to get votes using the VA email, on "company time" came from Secretary Shinseki.  He further suggested that the Plaintiff in the future take the risk without asking, and wait for someone to ask why the Plaintiff did it.

| | |
|---|---|
| | Friday, June 3, 2011, even though the Plaintiff knew that she missed out on most of the time to fairly solicit votes for the VHA competition, due to the retaliation she was experiencing from her chain of command, the Plaintiff submitted two ideas for the VHA Employee Competition, because she wanted to make a difference in the lives of veterans.   (Exhibit 44) |
| | June 7, 2011, the Plaintiff received an email from Secretary Shinseki's office, acknowledging receipt of the Plaintiff's two VHA Employee Competition entries. |
| | June 8, 2011, after having reported Allison Gill and Robert Ernest to the EEO Manager, the Plaintiff was ordered to attend and be a witness at an Administrative Investigative Board |

(AIB), regarding Plaintiffs' complaints against Allison Gill. The AIB was conducted in the VASDHS Regional Counsel's office, just one door away from Plaintiff's place of work, the Call Center, making it easy for Plaintiff's go-employees to see where she was going. In addition to the Plaintiff attending that AIB, Allison Gill, Brenda Moore, Aaron McDevitt and April Adams attended that meeting. No one else at the Plaintiff's level were witnesses attending that hearing. Near the end of that hearing, when the Plaintiff started to use that opportunity to ask them to vote for her in the VHA Employee Competition, Sheri Lacro abruptly stopped the Plaintiff from speaking and said that what she was about to say was not appropriate.

| | |
|---|---|
| | Plaintiff felt that this was yet another example of VASDHS discriminating and retaliating against the Plaintiff. |
| | June 8, 2011, as the Plaintiff left the AIB, Acting Supervisor, Brenda Moore, entered the AIB area as a witness.  They saw one another.  When both Moore and the Plaintiff were back in the Call Center, and this was less than 30 minutes after their having been witnesses in the AIB, Moore threatened the Plaintiff regarding a call that the Plaintiff had taken that morning, which Moore stating that the Plaintiff was lucky that the nurses hadn't complained about.  Given the excellent working relationship that up to then Moore and the Plaintiff had, the Plaintiff took that threat to mean that Moore, an African-American VA |

employee who had worked in the Call Center, and who had recently been promoted out of the Call Center, but still worked for McDonald, was she was feeling pressure and had to act just like McDonald would have wanted her to act, to show loyalty to McDonald.

June 9, 2011, Plaintiff approached Moore, to tell her about how the noise in the Call Center was adversely affecting the Plaintiff's breathing. Moore did not offer reasonable accommodations, nor did Moore respond to the Plaintiff's health concerns. Plaintiff took this as yet another example of her right to be heard, and part of the retaliation against her for having spoken up about being discriminated against by Ernest and Gill.

June 20, 2011, Tanisha Jackson, one of the VASDHS Patient Advocates called the Plaintiff to tell the Plaintiff about a complaint that she, Jackson had received about a Call Center Agent. Jackson and the Plaintiff had a previous working relationship, where the Plaintiff had worked in the Patient Advocate's office, as a volunteer before working in the Call Center. Any Call Center tools that the Plaintiff had created, such as key provider contacts, which were useful for the Call Center, the Plaintiff also emailed to the Call Center, because the Plaintiff intended to keep a working relationship with that department. Plaintiff also saw the resources as being just as useful in that department.

As the Plaintiff later learned, the complaint was against the Plaintiff. During this call, the Plaintiff and Jackson went from talking about the veteran complaint to about circumstances with the Plaintiff's supervisor, Allison Gill. They had had conversations in person about what the Plaintiff was experiencing. And prior to this telephone conversation, Jackson had advised the Plaintiff of the EEO Officer in Los Angeles that Ms. Jackson had to call, for her own VASDHS EEO problems.

Moore approached the Plaintiff about this complaint. The Plaintiff saw this as part of VASDHS, and in particular, McDonald's need to retaliate against the Plaintiff for having spoken up

| | |
|---|---|
| | against having been discriminated against. (Exhibit 45 |
| | June 22, 2011, the Plaintiff approached April Adams, one of the Call Center Team Leads about how the noise level in the call center bothered her breathing. Instead of initiating or discussing reasonable accommodation, or some solution, Adams then approached three employees whose cubicle was near and certainly within earshot of the Plaintiff's. Adams told them that the Plaintiff complained about the noise level coming from their voices. (Exhibit 46) |
| | June 26, 2011, Moore, Acting Call Center Supervisor, changed the Performance Evaluation Standards. The Plaintiff noted at that time that the "Fully successful" number, which the |

| | |
|---|---|
| | Plaintiff had been classified as, during her April 21, 2011 evaluation had become "less than fully successful," according to these new metrics. The Plaintiff believed that these new metrics were created in retaliation against the Plaintiff for the Plaintiff having reported Allison Gill, and for the outcome of the Plaintiff's having reported Gill. (Exhibit 47) |
| | July 24 – 28, 2011, Call Center Co-employee, Yolanda Yazzie, called the Plaintiff from New Mexico, because once again, Yazzie didn't get a response call from the Call Center Leads, nor from the Acting Supervisor of the Call Center when Yazzie needed to call in. This time, Yazzie was at the end of her vacation. She didn't have any vacation time left. But she needed |

that time, because her fiancé had just gotten into a near fatal car crash. Yazzie, a Native-American Call Center employee and friend of the Plaintiff, called the Plaintiff after the Call Center Leads and supervisor failed to return her calls. Yazzie's call was an attempt to get ahold of leadership, and to find a way to get more time. The Plaintiff did three things on behalf of Yazzie: Plaintiff contacted the Call Center Acting Supervisor to inform her of Yazzie's circumstances; Plaintiff also reached out to Labor Relations to ask what could be done on behalf of Yazzie for this emergency; and, the Plaintiff, through Diana MacLaclan, with VASDHS Labor Relations, initiated the necessary paperwork to help Yazzie. The Call Center Leads and the Acting

| | |
|---|---|
| | Supervisor had told the Plaintiff that Yazzie needed to first return to work, then talk about returning, in order to do something about this.  Yazzie had called before on another matter, months prior, and had not received a call back from VASDSH Call Center leadership; and had only reached them after calling the Plaintiff, who made that connection for Yazzie.  (Exhibit 48) |
| | June 2011 (exact date uncertain), McDevitt led the Call Center monthly team meeting.  He opened the meeting with team members around him in the Call Center, saying "We want Allison back.  She is very dedicated to this center."  As he ended this statement, McDevitt looked to his right at the Plaintiff, with a sneer on his face.  The |

Plaintiff took this as not only a passive-aggressive attack against the Plaintiff, but also another example of how the Plaintiff's discrimination complaints, non-selection and disability were being used against her.  This, to the Plaintiff was another example of the hostility that she was working within.  Plaintiff also saw this as an example of the team lead encouraging team mates to support him, at the expense of the Plaintiff's EEO rights.  (Exhibit 49)

June 23, 2011, the Plaintiff approached Adams, one of the Call Center Leads, for clarity on a new Call Center rule. Instead of a direct answer, Adams' reaction was one where Adams changed her vernacular from standard English to Ebonics.  And within that reaction, Adams' communicated to the

| | |
|---|---|
| | Plaintiff, according to the Plaintiff's interpretation, and training "If you don't understand what I am saying, give up your membership to the Black race." The Plaintiff took this as yet another example of being racially discriminated against at VASDHS. (Exhibit 50) |
| | July 1, 2011, Aaron McDevitt, one Call Center Lead, emailed the Plaintiff, cc'ing Adams, McDonald, Moore and Gill (who was not supposed to be involved with anything in the Call Center, at that time.). The email from McDevitt was a complaint stating that the Plaintiff didn't respond to McDevitts' emails. McDevitt had an adverse history with the Plaintiff as a result of the Plaintiff's refusal to use her journalism and cause-related |

marketing skills, which McDevitt was trying to force the Plaintiff to use, May 2011, to secure corporate funds in support of an offsite event for the Call center staff and supervisor.  Plaintiff had reported this to Marlene Carvajal and the AIB, which McDevitt did not deny having done so.  Note:  The email from McDevitt, regarding this complaint against the Plaintiff, is dated July 1, 2011, which was over 30 days prior to Gill returning to the Call Center, and this was while Gill was under investigation for things that the Plaintiff had reported about Gill. (Exhibit 51)

July 12, 2011, in reaction to the Plaintiff asking Adams, one of the Call Center Leads for information necessary to do her job, Adams changed her

| | voice and demeanor from how she normally spoke to the Plaintiff to Adams using Black English, when Adams said, "Yeah!  You should come to my class.  I can teach you a thing or two."  The Plaintiff took this as an attack against the Plaintiff for the Plaintiff not acting like she is "black enough."  Plaintiff saw this as a racial attack against the Plaintiff, by Adams. Plaintiff also saw this as an example of the outcome of how an employee is encouraged to violate another employees' Civil Rights, creating an even more hostile environment. (Exhibit 52) |
| --- | --- |
| | July 20, 2011, the Plaintiff visited VASDHS Employee Health, where the Plaintiff reported to the nurse that she felt that she was having a heart attack. |

Employee health nurse advised the
Plaintiff that she was having a reaction
to stress. She completed the necessary
forms and advised the Plaintiff to
follow up with her VASDHS Primary
provider. Allison Gill, who had
recently returned to the Call Center
after having been investigated (Gill had
been removed from the Call Center
move than once, as a result of
complaints by staff other than the
Plaintiff, which was brought up during
the VA ORM investigations) received
two Employee Health reports regarding
the Plaintiff's work stress-related
incidences. Gill invited the Plaintiff
into her office, where she asked the
Plaintiff, "What could have possibly
caused that? The Plaintiff saw this as
an opportunity to reiterate that anxiety

problems related to her work, that she
had already tried to address with Gill
and others in the position of leadership.
The Plaintiff described how the noise
in the Call Center caused the Plaintiff's
breathing to be off, and adversely
affected her.  Gill told the Plaintiff that
she could not do anything about that.
And when the Plaintiff asked for a
copy of the Employee Health Incidence
reports, Gill responded with, "They
aren't done yet.  Liz has done anything
with these."  Plaintiff told Gill she still
wanted a copy of those forms to
capture what had been done thus far.
Plaintiff noticed Gill's hesitation, but
waited nonetheless for a copy for those
reports.  Neither Gill nor her supervisor
did anything further regarding the
Plaintiff's work-related stress.  The

| | |
|---|---|
| 1 | Plaintiff believed that she was been |
| 2 | further discriminated against, and she |
| 3 | didn't have someone to advocate for |
| 4 | her on this issue.  (Exhibit 53). |
| 5 | |
| 6 | July 27, 2011, Plaintiff emailed |
| 7 | Marlene Carvajal, because Plaintiff had |
| 8 | not received the copy of Carvajals' |
| 9 | EEO Meeting Notes as was previously |
| 10 | expected.  (Exhibit 54) |
| 11 | |
| 12 | |
| 13 | July 29, 2011, the Plaintiff took a call |
| 14 | from a veteran who shared that he is |
| 15 | certain that he has some type of cancer |
| 16 | on his right temple.  The patient |
| 17 | insisted upon an appointment, which |
| 18 | the Plaintiff set for October 3, 2011, at |
| 19 | 1:00 pm.  This message was sent to the |
| 20 | patient's primary care team members, |
| 21 | as is protocol.  Christine Perry, from |
| 22 | the veteran's primary care team |
| 23 | messaged the Plaintiff "Why October? |

Was that his preference?  The Plaintiff response, "there were no slots open for a sooner appointment."  Perry, "I think something is wrong.  I have like 5 openings just today much less before October!"  Plaintiff "I am calling this patient.  I don't remember the particulars of this.  No one answers his phone line.  I'm leaving a message to have the patient call me back.  Perry, "The patient particulars are less concerning to me than the schedule particulars.  Why did you not think I had openings til October?"  Matthews, "I was thinking out loud, and I don't remember what the particulars were.  A better response would have been 'I'll check into this.'"  Ionara Gutierez, a GS-11 from the Primary Care team, who also sat in on the Plaintiff's team

lead interview a few months earlier, messaged back in response to this online dialogue, "Forwarding to Call Center Supervisor.  A next available appointment was today with ample availability throughout the template.  The desired date for this appointment is indicated as October as well?"  Perry, "There is a recall for October that may play into this?"  Sheila Kerr, a Primary Care team member, responded with, "Thanks for the follow up."  Gutierrez, "Appointment then should have been made earlier and recall deleted.  The Plaintiff responded with, "Patient states that he is returning from the Phillipines Septembere 28, 2011.  This is why I've set this appointment for October 2011."  Guitierrez, "Good to go … thanks Carmen," to which the Plaintiff said,

| | |
|---|---|
| | "No problem."  However, from the Plaintiff's perspective, this definitely was a problem.  Given that the Plaintiff's EEO complaint led to her supervisor to be transferred out of her position and into the Mission Valley Clinic, working around Guitierrez, Perry, and Kerr, and given that each of these 3 people worked closely with Gill, they had to have known about the Plaintiff's EEO complaint against Gill. The Plaintiff saw this as more harassment and retaliation against the Plaintiff.  (Exhibit 55) |
| Page 4, Lines 5 - 9 | The Plaintiff's complaints began with Robert Ernest, the Member Services Supervisor.  According to Elizabeth McDonald, the Manager of both Ernest and Gill, Plaintiff's complaints about Ernest were sexual discrimination |

| | |
|---|---|
| | related.  During the VA ORM investigations, McDonald initially denied that she believed the Plaintiff's allegations.  But once the investigator gave McDonald time to change her testimony, once the investigator told McDonald that he had in his possession a copy of the email which was written by McDonald, and emailed the Plaintiff, asserting that the Plaintiff's allegations were true, McDonald admitted that she wrote that email to Sheri Lacro, that she, McDonald, believed the Plaintiffs' complaints, and that McDonald was going after Ernest for what he did to the Plaintiff. (Exhibit 56) |
| Page 4, Lines 10- 16 | The Defendant's comments here are not complete.  Allison Gill had been remove from the VASDHS Call Center |

at least three times.  One of the reasons for Gill's removal was part of the EEO complaint that the Plaintiff filed with the VASDHS EEO Manager.  Also, according to the VA OIG's report, as well as "The Federal Medicine Magazine," the "Union Tribune" newspaper and the "San Diego Reader, Gill's leadership was "putting the health of all veterans throughout San Diego at risk."  The EEO Manager, in her May 12, 2011 notes, which memorialized her meeting with the Plaintiff, regarding Gill, she stated, "She is so out of there, and that McDonald had been notified. And, when asked by the ORM Investigator why Gill had been removed from the Call Center so many times, Gill's supervisor, Elizabeth McDonald did

| | |
|---|---|
| | not have an answer for the investigator. As is evidence by the transcripts, it took a great deal of effort for the investigator to try to get the reasons why Gill had been removed from the Call Center so many times. The Plaintiff believed and continues to believe that she was working in a hostile environment and that because she lodged an EEO complaint, that began with Robert Ernest and carried over to Allison, both of whom report to Elizabeth McDonald, the Plaintiff did not have a chance to resolve her EEO, employment, and reasonable accommodation issues with VASDHS. (Exhibit 57) |
| Page 4, Lines 17 - 19 | Plaintiff can't speak to this. |
| | August 3, 2011, report of contact, written by Aaron McDevitt, and never |

| | shared with the Plaintiff until the Plaintiff was given her termination file, September 28, 2011.  (Exhibit 58) |
|---|---|
| Page 4, Line 17 - 19 | Plaintiff can't speak to this |
| | August 4, 2011, Plaintiff took a call from a veteran who wanted to check on the status of a message the veteran had sent to his physician.  The Plaintiff asked the veteran what he would like the Plaintiff to do.  Because the veteran and previously spoken to another Call Center employee, Sara Holmes, the Plaintiff thought the caller might feel better understood if the Plaintiff were able to secure better details from the person who he had just spoken to. So, the Plaintiff put the call on hold, asked Holmes for details, and Holmes asks the Plaintiff to just transfer the call to Holmes, so that she can talk to the |

veteran. Plaintiff thought that this would help the veteran to not have to recreate what he had already shared with Holmes. Plaintiff transferred the call to Holmes.

In the "evidence" packet from VASDHS, as part of the Plaintiff's termination, this call is listed as, according to VASDHS Management, and example of the Plaintiff having a bad attitude and avoiding work by handing over calls to other Call Center employees. But, the fact is that the Plaintiff researched a solution and was asked to transfer the call to her co-employee who had already had a rapport established with the caller. After describing this problem and solution, to the Administrative Judge, during the Plaintiff's Unemployment

| | |
|---|---|
| | Hearing, the judge ruled that the Plaintiff was not terminated for the reasons stated on the VASDHS termination letter against the Plaintiff. (Exhibit 59) |
| | August 5, 2011, Allison Gill, opened the monthly VASDHS Call Center team meeting with telling everyone in attendance that she has the authority to do whatever she wants with anyone. Gill also stated that she could "writ anybody up when she wanted to." The Plaintiff scanned the audience of employees and noticed that many reacted to this statement as though it were threat. The Plaintiff regarded that statement as a threat against her employment for having not only reported Gill, but also for being the one |

| | |
|---|---|
| | who report led to Gill's AIB and removal from the Call Center. (Exhibit 60) |
| | August 7, 2011 (approximate date), after Gill's return to her Call Center position, and after the Plaintiff had begun planned meetings with the EEO Manager, Gill initiated a "Sign in/Sign Out Log" requiring Call Center staff to go to April Adams, a team lead, or to Gill, to sign in, or out, and to state why before logging the details in this new log.  The Plaintiff believed that this was an example of Gill's effort to retaliate against the Plaintiff, and also to send a message to anyone who remained in rapport with the Plaintiff. From that date forward, whenever the Plaintiff had an appointment with EEO, which was a twenty minute drive away, |

1   plus parking time, Gill and Adams

2   delayed the Plaintiff, telling the

3   Plaintiff that she would have to wait

4   until they got off the phone.

5   And on one occasion, when the

6   Plaintiff asks Adams for the sign out,

7   
8   Adams told the Plaintiff, "Don't worry

9   about it.  I need it right now.  Just go to

10   your EEO appointment."  The Plaintiff

11   
12   was unable to "officially sign out."

13   And, that same day, in an email Gill

14   accused the Plaintiff of leaving work

15   
16   without permission, because the

17   Plaintiff had not signed out.  Despite

18   
19   the Plaintiff's best efforts, Gill insisted

20   that the Plaintiff was not telling the

21   truth.  The Plaintiff believed that all

22   
23   along, this was a set up by Adams with

24   
25   Gill's encouragement, and that nothing

26

27

28

that the Plaintiff might have done could have countered that effect. (Exhibit 61)

August 7, 2011, Gill emailed the Call Center team members, telling them that the "must pay for use of the new fridge" which she communicated to the staff prior to her removal from the Call Center, is not something that HR approves of, but, according to Gill, in her email, "contributing money for using it would be the right thing to do." The Plaintiff believed that the policy that Gill had made, requiring employees to either pay for the new fridge, or pay $1.00 each time an employee uses it, was eliminated by HR, but, in Gill's email, she is not only trying to enforce her unauthorized policy, she was also communicating to the Plaintiff that she, Gill, could do

| | |
|---|---|
| | whatever she wanted to do, without having to be accountable to anyone. And she was retaliating against the Plaintiff.   (Exhibit 62) |
| | August 8, 2011, the Plaintiff emailed Gill, asking Gill why she said during the team meeting that she, Gill, could write anybody up when she wanted to. Gill replied to this email, telling the Plaintiff that she misunderstood that statement.   (Exhibit 63) |
| | August 16, 2011, the Plaintiff filed a "Complaint of Employment Discrimination" with the Office of Resolution Management."  (Exhibit 64) |
| | August 16, 2011, Gill emailed the Call Center team to announce that no one could get anymore kudos, if they had a complaint against them that was lodged |

with either the Patient Advocate's Office or the Director's Office." The Plaintiff forwarded this email to the Patient Advocate, Ted Napolitano. He emailed the Plaintiff back stating that he didn't know of any policy that precluded Call Center team mates from receiving kudos if they had complaints on record in his or the Director's office. Because the Plaintiff received a high number of emails and calls from veterans thanking her for how well she worked on their behalf, which led to many kudos posted on the VASDHS announcement board, Plaintiff believed that Gill created this new policy, and expected it to not be challenged by the Plaintiff. The Plaintiff forwarded Napolitano's email to Gill, who did not respond at that time. Days later, the

Plaintiff forwarded that email to Gill's Manager, Elizabeth McDonald.  Days later, Gill's new policy was rescinded. And Gill emailed the Call Center team that that policy was rescinded. (Exhibit 65)

August 16, 2011, Gill announced in an email to the Call Center team that the weekly performance audits, which were put into place, days after she returned to the Call Center, are face-to-face and mandatory.  The Plaintiff believed that some team members were not appearing for these new meetings. The Plaintiff also believed that these new one-on-one audits were designed as a pretext to appear to be leading fairly to all staff, but in fact were an attempt to gather information against the Plaintiff, in retaliation to the

| | |
|---|---|
| | Plaintiff's EEO complaints, and in an attempt to get rid of the Plaintiff. (Exhibit 66) |
| | August 18, 2011, Gill sat with the Plaintiff, one-on-one for the first of the new Weekly Performance Audit meetings.  Gill chose a call taken by the Plaintiff, from the previous work week (August 5, 2011).  The Plaintiff was ranked with the following by Gill:  Veteran Service:  100%; Internal Customer Service:  94%; Appointment Accuracy:  100%; Call Performance: 93%; Talk Time Performance 94%. Gill gave the Plaintiff these Veteran Service top scores during this audit:  Agent used patient or caller's name: 10; Agent verified the primary care provider:  10; Agent closed the encounter to the best of his or her |

ability, eliminating the need for patient

call-back:  10; Agent was polite,

genuinely respectful, and friendly; not

robotic or rude:  10; and, Agent was

efficient with time:  10.

For the Internal Customer Service

scores, Gill ranked the Plaintiff with

these high marks:  Agent was polite in

the communication:  10; Agent

provided helpful information:  10;

Agent effectively communicated

(provided the correct information in a

timely manner):  10; Agent used the

proper message standardization:  9;

and, Agent handled the problem or

issue skillfully:  8.

This is a material fact, because long

after the Plaintiff was terminated,

although Gill claims, that she issue a

Report of Contact against the Plaintiff

for the Plaintiff's alleged poor attitude and poor performance. This contradicts VASDHS' termination packet.

(Exhibit 67)

August 25, 2011, Gill sat with the Plaintiff, one-on-one for the second of the new Weekly Performance Audit meetings. Gill chose a call taken by the Plaintiff, from the previous work week (August 16, 2011). The Plaintiff was ranked with the following by Gill: Veteran Service: 94%; Internal Customer Service: 92%; Appointment Accuracy: 88%; Call Performance: 77%; Talk Time Performance 74%. Gill gave the Plaintiff these Veteran Service top scores during this audit: Agent used patient or caller's name: 10; Agent verified the primary care

provider: 10; Agent closed the encounter to the best of his or her ability, eliminating the need for patient call-back: 10; Agent was polite, genuinely respectful, and friendly; not robotic or rude: 9; and, Agent was efficient with time: 8.

For the Internal Customer Service scores, Gill ranked the Plaintiff with these high marks: Agent was polite in the communication: 10; Agent provided helpful information: 9; Agent effectively communicated (provided the correct information in a timely manner): 10; Agent used the proper message standardization: 9; and, Agent handled the problem or issue skillfully: 8.

This is a material fact, because this evaluation was made by the Plaintiff's

| | |
|---|---|
| | supervisor, Allison Gill, who claims in the Plaintiff's termination packet that the Plaintiff had a bad attitude, failed to do her job and other problems.  This was a month before Plaintiff was terminated.  This was also during the time that, according to the Plaintiff's termination packet, Gill, McDevitt and others were alleging that Plaintiff was a problem employee. <br><br>(Exhibit 68) |
| | Plaintiff emailed a request to Marlene Carvajal, VASDHS EEO Manager, to request one full work day off to complete her compilation of facts relevant to the Plaintiff's EEO case. Carvajal emailed back at first stating that she a request for official time, and that she is doubtful that the Plaintiff would receive one full day for this. |

| | |
|---|---|
| | September 2, 2011, Carvajal emailed the Plaintiff that the Service (meaning the Plaintiff's chain of command) would grant the Plaintiff two hours at a time, due to patient care/workload. This fact is important to this case, because it demonstrates that contrary to Gill, Lacro, and McDonald stating to the ORM and other investigators that they didn't know that the Plaintiff had filed an EEO complaint and, this demonstrates that they miss-represented their testimony, and that they were aware of the Plaintiff's EEO complaints. This also contradicts the AUSA's statement on page 4, ECF 58, lines 5 to 9. (Exhibit 69) |
| | September 1, 2011, Gill told the Plaintiff that she marked her down in |

her weekly performance audit, because, according to Gill, the Plaintiff threw here co-employee under the bus when the Plaintiff captured notes on behalf of a veteran caller who complained that he didn't get the results that he deserved from Ron, , another Call Center employee.

When the Plaintiff explained that what she wrote captured:  how Ron was contributed to her, the Plaintiff's panic attacks; the veteran caller was upset by how Ron talked to him; and, that this was a specific example of one of the problems that the Plaintiff had previously tried to address with not only Gill, but also with McDonald, Gill told the Plaintiff that she couldn't do anything about Ron.  Plaintiff's evaluation had a new line on the first

page one which did not appear on the evaluations the previous two weeks. The new line was "Days not Logged in 6.5 Hours in the Past Week."  The score was 3.

Plaintiff believed that this new line was added in a further attempt to retaliate against the Plaintiff's having filed EEO complaints.  Overall scores on this evaluation was still high.  However, Gill used the Plaintiff's note to the Primary Team, a note which needed to include Ron's name, against the Plaintiff.  Despite those 4 points taken away from her, the overall score of this September 1, 2011 (3 weeks prior to termination) audit were good.  Also, prior to adding the "Days Not Logged in 6.5 Hours in the past week" evaluation was not told to the Plaintiff

prior to that week that that would be an element in which she would be evaluated.  The Plaintiff believed that this score, or knowing about this new work performance element could have given Gill an opportunity to see if there was a problem with the Plaintiff's login and log out times, and why.  Plaintiff believed that Gill was not interested in problem solving with the Plaintiff, but instead, Plaintiff believed that Gill was more interested in finding ways to undermine the Plaintiff's work performance.   (Exhibit 70)

September 2 to 6, 2011, the Plaintiff took a call from a veteran's wife who was crying about the abuse that she was under with her veteran husband. With compassion, the Plaintiff captured the details then sent a message to the

| | |
|---|---|
| | veteran's primary provider, Dr. Pamela Jong, who complimented the Plaintiff in this same message for how the Plaintiff handled this call. This is a material fact, because this demonstrates the antithesis of what the Plaintiff's team leads, supervisor and manager stated about the Plaintiff's work.   (Exhibit 71) |
| | September 5, 2011, Gill requested that Plaintiff complete a Report of Contact to explain why the Plaintiff handled a recent call the way she handled that call.  The Plaintiff not only immediately wrote that Report of Contact, the Plaintiff, on her own time, after hours that same day, rewrote that Report of Contact and the next day emailed Gill an edited Report of Contact.  Gill emailed the Plaintiff |

back, stating that she, the Plaintiff, was not authorized to spend time writing that edited/resubmitted Report of Contact.

The Plaintiff believed that by having forced the Plaintiff to immediately to, and by criticizing the Plaintiff for filing an emailed Report of Contact on this matter, Gill was more interested in compiling information against the Plaintiff, in retaliation to the Plaintiff having reported Gill.

(Exhibit 72)

September 5, 2011, the Plaintiff, not having gotten the help that she needed for her panic attacks in the Call Center, sent a Request for Reasonable Accommodation to Sheri Lacro, Labor Relations Supervisor, and was told days later by Marlene Carvajal that the

| | |
|---|---|
| | Plaintiff needed to have sent her Request for Reasonable Accommodation to Carvajal, not Sheri. (Exhibit 73) |
| Page 4, Line 20 - 23 | September 7, 2011, Gill's recommendation to Elizabeth McDonald, that Plaintiff be terminated was not something that Plaintiff was aware of until September 28, 2011, when the Plaintiff received her termination packet.  Plaintiff was not given a warning, as was her right, even as a new federal employee still on probation.  Plaintiff also believed while still employed at VASDHS that her wrongful termination was a planned process from the beginning.  Plaintiff also believes that the mediation meeting, which was continually delayed until Plaintiff had already left |

| | |
|---|---|
| | this VASDHS was done so as part of the plan to get rid of the Plaintiff. And, in light of Plaintiff's second level supervisor's comments during Plaintiff's mediation meeting ("Anyone who makes the EEO complaints that you have made is a problem employee to be gotten rid of"), Plaintiff believes that management discriminated against the Plaintiff as far back when Plaintiff complained about Robert Ernest. (Exhibit 74) |
| | September 8, 2011, Gill's Weekly Performance Audit contained: an average of 92% in the Plaintiff's customer service scores; 50 out of 50 in the Veteran Service scores; and, 48 out of 50 in the Internal Customer Service scores. |

| | |
|---|---|
| | This is a material fact, because according to the Plaintiff's termination packet, Gill sent a request to McDonald, requesting that the Plaintiff be terminated. None of the Plaintiff's weekly audits were part of that request. (Exhibit 75 ) |
| | September 12, 2011, the Plaintiff gave Carvajal a new Request for Reasonable Accommodation. (Exhibit 6) |
| | September 13, 2011, Carvajal told the Plaintiff that she would need a letter from the Plaintiff's primary care provider that proved the Plaintiff's need for reasonable accommodation. When the Plaintiff received that letter, which is a VASDHS provider, Cavajal told the Plaintiff that the letter from her |

provider was not good enough, and

needs to be rewritten.

The Plaintiff took this to mean that

Cavajal was stalling and hoped that the

Plaintiff would not follow through.

Plaintiff relayed this message to her

primary provider, and asked that she

email the letter to the Plaintiff's MS

Outlook email account, at the Call

Center, and not to any of the other

email accounts at the Call Center,

because, as the Plaintiff described, the

Call Center leads and supervisor have

shown that they go into the other email

accounts.

When the Plaintiff received the revised

letter (September 19, 2011) from her

primary provider, she sent it to

Carvajal

(Exhibit 77)

| | |
|---|---|
| | September 17, 2011, the Plaintiff sent her request for medical records to both Sheri Lacro and Marlene Carvajal, as part of the Plaintiff's continued efforts to get reasonable accommodations. (Exhibit 78) |
| | September 15, 2011, Gill's Weekly Performance Audit, shows Gill evaluation of the Plaintiff's work as: External Customer Service: 90%; Veteran Service: 90%; and, Internal Customer Service at: 100%. This evaluation by Gill was conducted thirteen days prior to, and in the midst of Gill's insistence that the Plaintiff was unfit to work at the VASDHS. (Exhibit 79) |
| | September 23, 2011, the Director of Patient Advocates at VASDHS sent the Plaintiff a copy of the Patient Advocate |

| | |
|---|---|
| | Tracking System where it noted how pleased a veteran was to have been helped by the Plaintiff.  (Exhibit 80) |
| | September 22, 2011, Gill sat with Plaintiff for her Weekly Performance Audit.  The scores were:  External Customer Service average:  92%; Veteran Service:  100%; and, Internal Customer Service:  96%. Given that this evaluation was made less than seven days prior to Plaintiff having been terminated, Plaintiff believes that this is a material fact to be considered in the pattern of retaliation, denial of reasonable accommodation, non-selection, sexual and racial discrimination that she experienced at the VASDHS. (Exhibit 81) |

| | |
|---|---|
| | September 28, 2011, Gill called the Plaintiff in her office, where she terminated the Plaintiff, then abruptly showed the Plaintiff the door. |
| | September 28, 2011, Plaintiff went to Carvajal's office to share, "As you probably know, Allison fired me." To which, Carvajal responded with, "You must have done something really awful. They don't usually do things like that." Plaintiff took this as yet another attempt to push the Plaintiff to disown her rights. And, rather than reacting to this, the Plaintiff then asked Carvajal if she could use one to the computers in the empty cubicles. Carvajal approved of this, not knowing that the Plaintiff wanted this access to the check as best |

| | | |
|---|---|---|
| 1 | | that she could to see if there were other |
| 2 | | emails or documents which the |
| 3 | | Plaintiff had not forwarded to her |
| 4 | | personal email account, documents |
| 5 | | which she could use to pursue justice |
| 6 | | for this matter. |
| 7 | | |
| 8 | | |
| 9 | Page 5, Line 3 - 6 | Plaintiff first contacted the VA EEO |
| 10 | | office in Los Angeles August 3, 2011, |
| 11 | | after having tried other VA EEO |
| 12 | | offices in Los Angeles between June |
| 13 | | and July 2011, and based upon |
| 14 | | information sent to her by Tanisha |
| 15 | | Jackson, in Patient Advocate's office. |
| 16 | | (Exhibit 82) |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | Page 5, Line 7 - 13 | In addition to what the Defendant has |
| 21 | | listed, Plaintiff is also bringing claims |
| 22 | | of non-selection, and violation of |
| 23 | | Plaintiff's Fourteenth Amendment |
| 24 | | Right of due process (terminated from |
| 25 | | a government position without having |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| | the opportunity to first be heard by an objective panel). Plaintiff was not given notice before termination. And the mediation panel to decide the outcome of Plaintiff's position was delay several times, until November 4, 2011 (termination was September 28, 2011).<br><br>(Exhibit 83) |
| | November 4, 2011, Plaintiff attended the mediation meeting for her VASDHS position. This meeting had been delayed by VASDHS, several times. In support of the Plaintiff, Dr. Kwi Bulow, former VASDHS Physician who worked in the Mission Valley Clinic, and who not only wrote a glowing letter of recommendation for the Plaintiff, but also an email to the Plaintiff's supervisor, while the |

Plaintiff still worked at the VASDHS.

Also in support of the Plaintiff was a friend of the Plaintiff, Attorney Mari Paul.

Dr. Bulow took notes during this mediation meeting.

Others in attendance were: Elizabeth McDonald, Plaintiff's second level supervisor; Sue Hollis, supervisor to McDonald; David from HR; and the mediation rep.

As this meeting began, when the mediator open with "we are here to decide your position ..." McDonald interjected with, "That is a mute point. She has already lost her job."

Later and during this same meeting, McDonald said to the Plaintiff, "You have always been a problem employee. Allison always asked how she could

get rid of you.  You were a bad
employee."

When the Plaintiff asked McDonald
"Can you tell me how exactly I have
been a bad employee?" McDonald
said, "Well.  Anyone who makes EEO
complaints is a bad employee to be
gotten rid of."  McDonald went on to
present a Call Center production chart,
where she said that from that chart the
Plaintiff did not do her work.

Plaintiff asks who created that chart.
McDonald stated that the chart was
created by Adam Doyle.

When the Plaintiff pointed out that
Allison Gill had been reported as
playing favoritism to the men in the
Call Center, and Doyle was someone
who Gill played particular favoritism
towards, referring to him as "Mighty

Mouse," and having Doyle track Call Center staff activities, even though he was one of the newest Call Center employees, it was obvious to the Plaintiff that McDonald and the other mediation attendees devalued the production report that McDonald presented.  So, the Plaintiff took the opportunity to segue to three relevant topics:  Allison Gill had access to monitor and change computer system information; Plaintiff had numerous evaluations from Allison Gill that showed the Plaintiff as a valuable VASDHS employee; and, Plaintiff had hard copies of messages from veterans, thanking the Plaintiff for her excellent care in getting the veterans needed.  Plaintiff's presentation of documented facts that contradicted Gill and

| | |
|---|---|
| | McDonald's adverse description of the Plaintiff's work at the VASDHS led Susan Hollis, the mediator, McDonald and David to leave the room. McDonald returned to the room, telling the Plaintiff, "We will removed the negative status from your employment records, if you will agree to not sue us." Plaintiff responded with, "Gee. Where's the gift in that?" (Exhibit: 84) |
| | November 2011 to June 2014, Plaintiff worked with the Office of Resolution Management Investigators. (Exhibit 85) |
| Page 5, Line 17 – 27 to Page 8, line 12 | While volunteering at Member Services, Robert Ernest, the Plaintiff's supervisor, sexually harassed the Plaintiff, subjected to quid pro quo, and |

prevented the Plaintiff from getting a paid VASDHS position that Plaintiff had interviewed well for.

The Plaintiff chose to transfer from the Patient Advocate's Office as a volunteer to work for Ernest, in Member Services based upon a recommendation by Dulce, an employee with Volunteer Services.

The Plaintiff was interested in positioning herself with VASDHS to find the appropriate level and type of paid position. She had applied for GS-5, 7 and 9 positions. Plaintiff had worked from July 5, 2010 to the Fall of 2011 in Patient Advocate's office, volunteering on many levels. She chose to leave that assignment, in hopes of positioning herself within VASDHS.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The interactions between the Plaintiff and Ernest, from the Plaintiff's perspective, started off pleasant. Plaintiff saw Ernest as a potential mentor, as he described his meteoric rise from being a janitor to supervising Member Services.

When the Plaintiff was invited to ride with Ernest to an after work, off site party at 94th Aero Squadron in Kearny Mesa, Plaintiff took this invitation just as a nice gesture. However, once Ernest sat in his car, and before they left the VASDHS parking lot, the Plaintiff saw and heard a transformation in Ernest. He donned a golden, silk "doo rag" on his head. This was followed by Ernest putting on a heavy gold chain, necklace and gold rings. And, according to the Plaintiff,

Ernest voice even changed from a business tone at the hospital to a "too friendly" tone, by the time he started the engine of his car. He spoke to the Plaintiff more on a personal level, as he asked the Plaintiff questions about what area she lives in, and related questions.  Because the Plaintiff was not on the VA payroll, and because Plaintiff was in Ernest's car, Plaintiff struggled with who to be, and chose to minimize her responses to his comments.

At the offsite party, Plaintiff had little interactions with Ernest.  Plaintiff focused upon dancing and socializing with team mates.  As the Plaintiff started to leave the party that evening, Ernest told the Plaintiff that he would

give Plaintiff a ride.  Plaintiff accepted this as a kind gesture.

During the drive from the party, Ernest told the Plaintiff that she lives in his direction and that she could just go home with him.  Plaintiff declined that offer.  Ernest made this offer during that drive more than twice.  And as his car nearly past the Old town Trolley Stop, Plaintiff insisted that Ernest stop his car to let her out, which he did.  And, the Plaintiff quickly got out of Ernest' car, not daring to look back.  That was a Friday.

The next week, Plaintiff noticed a strong difference in how Ernest treated the Plaintiff.  For several consecutive days, when the Plaintiff entered Ernest' office, to pick up supplies, Ernest would make smacking sounds, and

from time to time he said to the Plaintiff, "you should have been at my house last night. You missed a really good meal." He then went on to describe the meal, as he continued to make "Um," "Oh," and other sounds that the Plaintiff took as being sexual. As the Plaintiff did her best to avoid the meaning of Ernest' sexual gestures, the Plaintiff focused upon the tasks she was assigned to, and any business-related comments that she needed to make, be that questions or just statements. The Plaintiff definitely felt sexually harassed by Ernest.

Ernest knew that the Plaintiff was looking for a direct-hire VASDHS position. The Plaintiff, in these moments, searched in her own mind

how she could just do her work, and move on from this position.

On subsequent occasion, after the Plaintiff had stopped by Ernest' office several times, trying to pick up supplies, Ernest seemed to be playing a power game.  He had a few male peers in his office at the time that the Plaintiff came to get supplies to do her job.  And, during these occasions, he kept putting the Plaintiff off, as though she was unimportant.

The last time that Ernest did this, the Plaintiff went back to the office she was working out of.  That office was shared with two direct-hire Member Services staff.  Within an hour, not seeing the Plaintiff, Ernest said to the men in that office, "Where's my little

helper. Y'all can't have her. She is all mine – all mine."

Plaintiff saw Ernest' demeanor as communicating that the Plaintiff was being objectified into some sort of sexual being.

Plaintiff took Ernest' comments about the Plaintiff as being offensive.

Plaintiff responded by moving towards the three of them, and said, "Gee. Should I have worn my Playboy Bunny outfit and hopped around the office for you?"

Ernest and the two other men in the office reacted with shocked facial expression, then Ernest left the office. Neither of them, including Ernest made any comments in response to the Plaintiff's "Playboy" comments.

Ernest left the office. Ernest never did give the Plaintiff the information and supplies she was looking for from him to do her job.  That afternoon the Plaintiff decided to leave her shift earlier than she normally would have left, as she was disgusted with how she had been treated, and didn't dare want to approach her supervisor about this, yet, because the Plaintiff saw her supervisor as one who would not respectfully listen to her concerns.

That next week, after Ernest asked the Plaintiff why she left early and before checking in with him, the Plaintiff told Ernest that she didn't appreciate how Ernest was treating her.

It occurred to the Plaintiff, at this point that although the Plaintiff was focused upon positioning herself for a paid

position, the Plaintiff saw her supervisor as thinking that the Plaintiff needed him to help her find a paid position.

Ernest told the Plaintiff that "if I have something to do with it, you will never have a paid position with the VA, with that attitude."

The Plaintiff took this to mean that because the Plaintiff told Ernest that she felt sexually harassed by him, and that she would not trade sex for a job, Ernest was threatening the Plaintiff into believing that he had control of rather or not she would be paid for working at the VA.

Days later, the Plaintiff was interviewed by Eva Schultz, who was not only one of Robert Ernest' peer supervisors, but also one who reported

to the same supervisor as that of Robert Ernest.

Ernest knew that the Plaintiff was scheduled for an interview with Schultz.  The Plaintiff's interview with Schultz went well. Schultz asked the Plaintiff for a copy of a document the Plaintiff had created while working in Patient Advocates as a volunteer.  Ms. Schultz' supervisor, Elizabeth McDonald, stopped by while the Plaintiff was being interviewed and remarked, "You're pretty calm for a job interview."  And Ernest asked the Plaintiff how the interview went. Plaintiff noticed an odd look on Ernest face, one that communicated he had his own agenda when it came to whether or not the Plaintiff would get that position.

Plaintiff did not receive an offer for that position.

The Plaintiff first reported this sexual harassment, quid pro quo, and related to Kiona, a GS-9 VASDSHS employee, who advised the Plaintiff to approach Elizabeth McDonald on this matter.

The Plaintiff chose to first talk to Sheri Lacro, then to Elizabeth McDonald. Plaintiff followed her meeting with both of them by emailing them, November 4, 2010, to memorialize her experience.

Ms. McDonald emailed a response back to Ms. Lacro, who forwarded that email to the Plaintiff.  In that email from McDonald, she affirmed everything that the Plaintiff had complained about, regarding Mr.

| | |
|---|---|
| | Ernest's sexual discrimination against the Plaintiff.<br><br>Later, during an investigation conducted by Bill Babby, EEO Contract Investigator, McDonald under oath, denied having believed that the Plaintiff's complaints about Ernest were true.  She only admitted that they were true after Babby implied that he had proof that she admitted that she was going after Ernest for what Ernest had done to the Plaintiff.   (Exhibit 86) |
| Page 8, Line 17 – 21 | Plaintiff applied for and was selected by the VASDHS HR to be interviewed for the two new, open Call Center lead positions.  Given how the Call Center Supervisor, Allison Gill, treated the Plaintiff from the day she called |

| | |
|---|---|
| | Plaintiff, before hiring Plaintiff, when she said to the Plaintiff, "HR says I need to interview you for an open position," along with many subsequent adverse ways in which Gill treated the Plaintiff, and other non-whites in the Call Center, the Plaintiff believed that Gill made up her mind that the Plaintiff, a black woman who is willing to disagree with how Gill treated her made the Plaintiff in the eyes of Gill and McDonald unworthy of being promoted.   (Exhibit 87) |
| Page 8, Line 22-23 | While it is true that Gill hired an African-American woman, April Adams, along with a white man, Aaron McDevitt, for the open Call Center Lead positions, the Plaintiff believes that hiring Adams was a pretext. (Exhibit:  Errata of Anita Mitchell, |

| | |
|---|---|
| | Donna Camp and of the Plaintiff; also, testimony at trial of one of the Plaintiff's witnesses; and, the provided report by the defense in discovery) (Exhibit 88) |
| Page 8, Line 24-27 | Because Plaintiff was prevented from reviewing her notes during her eleven hour deposition, as noted on page 151: 16-21), the details of her having been discriminated are not as detailed in her deposition.  (Exhibit 89) |
| Page 9, Line 2-14 | Plaintiff alleges that she experienced five types of racial discrimination while working at the Call Center:  (1) Hostile work environment; (2) Adverse treatment against the Plaintiff for associating with other black people in the Call Center, and within VASDHS; (3) Insulting/demeaning statements based upon the Plaintiff's race; (4) |

Restricting Plaintiff's chance for advancement, based upon her race; and, (5) Segregating employees, based upon race.

When April Adams, who is Black, and was promoted to being one of the Call Center leads, reacted to the Plaintiff's question about a new Call Center policy, by changing how she spoke to the Plaintiff from standard (White English) to Ebonics (Black English), she did not answer the Plaintiff's question. Nor did Adams tell the Plaintiff that she would get back to the Plaintiff with an answer.

Because the Plaintiff is Black, does not speak Ebonics, is degreed in Linguistics, and studied Ebonics, the Plaintiff perceived Adams' vernacular change as communicating to the

Plaintiff, "If you don't get what I am telling you, give up your membership to the black race."

The Plaintiff perceived Adams' change to Ebonics as her passive-aggressive way of insulting the Plaintiff. The Plaintiff also perceived Adams' change in how she treated the Plaintiff, after Adams had been promoted to a lead position, and the Plaintiff was not selected for that promotion, coupled with the many times that Adams tried to force the Plaintiff to "admit" that she was paying veterans for the many calls that the Plaintiff received, complimenting her for how well she helped them, as offensive, an unreasonable with the Plaintiff's work, one of the ways in which Adams was allowed by management to affect the

Plaintiff's psychological well-being. Prior to termination, Plaintiff was in counseling after her VASDHS primary provider referred her to counseling for her anxiety and panic attacks. Plaintiff had discontinued counseling, because she couldn't afford to pay the fee. Plaintiff is now in for her panic attacks. (Exhibit 90)

The Plaintiff believed that although Adams behaved this way toward the Plaintiff, because she felt threatened by the Plaintiff's not being what many expect black people to be; threatened by the Plaintiffs' skills, talents, and connections, the Plaintiff believed that the VASDHS management encouraged Adams to unreasonably interfere with the Plaintiff's work performance; and

| | | |
|---|---|---|
| 1 | | that management either knew of |
| 2 | | Adams behavior or should have been |
| 3 | | aware of it. |
| 4 | | |

| | | |
|---|---|---|
| 5 | | Plaintiff believed that her association |
| 6 | | with two black women in the Call |
| 7 | | Center:  Anita Mitchell and Barbara |
| 8 | | Harvey, RN, led the Plaintiff's |
| 9 | | supervisor, Allison Gill to racially |
| 10 | | discriminate against the Plaintiff. |
| 11 | | Barbara Harvey, RN, not only created |
| 12 | | the VASDHS Call Center, she also had |
| 13 | | an ongoing adverse history with the |
| 14 | | Plaintiff's supervisor. |
| 15 | | When the Plaintiff interrupted Gill and |
| 16 | | her manager, Elizabeth McDonald |
| 17 | | during a Call Center team meeting, to |
| 18 | | let everyone know that Harvey was |
| 19 | | moving her refrigerator from the Call |
| 20 | | Center to her new office, Gill blamed |
| 21 | | the Plaintiff for causing Gill problems. |

| | | |
|---|---|---|
| 1 | | Her attitude was, in the Plaintiffs' eyes, |
| 2 | | "You people (black folks sticking |
| 3 | | together) better not bother me |
| 4 | | anymore, or else."  (Exhibit 91) |
| 5 | | |
| 6 | | Anita Mitchell, long-time, VASDHS |
| 7 | | employee, in the Errata of her June |
| 8 | | 2015 deposition, described the |
| 9 | | Plaintiff's supervisor as being "She |
| 10 | | was okay with white people if they had |
| 11 | | an attitude, but not black people." |
| 12 | | Mitchell went on to say that Gill was |
| 13 | | threatened by black people who speak |
| 14 | | up. |
| 15 | | Mitchell also describes in her |
| 16 | | deposition and errata that when she |
| 17 | | went to Gill about a veteran calling |
| 18 | | Mitchell a nigger, Gill told her to not |
| 19 | | worry about this.  This, in Mitchell's |
| 20 | | mind meant that Gill was indirectly |
| 21 | | calling Mitchell a nigger. |

| | |
|---|---|
| 1 | Mitchell also stated that Gill never addressed and resolved this conflict with Mitchell. (Exhibit 91) |
| 6 | Donna Camp, a former VA employee who had been terminated by Allison Gill, and who had over twenty years of service working at the VA, described her racial discrimination experiences in her errata sheets by saying that she didn't speak up about Allison Gill's racism, because Camp feared that Gill would use this as a reason to fire her. Camp also stated that Gill "let the white boys, Aaron and Adam, get away with a lot of stuff."  She went on to say, "if I were white and kissed up to Allison, things might have been different." (Exhibit 92) |

When Allison Gill told the Plaintiff that she couldn't get a promotion to a GS-9 position, she didn't give the Plaintiff a reason.

Gill had told this to the Plaintiff during the April 2011 team meeting, after Gill had told the team how she went from a GS-5 to a GS-9 position in record time. This was also after the Plaintiff had refused to secure money for all Call Center team members, including Gill, in support of a Navy Family fundraiser. This was also just weeks before the Plaintiff interviewed for the open Call Center Team Lead position.  And this was addressed by the ORM Investigator when he questioned McDonald about this.  She didn't have an answer as to why the Plaintiff was

| | |
|---|---|
| | not considered for that position.  The Plaintiff believed that it was because the Plaintiff exercised her right to speak up about how she was being discriminated against. (Exhibit 93) |
| | In the Defendant's answer to Interrogatory # 9, of Plaintiff's Interrogatories, the Defendant avoided answering whether or not there were any racial discrimination complaints against the same people whom the Plaintiff is alleging discriminated against her in the years prior to and including the time when the Plaintiff worked at VASDHS. Instead, the Defendant offers information about an alleged 2014 complaint against Gill, in the Los Angeles VA |

| | This response also ignores complaints that have not reached the Federal Court.   (Exhibit:  Defendant's Revised Answers to Plaintiff's Amended First Set of Interrogatories, page 8-9) The Plaintiff knows from having spoken to the FOIA Officers in Washington, DC, that there have indeed been and are racial discrimination complaints against the Plaintiff's past VASDHS chain of command. |
| --- | --- |
| Page 9, Line 15-17 | Plaintiff did not file a complaint about the above incidences, at that time, because the Plaintiff saw from her other complaints to VASDHS Management that the problem was with the VASDHS Management.  And this was confirmed, November 2011, when Elizabeth McDonald during the |

| | |
|---|---|
| | Plaintiff's much postponed hearing, told the Plaintiff that anyone who files EEO complaints is a problem employee to be gotten rid of. (Exhibit 94) |
| Page 9, Line 18-20 | Yes. The Plaintiff describes other times that April Adams used Ebonics while speaking to the Plaintiff. But, this was after April Adams had been promoted, and after Allison Gill had been brought back to the Call Center. The Plaintiff believed that April Adams had used her position, and Allison Gill's encouragement to try to bully the Plaintiff for not speaking Ebonics. |
| Page 9, Line 21-24 | The Plaintiff believed that using Ebonics, after April Adams was aware not only that the Plaintiff had filed EEO complaints that led to the first time Gill was removed from the Call |

Center, but also that Gill and McDonald were looking for ways to get rid of the Plaintiff, was Adams method to attempt to unreasonably interfere with the Plaintiff's potential successes.

Also, when the Plaintiff approached Adams about the Plaintiff's request that she, Adams, help the Plaintiff with the noise from the co-workers near the Plaintiff's cubicle, Adams did not respond to this on a professional basis. She told those three co-workers that the Plaintiff complained that how they talk interferes with the Plaintiff's work. Those three former co-workers are: 2 black men and one El Salvadorian man. The Plaintiff believes that Adams purposefully tried to incite unnecessary racial hostility in this experience.

| Page 9, Line 25-27 | This is better explained earlier in this statement of disputed facts. |
| Page 10, line 1-18 | In addition to what the Defendant has listed here, Anita Mitchell's Errata Sheet, dated July 3, 2015, further supports the Plaintiff's understanding of how Allison Gill was racist towards Anita Mitchell.  In Mitchell's Errata Sheet, she describes Gill as playing favoritism to White people, while feeling threatened by Black people who speak up.  Mitchell also states that when she approached Gill about a call she, Mitchell, had taken where the caller referred to Mitchell as a nigger, Gill told Mitchell to not worry about it. And when approached later on this matter Gill continued to dismiss that experience. |

Mitchell took this to mean that because

Gill refused to address this, and

because she expected Mitchell to

tolerate this, Gill was also calling

Mitchell is nigger.

While it is true that the Plaintiff did not

witness this, Mitchell and the Plaintiff

had many discussions on what they

experienced at the Call Center.

In fact, one of the complaints in the

Plaintiff's termination packet, from

Aaron McDevitt was about the Plaintiff

spending time with Mitchell.

This is a material fact, because Allison

Gill knew that the Plaintiff spent time,

on the job with Mitchell.  The Plaintiff

saw, by Gill's attitude, and given what

Mitchell not only shared with the

Plaintiff, but also in her Errata Sheet,

that Gill past her racism on to the

| | |
|---|---|
| | Plaintiff for her association with Mitchell, and other Black folks in the Call Center. (Exhibit 95) |
| Page 10, Line 19 – 28 | The Plaintiff also remembers Gill having said during that meeting, "I can write up anyone I want to." And, though the Plaintiff hung out with many others at the Call Center, and they were members of many different races, Plaintiff noticed that Gill had particular intent upon separating the Plaintiff from Mitchell, Gray, Harvey and David, all of whom are Black. |
| Page 11, Line 2-7 | Plaintiff's belief is based upon the experiences identified in this summary, above, along with what was shared with Plaintiff from VASDHS employees who are Black; some of which are on the Plaintiff's witness list. |

| | |
|---|---|
| Page 11, Line 8 - 11 | During Plaintiff's rather lengthy deposition, she miss-spoke in that she believes that she experienced more than three incidences of racial discrimination, while working in the VASDHS Call Center.  And she hopes that she is better at capturing all the racial discrimination incidences in this summary of disputed facts |
| Page 11, Line 1-20 | After the Plaintiff spoke up about the sexual discrimination experiences that had an impact upon the Plaintiff's interviews, non-selection, and not being considered for a more appropriate GS-level, but also, by the attitude of her prospective supervisor, when she called the Plaintiff with "HR says I need to interview you for an open position," when the Plaintiff |

looked at the fact that the second level supervisor, (Elizabeth McDonald) told the Plaintiff that anyone who makes EEO complaints is a problem employee to be gotten rid of, and that Allison (Plaintiff's supervisor) was always looking for a way she could get rid of the Plaintiff, Plaintiff further believed that her suspicions of racism, sexual discrimination, and other allegations were correct.

June 2011, after Plaintiff filed an EEO complaint with the VASDHS EEO Manager, and after this led to the first of several removals of the Plaintiff's supervisor, Elizabeth McDonald went out of her way to deny the Plaintiff the right to contribute to the HAS Morale Team. When Gill returned the Call Center, she also removed the Plaintiff

| | |
|---|---|
| | from the Morale Planning Team. And June 2011, when the McDonald and Lacro refused to allow the Plaintiff to fully participate in the Employee Incentive program, the Plaintiff believed that this was because the Plaintiff, a Black woman dared to speak up in opposition to her EEO rights being violated. (Exhibit 96) |
| Page 11, Line 21-27 | Plaintiff believes that this was the first of many times when Gill was trying to use the Plaintiff's skills to bolster her own position, and not give the Plaintiff credit for the value that she added to the Call Center. What's most important in this situation was the fact that the Plaintiff emailed Gill more than twice and spoke to Moore, the team lead, while she asked |

| | |
|---|---|
| | about whether or not she was getting her byline for the story. |
| | The Plaintiff believed that Gill became aware of the Plaintiff's expectations, and that because of that awareness, the newsletter idea was scrapped, and the Plaintiff never received recognition for her contribution towards the newsletter. Plaintiff believes that this was part of the retaliation against her for having spoken up for herself, when Robert Ernest violated the Plaintiff's rights. (Exhibit 97) |
| Page 12, Line 4-13 | January 14, 2011, the Plaintiff interviewed for the open Program Support Assistant position (GS 0303-07).  She was told by the very kind, professional hiring manager that he would have loved to have given her the position, but HR told him that since the |

| | | |
|---|---|---|
| 1 | | Plaintiff had already taken the Call |
| 2 | | Center position she could not take this |
| 3 | | position. |
| 4 | | |
| 5 | | Plaintiff believed and still believes that |
| 6 | | this was part of Elizabeth McDonald |
| 7 | | and Allison Gill's retaliation for the |
| 8 | | |
| 9 | | Plaintiff's willingness to speak up for |
| 10 | | her EEO rights.  (Exhibit 98) |
| 11 | | |
| 12 | Page 12, Line 16-20 | Plaintiff agrees here; however, the |
| 13 | | support for the Plaintiff's allegation are |
| 14 | | not limited to her eleven hour |
| 15 | | |
| 16 | | deposition, where her anxiety clouded |
| 17 | | her focus, and during which she was |
| 18 | | not allowed to review her notes, but |
| 19 | | |
| 20 | | instead her support depends upon the |
| 21 | | facts being presented in this summary, |
| 22 | | |
| 23 | | along with her exhibits. |
| 24 | | Plaintiff's evidence shows a pattern of |
| 25 | | harassment that significantly escalated |
| 26 | | |
| 27 | | after the Plaintiff reported both Robert |
| 28 | | |

Ernest, and after Plaintiff's complaints led to Gill's first removal from her position in the Call Center.

Plaintiff believed and continues to believe that despite the Plaintiff's positive evaluations by her supervisor, McDonald, by her own words, and the fact that she lied to the VA EEO Investigator under oath about this, she intended to get rid of the Plaintiff for speaking up against being discriminated against. And this led to the Plaintiff's termination, which the Administrative Judge at the California Unemployment Hearing said that the Plaintiff was not terminated for the reasons stated on her termination letter.)

(Exhibit 99)

| | |
|---|---|
| Page 12, Line 23-27, continuing to page 13, Line 1-5) | Plaintiff's allegations in support of her sexual harassment claims also include: September 2010, Plaintiff transferred from Patient Advocates to Member Services, after speaking to Dulce from Volunteer Services about transferring to another volunteer position, with the purpose to increase Plaintiff's chance to find a paid VA position.  Dulce recommended Robert Ernest, Supervisor of Member Services, based upon his need for help. |
| | Plaintiff interviewed with Mr. Ernest, who asked Plaintiff of her career plans. Plaintiff shared with Mr. Ernest that she was applying for GS-5, GS-7 & GS-9 positions.  At the close of that meeting, Plaintiff transferred from Patient Advocates to Member Services. |

| | |
|---|---|
| | November 2010, Plaintiff met with both Elizabeth McDonald, who at the time was the Director of Health Administration (HAS), and Sheri Lacro, of Labor Relations.  Each meeting was separate and initiated by Plaintiff.  Ms. McDonald is the direct supervisor of Robert Ernest. |
| | During both meetings with both Lacro and McDonald, Plaintiff reported how Robert Ernest was Sexually Harassed Plaintiff (trying to force Plaintiff to go home with Mr. Ernest; sexually innuendoes at the office, on several occasions; states made by Ernest of Quid Pro Quo; and intervening on Plaintiff's chance of being hired for a position that Plaintiff applied and interviewed for. (Exhibit 100) |

| | |
|---|---|
| | Plaintiff followed up on these meeting with an email to Sheri Lacro and Elizabeth McDonald. |
| | November 2010, Plaintiff received an email from Sheri Lacro, which had been originated by Elizabeth McDonald, where Ms. McDonald expressed that everything that the Plaintiff complained about from Robert Ernest was true and that she was going after Mr. Ernest for what he did. (Exhibit 2: Email originated by Elizabeth McDonald) Also, when the Plaintiff's supervisor, Allison Gill referred to the Plaintiff on two occasions as a man, the Plaintiff took this to be a form of a threat against her potential success, as a woman, because during the first time that Gill referred to her as a man, this |

was after it was obvious to the Plaintiff that Gill had only hired the Plaintiff after learning that the Plaintiff protested against Gill's colleague, Robert Ernest, for his quid pro quo, and other sexually discriminatory behavior. The second time that Gill referred to the Plaintiff as a man was after the Plaintiff emailed Gill in May 2011, requesting time off to meet with the EEO Manager.  The EEO Manager had directed the Plaintiff to email a request for time off to meet with EEO.

Gill had called the Plaintiff a man, as she directed the Plaintiff into her office, asking the Plaintiff why she was going to the EEO.

From the Plaintiff's perspective, Gill's verbalized choices here had an implicit affect upon both the Plaintiff's work

| | |
|---|---|
| | performance and the fact that ultimately, and despite great reviews, Gill terminated the Plaintiff's employment. (Exhibit 101) |
| Page 13, Line 9-17 & Line 18-17 | Plaintiff reported this problem to the EEO Manager, May 2011. It was noted in the June 2011 AIB Hearing that the Plaintiff's supervisor, Allison Gill, applied a different dress code for women than men. This was also noted in the VA EEO investigation, and in the Plaintiff's deposition. Plaintiff also reported to the VASDHS EEO Manager how when the Plaintiff asked for help, such as computer and phone systems problems, Gill reacted to Plaintiff with, "Don't you know how to fix that!? Give it to Adam. Adam can fix anything. He is Superman!" |

Whenever Gill made those statements, inn reaction to the Plaintiff's need to have her phone and computer system repair, Gill delayed the Plaintiff's efforts to be more productive, because the man who Gill referred to as "Mighty Mouse" not only didn't know how to fix the problems, he didn't have IT access to do so.

The Plaintiff reported this problem to Elizabeth McDonald, via email, who did nothing to resolve this. The Plaintiff also reached out to the VASDHS IT, in a number of emails, after having sent Gill several messages on this matter.

It took more than two month (February to Mid-April 2011) for those problems to be resolved, leaving the Plaintiff less productive than she could have been.

Also, after Gill had told the team to share any new ideas or technologies that they come up with, amongst team mates, after Gill became aware of the many resources that the Plaintiff came up with and had shared with Call Center team mates, Gill told the Plaintiff to pass her accomplishments to Adam Doyle, before sharing them with the team.

And, when the Plaintiff interviewed for the open Call Center Lead position, Gill kept interjecting Adam Doyle's name into the interview.

Doyle was scheduled to be interviewed for the same position immediately after the Plaintiff was interviewed for the same position.

And, while it appeared that Doyle did not receive the promotion in pay, after

that interview, Doyle was given increasingly more responsibility to monitor productivity of Call Center employees.

Doyle was hired six weeks after the Plaintiff had been hired, and he had no previous healthcare, leadership, nor Systems Analysis experience, but had been positioned as if he deserved that opportunity above the Plaintiff.

And, because the Plaintiff had protested being sexually discriminated against, by Gill as well as Robert Ernest, the Plaintiff continues to believe that she was harmed and retaliated against for speaking up against being discriminated against, an that this directly resulted in the Plaintiff not receiving training that Doyle received; denied opportunities to

transfer out of the Call Center; being

denied opportunity to participate in VA

employee events; and ultimately, this,

according to the Plaintiff, resulted in

her being wrongfully terminated.

And, after the Plaintiff reported Robert

Ernest for his quid pro quo offer and

demand to the Plaintiff, the Plaintiff

believed and believes that because

Ernest and Gill shared the same

supervisor, Elizabeth McDonald, and

McDonald said anyone who reports

these types of problems is a problem

employee to be gotten rid of, the

Plaintiff believes that the sexual

discrimination against the Plaintiff that

began with Robert Ernest was carried

into the Plaintiff's employment at the

Call Center.

| | |
|---|---|
| | The Plaintiff believes that she did not have a fair chance in light of the discrimination that she experienced under Elizabeth McDonald's leadership. (Exhibit 102) |
| Page 13, Line 24-28, Page 14, line 1-3 | The reasons why Plaintiff believes that all discriminatory experiences and the wrongful termination that she alleges in her claims happened to her were a direct result of her having protested against Robert Ernest are numerous. After Plaintiff's protest to Elizabeth McDonald, and after McDonald emailed Sheri Lacro stating that the Plaintiff's complaints against Ernest were true and that she was going after him, Plaintiff was not brought in, to see what her skill set and potential really was.  Plaintiff was not considered for |

the GS-7, 8, nor 9 positions that which

she had applications on file for.

Instead, Gill, the Call Center

supervisor, who also, at the time, was a

peer of Ernest, and who also was a

direct-report to McDonald, called the

Plaintiff, stating, "HR says I have to

interview you."

That interview was conducted over the

phone.  It was never an in-person

interview.

And, when the Plaintiff tried to call

Gill, after the Plaintiff had accepted the

offer for the position, Gill never

returned the Plaintiff's calls, making it

next to impossible to find where she

was supposed to report to work.  The

Call Center, at that time, was located in

an unmarked building, in Mission

Valley, 20 minutes away from the VA hospital in La Jolla.

And from the minute the Plaintiff came on board, the Plaintiff sensed that no matter what she said or did, Gill had made up her mind to discriminate against the Plaintiff.

In the end, when McDonald told the Plaintiff during her mediation meeting, which had been postponed several times, until after she had been terminated, that "Allison had always been trying to find a way to get rid of you. Anyone who files this type of complaint is a problem employee to be gotten rid of," the Plaintiffs' suspicions were confirmed.

The Plaintiff believed that Gill was told by management about the Plaintiff's complaint against Ernest. The Plaintiff

| | |
|---|---|
| | also believed that McDonald had made up her mind to encourage Gill and those who report to her to do things that would adversely impact the terms and conditions of the Plaintiff's employment.<br><br>(Exhibit 103) |
| Page 14, Line 4-7 | Plaintiff has addressed this in this summary, above. |
| Page 14, Line 8-15 | Plaintiff was well aware of an attitude in Gill's tone that communicated that she didn't want to interview me, but had to do so.<br><br>Gill's attitude, coupled with the pattern of Gill's behavior after the interview and all the way to the Plaintiff's termination, indicated that Gill was retaliating against the Plaintiff for the Plaintiff's having exercised her rights. |

| | |
|---|---|
| Page 14, Line 16-23 | From Gill's attitude towards the Plaintiff, coupled with Gill's having started to tell the Plaintiff that she couldn't get a GS-9 position with the VA, and especially not one that reports to Elizabeth McDonald, the Plaintiff believed that she didn't get the position because the Plaintiff spoke up for her rights.<br><br>Also, during the VA EEO investigation, when asked why the Plaintiff was not given consideration for the open Supervisor Program Analyst position, McDonald's response failed to answer the investigator's question in the same way that McDonald's answer as to why Gill had been transferred so many times out of the Call Center didn't answer the investigator's question. |

| | |
|---|---|
| | Also, McDonald's statement about "anyone who makes an EEO complaint is a problem employee to be gotten rid of; and, Allison what searching for a way to get rid of you," demonstrated to the Plaintiff that she had most certainly been blacklisted. (Exhibit 104) |
| Page 14, Line 24-27; page 15, line 1-2 | This was said in the presence of Dr. Kwi Bulow, Sue Hollis, the mediator, David from VASDHS HR, and one of the Plaintiff's friends. Dr. Bulow, who was a VASDHS Manager/Doctor, took notes during that mediation meeting. (Exhibit 105) |
| Page 15, Line 6-10 | After several complaints on how the noise was affecting the Plaintiff's breathing, and once this problem reached a level that scared the Plaintiff, |

she visited VASDHS Employee Health.  Plaintiff thought she was having a heart attack.  During that August 2011 visit, the nurse described the Plaintiff's problems as "Stress, heart palpitations, tingling in upper arms, difficulty breathing in the Call Center during the time the Supervisor returned because of unnecessary additional rules and regulations, perceived threats from supervisors of punish action during meeting."

Plaintiff was advised to follow up with her primary provider, Dr. Rebecca Kaplowitz, former VASDHS physician.

The VASDHS Employee Health nurse completed two Incident Reports.  Plaintiff was called into the office by her supervisor about this, where the

supervisor asked the Plaintiff "Why on earth could this have happened?" Plaintiff reminded her supervisor, Allison Gill that Plaintiff had already reached out to her and the leads on many occasions regarding this. Gill told the Plaintiff that she couldn't do anything about this until the scheduled "build arounds" were approved and put into place.

It is interesting to note that the two VASDHS Incident Reports on this matter do not express a corrective action.

Although the Plaintiff met with Gill, and the Plaintiff asked for a copy of the outcome of those forms, at the closure of that meeting, Gill resisted handing a copy to the Plaintiff, telling the Plaintiff that the report was not

complete until Elizabeth McDonald completes her part.

The Plaintiff insisted upon and got a copy of that report, and never heard from McDonald, her second level supervisor about this matter.

However, VASDHS sent the VASDHS Engineering in to measure noise level in the Call Center.

When the Plaintiff emailed the entire team to ask about the results of that measurement, Gill emailed an attack to the Plaintiff that left little to no room for resolution.

Review of the Engineering report appears to have been made long before the Plaintiff worked in the Call Center, and therefore makes it of no value to the Plaintiff or the Defense.

The Plaintiff met with her primary provider who, per Marlene Carvajal's demand, wrote a letter to express the Plaintiff's need for reasonable accommodation.  Plaintiff's primary provided labeled the Plaintiff's problems as panic attacks.

Plaintiff described how working in the Call Center felt isolating, limiting, threatening, and a no win situation that made it extremely difficult for her to breath.  During this assessment, Dr. Kaplowitz noted how the Plaintiff's vitals (weight, blood pressure, cholesterol and more) rose out of control during the Plaintiff's work at the Call Center.

Several days after the Plaintiff gave that letter to Carvajal, Carvajal said that the Plaintiff's letter from her

doctor was not specific enough, and
demanded that she get another letter
from her provider.

Plaintiff secured a second letter from
Dr. Kaplowitz.

Plaintiff also had sent a request for
reasonable accommodation to Sheri
Lacro, but didn't get a response to this.
When the Plaintiff asked Carvajal
about this, Carvajal once again told the
Plaintiff to resend it; this time to
Carvajal, not Lacro.

Plaintff believed that this was an
example of Carvajal and VASDHS
management's attempts to stall
Plaintiff's efforts to receive reasonable
accommodation.  Plaintiff also believes
that those efforts were part of
VASDHS Management's agenda to get
rid of the Plaintiff, no matter what.

Moments after Plaintiff received the second letter from her primary provider, Plaintiff noticed that Aaron McDevitt, one of the Call Center team leads had access to her email messages. When the Plaintiff emailed Gill about this, it appeared that Gill was falling all over herself to persuade the Plaintiff to believe otherwise.

Days later, despite her good reviews and the comments coming in from the veterans, the Plaintiff was terminated. Plaintiff has seen a professional at the end of her VASDHS employment for her anxiety and panic attacks.  Plaintiff discontinued those visits, because she couldn't afford to continue those services once she left the VA.

Plaintiff continues to have anxiety and panic attacks.

During the Plaintiff's review of the VASDHS calls, at the U.S. Attorney's office, where the Plaintiff had to mentally and emotionally put herself back into her experiences with the VASDHS Call Center, she had a full blown panic attack at the U.S. Attorney's office that continued that same day during her VASDHS Primary care appointment.

After those dangerous experiences, Plaintiff requested from her current Primary Provider, out-in-the-community counseling for her anxiety and panic attacks.

Plaintiff has approved of for fifteen appointments, and has thus far attended two weeks of therapy.

Since complaining of having anxiety and panic attacks, as a direct result of

| | |
|---|---|
| | her experiences with the VASDHS, Plaintiff has suffered harm in the form of psychological distress, moving more than ten times, due to loss of income, and panic attacks during basic employment screening exams. (Exhibit 106) |
| Page 15, Line 11-18 | Plaintiff's anxiety and panic attacks are triggered by not only having to apply for and be part of jobs that make her underemployed, where she is not free to express her actual level of knowledge, skills and abilities, there are other factors.  Some of the major life activities that have been limited, as a result of the Plaintiff's panic and anxiety attacks are:  concentrating, sleeping, breathing and speaking (under some circumstances).  And because the Plaintiff is in counseling |

| | |
|---|---|
| | now, she would rather her counselor provide the circumstances in which her anxiety and panic attacks are triggered. (Exhibit 107) |
| Page 15, Line 19-21 | Plaintiff's anxiety and panic attacks prevents her from: sleeping, concentrating, breathing fully, taking standardized employment exams, and sometimes speaking. |
| Page 15, Line 25-27, page 16, line 1-11 | After several complaints to her supervisor, second level manager and the leads, on how the noise was affecting the Plaintiff's breathing, and once this problem reached a level that scared the Plaintiff, she visited VASDHS Employee Health.  Plaintiff thought she was having a heart attack. During that August 2011 visit, the nurse described the Plaintiff's problems as "Stress, heart palpitations, |

tingling in upper arms, difficulty breathing in the Call Center during the time the Supervisor returned because of unnecessary additional rules and regulations, perceived threats from supervisors of punish action during meeting."

Plaintiff was advised to follow up with her primary provider, Dr. Rebecca Kaplowitz, former VASDHS physician.

The VASDHS Employee Health nurse completed two Incident Reports. Plaintiff was called into the office by her supervisor about this, where the supervisor asked the Plaintiff "Why on earth could this have happened?" Plaintiff reminded her supervisor, Allison Gill that Plaintiff had already reached out to her and the leads on

many occasions regarding this.  Gill told the Plaintiff that she couldn't do anything about this until the scheduled "build arounds" were approved and put into place.

It is interesting to note that the two VASDHS Incident Reports on this matter do not express a corrective action.

Although the Plaintiff met with Gill, and the Plaintiff asked for a copy of the outcome of those forms, at the closure of that meeting, Gill resisted handing a copy to the Plaintiff, telling the Plaintiff that the report was not complete until Elizabeth McDonald completes her part.

The Plaintiff insisted upon and got a copy of that report, and never heard

from McDonald, her second level supervisor about this matter.

However, VASDHS sent the VASDHS Engineering in to measure noise level in the Call Center.

When the Plaintiff emailed the entire team to ask about the results of that measurement, Gill emailed an attack to the Plaintiff that left little to no room for resolution.

Review of the Engineering report appears to have been made long before the Plaintiff worked in the Call Center, and therefore makes it of no value to the Plaintiff or the Defense.

The Plaintiff met with her primary provider who, per Marlene Carvajal's demand, wrote a letter to express the Plaintiff's need for reasonable accommodation.  Plaintiff's primary

provided labeled the Plaintiff's problems as panic attacks.

Plaintiff described how working in the Call Center felt isolating, limiting, threatening, and a no win situation that made it extremely difficult for her to breath.  During this assessment, Dr. Kaplowitz noted how the Plaintiff's vitals (weight, blood pressure, cholesterol and more) rose out of control during the Plaintiff's work at the Call Center.

Several days after the Plaintiff gave that letter to Carvajal, Carvajal said that the Plaintiff's letter from her doctor was not specific enough, and demanded that she get another letter from her provider.

Plaintiff secured a second letter from Dr. Kaplowitz.

Plaintiff also had sent a request for reasonable accommodation to Sheri Lacro, but didn't get a response to this. When the Plaintiff asked Carvajal about this, Carvajal once again told the Plaintiff to resend it; this time to Carvajal, not Lacro.

Plaintff believed that this was an example of Carvajal and VASDHS management's attempts to stall Plaintiff's efforts to receive reasonable accommodation. Also, Carvajal introduced the Plaintiff to Carvajal's daughter, who was at the time in charge of Workers' Compensation. Carvajal, in the presence of her daughter, asked the Plaintiff to review the Workers' Comp package before making a decision of whether or not she wants reasonable accommodation

or Workers' Comp.  During that same impromptu meeting, Plaintiff chose to continue her request for reasonable accommodation.

Plaintiff also believes that those efforts were part of VASDHS Management's agenda to get rid of the Plaintiff, no matter what.

Moments after Plaintiff received the second letter from her primary provider, Plaintiff noticed that Aaron McDevitt, one of the Call Center team leads had access to her email messages. When the Plaintiff emailed Gill about this, it appeared that Gill was falling all over herself to persuade the Plaintiff to believe otherwise.

Days later, despite her good reviews and the comments coming in from the veterans, the Plaintiff was terminated.

| | |
|---|---|
| | Plaintiff has seen a professional at the end of her VASDHS employment for her anxiety and panic attacks. Plaintiff discontinued those visits, because she couldn't afford to continue those services once she left the VA. (Exhibit 108) |
| Page 16, Line 12-14 | Yes, Carvajal was the Chair of the VASDHS Reasonable Accommodation Committee. Plaintiff continues to believe that as the Chair of the VASDHS Reasonable Accommodation Committee, and the EEO Manager who directed the Plaintiff to ask her supervisor for permission to meet with the EEO Manager during a less productive day for the Call Center, she set the Plaintiff up to continue to be part of a hostile environment. |

| | |
|---|---|
| Page 16, Line 15-19 | Plaintiff requested a work environment where employees did not scream, hit workstations, and use "violent vernacular." |
| | Plaintiff had complained not only about the constant loud noises and how they had an adverse impact against her.  The Plaintiff also complained about how Gill, the Plaintiff's supervisor screamed at her in the Call Center. |
| | The Plaintiff's request to get out of the Call Center, where the noise level, due to how the workstations did not buffer sounds, was recognized by not only the Call Center supervisor, but also the entire VASDHS management chain of command. |
| | When the Plaintiff had a potential opportunity to move out of the Call |

Center, after she had requested reasonable accommodation, and move into a more appropriate position, and newly opened position, in the Patient Advocate's office, as a GS-7, Marlene Carvajal intervened, telling the Plaintiff and the then Manager of Patient Advocate, Ted Napolitano, that the Plaintiff couldn't compete for that position, because she had accepted and held a GS-5 position.

The Plaintiff believed that this was part of her having been blacklisted, no matter what.

And when Carvajal presented the Plaintiff with forms for consideration of where to place her, Carvajal reacted to the Plaintiff's choices by telling her that this was not a promotion.

(Exhibit 109)

| Page 16, Line 20-23 | Yes, the Plaintiff did protest to Elizabeth McDonald, Allison Gill and to April Adams that the Ron's screaming and slamming in the Call Center was extremely difficult to deal with.<br><br>And, on one of the Plaintiff's weekly evaluations by Gill, Gill not only docked the Plaintiff for reporting to the clinical team the details of a veteran caller who complained about how Ron's voice adversely affected him, Gill told the Plaintiff she couldn't do anything about that, but to punish the Plaintiff for "throwing her co-worker under the bus."<br><br>(Exhibit 110) |
| Page 16, Line 24-26 | After Carvajal told the Plaintiff that she needed to get a note from her provider |

| | |
|---|---|
| | to prove that she needs reasonable accommodation, Plaintiff told Carvajal, "That will be easy since my primary provider is a VA doctor." |
| | And when the Plaintiff told Carvajal that her provider is Dr. Kaplowitz, the Plaintiff was surprised that given the release of information that the Plaintiff had already given to Carvajal and Lacro, Carvajal didn't just directly request that letter from Carvajal. Plaintiff believed that Carvajal was stalling due to VASDHS management politics. |
| Page 16, line 56, page 17, line 1-13 | Days after Plaintiff gave Carvajal the letter from her primary, Carvajal told the Plaintiff that the letter "was not good enough." And rather than just calling Dr. Kaplowitz, Carvajal |

directed the Plaintiff to get a "better letter."

Plaintiff spoke to her Primary to request another letter, and she asked that she not email the letter via the VASDHS, but instead via Outlook, because, as the Plaintiff explained in an email to Dr. Kaplowitz, her emails were being closely watched by her team leads and supervisor.

The same day that Dr. Kaplowitz emailed the second letter to the Plaintiff, the Plaintiff also noticed that her emails had been accessed by Aaron McDevitt (one of the team leads, and one of the people who the Plaintiff had reported to Carvajal, May 12, 2011). When the Plaintiff emailed her supervisor, Gill, about this, Gill said that this wasn't true. Gill profusely

| | |
|---|---|
| | tried to convince the Plaintiff that McDevitt did not access her emails. Shortly after that, Plaintiff was terminated. (Exhibit 111) |
| Page 17, Line 14 – 17 | While Carvajal did receive the second doctor's note until September 23, 2011, she had begun the reasonable accommodation process after she introduced the Plaintiff to her daughter, who was in charge of the Worker's Comp options. Plaintiff had declined Worker's Comp. Then Carvajal had emailed Plaintiff the reasonable accommodation forms. Also before the Plaintiff contacted Carvajal to request reasonable accommodation, the Plaintiff had reached out Sheri Lacro about this, but |

| | |
|---|---|
| | had not received a response from Lacro. Plaintiff told Carvajal that she had contacted Lacro before on this, and that is when Carvajal had directed the Plaintiff to get a letter from her doctor. (Exhibit 112) |
| Page 17, Line 18-25; line 26-28; page 18, line 1-15 | Though Carvajal may have been the Chair of the VASDHS's Reasonable Accommodation Committee, and though, according to the Defendant, Caravajal couldn't make a unilateral decision to on the Plaintiff's need for reasonable accommodation, Plaintiff was never told this by Carvajal, Lacro, nor by Plaintiff's chain of command. Carvajal also never showed the Plaintiff the alleged VASDHS Reasonable Accommodation policy. |

Carvajal did, however, attempt to convince the Plaintiff to accept Worker's Comp, as a viable solution, when Carvajal introduced the Plaintiff to Carvajal's daughter, the VASDHS Workers Comp contact.  The Plaintiff declined that offer.

Also, Carvajal began collating Reasonable Accommodation details from the Plaintiff, by sending the Plaintiff documents that addressed where the Plaintiff would be willing to move to, and what type of job the Plaintiff would be willing to accept as part of her Reasonable Accommodation.

The Plaintiff emailed positions that the VASDHS that were open, and that the Plaintiff would be interested in.

Carvajal emailed back, telling Plaintiff

that Reasonable Accommodation was not a promotion.  And nothing became of that that, other than Carvajal telling the Plaintiff that she needs a better letter than what the Plaintiff's VASDHS primary provider provided. Plaintiff believed that this was all a pretext, in that Carvajal had no intent to find a better location/environment for the Plaintiff, due to the retaliation of VASDHS against the Plaintiff.

It is important to note that once the Plaintiff received a second letter from Dr. Kaplowitz, which was sent via the Plaintiff's Outlook email account, Plaintiff was terminated.

Plaintiff believed and continues to believe that Carvajal's assertion that she didn't have time to reasonably

accommodate the Plaintiff, because the

Plaintiff was terminated was a pretext.

Carvajal had already emailed the

Plaintiff, after her EEO complaint, and

before her termination, that she, the

Plaintiff would experience a great deal

of retaliation from VASDHS.

The Plaintiff took this as a threat.

And, given that Carvajal made the

Plaintiff inform the VASDHS

management that she was filing an

EEO complaint, Carvajal had to have

known at least after that, that VASDHS

management was in the process of

terminating the Plaintiff.

Plaintiff believes that the reasons for

the delays in processing her

Reasonable Accommodation request

mirrored the reasons why the Plaintiff's

mediation meeting, to hear her

| | |
|---|---|
| | grievances were delayed until long after the Plaintiff had been terminated. VASDHS Management had made up their minds that the Plaintiff was a problem to be gotten rid of, because the Plaintiff was willing to speak up against her EEO Rights being violated. (Exhibit 118) |
| Page 18, line 18-27 | While Plaintiff acknowledges the August 24, 2011 email from McDonald to Lacro to have Plaintiff removed from VA employment, which Plaintiff only learned of after she had been terminated, because the Plaintiff was not given the right to be heard by an objective panel, prior to termination, as was her federal employee right, what is missing here are the facts that surround this. |

It is important to note the many events that led up to August 24, 2011.

August 16, 2011, Plaintiff's supervisor, Gill, emailed the Call Center team stating that anyone who receives kudos (complimentary feedback) from veterans who has had any patient complaints on file with the Patient Advocate's Office, or the director's office in the past six months, was not eligible to have their kudos published on the SharePoint site that is seen VA-wide.

Gill said that this was a VASDHS rule, and the Plaintiff emailed the Manager of Patient Advocates to ask about that rule. He told her that there was no such rule. The Plaintiff emailed this back to Gill, who did not respond to the Plaintiff's comments. So, days later,

the Plaintiff emailed McDonald with the message from the Director of Patient Advocates about this rule. Days later, Gill emailed the Call Center team that that rule was no longer in effect.

August 17, 2011, after Gill handed out hard copies of Call Center Standard Operating Procedures, the Plaintiff noticed that the expiration date on the SOP had already passed.  Plaintiff emailed Gill and McDonald about this. McDonald, in her email response thanked the Plaintiff and said "… it better be changed."

August 17, 2011 is also the date in which Gill met with the Plaintiff to discuss the Plaintiffs' two Employee Health Incidence Reports, where the Employee Health nurse stating that the

Plaintiff's work environment has led to the Plaintiff's anxiety.  It was also during this same August 17, 2011 meeting when Gill resisted giving the Plaintiff a copy of this incidence report, stating that it wasn't complete until McDonald reviewed it.

Plaintiff prevailed and Gill reluctantly gave her a copy of that report.

Plaintiff never was called by McDonald to have an interactive meeting to assess the Plaintiff's anxiety and panic attacks at the Call Center.

August 18, 2011, during Gill's Weekly Performance Evaluation of the Plaintiff, the scores were:

Veteran Service:  100%

Internal Customer Service: 94%

Appointment Accuracy:  100%

Call Performance: 93%

Talk Time Performance: 94%

Plaintiff also received many Kudos during this time and before that expressed gratitude for how the Plaintiff cared about the caller.

Also, given that McDonald, during the Plaintiff's much postponed mediation meeting, described the Plaintiff as a problem employee to be gotten rid of, the Plaintiff continues believe that because she spoke up against how her EEO and Constitutional rights were being violated, McDonald and Gill made it their mission to get rid of the Plaintiff.

Moore, believed in Plaintiff's skills, when she wrote a letter of recommendation for the Plaintiff.  So, for the Defendant to say that Moore had recommended that Plaintiff be

terminated, the Plaintiff believed and continues to believe that because Moore reports to McDonald, to allege that Moore recommended the Plaintiff's termination is a pretext.

February 12, 2012, when the VA EEO investigator asked Lacro if she at any time attempted to verify the circumstances described and relied upon by management for the Plaintiff's termination, Lacro said she only relied upon documents from Gill and McDonald and that she was not aware of rebuttals from the Plaintiff.

The VA EEO investigator also asked McDonald why Gill had been transferred out of the Call Center so many times.

McDonald just stated that Gill had some things to work on.

But the Department of Veterans Affairs Office of Inspector General in their Report No. 11-03074-57, dated December 21, 2011, stated that Gill's leadership in the VASDHS Call Center was putting "the health of all veterans at risk."

This fact was also reported in "U. S. Medicine," "San Diego Union Tribune," and "San Diego Reader" Magazine.

Plaintiff also received letters of recommendation from many VASDHS employees, to include:  Tanisha Jackson, Brenda Moore, Michael Hosey, Dr. Kwi Bulow, Dr. Paul Jain, and more.

And, during the Plaintiff's Unemployment Hearing, the Administrative Judge ruled that the

| | |
|---|---|
| | Plaintiff "was not terminated for the reasons stated on her termination letter. (Exhibit 114) |
| Page 19, Line 1-10 | The Unemployment Administrative Judge states that the Plaintiff was not terminated for the reasons stated on her termination letter. Plaintiff received many kudos from veterans, during her employment in the Call Center. Plaintiff received from Gill high marks on Plaintiff's weekly performance reviews up to termination. (Exhibit 115) |
| Page 19, Line 11-13 | Plaintiff did not read Aaron McDevitt's emails as quickly as McDevitt would have like, because as the Plaintiff described, McDevitt's emails, after he was promoted to a lead position, always had to be corrected by |

McDonald, because McDevitt sent emails to the team every time McDonald sent emails to the same team members.  Only McDevitts's emails were worded such that they did not convey what McDonald's intended message was.

The Plaintiff told both Gill and McDonald, as well as McDevitt about this choice that the Plaintiff made.

It is also important to note here that the Plaintiff reported McDevitt for having tried to force the Plaintiff to use her connections to secure $45 for each Call Center employee, so that they could attend the annual Navy Coronado Bridge Run.  Plaintiff refused to do this, and McDevitt tried to force Plaintiff to change her mind.

| | |
|---|---|
| | This was reported to Carvajal and to the AIB Hearing. |
| | It is also interesting to note that McDevitt's July 1, 2011 email to Allison Gill, among others, was received by McDonald, July 3, 2011, and by Gill on July 5, 2011.  At that time, Gill was not the supervisor of the Call Center. |
| | And, in fact, Gill was order to have no communication with anyone in the Call Center during this first of three times that Gill was removed from the Call Center. |
| | Yet, this email shows that Gill was very much involved and that McDonald knew of this violation. (Exhibit 116) |
| Page 19, Line 14-20 | Plaintiff continues to believe that her entire chain of command went out of |

their way, in retaliation for the

Plaintiff's complaints, to look for ways

to down play the Plaintiff's

employment successes, and hone in on

what they would interpret as the

Plaintiff's errors.

Three of the six recordings that

VASDHS management used as

"alleged "reasons to terminate the

Plaintiff, contain three which the VA

alleges that the Plaintiff was rude to the

veteran caller.

Recording 3 alleged that August 55,

2011, Plaintiff inappropriately

transferred a patient to Oceanside, in an

act of work avoidance and willful

idleness.  Plaintiff's statement to that

veteran was not uncommon in the Call

Center, agents, to let the veterans know

that often it takes a long time to be

seen, after a vesting appointment has

been cancelled.  Sometimes, the

Plaintiff actually called the clinic, as

they may know something that the

Plaintiff didn't know.  And in this

cases, the Plaintiff learned by calling

the Oceanside clinic, on the veteran's

behalf, that, according to the employee

in Oceanside, whose name is Joe, that

the patient had more options than I

would have known that the patient had.

Joe took over the call, for the benefit of

the veteran.

That call added value to the Plaintiff's

position.

Recording 4:  While VASDHS

Management may have looked for this

call to have been handled

unprofessionally, the Plaintiff's

interpretation of that call is:  she

scanned the callers record for appointments and other relevant information, in support of the veteran's needs.  When the patient asked for an appointment and the Plaintiff said that he has a recall note from the doctor, to make an appointment for July 11, 2011, that was to set the stage.  Many times, when the agent, Plaintiff included, is talking to the veteran there is cross talk, not intended interruption.  This was a time of the year when residents were not in place.  And it was next to impossible to set appointments for the residents, on behalf of the patients.  Plaintiff, in this situation, instructed the veterans to call back.  This was a very common VA Call Center problem.

Recording 5:

June 20, 2011, after making an appointment without incidence, for this veteran, the combination of the yelling in the Call Center from several agents, mixed with a challenging veteran on the phone, was overwhelming.

Plaintiff continues to believe that the shortness of breath, anxiety and panic attacks that she experienced at the Call Center contributed, at times to had an impact on how she communicated to some, not all veterans.

Plaintiff also believed that the weekly reviews conducted by Gill, coupled with the Kudos from veterans present a more favorable picture of who the Plaintiff was at the Call Center.

Recording 6:

After the Plaintiff helped the caller to the best of her abilities, and after the

caller continued to ask for more, the Plaintiff choose to ask the caller what the Plaintiff believed was a fair question.  Plaintiff asked, without malice or annoyance, what the veteran would like the Plaintiff do.

Given that the caller had initially talked to another agent, Sarah Holmes, the Plaintiff went the extra mile by putting the caller on hold, to ask Holmes questions about this situation.  Holmes asked the Plaintiff to transfer the call to Holmes.  And the Plaintiff thought that this was a great idea, so that the veteran would feel understood.

Plaintiff believes that the few recordings identified by the Defendant ignore examples of the strong way in which the Plaintiff handles challenging calls, such as July 29, 2011, the

Plaintiff took a call from a veteran who shared that he is certain that he has some type of cancer on his right temple.  The patient insisted upon an appointment, which the Plaintiff set for October 3, 2011, at 1:00 pm.  This message was sent to the patient's primary care team members, as is protocol.  Christine Perry, from the veteran's primary care team messaged the Plaintiff "Why October?  Was that his preference?  The Plaintiff response, "there were no slots open for a sooner appointment."  Perry, "I think something is wrong.  I have like 5 openings just today much less before October!"  Plaintiff "I am calling this patient.  I don't remember the particulars of this.  No one answers his phone line.  I'm leaving a message to

have the patient call me back. Perry, "The patient particulars are less concerning to me than the schedule particulars. Why did you not think I had openings til October?" Matthews, "I was thinking out loud, and I don't remember what the particulars were. A better response would have been 'I'll check into this.'" Ionara Gutierez, a GS-11 from the Primary Care team, who also sat in on the Plaintiff's team lead interview a few months earlier, messaged back in response to this online dialogue, "Forwarding to Call Center Supervisor. A next available appointment was today with ample availability throughout the template. The desired date for this appointment is indicated as October as well?" Perry, "There is a recall for October that may

| | |
|---|---|
| | play into this?"  Sheila Kerr, a Primary Care team member, responded with, "Thanks for the follow up."  Gutierrez, "Appointment then should have been made earlier and recall deleted.  The Plaintiff responded with, "Patient states that he is returning from the Phillipines September 28, 2011.  This is why I've set this appointment for October 2011."  Guitierrez, "Good to go … thanks Carmen," to which the Plaintiff said, "No problem." (Exhibit 117) |
| Page 19, Line 21-26 & Page 20, line 1-18 | Plaintiff needed to move on from that call.  And, it was not unusual during that time of year to not have a primary provider to see a veteran, because is a transition time where agents had to |

| | |
|---|---|
| | wait for new residents to be assign to their positions. |
| Page 20, Line 19-28, Page 21, line 1-2 | Yes, compared to all of the stellar reviews and Kudos that the Plaintiff had received while working in the Call Center, this call, which the Plaintiff believes was influenced by the anxiety that she had experienced, in reaction to the Call Center noise, did not demonstrate the level of professionalism that she aspired to always demonstrate. (Exhibit 118) |
| Page 21, Line 3-28, page 22, line 1-13 | Plaintiff believes that this entry from the defense is really meant to be for an August 5, 2011, not August 4, 2011 call (Recording No. 6).  And Plaintiff has addressed this in the entry above. |
| Page 22, Line 14-20 | It is interesting to note that during the September 8, 2011 Weekly |

| | |
|---|---|
| | Performance Review, which was a sample that Gill used during the week of August 30, 2011, to assess the Plaintiff's performance, Gill gave the Plaintiff the following evaluation: Veteran Service: 100% Internal Customer Service: 100% Cumulative Appointment Accuracy: 83% Cumulative Calls Taken: 92% Days Not Logged in 6.5 Hours in the Past Week: 1 This evaluation of the Plaintiff by Gill contradicts the Defendant's allegations. (Exhibit 119) |
| Page 22, Line 21-27 | Plaintiff was forced by Gill to write a Report of Contact and to send it to her immediately. The Plaintiff complied, then, once home, reflected upon the truth; then, rescinded her September 2, |

| | |
|---|---|
| | 2011 Report of Contact to reflect a more accurate assessment. After Plaintiff emailed her amended ROC to Gill, Gill emailed the Plaintiff to tell her that she was not authorized to do this on VA time. (Exhibit 120) |
| Page 23, Line 1-8 | Moore wrote a Letter of Recommendation on behalf of the Plaintiff. Plaintiff believes that had Moore truly disapproved of the Plaintiff's work, Moore would not have written a letter of recommendation for the Plaintiff. (Exhibit 121) |
| Page 23, Line 14-22 | As Plaintiff explained in this document above, and elsewhere, Plaintiff did not refuse to read McDevitts' emails. Plaintiff waited to read his emails after seeing that McDonald had to correct all |

| | of his emails to the Call Center, because his messages did not communicate what McDonalds' emails had already communicated to the Call Center. |
|---|---|

DATED:     October 17, 2015

Respectfully submitted,

CARMEN MATTHEWS,

Plaintiff, pro se

CARMEN MATTHEWS
P.O. Box 23213
San Diego, CA  92193
(858) 750-9824
vjudo@hotmail.com

Plaintiff, Pro Se

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEN MATTHEWS,<br><br>          Plaintiff,<br><br>   vs.<br><br>ROBERT A. McDONALD,<br>Secretary, Department of Veterans<br>Affairs, Agency; and ROES 1<br>through 19, Inclusive<br><br>Defendants. | Case No.: 14cv1340-MMA (BLM)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: October 19, 2015<br>TIME:  2:30 pm<br>CTRM:  3A (3rd Floor – Schwartz)<br>       221 West Broadway<br><br>HON. MICHAEL M. ANELLO<br><br>NO ORAL ARGUMENT REQUESTED PER LOCAL RULE |

OCT 21, 2015
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
RECEIVED

# TABLE OF CONTENTS

I.     INTRODUCTION

II.     FACTUAL BACKGROUND

       A. BRIEF BACKGROUND OF FACTS

       B. PLAINTIFF'S SEXUAL HARASSMENT, INCLUDING QUID PRO QUO SEXUAL HARASSMENT, CLAIMING INVOLVING ROBERT ERNEST

       C. PLAINTIFF'S COMPLAINTIS INVOLVING THE CALL CENTER

       D. PLAINTIFF'S DISIBILITY CLAIM

       E. PLAINTIFF'S TERMINATION

III.     ANALYSIS

       A. STANDARD OF REVIEW

       B. PLAINTIFF CAN MAINTAIN A RACIAL AND SEXUAL HARASSMENT CLAIM AS A MATTER OF LAW

       C. PLAINTIFF AN MEET HER BURDEN OF PROOF, SUFFICIENT TO SHOW THAT A SUMMARY JUDGMENT IS NOT APPROPRIATE, THAT HER TERMINATION WAS BECAUSE OF HER RACE, GENDER, DISABILITY, REPRISAL AND WILLINGNESS TO SPEAK UP

D. PLAINTIFF'S DISABIIITY CLAIM DOES NOT FAIL AS A

MATTER OF LAW

E. PLAINTIFF'S RETALIATION CLAIMS DO NOT FAIL AS A

MATTER OF LAW

F. PLAINTIFF'S CLAIMS UNDER 42 U.S.C § 1981 AND § 1983 ARE

NOT BARRED BY SOVEREIGN IMMUNITY

G. TITLE VII IS THE REMEDY FOR PLAINTIFF CLAIMS, WHILE

THE CONSTUTITIONAL LAWS STIL APPLY TO PLAINTIFF

IV.   CONCLUSION

# TABLE OF AUTHORITIIES

## **CASES**

*Brown v. General Services Administration,*
425 U.S. 820, 835 (1976)

*Brown v. Marsh,*
777 F.2d 8, 14, (D.C. 1985)

*Burlington N. & S.F. Ry. V. White,*
548 U.S. 53, 68 (2006)

*Bundy, v. Jackson,*
641 F.2d 934, 947

*EEOC v. Renaissance III,*
No. 3:05-1063B (N.D. Tex. July 19, 2006)

*Faragher v. City of Boca Raton,*
413 U. S. 776 (1988)

*Hatley v. Hilton Hotels Corp.,*
308 F.3d 473 (4th Cir. 2002)

*Kang v. U. Lim America, Inc.,*
296 F.3d 810, 818-19 (9th Cir. 2002)

*Meritor Savings Bank v. Vinson,*
477 U.S. 57 (1986), 106 S.ct. 2405

*McDonnell Douglas Corp v. Green,*
411 U. S. 792 (1973)

*National Railroad Passenger Corp. v. Morgan,*
536 U.S. 105 (2002)

*Oncale v. Sundowner Offshore Services, Inc. et al.*
523 U.S. 78 (1988)

*Reeves v. Sanderson Plumbing,*
530 U.S. 133 (2000)
*Veterans Admin.,*
EEOC No. 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x-RNS (Sept. 21, 1998).

*Smith v. O'Neill,*
277 F.Supp.2d 12 (D.D.C. 2003)

## STATUTES

**42 U. S. C. § 1981**

**42 U. S. C. § 1983**

**42 U. S. C. § 2000e-3**

**42 U. S. C. § 200e-16**

**42 U. S. C. § 12102(2)(8)**

**42 U. S. C. § 12111(8)**

**42 U. S. C. § 1614.105(a)**

**29 C. F. R. § 1604.11**

**29 C. F. R. § 1630.20(i)**

**29 C. F. R. § 1630.2(p)**

**29 C. F. R. § 1630.2(o)(3)**

**5 C. F. R. § 315.804**

1   CARMEN MATTHEWS
    P.O. Box 23213
2   San Diego, CA 92193
    (858) 750-9824
3   vjudo@hotmail.com

4   Plaintiff, Pro Se

5

6

7

8              **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| CARMEN MATTHEWS, | Case No.: 14cv1340-MMA (BLM) |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES.IN.SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| ROBERT A. McDONALD, Secretary, Department of Veterans Affairs, Agency; and ROES 1 through 19, Inclusive | DATE: October 19, 2015<br>TIME: 2:30 pm<br>CTRM: 3A (3rd Floor – Schwartz)<br>       221 West Broadway |
| Defendants. | HON. MICHAEL M. ANELLO<br><br>NO ORAL ARGUMENT REQUESTED PER LOCAL RULE |

## I.   INTRODUCTION

Plaintiff worked at the Veterans Affairs Hospital in La Jolla

("VASDHS"), first as a volunteer in 2010.  As a volunteer, she started in the

Patient Advocates office, then moved to Member Services, before becoming an

employee in 2010 and 2011.  Allison Gill, the VASDHS Call Center

Supervisor, hired Plaintiff, without meeting Plaintiff in person. The interview was done over the phone. Before working for Gill, Plaintiff reported her supervisor, Robert Ernest, Member Services Supervisor to Elizabeth McDonald and to Labor Relations, Sheri Lacro, for sexual discrimination and non-selection. McDonald, in her email to Lacro confirmed Plaintiff's allegation against Ernest. Lacro emailed that confirmation to the Plaintiff. When questioned under oath by the VA EEO Investigator, McDonald insisted that she didn't know rather or not the Plaintiff's sexual discrimination and non-selection allegations were true, until the investigator told McDonald that he has the email from McDonald to Lacro that confirms the Plaintiff's allegations against Ernest. McDonald is the supervisor for both Gill and Ernest. Gill and Ernest's positions were both GS-9, during the Plaintiff's VASDHS employment. When Gill invited the plaintiff to a telephonic interview, she did so with, "HR says I have to interview you." May 2011, Plaintiff reported Gill for Sexual Discrimination; forcing employees to buy a department refrigerator; harassment; trying to force the Plaintiff to secure $45 from corporations to support the VASDHS Call Center team in their wish to contribute to the Coronado Navy Run; unauthorized offsite team meetings; creating a hostile environment; and, non-selection based upon discrimination. Although Marlene Carvajal told the Plaintiff that Gill was being terminated, effective immediately,

Gill was instead temporarily removed from her position, as a result of the

Plaintiff's complaint.  An Administrative Investigation Board (AIB) met to

investigate the Plaintiffs allegations.  The results of which confirmed the

Plaintiff's allegation.  Despite Plaintiffs' great evaluations by Gill, and the

many calls that veterans made on the Plaintiff's behalf, before Plaintiff -could

complete her one-year-probation, Gill recommended Plaintiff's termination,

based, according to Gill on poor customer service, wasted time and

insubordination.  Plaintiff alleges that the VA's motive for terminating Plaintiff

was based upon impermissible factors under Title VII of the Civil Rights Act.

Plaintiff also alleges that she was racially and sexually harassed during her

employment.  Plaintiff further alleges that the VA violated the Rehabilitation

Act, because the agency failed to reasonably accommodate the Plaintiff's

disability.  And Plaintiff alleges that because she was a government employee,

she had the right under due process to have been heard by an objective

committee before she was terminated, but instead the committee was postponed

several times until long after the Plaintiff had been terminated.  Plaintiff further

alleges that her second level supervisor, Elizabeth McDonald believed and said

to the Plaintiff that anyone who files an EEO complaint is a problem employee

to be gotten rid of.  Plaintiff relies upon not only her documented evidence, but

also the pattern of events that she experienced.  While Plaintiff was still

employed at VASDHS, Plaintiff contacted an EEO Counselor (Sophia Eaves, and Gary P. Sugg), after being referred to the EEO Counselors by Tanisha Jackson, at the Patient Advocates office. Plaintiff had some discussions over the phone with Sophia Eaves, August 2011. Plaintiff later was assigned to work with Carolyn Patterson, an EEO Counselor in Los Angeles, who kept rewording the Plaintiffs' claims, telling the Plaintiff she "sounded too legalise." On numerous occasions, Plaintiff sought help with how the noise in her work environment had an adverse impact upon her health. Plaintiff secured Employee Health documentation that confirmed her anxiety and panic attacks associated with her work environment. Plaintiff initiated paperwork August 2011, in hopes of resolve this matter, by getting out of the Call Center. Plaintiff is disabled as a result of her having to endure what led her to have panic attacks and anxiety. Plaintiff met with a counselor prior to leaving the VA who confirmed her disability. Plaintiff discontinued her counseling until recently, when she was so overwhelmed with anxiety that she nearly fell over a banister to the first floor. The VASDHS EEO Manager created many delays in processing the Plaintiff's request for reasonable accommodation. One of the delays was to tell the Plaintiff that her letter from her provider was not good enough. Another delay was when Carvajal introduced the Plaintiff to Lisa Carvajal, the daughter of Marlene Carvajal, who was also he Worker's

Compensation Specialist.  Plaintiff declined the Workers Compensation offer

made by Marlene and Lisa Carvajal.  Plaintiff was terminate, September 28,

2011, prior to being given her reasonable accommodation.  Plaintiff, being pro

se, based her claims on both Title VII, as well as statutes and laws, not

recognizing that Title VII is the exclusive remedy for federal employee

discrimination claims.  Plaintiff ask the Court to give the Plaintiff some leeway

in that she did the best that she knew at the time, in selecting statutes, laws and

Title VII in support of her claims.

Plaintiff recognizes that she has the burden of coming forth with specific

and substantial evidence of either discrimination or retaliation.  Plaintiff has a

great deal of evidence and Plaintiff requests that the Court grant the Plaintiff's

opposition to Defendant's summary judgment motion.

## II.    FACTUAL BACKGROUND

## A. BRIEF BACKGROUND OF FACTS

Plaintiff started volunteering at the VA, July 5, 2010, in the Patient

Advocate's office of the hospital where she revamped the "We Care/We Listen"

brochure designed to encourage veterans and their loved ones to partner with

their VASDHS providers (Plf. Ex. 1).   October 2010, Plaintiff transferred her

volunteer work to Member Services, reporting to Robert Ernest.  Plaintiff

volunteered in Member Services until she complained about Ernest's sexual

discrimination against the Plaintiff, late November 2010 (Plf. Ex. 2).  She was hired by Allison Gill for a paid position in the VA Call Center, December 2010. Gill never met the Plaintiff, face-to-face, prior to hiring her.  Their interview was over the phone, only.

During Plaintiff's April 21, 2011, Mid-term review, which was made by Allison Gill, Plaintiff was rated as "Fully successful" at her half way point of her one-year-employment probation.  (Plf. Ex. 18)

Two weeks after beginning her position at the Call Center, the Plaintiff interviewed for a GS-07 position with Harry Klemfuss, (Plf. Ex. 5) but was told by HR that she couldn't take that position, because she had already accepted the Call Center position.

May 12, 2011, Plaintiff met with Marlene Carvajal, the then EEO Manager for VASDHS, and filed a written report.  (Plf. Ex. 3)  Carvajal directed the Plaintiff to request time to meet with EEO from her supervisor, before meeting with Carvajal (Plf. Ex. 101) During her meeting with Carvajal, Plaintiff talked about Gill and Robert Ernest, but was shot down by Carvajal on the subject of Ernest.

Plaintiff reported Gill's screaming; having a dress code that differed based upon gender; favoritism towards men; an unauthorized offsite luncheon; forcing employees to pay for into Gill's credit card for a refrigerator, prevention

of Plaintiff from doing her job; Gill shutting down the Call Center computer system, preventing veterans from calling into, while VA employees were offsite; trying to force Plaintiff to secure money from corporations, in support of Gill's attempt to make the Call Center employees participate in an offsite, Coronado Bridge Navy Run Family Fundraiser; and, Gill's creating a hostile work environment.

During Plaintiff's meeting with Carvajal, Carvajal, referring to Plaintiff's supervisor, said, "She is so out of here!" (Plf. Ex. 3). Carvajal then told Plaintiff that Gill would be terminated by the next morning. But, instead, Gill was removed from her position, and placed in an Administrative position while the Administrative Board of Investigation ("AIB"), convened.

The Office of Resolution Management asked Gill's supervisor, Elizabeth McDonald why Gill had been transferred out of the Call Center so many times. McDonald's reply didn't answer this question. (Plf. Ex. 57)

After Gill's first return to the Call Center, August 2, 2011, she instituted a Weekly Performance Evaluation to evaluate the Call Center Agents, one-on-one. The Plaintiff's weekly evaluation scores by Gill were all high numbers from the first evaluation to the last evaluation, which was days before being terminated. (Plf. Ex. 124). The Plaintiff also received many Kudos from

veterans who wanted to share their appreciation for the value of the Plaintiff's commitment to serve them.  (Plf. Ex. 122).

The Office of the Inspector General, the "Union Tribune," and the "San Diego Reader," all reported that Gill's leadership in the Call Center puts the health of all veterans throughout San Diego County at risk.  (Plf. Ex. 125)

VASDHS Management viewed Plaintiff's EEO complaints as reasons to find a way to get rid of Plaintiff, when Plaintiff's second level supervisor, Elizabeth McDonald told the Plaintiff, "You have a bad attitude.  Allison was always trying to find a way to get rid of you.  Anyone who files those kinds of complaints that you filed is a problem employee to be gotten rid of." (Plf. Ex. 39)

Through Plaintiff's Call Center employment, she complained of how noise level was affecting her breathing.  Plaintiff visited Employee Health, wrote two Incident Reports, and referred Plaintiff to see her primary provider.  Plaintiff's primary provider, a VASDHS physician diagnosed Plaintiff as having panic attacks related to her work environment.  Plaintiff met with Gill to discuss Plaintiff's Employee Health Incident Reports. (Plf. Ex. 53)  Gill did not initiate Reasonable Accommodation at that time, before then, nor later, but instead told the Plaintiff that she couldn't do anything about that.  Plaintiff tried to get Reasonable Accommodation from both Sheri Lacro and Marlene

Carvajal.  Lacro never responded to that request.  And Carvajal required Plaintiff to secure a letter from her provider, who at the time was a VASDHS Physician.  Carvajal rejected the first letter written by the Plaintiff's Physician, and directed the Plaintiff to get a better letter from her provider.  The Plaintiff secured a second letter from her physician.  (Plf. Ex. 126)

Plaintiff contacted the Los Angeles VA EEO Office for the first time, July 7, 2011, and then August 16, 2011, based upon help from Tanisha Jackson, from the Patient Advocates' office.  (Plf. Ex. 127)

Plaintiff was terminated September 28, 2011.

## B. PLAINTIFF'S SEXUAL HARASSMENT, INCLUDING QUID PRO QUO SEXUAL HARASSMENT, CLAIMING INVOLVING ROBERT ERNEST

While volunteering at Member Services, Plaintiff's supervisor, Robert Ernest said to two men on the team, and within the Plaintiff's presence, "Where's my little helper?   Y'all can't have her.  She is my little helper. She is all mine." Plaintiff responded with, "Gee, should I have worn a Playboy Bunny suit and hopped around?"  Ernest and the other men looked shocked.  Ernest then walked away, saying nothing.  (Plf. Ex. 128)

Days later, VA employees had an after-work-off-site party.  Ernest invited the Plaintiff to ride with him to the party.  At the end of the party, as

Plaintiff was about to leave, Ernest insisted that Plaintiff allow him to give her a ride home.  During the drive, Ernest invited the Plaintiff to come home with him.  Plaintiff declined.  Plaintiff also felt as though Ernest was trying to put pressure on her.  Plaintiff asked Ernest to drop her off at the trolley station, which he did.  (Plf. Ex. 128)

During the following week, twice when Plaintiff entered Ernest's office, Ernest made noises like he was eating food and enjoying it.  And he would describe to Plaintiff how good the food was that he had cooked.  Ernest voice, and overall demeanor was one that attempted to bait the Plaintiff into a sexual experience.  Because the Ernest kept making sexually suggestive sounds, and otherwise ignoring her business questions when she entered his office, Plaintiff felt Ernest was playing games with her.  (Plf. Ex. 128)

November 2010, Plaintiff interviewed for a paid position with Eva Schultz and a panel of three others.  Schultz was one of Ernest's peers and reported to the same manager as Ernest.  Ernest asked the Plaintiff how that interview went.  The Plaintiff told him that it went well.  That same day, Ernest tasked the Plaintiff with a menial project that required the Plaintiff to stuff flyers in notebooks.  After the Plaintiff visited Ernest's office several times, trying to get the supplies to do her job, Ernest ignored her.

Plaintiff felt minimized and as though she was up against a manager who expected her to have sex with her, as part of her right to be there. Plaintiff walked off the job two hours before she normally would have left for the day, as a volunteer.

The next week, Ernest asked the Plaintiff what happened to her. Plaintiff saw this as an opportunity to confront Ernest about how she felt that he had intentions that had nothing to do with work. Ernest reacted with, "I'm gonna make sure you never have a paid VA position." Plaintiff interpreted this to mean that Ernest was a man who expected a woman to have sex with him to make him feel important, and to get a job.

Plaintiff did not get the job for which she interviewed with Eva Schultz.

November 2010, Plaintiff complained about Ernest to Elizabeth McDonald, his supervisor, and to Sheri Lacro of Labor Relations. (Plf. Ex. 2)

Lacro forwarded the results of the Plaintiff's complaint against Ernest, which was an email from McDonald, confirming the Plaintiff's allegations and stated she is going after Ernest. McDonald denied under oath having investigated Plaintiff's complaints about Ernest quid pro quo offer, and that she believed the Plaintiff's allegations when she spoke to the ORM

Investigation, until the investigator referred to the email that McDonald sent Lacro regarding this issue.  (Plf. Ex. 56)

Later, during Plaintiff's much delayed employment mediation meeting, McDonald stated to the Plaintiff, "You have a bad attitude.  Allison was always trying to get rid of you.  Anyone who files those kinds of complaints is a problem employee."

## C. PLAINTIFFS' COMPLAINTS INVOLVING THE CALL CENTER

1. <u>Plaintiff's Allegations in Support of Her Racial Discrimination Claims</u>

Plaintiff alleges that she experienced five types of racial discrimination while working at the Call Center:  (1)  Hostile work environment; (2) Adverse treatment against the Plaintiff for associating with other black people in the Call Center, and within VASDHS; (3) Insulting/demeaning statements based upon the Plaintiff's race; (4) Restricting Plaintiff's chance for advancement, based upon her race; and, (5) Segregating employees, based upon race policy, by changing how she spoke to the Plaintiff from standard (White English) to Ebonics (Black English), she did not answer the Plaintiff's question.  Nor did Adams tell the Plaintiff that she would get back to the Plaintiff with an answer.   Because the Plaintiff is Black, does not speak Ebonics, is degreed in Linguistics, and studied Ebonics, the Plaintiff perceived Adams' vernacular change as communicating to the Plaintiff, "If you don't get what I am telling you, give up your membership to the black race."

The Plaintiff perceived Adams' change to Ebonics as her passive-aggressive way of insulting the Plaintiff.  The Plaintiff also perceived Adams' change in how she treated the Plaintiff, after Adams had been promoted to a lead position, and the Plaintiff was not selected for that promotion, coupled with the many times that Adams tried to force the Plaintiff to "admit" that she was paying veterans for the many calls that the Plaintiff received, complimenting her for how well she helped them, as offensive, an unreasonable with the Plaintiff's work, one of the ways in which Adams was allowed by management to affect the Plaintiff's psychological well-being.  Prior to termination, Plaintiff was in counseling after her VASDHS primary provider referred her to counseling for her anxiety and panic attacks. Plaintiff had discontinued counseling, because she couldn't afford to pay the fee. Plaintiff is now in for her panic attacks.  (Exhibit 90)

The Plaintiff believed that although Adams behaved this way toward the Plaintiff, because she felt threatened by the Plaintiff's not being what many expect black people to be; threatened by the Plaintiffs' skills, talents, and connections, the Plaintiff believed that the VASDHS management encouraged Adams to unreasonably interfere with the Plaintiff's work performance; and that management either knew of Adams behavior or should have been aware of it.

Plaintiff believed that her association with two black women in the Call

Center:  Anita Mitchell and Barbara Harvey, RN, led the Plaintiff's supervisor,

Allison Gill to racially discriminate against the Plaintiff.

Barbara Harvey, RN, not only created the VASDHS Call Center, she also had an

ongoing adverse history with the Plaintiff's supervisor.

When the Plaintiff interrupted Gill and her manager, Elizabeth McDonald

during a Call Center team meeting, to let everyone know that Harvey was moving

her refrigerator from the Call Center to her new office, Gill blamed the Plaintiff for

causing Gill problems.  Her attitude was, in the Plaintiffs' eyes, "You people

(black folks sticking together) better not bother me anymore, or else."  (Exhibit 91)

Anita Mitchell, long-time, VASDHS employee, in the Errata of her June 2015

deposition, described the Plaintiff's supervisor as being "She was okay with white

people if they had an attitude, but not black people."  Mitchell went on to say that

Gill was threatened by black people who speak up.

Mitchell also describes in her deposition and errata that when she went to

Gill about a veteran calling Mitchell a nigger, Gill told her to not worry about this.

This, in Mitchell's mind meant that Gill was indirectly calling Mitchell a nigger.

Mitchell also stated that Gill never addressed and resolved this conflict with

Mitchell. (Exhibit 91)

Donna Camp, a former VA employee who had been terminated by Allison Gill, and who had over twenty years of service working at the VA, described her racial discrimination experiences in her errata sheets by saying that she didn't speak up about Allison Gill's racism, because Camp feared that Gill would use this as a reason to fire her.

Camp also stated that Gill "let the white boys, Aaron and Adam, get away with a lot of stuff." She went on to say, "if I were white and kissed up to Allison, things might have been different." (Exhibit 92)

Plaintiff believes that Gill has a problem being around black people, especially those who disagree with Gill. Plaintiff's belief is based upon direct observations of Gill and how she treated people according to their race.

Plaintiff also believes that she was denied the following opportunities, because of her race:

(1)   Plaintiff's second level supervisor, Elizabeth McDonald, emphatically blocked the Plaintiff's contributions to the HAS Morale Team. Gill later denied the Plaintiff from continuing to participate with this group.

(2)   After Gill asked the team to write an article for the new newsletter, the Plaintiff was the only team member to agree to write that article for the team. Gill never acknowledged Plaintiff's contribution, and never used that contribution.

(3)   Early January 2011, Plaintiff applied and was interviewed for a more appropriate position in another department.  Human Resources said Plaintiff could not accept that position, because she had already accepted the Call Center position.  Plaintiff believes that Gill and McDonald were involved in that decision.

(4)   When Ted Napolitano, former Director of Patient Advocates wanted to hire the Plaintiff, months after Plaintiff had filed her EEO complaint against Allison Gill, and just after Marlene Carvajal, the EEO Manager had begun to ask the Plaintiff questions regarding her Request for Reasonable Accommodation, Carvajal told the Plaintiff that she couldn't be considered for that position, because it was a GS-7 position, and she had accepted a GS-9 position.

(5)   When the Secretary of the VA emailed everyone to encourage them to compete in the nation-wide VA Incentive program, June 2011, the Plaintiff reached out to McDonald and Lacro to ask if she could email anyone and everyone, to get them to vote on her two ideas.  She reached out to them, because Gill had been transferred out of the Call Center, and because Gill's order to the Plaintiff just weeks prior was for the Plaintiff to never contact anyone outside of the Call Center, unless the Plaintiff runs it by Gill first.  This order contradicted with the Secretary's message.  And,

neither McDonald nor Lacro responded to the Plaintiff's question.  Plaintiff reported this to the ORM Investigators.

(6)   Promotion to Team Lead.  While one other African-American woman was selected for that promotion, the Plaintiff believes that her promotion was a pretext.

2.   <u>Plaintiff's Allegations in Support of Her Racial Harassment Claims</u>

Plaintiff allegations in support of here racial discrimination claims are the same incidents that form the basis for her racial harassment claims.  The support for the Plaintiff's allegation are not limited to her eleven hour deposition, where her anxiety clouded her focus, and during which she was not allowed to review her notes, but instead her support depends upon the facts being presented in this summary, along with her exhibits.  Plaintiff's evidence shows a pattern of harassment that significantly escalated after the Plaintiff reported both Robert Ernest, and after Plaintiff's complaints led to Gill's first removal from her position in the Call Center.  Plaintiff believed and continues to believe that despite the Plaintiff's positive evaluations by her supervisor, McDonald, by her own words, and the fact that she lied to the VA EEO Investigator under oath about this, she intended to get rid of the Plaintiff for speaking up against being discriminated against.  And this led to the Plaintiff's termination, which the Administrative Judge

at the California Unemployment Hearing said that the Plaintiff was not terminated for the reasons stated on her termination letter.  (Exhibit 99)

       3.  <u>Plaintiff's Allegations in Support of Her Sexual Harassment Claims</u>

Plaintiff's allegations in support of her sexual harassment claims also include: September 2010, Plaintiff transferred from Patient Advocates to Member Services, after speaking to Dulce from Volunteer Services about transferring to another volunteer position, with the purpose to increase Plaintiff's chance to find a paid VA position.  Dulce recommended Robert Ernest, Supervisor of Member Services, based upon his need for help.  Plaintiff interviewed with Mr. Ernest, who asked Plaintiff of her career plans.  Plaintiff shared with Mr. Ernest that she was applying for GS-5, GS-7 & GS-9 positions.  At the close of that meeting, Plaintiff transferred from Patient Advocates to Member Services.  November 2010, Plaintiff met with both Elizabeth McDonald, who at the time was the Director of Health Administration (HAS), and Sheri Lacro, of Labor Relations.  Each meeting was separate and initiated by Plaintiff.  Ms. McDonald is the direct supervisor of Robert Ernest.  During both meetings with both Lacro and McDonald, Plaintiff reported how Robert Ernest was Sexually Harassed Plaintiff (trying to force Plaintiff to go home with Mr. Ernest; sexually innuendoes at the office, on several occasions; states made by Ernest of Quid Pro Quo; and intervening on Plaintiff's chance of being hired for a position that Plaintiff applied and interviewed for.

(Exhibit 100)  Plaintiff followed up on these meeting with an email to Sheri Lacro and Elizabeth McDonald.  November 2010, Plaintiff received an email from Sheri Lacro, which had been originated by Elizabeth McDonald, where Ms. McDonald expressed that everything that the Plaintiff complained about from Robert Ernest was true and that she was going after Mr. Ernest for what he did.  (Exhibit 2: Email originated by Elizabeth McDonald)

Also, when the Plaintiff's supervisor, Allison Gill referred to the Plaintiff on two occasions as a man, the Plaintiff took this to be a form of a threat against her potential success, as a woman, because during the first time that Gill referred to her as a man, this was after it was obvious to the Plaintiff that Gill had only hired the Plaintiff after learning that the Plaintiff protested against Gill's colleague, Robert Ernest, for his quid pro quo, and other sexually discriminatory behavior.

The second time that Gill referred to the Plaintiff as a man was after the Plaintiff emailed Gill in May 2011, requesting time off to meet with the EEO Manager. The EEO Manager had directed the Plaintiff to email a request for time off to meet with EEO.  Gill had called the Plaintiff a man, as she directed the Plaintiff into her office, asking the Plaintiff why she was going to the EEO.  From the Plaintiff's perspective, Gill's verbalized choices here had an implicit affect upon both the Plaintiff's work performance and the fact that ultimately, and despite great reviews, Gill terminated the Plaintiff's employment.  (Exhibit 101)

4. <u>Plaintiff's Allegations in Support of Her Sexual Discrimination</u>
<u>Claims</u>

Plaintiff reported this problem to the EEO Manager, May 2011. It was noted in the June 2011 AIB Hearing that the Plaintiff's supervisor, Allison Gill, applied a different dress code for women than men. This was also noted in the VA EEO investigation, and in the Plaintiff's deposition. Plaintiff also reported to the VASDHS EEO Manager how when the Plaintiff asked for help, such as computer and phone systems problems, Gill reacted to Plaintiff with, "Don't you know how to fix that!? Give it to Adam. Adam can fix anything. He is Superman!" Whenever Gill made those statements, inn reaction to the Plaintiff's need to have her phone and computer system repair, Gill delayed the Plaintiff's efforts to be more productive, because the man who Gill referred to as "Mighty Mouse" not only didn't know how to fix the problems, he didn't have IT access to do so. The Plaintiff reported this problem to Elizabeth McDonald, via email, who did nothing to resolve this. The Plaintiff also reached out to the VASDHS IT, in a number of emails, after having sent Gill several messages on this matter. It took more than two month (February to Mid-April 2011) for those problems to be resolved, leaving the Plaintiff less productive than she could have been. Also, after Gill had told the team to share any new ideas or technologies that they come up with, amongst team mates, after Gill became aware of the many resources that the

Plaintiff came up with and had shared with Call Center team mates, Gill told the

Plaintiff to pass her accomplishments to Adam Doyle, before sharing them with the

team.  And, when the Plaintiff interviewed for the open Call Center Lead position,

Gill kept interjecting Adam Doyle's name into the interview.    Doyle was

scheduled to be interviewed for the same position immediately after the Plaintiff

was interviewed for the same position.  And, while it appeared that Doyle did not

receive the promotion in pay, after that interview, Doyle was given increasingly

more responsibility to monitor productivity of Call Center employees.  Doyle was

hired six weeks after the Plaintiff had been hired, and he had no previous

healthcare, leadership, nor Systems Analysis experience, but had been positioned

as if he deserved that opportunity above the Plaintiff.  And, because the Plaintiff

had protested being sexually discriminated against, by Gill as well as Robert

Ernest, the Plaintiff continues to believe that she was harmed and retaliated against

for speaking up against being discriminated against, an that this directly resulted in

the Plaintiff not receiving training that Doyle received; denied opportunities to

transfer out of the Call Center; being denied opportunity to participate in VA

employee events; and ultimately, this, according to the Plaintiff, resulted in her

being wrongfully terminated.  And, after the Plaintiff reported Robert Ernest for

his quid pro quo offer and demand to the Plaintiff, the Plaintiff believed and

believes that because Ernest and Gill shared the same supervisor, Elizabeth

McDonald, and McDonald said anyone who reports these types of problems is a problem employee to be gotten rid of, the Plaintiff believes that the sexual discrimination against the Plaintiff that began with Robert Ernest was carried into the Plaintiff's employment at the Call Center.  The Plaintiff believes that she did not have a fair chance in light of the discrimination that she experienced under Elizabeth McDonald's leadership.  (Exhibit 102)

### 5. Plaintiff's Allegations in Support of Her Retaliation Claims

The reasons why Plaintiff believes that all discriminatory experiences and the wrongful termination that she alleges in her claims happened to her were a direct result of her having protested against Robert Ernest are numerous. After Plaintiff's protest to Elizabeth McDonald, and after McDonald emailed Sheri Lacro stating that the Plaintiff's complaints against Ernest were true and that she was going after him, Plaintiff was not brought in, to see what her skill set and potential really was.  Plaintiff was not considered for the GS-7, 8, nor 9 positions that which she had applications on file for.

Instead, Gill, the Call Center supervisor, who also, at the time, was a peer of Ernest, and who also was a direct-report to McDonald, called the Plaintiff, stating, "HR says I have to interview you."  That interview was conducted over the phone. It was never an in-person interview.   And, when the Plaintiff tried to call Gill, after the Plaintiff had accepted the offer for the position, Gill never returned the

Plaintiff's calls, making it next to impossible to find where she was supposed to report to work.  The Call Center, at that time, was located in an unmarked building, in Mission Valley, 20 minutes away from the VA hospital in La Jolla.  And from the minute the Plaintiff came on board, the Plaintiff sensed that no matter what she said or did, Gill had made up her mind to discriminate against the Plaintiff.   In the end, when McDonald told the Plaintiff during her mediation meeting, which had been postponed several times, until after she had been terminated, that "Allison had always been trying to find a way to get rid of you.  Anyone who files this type of complaint is a problem employee to be gotten rid of," the Plaintiffs' suspicions were confirmed.  The Plaintiff believed that Gill was told by management about the Plaintiff's complaint against Ernest.  The Plaintiff also believed that McDonald had made up her mind to encourage Gill and those who report to her to do things that would adversely impact the terms and conditions of the Plaintiff's employment.  (Exhibit 103)

### D. PLAINTIFF'S DISIBILITY CLAIM

1. <u>Plaintiff's Claimed Disability</u>

After several complaints on how the noise was affecting the Plaintiff's breathing, and once this problem reached a level that scared the Plaintiff, she visited VASDHS Employee Health.  Plaintiff thought she was having a heart attack. During that August 2011 visit, the nurse described the Plaintiff's problems as

"Stress, heart palpitations, tingling in upper arms, difficulty breathing in the Call Center during the time the Supervisor returned because of unnecessary additional rules and regulations, perceived threats from supervisors of punish action during meeting."  Plaintiff was advised to follow up with her primary provider, Dr. Rebecca Kaplowitz, former VASDHS physician.  The VASDHS Employee Health nurse completed two Incident Reports.  Plaintiff was called into the office by her supervisor about this, where the supervisor asked the Plaintiff "Why on earth could this have happened?"  Plaintiff reminded her supervisor, Allison Gill that Plaintiff had already reached out to her and the leads on many occasions regarding this. Gill told the Plaintiff that she couldn't do anything about this until the scheduled "build arounds" were approved and put into place.   It is interesting to note that the two VASDHS Incident Reports on this matter do not express a corrective action. Although the Plaintiff met with Gill, and the Plaintiff asked for a copy of the outcome of those forms, at the closure of that meeting, Gill resisted handing a copy to the Plaintiff, telling the Plaintiff that the report was not complete until Elizabeth McDonald completes her part.  The Plaintiff insisted upon and got a copy of that report, and never heard from McDonald, her second level supervisor about this matter.  However, VASDHS sent the VASDHS Engineering in to measure noise level in the Call Center.  When the Plaintiff emailed the entire team to ask about the results of that measurement, Gill emailed an attack to the Plaintiff that left little

to no room for resolution.  Review of the Engineering report appears to have been made long before the Plaintiff worked in the Call Center, and therefore makes it of no value to the Plaintiff or the Defense.  The Plaintiff met with her primary provider who, per Marlene Carvajal's demand, wrote a letter to express the Plaintiff's need for reasonable accommodation.  Plaintiff's primary provided labeled the Plaintiff's problems as panic attacks.  Plaintiff described how working in the Call Center felt isolating, limiting, threatening, and a no win situation that made it extremely difficult for her to breath.  During this assessment, Dr. Kaplowitz noted how the Plaintiff's vitals (weight, blood pressure, cholesterol and more) rose out of control during the Plaintiff's work at the Call Center.  Several days after the Plaintiff gave that letter to Carvajal, Carvajal said that the Plaintiff's letter from her doctor was not specific enough, and demanded that she get another letter from her provider.  Plaintiff secured a second letter from Dr. Kaplowitz. Plaintiff also had sent a request for reasonable accommodation to Sheri Lacro, but didn't get a response to this.  When the Plaintiff asked Carvajal about this, Carvajal once again told the Plaintiff to resend it; this time to Carvajal, not Lacro.  Plaintiff believed that this was an example of Carvajal and VASDHS management's attempts to stall Plaintiff's efforts to receive reasonable accommodation.  Plaintiff also believes that those efforts were part of VASDHS Management's agenda to get rid of the Plaintiff, no matter what.  Moments after Plaintiff received the second

letter from her primary provider, Plaintiff noticed that Aaron McDevitt, one of the Call Center team leads had access to her email messages.  When the Plaintiff emailed Gill about this, it appeared that Gill was falling all over herself to persuade the Plaintiff to believe otherwise.  Days later, despite her good reviews and the comments coming in from the veterans, the Plaintiff was terminated.  Plaintiff has seen a professional at the end of her VASDHS employment for her anxiety and panic attacks.  Plaintiff discontinued those visits, because she couldn't afford to continue those services once she left the VA.  Plaintiff continues to have anxiety and panic attacks. During the Plaintiff's review of the VASDHS calls, at the U.S. Attorney's office, where the Plaintiff had to mentally and emotionally put herself back into her experiences with the VASDHS Call Center, she had a full blown panic attack at the U.S. Attorney's office that continued that same day during her VASDHS Primary care appointment.  After those dangerous experiences, Plaintiff requested from her current Primary Provider, out-in-the-community counseling for her anxiety and panic attacks.  Plaintiff has approved for fifteen appointments, and has thus far attended two weeks of therapy. Plaintiff is in counseling, and is waiting for an affidavit from her counsel. Since complaining of having anxiety and panic attacks, as a direct result of her experiences with the VASDHS, Plaintiff has suffered harm in the form of psychological distress, moving more than ten times, due to loss of income, and panic attacks during basic employment screening

exams. (Exhibit 106) Plaintiff's anxiety and panic attacks are triggered by not only having to apply for and be part of jobs that make her underemployed, where she is not free to express her actual level of knowledge, skills and abilities, there are other factors. Some of the major life activities that have been limited, as a result of the Plaintiff's panic and anxiety attacks are: concentrating, sleeping, breathing and speaking (under some circumstances). And because the Plaintiff is in counseling now, she would rather her counselor provide the circumstances in which her anxiety and panic attacks are triggered. (Exhibit 107) Plaintiff's anxiety and panic attacks prevents her from: sleeping, concentrating, breathing fully, taking standardized employment exams, and sometimes speaking.

2. Plaintiff's Failure-to-Accommodate Claim

After several complaints to her supervisor, second level manager and the leads, on how the noise was affecting the Plaintiff's breathing, and once this problem reached a level that scared the Plaintiff, she visited VASDHS Employee Health. Plaintiff thought she was having a heart attack. During that August 2011 visit, the nurse described the Plaintiff's problems as "Stress, heart palpitations, tingling in upper arms, difficulty breathing in the Call Center during the time the Supervisor returned because of unnecessary additional rules and regulations, perceived threats from supervisors of punish action during meeting." Plaintiff was advised to follow up with her primary provider, Dr. Rebecca Kaplowitz, former VASDHS physician.

The VASDHS Employee Health nurse completed two Incident Reports.  Plaintiff was called into the office by her supervisor about this, where the supervisor asked the Plaintiff "Why on earth could this have happened?"  Plaintiff reminded her supervisor, Allison Gill that Plaintiff had already reached out to her and the leads on many occasions regarding this.  Gill told the Plaintiff that she couldn't do anything about this until the scheduled "build arounds" were approved and put into place.  It is interesting to note that the two VASDHS Incident Reports on this matter do not express a corrective action.   Although the Plaintiff met with Gill, and the Plaintiff asked for a copy of the outcome of those forms, at the closure of that meeting, Gill resisted handing a copy to the Plaintiff, telling the Plaintiff that the report was not complete until Elizabeth McDonald completes her part.  The Plaintiff insisted upon and got a copy of that report, and never heard from McDonald, her second level supervisor about this matter.  However, VASDHS sent the VASDHS Engineering in to measure noise level in the Call Center.  When the Plaintiff emailed the entire team to ask about the results of that measurement, Gill emailed an attack to the Plaintiff that left little to no room for resolution. Review of the Engineering report appears to have been made long before the Plaintiff worked in the Call Center, and therefore makes it of no value to the Plaintiff or the Defense.  The Plaintiff met with her primary provider who, per Marlene Carvajal's demand, wrote a letter to express the Plaintiff's need for

reasonable accommodation. Plaintiff's primary provided labeled the Plaintiff's problems as panic attacks. Plaintiff described how working in the Call Center felt isolating, limiting, threatening, and a no win situation that made it extremely difficult for her to breath. During this assessment, Dr. Kaplowitz noted how the Plaintiff's vitals (weight, blood pressure, cholesterol and more) rose out of control during the Plaintiff's work at the Call Center. Several days after the Plaintiff gave that letter to Carvajal, Carvajal said that the Plaintiff's letter from her doctor was not specific enough, and demanded that she get another letter from her provider. Plaintiff secured a second letter from Dr. Kaplowitz. Plaintiff also had sent a request for reasonable accommodation to Sheri Lacro, but didn't get a response to this. When the Plaintiff asked Carvajal about this, Carvajal once again told the Plaintiff to resend it; this time to Carvajal, not Lacro. Plaintff believed that this was an example of Carvajal and VASDHS management's attempts to stall Plaintiff's efforts to receive reasonable accommodation. Also, Carvajal introduced the Plaintiff to Carvajal's daughter, who was at the time in charge of Workers' Compensation. Carvajal, in the presence of her daughter, asked the Plaintiff to review the Workers' Comp package before making a decision of whether or not she wants reasonable accommodation or Workers' Comp. During that same impromptu meeting, Plaintiff chose to continue her request for reasonable accommodation. Plaintiff also believes that those efforts were part of VASDHS

Management's agenda to get rid of the Plaintiff, no matter what.  Moments after Plaintiff received the second letter from her primary provider, Plaintiff noticed that Aaron McDevitt, one of the Call Center team leads had access to her email messages.  When the Plaintiff emailed Gill about this, it appeared that Gill was falling all over herself to persuade the Plaintiff to believe otherwise.  Days later, despite her good reviews and the comments coming in from the veterans, the Plaintiff was terminated.  Plaintiff has seen a professional at the end of her VASDHS employment for her anxiety and panic attacks.  Plaintiff discontinued those visits, because she couldn't afford to continue those services once she left the VA. (Exhibit 108)  Plaintiff continues to believe that as the Chair of the VASDHS Reasonable Accommodation Committee, and the EEO Manager who directed the Plaintiff to ask her supervisor for permission to meet with the EEO Manager during a less productive day for the Call Center, she set the Plaintiff up to continue to be part of a hostile environment.  Plaintiff requested a work environment where employees did not scream, hit workstations, and use "violent vernacular." Plaintiff had complained not only about the constant loud noises and how they had an adverse impact against her.  The Plaintiff also complained about how Gill, the Plaintiff's supervisor screamed at her in the Call Center.

The Plaintiff's request to get out of the Call Center, where the noise level, due to how the workstations did not buffer sounds, was recognized by not only the Call Center supervisor, but also the entire VASDHS management chain of command. When the Plaintiff had a potential opportunity to move out of the Call Center, after she had requested reasonable accommodation, and move into a more appropriate position, and newly opened position, in the Patient Advocate's office, as a GS-7, Marlene Carvajal intervened, telling the Plaintiff and the then Manager of Patient Advocate, Ted Napolitano, that the Plaintiff couldn't compete for that position, because she had accepted and held a GS-5 position. The Plaintiff believed that this was part of her having been blacklisted, no matter what. And when Carvajal presented the Plaintiff with forms for consideration of where to place her, Carvajal reacted to the Plaintiff's choices by telling her that this was not a promotion. (Exhibit 109) Yes, the Plaintiff did protest to Elizabeth McDonald, Allison Gill and to April Adams that the Ron's screaming and slamming in the Call Center was extremely difficult to deal with.

And, on one of the Plaintiff's weekly evaluations by Gill, Gill not only docked the Plaintiff for reporting to the clinical team the details of a veteran caller who complained about how Ron's voice adversely affected him, Gill told the Plaintiff she couldn't do anything about that, but to punish the Plaintiff for "throwing her co-worker under the bus." Yes, the Plaintiff did protest to Elizabeth McDonald,

Allison Gill and to April Adams that the Ron's screaming and slamming in the

Call Center was extremely difficult to deal with.

And, on one of the Plaintiff's weekly evaluations by Gill, Gill not only docked the

Plaintiff for reporting to the clinical team the details of a veteran caller who

complained about how Ron's voice adversely affected him, Gill told the Plaintiff

she couldn't do anything about that, but to punish the Plaintiff for "throwing her

co-worker under the bus." (Exhibit 110)  After Carvajal told the Plaintiff that she

needed to get a note from her provider to prove that she needs reasonable

accommodation, Plaintiff told Carvajal, "That will be easy since my primary

provider is a VA doctor."   And when the Plaintiff told Carvajal that her provider is

Dr. Kaplowitz, the Plaintiff was surprised that given the release of information that

the Plaintiff had already given to Carvajal and Lacro, Carvajal didn't just directly

request that letter from Carvajal.  Plaintiff believed that Carvajal was stalling due

to VASDHS management politics.  Days after Plaintiff gave Carvajal the letter

from her primary, Carvajal told the Plaintiff that the letter "was not good enough."

And rather than just calling Dr. Kaplowitz, Carvajal directed the Plaintiff to get a

"better letter."

Plaintiff spoke to her Primary to request another letter, and she asked that she not

email the letter via the VASDHS, but instead via Outlook, because, as the Plaintiff

explained in an email to Dr. Kaplowitz, her emails were being closely watched by her team leads and supervisor.

The same day that Dr. Kaplowitz emailed the second letter to the Plaintiff, the Plaintiff also noticed that her emails had been accessed by Aaron McDevitt (one of the team leads, and one of the people who the Plaintiff had reported to Carvajal, May 12, 2011). When the Plaintiff emailed her supervisor, Gill, about this, Gill said that this wasn't true. Gill profusely tried to convince the Plaintiff that McDevitt did not access her emails. Shortly after that, Plaintiff was terminated. (Exhibit 111) While Carvajal did receive the second doctor's note until September 23, 2011, she had begun the reasonable accommodation process after she introduced the Plaintiff to her daughter, who was in charge of the Worker's Comp options. Plaintiff had declined Worker's Comp. Then Carvajal had emailed Plaintiff the reasonable accommodation forms. Also before the Plaintiff contacted Carvajal to request reasonable accommodation, the Plaintiff had reached out Sheri Lacro about this, but had not received a response from Lacro. Plaintiff told Carvajal that she had contacted Lacro before on this, and that is when Carvajal had directed the Plaintiff to get a letter from her doctor. (Exhibit 112) Though Carvajal may have been the Chair of the VASDHS's Reasonable Accommodation Committee, and though, according to the Defendant, Caravajal couldn't make a unilateral decision to on the Plaintiff's need for reasonable accommodation,

Plaintiff was never told this by Carvajal, Lacro, nor by Plaintiff's chain of command.  Carvajal also never showed the Plaintiff the alleged VASDHS Reasonable Accommodation policy.

Carvajal did, however, attempt to convince the Plaintiff to accept Worker's Comp, as a viable solution, when Carvajal introduced the Plaintiff to Carvajal's daughter, the VASDHS Workers Comp contact.  The Plaintiff declined that offer.

Also, Carvajal began collating Reasonable Accommodation details from the Plaintiff, by sending the Plaintiff documents that addressed where the Plaintiff would be willing to move to, and what type of job the Plaintiff would be willing to accept as part of her Reasonable Accommodation.

The Plaintiff emailed positions that the VASDHS that were open, and that the Plaintiff would be interested in.  Carvajal emailed back, telling Plaintiff that Reasonable Accommodation was not a promotion.  And nothing became of that that, other than Carvajal telling the Plaintiff that she needs a better letter than what the Plaintiff's VASDHS primary provider provided.

Plaintiff believed that this was all a pretext, in that Carvajal had no intent to find a better location/environment for the Plaintiff, due to the retaliation of VASDHS against the Plaintiff.

It is important to note that once the Plaintiff received a second letter from Dr. Kaplowitz, which was sent via the Plaintiff's Outlook email account, Plaintiff was terminated.

Plaintiff believed and continues to believe that Carvajal's assertion that she didn't have time to reasonably accommodate the Plaintiff, because the Plaintiff was terminated was a pretext.

Carvajal had already emailed the Plaintiff, after her EEO complaint, and before her termination, that she, the Plaintiff would experience a great deal of retaliation from VASDHS. The Plaintiff took this as a threat. And, given that Carvajal made the Plaintiff inform the VASDHS management that she was filing an EEO complaint, Carvajal had to have known at least after that, that VASDHS management was in the process of terminating the Plaintiff. Plaintiff believes that the reasons for the delays in processing her Reasonable Accommodation request mirrored the reasons why the Plaintiff's mediation meeting, to hear her grievances were delayed until long after the Plaintiff had been terminated. The Plaintiff believes that VASDHS Management had made up their minds that the Plaintiff was a problem to be gotten rid of, because the Plaintiff was willing to speak up against her EEO Rights being violated. (Exhibit 118)

### E. PLAINTIFF'S TERMINATION

Despite high scores on her weekly performance reviews by her supervisor, "fully satisfactory" status on her mid-term review, also by Plaintiff's supervisor; and, despite the many calls received from veterans around San Diego, thanking the Plaintiff for her work in the Call Center, Plaintiff's second level supervisor recommended to Lacro that the Plaintiff be removed from employment. (Plf. Ex. 122; Plf. Ex. 18, & Plf. Ex. 124)  When asked by the ORM Investigator rather or not Sheri Lacro investigated the Plaintiff's supervisors' reasoning to terminate the Plaintiff, Lacro, Labor Relations Specialist said no.  (Plf. Ex. 129)

As a Federal employee, Plaintiff was not given the opportunity to be heard by an objective mediation board before she was terminated.  The EEO Department scheduled a mediation, which they postponed several times, more than a month after the Plaintiff had been terminated.  During that mediation meeting, McDonald told the Plaintiff that she has always been a problem employee and that Gill was always searching for a way to get rid of the Plaintiff.

Because of the way that Plaintiff's termination letter was written, initially Plaintiff was denied Unemployment Benefits.  However, the Administrative Judge who presided over the Plaintiff's hearing ruled that the Plaintiff was not terminated for the reasons stated on the Plaintiff's termination letter.  (Plf. Ex. 130)

Plaintiff also has many Letters of Recommendation from current and former VA employees, to include Brenda Moore, who appreciated the Plaintiff's customer service, diligence and resourcefulness. (Plf. Ex. 123)

### III.    ANALYSIS

### A. STANDARD OF REVIEW

Summary judgment is only proper when material facts are not in genuine dispute. 29 C.F.R. § 1614.109(g) Only a dispute over facts that are material to the outcome of the case should preclude judgment. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 248 (1986) The opposing party must identify the disputed facts in the record, or demonstrate that there is a dispute y producing affidavits, or records that tend to disprove the facts asserted by the moving party. The non-moving party must also explain how the facts in dispute are material under the legal principles applicable to the case. 29 C.F.R. § 1614.109(e)(2)

### B. PLAINTIFF CAN MAINTAIN A RACIAL AND SEXUAL HARASSMENT CLAIM AS A MATTER OF LAW

Under Title VII, to establish a prima facie case of racial and sexual harassment as a matter of law, Plaintiff must show that: (1) she belongs to a class of individuals protected under Title VII; (2) she was subjected to unwelcome conduct related to her protected class; (3) the harassment complained of was based upon her membership; (4) the harassment had the purpose or effect of

unreasonably interfering with her work performance and/or creating an

intimidating, hostile, or offensive work environment; and, (5) there is a basis for

imputing liability to the employer.  Roberts v. Department of Transp.  EEOC

Appeal No. 01970727 (Sept. 15, 2000); McCleod v. Social Security Admin.,

EEOC Appeal No. 01963810 (Aug. 5, 1999) (Citing Henson v. Dundee), 682 F.2d

897 (11th Cir. 1992)).

    In determining whether the Plaintiff has set forth an actionable claim of

harassment, the conduct in question must be viewed in the context of the totality of

the circumstances, and must consider the nature, frequency of the offensive

encounters, and the amount of time over which the encounters occurred.  29 C.F.R.

§ 1604.11(b)

    Conduct that leads to a valid claim of harassment/hostile work environment

must be objectively and subjectively serious such that a reasonable person would

find the work environment to be hostile or abusive, and that the Plaintiff did in fact

perceive it to be so.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)

    Once a prima facie case is established, the burden then shifts to the Agency,

who must articulate a legitimate non-discriminatory reason for its actions.  Texas

Dep't of Cmty. Affairs v. Burdine, 450 U.S 248, 253 (1981).  If the Agency

articulates a non-discriminatory reason for its action, the burden shifts back to the

Plaintiff who is then required to prove that the Agency's actions were pretextual

for discrimination. <u>Id</u>.  The Plaintiff always retains the burden of persuasion, and it is here obligation to show by a preponderance of the evidence that in reality the basis of the Agency's action was a prohibited reason. <u>St. Mary's Honor Ctr. V. Hicks</u>, 509 U.S. 502 (1993); <u>U. S. Postal Serv. Bd. Of Governors v. Aikens</u>, 460 U.S. 711, 715-716 (1983).

C. PLAINTIFF CAN MEET HER BURDEN OF PROOF, SUFFICIENT TO SHOW THAT A SUMMARY JUDGMENT IS NOT APPROPRIATE, THAT HER TERMINATION WAS BECAUSE OF HER RACE, GENDER, DISABILITY, REPRISAL AND WILLINGNESS TO SPEAK UP

A hostile work environment claim generally requires a showing of a pattern of offensive conduct. <u>Sapp v. City of Warner-Robbin</u>, 655 F.Supp, 1043, 43FEP Case 486 (MD. GA. 1987) The Plaintiff has shown by her evidence a discriminatory/hostile pattern that began with her volunteer work, which was carried over well into her paid position that she experienced to her termination. Though Plaintiff's supervisor promoted April Adams, another African-American woman above the Plaintiff, the Plaintiff believed that this was a pretext.  Adams change from Standard English to Ebonics communicated a clear signal to the Plaintiff that Adams considered that Plaintiff as not "acting like she is black." <u>EEOC v. Renaissance II</u>, No. 3:05-1063-B (N.D. Tex July

1   19 2009.  And when the Plaintiff's second level supervisor told her that her first

2   level supervisor was always trying to find a way to get rid of her, because

3   anyone who files EEO complaints is an employee to be gotten rid of, Plaintiff

4

5   beliefs about how management discriminated against her were further validated.

6   Exhaustion under Title VII should never be allowed to become so formidable a

7   demand that it obscures the clear Congressional purpose of rooting out every

8

9   vestige of employment discrimination with the Federal government.  Brown v.

10  Marsh 777 F.2d 8, 14, 39 FEP 505 (D.C. Ci. 1985)  Failure to comply with

11  procedural requirements is not a jurisdictional bar to suit but is subject to

12

13  equitable tolling, estoppel, and waiver.  Blackmon-Malloy, 575 F.3d 705  And

14  in Brown v. GSA, the Supreme Court described the federal administrative

15  exhaustion requirements and time limitations as "rigorous."  425 U.S. 820, 833,

16

17  12 FEP 1361 (1976)  With direct evidence, Plaintiff under McDonnell Douglas

18  Corp. v. Green, 411 U.S. 792 (1973) has established a prima facie case of

19  discrimination.  Though Plaintiff cannot contest what is on the six of many

20

21  recordings that the VA has used against her, the Plaintiff can contest that the

22  interpretation of that some sample, in light of not only many other recordings,

23  coupled with: Plaintiff's great reviews from her supervisor; compliments from

24

25  veterans; letters of recommendation from other VA employees; the ruling of the

26  Unemployment Administrative Judge, the Plaintiff was qualified to do her job.

27

28

Plaintiff can show that one of the letters of recommendation, which was signed twice in a time span of seven months, and which was from one of the Plaintiff's supervisors, Brenda Moore, who is African-American, further demonstrates that the Plaintiff was qualified to do her job.  Plaintiff can show by the fact that McDevitt was one whom the Plaintiff reported for misconduct on several occasions, any complaints that he had later about the Plaintiff was merely based upon revenge.   And although the Plaintiff does not have access to the Call Center IT records, yet, Plaintiff is currently reviewing a large sampling of calls from all Call Center employees, as part of her continued discovery for this case. Plaintiff has thus far identified many inappropriate conversations between Call Center employees and veteran callers.

To be considered similarly situated to Plaintiff, Plaintiff must show the individual is similar in all material respects.  Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006).  Plaintiff has presented evidence that Aaron McDevitt, a probationary employee with less experience than the Plaintiff, who began working at the VA less than one month prior to the Plaintiff had conduct problems that were substantiated.  Examples of substantiated proof include but are not limited to McDevitt's trying to force the Plaintiff to secure $45 for the Call Center employees in support of an offsite event.  Plaintiff reported this to the Carvajal during her EEO meeting.  Plaintiff also reported one employee,

Ronald Bridgeforth who was a probationary employee working in the Call Center whose yelling and offensive behavior towards the callers was had an effect upon the Plaintiff's level of anxiety and ability to focus. Gill punished the Plaintiff for this, by telling the Plaintiff that she couldn't do anything about this, and that she was docking the Plaintiff for "throwing her co-employee under the bus," for reporting this problem. Although three supervisors stated that Plaintiff was not a good fit for the position, the Defendant ignores the fact that one of the supervisors wrote a great letter of recommendation on behalf of the Plaintiff. Another of those supervisors gave the Plaintiff great reviews. And the third supervisors, which the other two report to, stated that anyone who makes EEO complaints is a problem employee to be gotten rid of. That same supervisor tried to lie under oath while being investigated by the ORM for rather or not she investigated and found to be true the Plaintiffs' allegations against her supervisor. This makes the VA's articulated non-discriminatory reasons for terminating the Plaintiff pretextual.

D. PLAINTIFF'S DISABIIITY CLAIM DOES NOT FAIL AS A MATTER OF LAW

Under the Rehabilitation Act, an employer is forbidden from discriminating against a qualified individual with a disability because of that individual's disability. 42 U.S.C. § 12112(a); <u>Bates v. United Parcel Serv.</u>, 511 F.3 974, 988

(9th Cir. 2007)  To prevail on a claim of unlawful discharge under the Rehabilitation Act, Plaintiff must establish:  (1)  she is a disabled person with the meaning of the Act; (2)  she is qualified, meaning she is able to perform the essential functions of the job; and, (3) the VA terminated her because of her disability.  42 U.S.C. § 12111(8); <u>Bates</u>, 511 F.3d at 989; <u>Cooper v. Neiman Marcus Grp.</u>, 125 F.3d 786, 790 (9th Cir. 1997).  Plaintiff has the burden of providing she is a "qualified individual with a disability" under the Act.  <u>Bates</u>, 511 F.3d at 988.

A "disability" is statutorily defined as a physical or mental impairment that substantially limits one or more of the individual's major life activities.  42 U.S.C. § 12102(2).  Working can be considered a "major life activity."  Plaintiff is currently in counseling, which was referred by the VA to an "out in the community" healthcare.  After she nearly fell over the railing to the next floor, post reviewing Call Center recordings in the U. S. Attorney's office, the VA referred her to a counselor.  Plaintiff has suffered anxiety, panic attacks, breathing problems, sleep deprivation, and difficultly taking basic employment application exams, as a result of her disability.  Plaintiff is seeing that counselor once per week for her anxiety and panic attacks.  Plaintiff is awaiting an affidavit from her counsel, to be used as part of her proof that she has a disability, according to the Rehabilitation Act.

Given the many times that the Plaintiff complained about how the noise in the Call Center was effecting her, and given the delays in which the Plaintiff was given by VASDHS management in processing her request for reasonable accommodation, Plaintiff's request for reasonable accommodation was valid. Plaintiff spoke up about her need for reasonable accommodation several times. The VA Employee Health Nurse established anxiety problems that the Plaintiff was having as a result of working in the Call Center. Plaintiff saw a counsel prior to leaving the VA, but couldn't continue services once terminated, because she had no income. Also, even though Gill recommended to McDonald that the Plaintiff be terminated, the Defendant's argument ignores the fact that Gill's performance reviews of the Plaintiff for the entire time that the Plaintiff worked in the Call Center were good. This also ignores the fact that Gill's first time being transferred out of the Call Center was after the Plaintiff reported Gill's discriminatory and lack of professionalism. And, The VA OIG, as well as three other entities: "Federal Medicine Magazine," "Union Tribune," and "San Diego Reader" reported that Gill's leadership in the Call Center was putting the health of all veterans throughout San Diego County at risk. Plaintiff believed that Gill, having seen from the Plaintiff's resume, that the Plaintiff freelances as a journalist, blamed the Plaintiff for those reports.

E.  PLAINTIFF'S RETALIATION CLAIMS DO NOT FAIL AS A MATTER

   OF LAW

Pusuant to EEOC Regulation 29 C.F.R. § 1614.101(b), no person shall be

subject to retaliation for opposing any practice made unlawful by Title VII.  To

successfully state a prima facie case of reprisal, a Plaintiff must show that:  (1)

she engaged in a protected action; (2)  the VA was aware of the protected

action; (3) subsequently, she was subjected to the Agency's actions adverse

treatment on the Plaintiff; and, (4) that a causal nexus existed between the

Plaintiff's protected action and employer's adverse treatment of her.  <u>Whitmire</u>

<u>v. Dep't of the Air Force</u>, EEOC Appeal No. 01A00340 (Sept. 25, 2000).

Protected activity is defined as and consists of:  (a) an action that opposes a

practice which is made unlawful by one of the employment discrimination

statutes; or, (b) filing a charge, testifying, assisting, or participating in any

manner in an investigation, proceeding, or hearing under the applicable statute.

<u>EEOC Compliance Manual Section 8</u>, "Retaliation," No. 915.003, at 8-1.A

(May 20, 1998).  The statutory retaliation clauses prohibit any adverse

treatment that is based on retaliatory motive and is reasonably likely to deter the

Plaintiff from engaging in protected activity.  <u>Quinones . Department of the</u>

<u>Interior</u>, EEOC Request No. 05920869 (May 14, 1993).

Plaintiff has shown by her email dialogue evidence that because the EEO manager required the Plaintiff to ask for time to meet with her, the VA Management was well aware of the Plaintiff's EEO complaints.  Also, because the AIB witnesses included the Plaintiff, along with her chain of command, VA management was well aware of the Plaintiffs complaint.  And, when the Plaintiff emailed the EEO manager to ask for time to meet in a quiet space, during work time, to compile the facts that she has to support her allegations, the EEO manager's response included comments that demonstrated that management knew of the Plaintiff's EEO complaints.

F. PLAINTIFF'S CLAIMS UNDER 42 U.S.C § 1981 AND § 1983 ARE NOT
   BARRED BY SOVEREIGN IMMUNITY

As a pro se Plaintiff, the Plaintiff was not aware that Title VII trumps 42 U.S.C § 1981 & § 1983, until being at this juncture of this journey.

G. TITLE VII IS THE REMEDY FOR PLAINTIFF CLAIMS, WHILE THE
   CONSTUTITIONAL LAWS STIL APPLY TO PLAINTIFF

At this time, Plaintiff has no argument against Constitutional and state law claims, with the exception that it is a Constitutional right of all government employees under the due process clause to be heard by an objective body before that employee is terminated.  The Plaintiff was not given that opportunity.  The

mediation meeting for the Plaintiff position had been delay several times by the

EEO office, until after the Plaintiff's termination.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff requests the Court to grant her

Opposition to Defendant's Motion for Summary Judgment in its entirely.

DATED:   October 19, 2015              Respectfully submitted,

                                       CARMEN MATTHEWS
                                       Plaintiff, pro se

1   CARMEN MATTHEWS
    P.O. Box 23213
2   San Diego, CA 92193
    (858) 750-9824
3   vjudo@hotmail.com

4   Plaintiff, Pro Se

5

6

7

8              UNITED STATES DISTRICT COURT
9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  CARMEN MATTHEWS,              )  Case No.: 14cv1340-MMA (BLM)
                                  )
                  Plaintiff,      )  **PLAINTIFF'S TABLES OF**
12         vs.                    )  **EXHIBITS**
                                  )
13  ROBERT A. McDONALD,           )
    Secretary, Department of Veterans )
14  Affairs, Agency; and ROES 1   )
    through 19, Inclusive         )
15                                )
                                  )
16  Defendants.                   )
                                  )
17  _____

18

| 1 | VASDSHS Quality Control Brochure Created by the Plaintiff | |
| 2 | Email Dialogue between McDonald and Lacro Acknowledging that Plaintiff's quid pro quo Complaints are True | |
| 3 | EEO Manager Notes | |
| 4 | Plaintiff's Deposition | |
| 5 | Email from Harry Klemfuss, regarding GS-7 Interview for Plaintiff | |

1

| 6 | Gill's Refusal to Respect the Plaintiff's Efforts to Contribute to the Team | |
| 7 | Plaintiff Supervisor Ordering Her Crochet Her a Ski Cap | |
| 8 | Plaintiff Reported that Gill Ordered Team to Attend an Unauthorized Offsite Party | |
| 9 | Gill Ordered Plaintiff to Ride in Her Car to Return from Unauthorized Party | |
| 10 | Gill Discussed with Plaintiff Her Relationship with Men, and that she Had Owned the Car that a Male Employee was Driving in Front of Us | |
| 11 | Gill Turned the Plaintiff's Computer & Phone Problems into Sexual Harassment and an Hostile Environment | |
| 12 | Gill Confuses Plaintiff's Successes with that of Another African-American Co-employee | |
| 13 | McDevitt, on Behalf of Gill Trying to Force Plaintiff to Secure Money for Teammates to Attend the Annual Coronado Navy Run Fundraiser | |
| 14 | Gill's Email to the Call Center Team About the Coronado Bridge Run | |
| 15 | Gill's Email to the Call Center Team About the Coronado Bridge Run | |
| 16 | Plaintiff's VA EEO Affidavits about Sarah Holmes, asking If Anyone Could Apply for the Open Team Lead Positions | |
| 17 | Gill Told Plaintiff She Wouldn't Be Considered for a GS-9 HAS Position | |
| 18 | Plaintiff's Mid-Term Review | |

| 19 | Email Dialogue Between Plaintiff and Gill About How the Noise is Affecting the Plaintiff | |
| 20 | Email from Plaintiff to Gill, In Support of Barbara Harvey's Concerns | |
| 21 | How Call Center Leadership Miss-Handled Plaintiff's Work Schedule Concerns | |
| 22 | Gill and McDonald Scapegoat Plaintiff for Harvey's Call Center Changes | |
| 23 | Gill's emails to Plaintiff, Demanding Plaintiff's Attention | |
| 24 | Adams Tried to Force the Plaintiff to Say She Paid Veterans to Call in to Compliment Her Work | |
| 25 | Plaintiff Called in Sick - Plaintiff's VA EEO Affidavit | |
| 26 | Gill's Email to Plaintiff, Threatening to Have Punished Plaintiff | |
| 27 | Plaintiff's Involvement VASDHS Management Email Showing Their Disrespect for One Another | |
| 28 | Gill Trying to Force the Team to Pay for Her Refrigerator | |
| 29 | Plaintiff's Preparation Notes Before Meeting with EEO | |
| 30 | Email From VASDHS HR About Team Lead Interview | |
| 31 | Plaintiff's Call Center Promotion Interview | |
| 32 | Team Lead Non-selection Email | |

3

| 33 | EEO Manager Directed Plaintiff to Ask Supervisor When It Would be Okay to Meet with EEO | |
| 34 | Supervisor Tried to Bully Plaintiff Out of Going to EEO | |
| 35 | Plaintiff's Notes Before Meeting with EEO | |
| 36 | Reasons Why Plaintiff's Initial EEO List of Complaints Grew | |
| 37 | EEO's Meeting Notes | |
| 38 | Plaintiff's Notes Before Meeting with EEO | |
| 39 | Dr. Kwi Bulow's Notes on McDonald's Admission that the Plaintiff's Termination was a Result of Plaintiff's EEO Complaints | |
| 40 | Plaintiff's Justification for McDevitt's Claim that Plaintiff Stopped Working without Permission | |
| 41 | EEO Manager's Warning that the Plaintiff Would Experience Retaliation | |
| 42 | Moore Assigned Plaintiff to Morale Team Lead for the Call Center | |
| 43 | McDonald Goes out of Her Way to Prevent Plaintiff From Having Noticeable  Successes with the HAS Morale Team Planning | |
| 44 | McDonald and Lacro Prevented Plaintiff from Fully Participating in the Nation-wide VA Employment Incentive Program | |
| 45 | Post AIB Hearing Hostile Working Environment Experience With Moore | |

4

| 46 | Plaintiff's Attempt to Get Help From Adams Regarding Call Center Noise Levels | |
| 47 | New Performance Standards, Post-EEO Complaint | |
| 48 | Emails Between Plaintiff and Diana MacLaclan | |
| 49 | VA EEO Investigation Affidavits | |
| 50 | Adam's Switch to Ebonics – Post Plaintiff EEO Complaint | |
| 51 | McDevitt's Email that Plaintiff Didn't Answer his Email | |
| 52 | Plaintiff's Deposition Regarding Adams Changing to Ebonics | |
| 53 | Plaintiff's Employee Health Incident Reports | |
| 54 | Plaintiff Continued to Email EEO Manager for Her EEO Notes | |
| 55 | Email Where Plaintiff Had to Defend Her Position Post Plaintiff's EEO Complaint – And Won | |
| 56 | McDonald's Under Oath Denied Agreeing to the Fact that She Investigated and Found to Be True Ernest's Sexual Discrimination – Transcript | |
| 57 | Outside Authorities Question Why Plaintiff's Supervisor Was Removed More than Once From Her Position | |
| 58 | McDevitt's Report Of Contact | |
| 59 | September 20, 2011 Email, Recording Report From Gill to Lacro | |

| 60 | Plaintiff Deposition | |
| 61 | Email Dialogue Between Gill and Plaintiff, Accusing Plaintiff of Not Having Signed Out Before Leaving for Her EEO Meeting | |
| 62 | Plaintiff Reported Gill For Forcing Employees to Pay for Her Refrigerator | |
| 63 | Email Between Plaintiff and Gill – Regarding Gill's Threat to the Team | |
| 64 | Email Between Plaintiff and Los Angeles VA  EEO Plaintiff | |
| 65 | Plaintiff Challenged & Investigated New, Unheard of Kudos Rule | |
| 66 | New Weekly Audits Email From Gill (August 16, 2011) | |
| 67 | August 18, 2011, Gill's Evaluation of Plaintiff's Performance | |
| 68 | August 25, 2011, Gill's Evaluation of Plaintiff's Performance | |
| 69 | Email Dialogue between Plaintiff and EEO, Requesting Time Off and Space to Work on Her EEO Claims | |
| 70 | Gill's September 1, 2011 Evaluation of Plaintiff's Work Performance | |
| 71 | Dr. Pamela Jong' email to Plaintiff | |
| 72 | Plaintiff's Report of Contract With Email Dialogues (August 30 – Sept 5, 2011) | |
| 73 | Plaintiff's Request for Medical Records as Part of Her Request for  Reasonable Accommodation | |

| | | |
|---|---|---|
| 74 | Gill's Email Recommending Plaintiff for Termination & EEO's Mediation Delays | |
| 75 | Gill's Recommendation Email That Plaintiff Be Terminated & Gill's Positive Work Performance Evaluation of Plaintiff, during the Same Time | |
| 76 | September 12, 2011, New Request to EEO For Reasonable Accommodation | |
| 77 | Second Letter Recommending Plaintiff Received Reasonable Accommodation | |
| 78 | Plaintiff's Request for Medical Records Sent to Both Carvajal and Lacro | |
| 79 | Plaintiff's September 15, 2011 Performance Evaluation Less Than Two Weeks Prior to Termination | |
| 80 | September 23, 2011, Patient Advocate Tracking Report | |
| 81 | Gill's Performance Evaluation of Plaintiff, Six Days Prior to Terminating Plaintiff | |
| 82 | August 3, 2011, Email Proving When Plaintiff Started Working With LA VA EEO | |
| 83 | EEO Mediation Delay Emails | |
| 84 | Dr. Kwi Bulow's Documents | |
| 85 | ORM emails | |
| 87 | HR Interview Selection Email | |

| 88 | Anita Mitchell's Errata Sheets from Her Deposition | |
| 89 | Plaintiff's Deposition and Errata Sheets | |
| 90 | Proof of Counseling Related to Disability | |
| 91 | Anita Mitchell's Errata Sheets from Her Deposition | |
| 92 | Donna Camp's Errata Sheets from Her Deposition | |
| 93 | McDonald's ORM Transcripts | |
| 94 | Dr. Kwi Bulow's Notes & Plaintiff's Deposition | |
| 95 | Anita Mitchell's Errata Sheets from Her Deposition | |
| 96 | Dr. Kwi Bulows' Notes & Morale Team Emails From McDonald , ORM Transcripts with McDonald & McDonald's Skewed Production Report | |
| 97 | Emails Referring to Newsletter  & ORM Transcripts | |
| 98 | Email Dialogue Between McDonald & Lacro, Validating Plaintiff's Complaint Against Ernest | |
| 99 | EEO Investigation Transcripts; Unemployment Judge's Opinion; & Dr, Kwi Bulow's Notes | |
| 100 | ORM Transcripts; Email Dialogue Between McDonald and Lacro | |
| 101 | Emailed Request From Plaintiff to Meet with EEO | |

| 102 | EEO Manager's Notes & Plaintiff's ORM Transcripts | |
| 103 | Dr. Bulow's Notes & McDonald's ORM Transcripts | |
| 104 | ORM Transcripts of McDonald & Dr. Kwi Bulows' Notes | |
| 105 | Dr. Kwi Bulows Notes | |
| 106 | VA Employee Health Incident Reports; Letter from Dr. Kaplowitz; VASDHS Engineering Report; Plaintiff's Request for Reasonable Accommodation to Lacro; Plaintiff's Performance Reviews; TriWest Counseling Letter | |
| 107 | Plaintiff's Approval Letter for Counseling | |
| 108 | Employee Health Incident Reports; Plaintiff's Email about the Noise Level Evaluation; Dr. Kaplowitz's Letter Establishing Need; Lisa Carvajal's Worker's Comp Flyer; Email between Plaintiff and Gill about McDevitt accessing Plaintiffs' Emails | |
| 109 | Carvajals' EEO Notes | |
| 110 | Plaintiff's Deposition & Gill's Relevant Evaluation of Plaintiff's Work Performance | |
| 111 | Email Dialogue Between Plaintiff and Gill About McDevitt Accessing Plaintiff's Emails | |
| 112 | Plaintiff's Request for Reasonable Accommodation to Lacro | |
| 113 | Email between Carvajal and Plaint Regarding Reasonable Accommodation Options | |

| 114 | New Kudos Policy Emails; Plaintiff's Employee Health Incident Reports; Gill's August 18, 2011, Evaluation of Plaintiff's Work Performance & Kudos from Veterans Commending Plaintiff's Work | |
| 115 | Unemployment Administrative Judge's Report; Kudos From Veterans to Plaintiff; Gill's Performance Evaluations of Plaintiff | |
| 116 | McDevitt's Email Complaining About Plaintiff Not Responding to it & Plaintiff Preparation Notes Before Meeting with EEO | |
| 117 | Termination Packet Recording Report; & Email Between Christine Perry, Plaintiff and Ionarra Gutierrez | |
| 118 | Letters of Recommendation on Plaintiff's Behalf; Plaintiff Kudos from Veterans | |
| 119 | Gill's Evaluation of Plaintiff's Work 20 Days Before Terminating Plaintiff | |
| 120 | Plaintiff's Report of Contact, Emails Relating to this; and, Plaintiff's Rescinded Report of Contact | |
| 121 | Moore's Letter of Recommendation about Plaintiff | |
| 122 | Plaintiff's Kudos from the Veterans | |
| 123 | Plaintiff's Letters of Recommendation | |
| 124 | Gill's Weekly Performance Evaluations of the Plaintiff | |
| 125 | Official Reports against Gill's Leadership | |

| 126 | Dr. Kaplowitz's Second Disability Letter for the Plaintiff | |
| 127 | Emailed Dialogue Started by Plaintiff, with the LA VA EEO Office (July - August 2011) | |
| 128 | Plaintiff's Deposition Taken by AUSA Clukey | |
| 129 | ORM Transcripts of Sheri Lacro | |
| 130 | Unemployment Hearing Administrative Judge's Opinion | |

Dated:  August 19, 2015

Respectfully submitted,

CARMEN MATTHEWS
Plaintiff, pro se

# Exhibit 1



# WE CARE

*About...*

**Your Medical Care**
**Your Concerns**
**Your Opinions**
**Your Ideas**
**Your Praise**
**Your Health!**

## Tell us about your experience at any of the VHA locations
(check one)

☐ San Diego Medical Center (VAMC)
☐ Chula Vista Clinic
☐ Escondido Clinic
☐ Imperial Valley Clinic
☐ Mission Gorge Clinic
☐ Mission Valley Clinic
☐ Oceanside Clinic

## Your contact information

Full Name: _____
Last 4 SSN: _____
Email: _____
Phone/cell: _____
Date of visit: _____
Hospital area: _____

## Your feedback is important to us

1. How courteous was our staff?
   _____

2. What do you like about the appointment scheduling system?
   _____

3. How do you rate the medical center phone system?
   _____

4. How easy was it to access your provider?
   _____

5. How was the quality of your care today?
   _____

## Who and what made the biggest impact on your VA experience?

Staff member: _____ Hospital area: _____

### Your Comments:
_____
_____
_____
_____
_____
_____
_____
_____

**Remember, your comments mean everything to us!**

Please drop this completed form into any **We Care / We Listen**
Please drop this completed form into any **We Care / We Listen**
box located in the waiting areas, lobbies, or just drop it in the US mail.



*Service Ambassador*
I MAKE THE DIFFERENCE

Subject: FW: Follow Up to What I've Submitted
Date: Tue, 9 Nov 2010 10:57:35 -0800
From: Sheri.Lacro@va.gov
To: vjudo@hotmail.com

Here is the services' response to your concerns.

**From:** McDonald, Elizabeth P. (VHASDC)
**Sent:** Tuesday, November 09, 2010 9:57 AM
**To:** Lacro, Sheri A.
**Subject:** RE: Follow Up to What I've Submitted

Hi Sheri, I did my fact finding regarding the issues that Carmen Mathews has raised. I am taking appropriate action with Robert Earnest based on my findings. Please let Carmen know that this is being addressed. If there are any other issues, please have her contact Brian Pellar at x1144.

**From:** carmen matthews [mailto:vjudo@hotmail.com]
**Sent:** Thursday, November 04, 2010 8:45 AM
**To:** Lew, Michael; Lacro, Sheri A.
**Subject:** Follow Up to What I've Submitted

Hi, Michael and Sheri.

I'm just sending you a note after having emailed the detailed complaint, last week.

Having submitted several VASDH applications, in the past 5 business days, I hope that the complaint that I've submitted won't have an adverse impact upon my desire to work at the VA. I also hope that the threat by Robert Earnest won't impact my applications.


Simply The Best,

Carmen Matthews
Quoted by Oprah, February 2006 (Which aired 3 times)

Publisher of "Tri-Mesa Community Newsletter" (Clairemont, Kearny Mesa & Serra Mesa)
**www.serenesamurai.com**

Facebook Friend

My Letter to the Editor, "Los Angeles Times", Saturday, December 5, 2009, about a need for a new women's healthcare movement
**Guiding Thoughts**: "Self-control is strength. Right thought is mastery. Calmness is power." by James Allen
Book Reviews: www.amazon.com/gp/cdp/member-
reviews/A99CILDQPTRTZ/ref=cm_cr_dp_auth_rev?ie=UTF8&sort%5Fby=MostRecentReview


Phone: (858) 750-9824

v

**VA**  **Department of Veterans Affairs**

# EMPLOYEE LIMITATIONS ON REASSIGNMENT OPTIONS

It has been determined that you are no longer able to perform the essential functions of your current position due to functional limitations caused by your disability. VA would like to retain you as an employee. Therefore, we are offering to seek a suitable position for you. VA will not be able to create a new position; we are limited to identifying an existing position. Please review the options listed below and check those you are willing to consider. Please consider as many options as possible to aid our effort to identify a suitable reassignment.

This offer does not guarantee that VA will be able to reassign you to a different position. *Please return the completed form to me by* (enter date) _____

| NAME OF LOCAL REASONABLE ACCOMMODATION COORDINATOR | TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|---|
| Marlene Carvajal, LRAC | 858-642-3840 | marlene.carvajal@va.gov |

I  Carmen L. Matthews _____   am willing to consider reassignment.

[X] OUTSIDE MY CURRENT FACILITY OR COMMUTING AREA; *(List locations or indicate that you are willing to be reassigned to any location.)* *(NOTE: VA will not pay relocation expenses, except if they are authorized in the job announcement.)*

[X] TO A DIFFERENT TYPE OF POSITION FOR WHICH I AM QUALIFIED; *(List the types of positions or job series you will accept)*

    EO Trainee, Publicity, Educator, Researcher, etc.

[X] TO A TITLE 5 POSITION; *(For Title 38 employees only)*

[X] TO A DIFFERENT SUB-COMPONENT OF THE AGENCY;

[ ] TO A LOWER GRADE POSITION IF NO POSITION IS AVAILABLE AT MY CURRENT PAY LEVEL; *(Indicate the lowest pay level you will accept)* |    AND/OR

[ ] TO A PART TIME POSITION

I certify that I have selected the options which I am willing to consider, and I understand that if VA cannot find a suitable position, the agency has no further obligation to accommodate me, and I will be advised of other options.

| NAME OF EMPLOYEE | SIGNATURE OF EMPLOYEE | DATE OF SIGNATURE |
|---|---|---|
| Carmen L. Matthews | *Carmen L Matthews* | 09/13/11 |

Please return the completed form to the Local Reasonable Accommodation Coordinator listed above.

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
JUN 2010   **0857h**

Adobe LiveCycle Designer

**VA** Department of Veterans Affairs

# EMPLOYEE LIMITATIONS ON REASSIGNMENT OPTIONS

It has been determined that you are no longer able to perform the essential functions of your current position due to functional limitations caused by your disability. VA would like to retain you as an employee. Therefore, we are offering to seek a suitable position for you. VA will not be able to create a new position; we are limited to identifying an existing position. Please review the options listed below and check those you are willing to consider. Please consider as many options as possible to aid our effort to identify a suitable reassignment.

This offer does not guarantee that VA will be able to reassign you to a different position. *Please return the completed form to me by (enter date)* _____

| NAME OF LOCAL REASONABLE ACCOMMODATION COORDINATOR | TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|---|
| Marlene Carvajal, LRAC | 858-642-3840 | marlene.carvajal@va.gov |

I Carmen L. Matthews _____ am willing to consider reassignment.

[X] OUTSIDE MY CURRENT FACILITY OR COMMUTING AREA; *(List locations or indicate that you are willing to be reassigned to any location.)* *(NOTE: VA will not pay relocation expenses, except if they are authorized in the job announcement.)*

_____

[X] TO A DIFFERENT TYPE OF POSITION FOR WHICH I AM QUALIFIED; *(List the types of positions or job series you will accept)*

EO Trainee, Publicity, Educator, Researcher, etc.

_____

[X] TO A TITLE 5 POSITION; *(For Title 38 employees only)*

[X] TO A DIFFERENT SUB-COMPONENT OF THE AGENCY;

[ ] TO A LOWER GRADE POSITION IF NO POSITION IS AVAILABLE AT MY CURRENT PAY LEVEL; *(Indicate the lowest pay level you will accept)* ; AND/OR

[ ] TO A PART TIME POSITION

I certify that I have selected the options which I am willing to consider, and I understand that if VA cannot find a suitable position, the agency has no further obligation to accommodate me, and I will be advised of other options.

| NAME OF EMPLOYEE | SIGNATURE OF EMPLOYEE | DATE OF SIGNATURE |
|---|---|---|
| Carmen L. Matthews | *Carmen L Matthews* | 09/13/11 |

Please return the completed form to the Local Reasonable Accommodation Coordinator listed above.

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
JUN 2010  **0857h**

Adobe LiveCycle Designer

*2/6/11*

| VA Department of Veterans Affairs | EEO COMPLAINT & WORKPLACE DISPUTE TRACKING REPORT |
|---|---|
| 1. Complainant's Name, Job Title and Grade<br>*Carmen Matthews* | 2. Complainant's Service & Unit to include Supervisor's Name and Phone Number.<br>*HAS/PCCC* |
| 3. Case Number | 4. Responsible Management Official(s)<br>*Alison Gill* |

**5.   Basis of the Complaint** · (Check one or more as appropriate and specify)

- [ ] Age        (DOB: _____ )
- [ ] Color      ( _____ )
- [ ] Disability ( _____ )
- [ ] Gender     ( _____ )
- [ ] Nat'l Origin ( _____ )
- [ ] Race       ( _____ )
- [ ] Religion   ( _____ )
- [ ] Reprisal for prior EEO activity.
- [ ] Sexual Orientation –
      Note: Not covered by Title VII

**6.   Claim(s) of the Complaint**   (Check one or more as appropriate, which reflect the personnel action and/or event the complainant is alleging as disparate treatment/impact.  The complainant must provide a date for each issue checked.)

| Claim | Date Occurred | Claim | Date Occurred |
|---|---|---|---|
| [ ] Admonishment | | [ ] Harassment (sexual) | |
| [ ] Assignment of Duties | | [ ] Performance Appraisal / Proficiency Rpt | |
| [ ] Award | | [ ] Reassignment | |
| [ ] Constructive Discharge | | [ ] Reprimand | |
| [ ] Demotion | | [ ] Suspension | |
| [ ] Duty Hours | | [ ] Termination / Removal | |
| [ ] Failure to Hire / Select | | [ ] Time & Attendance | |
| [ ] Failure to Promote | | [x] Working Conditions | |
| [ ] Harassment (non-sexual) | | [x] Other: *harassment / hostile environment* | |

**Complaint Processing Timeline**

| Stage | Date | Stage | Date |
|---|---|---|---|
| Initial contact with ORM counselor | | Complaint forwarded to EEOC | |
| Request for information received | | Agency representative assigned | |
| Request for information mailed | | EEOC Decision received | |
| | | EEOC Remand to OEDCA | |
| Formal complaint filed | | **- and/or -** | |
| Request for additional information received | | Complaint/Decision forwarded to OEDCA | |
| Request for additional information mailed | | OEDCA FAD received | |
| ORM: [ ] accepted [ ] dismissed complaint | | | |
| | | Complaint settled | |
| Notice of assignment of investigator | | Complaint withdrawn by complainant | |
| Investigation commenced | | | |
| Request for additional information received | | Comments: | |
| Request for additional information mailed | | | |
| Investigation completed | | | |

**Note:**  On this date, _5/12/11_, you discussed the above Bases & Claims with me.  **However, please be advised that I am not an ORM EEO Counselor**.  If you feel that you have been discriminated against & wish to file an EEO complaint, **you must contact an ORM Counselor within 45-calendar days of the alleged incident in order to preserve your EEO rights**.  If you feel that your rights as a bargaining unit employee have been violated, you should contact your Union Office within 30-calendar days of the alleged violation.  I am the EEO/ADR Consultant for this facility and I will do everything within my power to resolve the issues we have discussed today. On the date shown below, this form was shown to me.

Signature of Complainant/Disputant: *Carmen L Matthews*        Date: _5/12/2011_

5/12/11 Started working Dec 30 in

Supervisor

Tells pattern of harassment / pattern of gender bias
                                        favoritism toward men can
Why are you going to see EEO? wear everyday / T-Shirt c holes
Why are you going to complain.
                        Alison said to staff she
Tues. 5/10 said she heard         purchased a refrigerator. $20
negatives statements from staff.  expected everyone to pay.
Then yesterday when she questioned each, she actually stopped
why are you scared EEO? Yes, you maybe everyone from working in a
are so positive.          demanding tone + said get off your phone
Called a mtg to specifically to ask why are you complaining
                                        to me.
    April Adams & Aaron McDevitt.
Asked what was her issue to complain about the call center.
When she called in sick leads (Aaron)
Asked her what did she eat when she found out she
said she got food poison. — Said you don't look
like you were sick
              Run's this weekend
Aaron asked her to get funding from Organizations for
    the call center staff to run ox an event this weekend
for $40⁰⁰ per person. Can use VA time to find vendors +
they will pay her $45⁰⁰ entry fee for trying to find —
She refused verbally to find vendors — He got
upset, then changed story to say he will pay
your entry fee, stating I didn't know you wanted
to get reimbursed for her entry fee.

told not allowed to email anyone without her permission.
Due to incident Carmen innocently sent to email
grup about 98.1 being at La Jolla — She did not get
permission —

Diggi-Loggr

Tied & took phones off-line — Allison
Says she always does that,

As early as Feb Carmen has witnessed Adam Doyle
& Allison Gill get out of the same car in the
parking. Brenda Moore's party off station, road
back c̄ Allison to work. On the Border MV.
based on her insisting —
She said ____ in the parking lot to Carmen — did you
see that logo on that car? The logo was a
purple butterfly — Adam Doyle was driving that car.
That was the band I used to be in. Switched topic to
relationships — Said now I have a boyfriend — It can
be difficult — They want to take off work. They
are such wimps. Staff aware of relationship. Did you see
that?

When someone's looking for Allison, you go to
Adam & he will text her. This occurred up to the
time when I bods were announced.

I wks ago April 29th traing partially c̄ lia in the
jinning 1/2 hrs into trng — everyone left — no chry to leave
left facility. 4 left trying to move PC's. Remainder
of staff returned. Carmen also helping people. Allison told
p back to her job. Allison granted 59 min. for
1½-2 to leave
P 1 doss/month — plus you have almost 3HRS —

Does home work.) 2 sweaters, brawls, socks

During down time — watch movies — Read — Texting

or shut off phones — Dbl check to make busy —

Chris Rice Watch movies

Aaron —

McDevett — 40 calls to her 80.

Adam portrays himself with the attitude
I'm protected by Allison do as I say
staff comment.

10:10 Am aware = termination
aw =

Eliz McDonald X6331

--------------------------------------------------------------------------

Mail Message From: MATTHEWS,CARMEN L  Dated: 09/02/2011 16:03
Subject: Msg/Shnable 3786/Hose & Vasquez

In response to letter from Maria Vasquez:

Pt is calling to register for the Htn September 16, 2011 13:00 Class

Contact:  760-438-5433

thx
clm

Response: 1) HOSE,MICHAL I  09/06/2011 11:14

Eloy, please assist with scheduling

Response: 2) GONZALEZ,ELOY N  09/15/2011 14:21

Jesse you will need to make appointments. I em unable to overbook

Response: 3) VAZQUEZ,MARIA Y  09/19/2011 11:30

Joe, can u please call him and offer him the next class?

Response: 4) GONZALEZ,ELOY N  09/20/2011 08:38

I already scheduled him last week

Response: 5) GONZALEZ,ELOY N  09/20/2011 08:41

pt informed

Response: 6) VILORIA,JOSE V  09/21/2011 08:17

Appt made for 10/21/11 @ 1:00pm w/ Os Nurse Edu HTN Grp by Aaron McDevitt
and letter has been mailed.

[Handwritten notes in right margin:]
Allison said AARON did this because He asked her if there was something to do, She said she told him to call Tess who told him to schedule the HTN, the note state

"Scheduled per Eloy Request"

Why would a Health Tech call Request this of AARON?

[Handwritten notes at bottom:]
Questions
1. Why would Aaron go into my Gui mail email?
2. If he has access to my Gui mail, and if he solved something on this level, why not send a Gui to me and to the clinic?
3.

**Windows Live™**   Hotmail (89)   Messenger (0)   Office   Photos   |   MSN   carmen

## Hotmail

**Inbox (89)**

New   |   Reply   Reply all   Forward   |   Delete   Junk   Sweep ▾   Mark as ▾   Move to ▾   |

### Folders

Junk

Drafts

Sent

**Deleted (5)**

alex fernandez

knitting patterns

myinbox

Search Results

New folder

### Quick views

Flagged

**Photos (9)**

**Office docs (11)**

Shipping updates

### Messenger

You're signed in to Messenger. To change your status, click your name in the upper right corner.
Keep me signed in | Sign out of Messenger

32 invitations

Search contacts

No friends are online.

Sign out of Messenger

Home

Contacts

Calendar



**FW: Midterm Evals**          Back to messages   |

**Carmen Matthews**                     5/05/11
To vjudo@hotmail.com                   Reply ▾

**From:** Gill, Allison M.
**Sent:** Thursday, April 21, 2011 12:00 PM
**To:** Matthews, Carmen L.
**Subject:** Midterm Evals

Good morning!

I'm completing your midterm evaluations and wanted to let you know your current numbers:

Average calls per day: 84
Average call length: 3:00

This means you are fully successful at the half way point.  Official evaluations will be done in September.  I will drop off your mid-term evaluation at your desk for you to sign and return to me.  Thank you!

Awesome job!

*Allison Gill, MBA*
**Supervisory Medical Administration Specialist**
**Patient Care Call Center**
O:  858-642-6466
F:  619-296-1769
E:  allison.gill@va.gov

New   |   Reply   Reply all   Forward   |   Delete   Junk   Sweep ▾   Mark as ▾

Move to ▾   |



move t
AT&T

TV + High Sp
+ Home Pho

GET START

Details

your security is important

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1356   Page 295 of 432

© 2011 Microsoft    Terms    Privacy    About our ads    Advertise                    Help Center    Feec

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD

**SAN DIEGO OFFICE OF APPEALS**
3517 Camino Del Rio South, #100
**SAN DIEGO CA 92108**

(619) 521-3300

| | |
|---|---|
| CARMEN L MATTHEWS<br>Claimant-Appellant | Case No. **3973362 (UCFE)**<br><br>Issue(s): 1256<br><br>Date Appeal Filed: 11/15/2011<br><br><br>EDD:  0210   BYB:  10/02/2011 |

**Date and Place of Hearing(s):**
(1)  12/30/2011   San Diego

**Parties Appearing:**
Claimant

---

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 20 calendar days from the date of mailing shown below.  See the attached "Notice to Parties" for further information on how to file an appeal. If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

**Yolanda Gammill**, Administrative Law Judge

CARMEN L MATTHEWS
PO BOX 232313
SAN DIEGO, CA 92193-2313

Date Mailed:   JAN 0 9 2012

**Case No.: 3973362**                    **San Diego Office of Appeals**
CLT/PET: Carmen L. Matthews             ALJ:  Yolanda Gammill
Parties Appearing:  Claimant
Parties Appearing by Written Statement:  None

---

ISSUE STATEMENT

The claimant appealed from a determination disqualifying the claimant for unemployment benefits under Unemployment Insurance Code section 1256. The issue in this case is whether the claimant was discharged for misconduct connected with the most recent work.

FINDINGS OF FACT

The claimant most recently worked for the employer as a medical support assistant for ten months with a final pay of $34,067 per year.  She last worked for the employer on September 28, 2011.  The employer discharged her due to poor work performance.

The employer discharged the claimant because she left her job assignment without authorization, received complaints about her customer service performance and wasted time by loafing or willful idleness.  The claimant had no prior warnings concerning similar conduct.

REASONS FOR DECISION

An individual is disqualified for benefits if he or she has been discharged for misconduct connected with his or her most recent work. (Unemployment Insurance Code, section 1256.)

 "Misconduct connected with the work" is a substantial breach by the claimant of an important duty or obligation owed the employer, wilful or wanton in character, and tending to injure the employer. (Precedent Decision P-B-3, citing *Maywood Glass Co. v. Stewart* (1959) 170 Cal.App.2d 719.)

On the other hand, mere inefficiency, unsatisfactory conduct, poor performance as the result of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good faith errors in judgment or discretion are not misconduct.

While there are some exceptions, misconduct is not usually found unless there has been a warning for conduct similar to the conduct which led to the discharge. (Precedent Decision P-B-293).

3973362                              2

In this case, the claimant made an isolated good faith error in judgment by not always performing her job well.  However, the claimant had no prior warnings concerning her job performance.  The claimant did not substantially breach an important duty or obligation owed the employer because she did not intentionally fail to perform her job.  Thus, the claimant was discharged for reasons other than misconduct connected with her most recent work.  Accordingly, the claimant is qualified for benefits under section 1256.

DECISION

The department's determination is reversed.  The claimant is qualified for benefits under code section 1256.  Benefits are payable provided the claimant is otherwise eligible.

SD: yg

3973362                              3



CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD

**SAN DIEGO OFFICE OF APPEALS**     **(619) 521-3300**
3517 Camino Del Rio South, #100
SAN DIEGO CA 92108

---

CARMEN L MATTHEWS
Claimant-Appellant

Case No. 3973362 (UCFE)

Issue(s): 1256

Date Appeal Filed: 11/15/2011

EDD: 0210   BYB: 10/02/2011

---

**Date and Place of Hearing(s):**          **Parties Appearing:**
(1) 12/30/2011   San Diego                Claimant

---

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 20 calendar days from the date of mailing shown below. See the attached "Notice to Parties" for further information on how to file an appeal. If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

**Yolanda Gammill**, Administrative Law Judge

CARMEN L MATTHEWS
PO BOX 232313
SAN DIEGO, CA 92193-2313

Date Mailed:   JAN 0 9 2012

Case No.: 3973362                    **San Diego Office of Appeals**
CLT/PET: Carmen L. Matthews          ALJ: Yolanda Gammill
Parties Appearing: Claimant
Parties Appearing by Written Statement: None

---

## ISSUE STATEMENT

The claimant appealed from a determination disqualifying the claimant for unemployment benefits under Unemployment Insurance Code section 1256. The issue in this case is whether the claimant was discharged for misconduct connected with the most recent work.

## FINDINGS OF FACT

The claimant most recently worked for the employer as a medical support assistant for ten months with a final pay of $34,067 per year. She last worked for the employer on September 28, 2011. The employer discharged her due to poor work performance.

The employer discharged the claimant because she left her job assignment without authorization, received complaints about her customer service performance and wasted time by loafing or willful idleness. The claimant had no prior warnings concerning similar conduct.

## REASONS FOR DECISION

An individual is disqualified for benefits if he or she has been discharged for misconduct connected with his or her most recent work. (Unemployment Insurance Code, section 1256.)

"Misconduct connected with the work" is a substantial breach by the claimant of an important duty or obligation owed the employer, wilful or wanton in character, and tending to injure the employer. (Precedent Decision P-B-3, citing *Maywood Glass Co. v. Stewart* (1959) 170 Cal.App.2d 719.)

On the other hand, mere inefficiency, unsatisfactory conduct, poor performance as the result of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good faith errors in judgment or discretion are not misconduct.

While there are some exceptions, misconduct is not usually found unless there has been a warning for conduct similar to the conduct which led to the discharge. (Precedent Decision P-B-293).

3973362                                    2

In this case, the claimant made an isolated good faith error in judgment by not always performing her job well.  However, the claimant had no prior warnings concerning her job performance.  The claimant did not substantially breach an important duty or obligation owed the employer because she did not intentionally fail to perform her job.  Thus, the claimant was discharged for reasons other than misconduct connected with her most recent work.  Accordingly, the claimant is qualified for benefits under section 1256.

<u>DECISION</u>

The department's determination is reversed.  The claimant is qualified for benefits under code section 1256.  Benefits are payable provided the claimant is otherwise eligible.


SD: yg

**Windows Live™**   Hotmail (89)   Messenger (0)   Office   Photos   |   MSN         carmen

## Hotmail

New   |   Reply   Reply all   Forward   |   Delete   Junk   Sweep ▾   Mark as ▾   Move to ▾   |

**Inbox (89)**

**Folders**

Junk

Drafts

Sent

**Deleted (5)**

alex fernandez

knitting patterns

myinbox

Search Results

New folder

**Quick views**

Flagged

**Photos (9)**

**Office docs (11)**

Shipping updates

**Messenger**

You're signed in to
Messenger. To change
your status, click your
name in the upper right
corner.
Keep me signed in | Sign
out of Messenger

32 invitations

Search contacts

No friends are online.

Sign out of Messenger

Home

Contacts

Calendar

### FW: Midterm Evals                    Back to messages   |

**Carmen Matthews**                                     5/05/11
To vjudo@hotmail.com                                   Reply ▾

**From:** Gill, Allison M.
**Sent:** Thursday, April 21, 2011 12:00 PM
**To:** Matthews, Carmen L.
**Subject:** Midterm Evals

Good morning!

I'm completing your midterm evaluations and wanted to let you
know your current numbers:

Average calls per day: 84
Average call length: 3:00

This means you are fully successful at the half way point. Official
evaluations will be done in September. I will drop off your mid-
term evaluation at your desk for you to sign and return to me.
Thank you!

Awesome job!

*Allison Gill, MBA*
**Supervisory Medical Administration Specialist**
**Patient Care Call Center**
O:  858-642-6406
F:  619-296-1769
E:  allison.gill@va.gov

New   |   Reply   Reply all   Forward   |   Delete   Junk   Sweep ▾   Mark as ▾

Move to ▾   |



move t
AT&T

TV + High Sp
+ Home Pho

GET START

Details





© 2011 Microsoft   Terms   Privacy   About our ads   Advertise                    Help Center   Feec

Department of Veterans Affairs
**WEEKLY PERFORMANCE AUDIT FORM 2011-1**

**AGENT**: _____Carmen Matthews_____   **DATE**: _____09/8/11_____

**SCORES:**

VETERAN SERVICE: ____100%_____

INTERNAL CUSTOMER SERVICE: ___100%___

CUMULATIVE APPOINTMENT ACCURACY: __83%__

CUMULATIVE CALLS TAKEN: __92%___

CUMULATIVE TALK TIME PERFORMANCE: __88%___

DAYS NOT LOGGED IN 6.5 HOURS IN THE PAST WEEK: ___1____
(spoke to Carmen about being logged in)

**VETERAN SERVICE:**

Choose a random patient call from the previous week. Award up to ten points for each of the following and record the percentage above:

PATIENT: __WAGNER_____LAST FOUR: __3418__ DATE OF CALL: _08/29/11___

___10__   Agent used patient or caller's name

___10__   Agent verified the primary care provider

___10__   Agent closed the encounter to the best of his or her ability, eliminating the need
          for patient call-back

___10__   Agent was polite, genuinely respectful, and friendly; not robotic or rude

___10__   Agent was efficient with time, but addressed all the issues with patience
          (Checked for consult, was thorough)

REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week.  Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

_10__      Agent was polite in the communication

_10__      Agent provided helpful information (excessive information about teammate)

_10__      Agent effectively communicated (provided the correct information in a timely manner)

_10__      Agent used the proper message standardization and followed all SOPs (no caps)

_10__      Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week.  Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited.  Then calculate the FTE that worked during that period of time.  Divide the number of calls offered by the FTE to get the benchmark.  Next, run a report showing how many calls the agent being audited took that day.  Enter the percentage (agent's number divided by the benchmark) and record it on page 1.  Do the same for calculations for average talk time.  Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

**APPENDIX A**

*Assumptions for calculating benchmarks for talk time and average calls per hour:*

Where X = average calls per **SHIFT** for the time period under review (we are going to have to calculate per shift as opposed to per day because of the unequal distribution of calls throughout the day when we expand hours)
Where Y = average FTEE per **SHIFT** for the time period under review
And 3 is the average call time in minutes (this is a constant)

The FTEE per SHIFT is when we are fully staffed is as follows:

6:30 – 3:00 = 13.81 FTEE
8:00 – 4:30 = 17 FTEE
9:30 – 6:00 = 15.6 FTEE
10:00 – 6:30 = 14.88 FTEE
9:00 – 5:30 = 16 FTEE
11:00 – 7:30 = 13.6 FTEE

(FTEE is calculated as follows:  1 FTEE = 30(15 minute blocks of time on the phone). Subsequently, 1 FTEE / 30 blocks = .033.  Therefore, one block of 15 minutes of work is .033 FTEE.  Therefore, the number of 15 minute blocks worked by the number of employees on the phones during a shift multiplied by .033 gives you the FTEE for a given shift.)

**To calculate talk time:**

$$\frac{X(3)}{Y} = Z$$

(where Z = the average talk time per agent in minutes required to answer all calls)

\*The standard:  (Z - 30 minutes) to Z = Fully Successful, > Z is outstanding, < (Z -30 minutes) is less than successful

*\*Divide Z by 2 for Part time employees.*

**EXAMPLE FOR CALCULATING TALK TIME:**

Contact center manager reports say that the 6:30 – 3:00 shift takes an average of 795 calls per day from July 2011 – September 2011, and there are 13.81 FTEE during that shift.  Therefore X = 795 and Y = 13.81:

REVISED JUNE 26, 2011

$\frac{795(3)}{13.81} = 172.7$ minutes of talk time

Therefore, in order to be fully successful, agents with the 6:30 – 3:00 shift during this time period will have to have 142.7 – 172.7 minutes of talk time on average per day. You can divide by 60 to get the number in hours. If the agent has more than 172.7 minutes of talk time per day, that is outstanding. Less than 142.7 would be less than fully successful.

**To calculate average calls per hour:**

$$\left(\frac{X}{Y}\right)(.16) = Z$$

(where $Z$ = the average calls per hour per agent required to answer all calls, and multiplying by .16 is the same as dividing by 6, which is the number of hours each agent is working on phones per shift)

\*The standard: $Z \pm 1$ = fully successful, $> Z + 1$ = outstanding, $< Z + 1$ = less than successful

*\*Divide X by 2 for part time employees*

**EXAMPLE FOR CALCULATING AVERAGE CALLS PER HOUR:**

Contact Center Manager reports say that the 1100 – 7:30 shift takes an average of 703 calls per shift from July 2011 – September 2011. The late shift has an average of 13.6 FTEE. Therefore, $X = 703$ and $Y = 13.6$.

$\frac{703}{13.6}(.16) = 8.3$ Calls Per Hour

Therefore, 7.3 – 9.3 calls per hour is fully successful, $< 7.3$ is less than fully successful, and $> 9.3$ is outstanding for the agents on the late shift during this particular time period.

REVISED JUNE 26, 2011

**AGENT**: ___Carmen Matthews___   **DATE**: ___09/8/11___

**SCORES:**

VETERAN SERVICE: ___100%___

INTERNAL CUSTOMER SERVICE: ___100%___

CUMULATIVE APPOINTMENT ACCURACY: __83%__

CUMULATIVE CALLS TAKEN: __92%__

CUMULATIVE TALK TIME PERFORMANCE: __88%__

DAYS NOT LOGGED IN 6.5 HOURS IN THE PAST WEEK: ___1___
(spoke to Carmen about being logged in)

**VETERAN SERVICE:**

Choose a random patient call from the previous week.  Award up to ten points for each of the following and record the percentage above:

PATIENT: ___WAGNER___   LAST FOUR: __3418__   DATE OF CALL: _08/29/11_


___10___    Agent used patient or caller's name


___10___    Agent verified the primary care provider


___10___    Agent closed the encounter to the best of his or her ability, eliminating the need
for patient call-back


___10___    Agent was polite, genuinely respectful, and friendly; not robotic or rude


___10___    Agent was efficient with time, but addressed all the issues with patience
(Checked for consult, was thorough)


REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week.  Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

__10__     Agent was polite in the communication

__10__     Agent provided helpful information (excessive information about teammate)

__10__     Agent effectively communicated (provided the correct information in a timely manner)

__10__     Agent used the proper message standardization and followed all SOPs (no caps)

__10__     Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week.  Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time.  Divide the number of calls offered by the FTE to get the benchmark.  Next, run a report showing how many calls the agent being audited took that day.  Enter the percentage (agent's number divided by the benchmark) and record it on page 1.  Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

Department of Veterans Affairs
**WEEKLY PERFORMANCE AUDIT FORM 2011-1**

APPENDIX A

*Assumptions for calculating benchmarks for talk time and average calls per hour:*

Where X = average calls per **SHIFT** for the time period under review (we are going to have to calculate per shift as opposed to per day because of the unequal distribution of calls throughout the day when we expand hours)
Where Y = average FTEE per **SHIFT** for the time period under review
And 3 is the average call time in minutes (this is a constant)

The FTEE per SHIFT is when we are fully staffed is as follows:

6:30 – 3:00 = 13.81 FTEE
8:00 – 4:30 = 17 FTEE
9:30 – 6:00 = 15.6 FTEE
10:00 – 6:30 = 14.88 FTEE
9:00 – 5:30 = 16 FTEE
11:00 – 7:30 = 13.6 FTEE

(FTEE is calculated as follows:  1 FTEE = 30(15 minute blocks of time on the phone). Subsequently, 1 FTEE / 30 blocks = .033.  Therefore, one block of 15 minutes of work is .033 FTEE.  Therefore, the number of 15 minute blocks worked by the number of employees on the phones during a shift multiplied by .033 gives you the FTEE for a given shift.)

**To calculate talk time:**

$$\frac{X(3)}{Y} = Z$$

(where Z = the average talk time per agent in minutes required to answer all calls)

*The standard:  (Z - 30 minutes) to Z = Fully Successful, > Z is outstanding, < (Z -30 minutes) is less than successful

*Divide Z by 2 for Part time employees.*

**EXAMPLE FOR CALCULATING TALK TIME:**

Contact center manager reports say that the 6:30 – 3:00 shift takes an average of 795 calls per day from July 2011 – September 2011, and there are 13.81 FTEE during that shift.  Therefore X = 795 and Y = 13.81:

REVISED JUNE 26, 2011

$$\frac{795\,(3)}{13.81} = 172.7 \text{ minutes of talk time}$$

Therefore, in order to be fully successful, agents with the 6:30 – 3:00 shift during this time period will have to have 142.7 – 172.7 minutes of talk time on average per day.  You can divide by 60 to get the number in hours.  If the agent has more than 172.7 minutes of talk time per day, that is outstanding.  Less than 142.7 would be less than fully successful.

**To calculate average calls per hour:**

$$\left(\frac{X}{Y}\right)(.16) = Z$$

(where Z = the average calls per hour per agent required to answer all calls, and multiplying by .16 is the same as dividing by 6, which is the number of hours each agent is working on phones per shift)

\*The standard:  Z ± 1 = fully successful, > Z + 1 = outstanding, < Z + 1 = less than successful

*\*Divide X by 2 for part time employees*

**EXAMPLE FOR CALCULATING AVERAGE CALLS PER HOUR:**

Contact Center Manager reports say that the 1100 – 7:30 shift takes an average of 703 calls per shift from July 2011 – September 2011.  The late shift has an average of 13.6 FTEE.  Therefore, X = 703 and Y = 13.6.

$$\frac{703}{13.6}(.16) = 8.3 \text{ Calls Per Hour}$$

Therefore, 7.3 – 9.3 calls per hour is fully successful, < 7.3 is less than fully successful, and > 9.3 is outstanding for the agents on the late shift during this particular time period.

REVISED JUNE 26, 2011

## FW: Mid-Term Review Question From Friday's Mediation

From: **carmen matthews** (vjudo@hotmail.com)
Sent: Tue 11/22/11 6:32 PM
To:    Claudia Torres (claudia.torres@va.gov); Carolyn Patterson (carolyn.patterson@va.gov)

Hi, again.

I'm forwarding to you the Mid-Term Review email sent to mediation attendees:

From: vjudo@hotmail.com
To: bridget.reinhold@va.gov; marlene.carvajal@va.gov
CC: lynne.woods-hurd@va.gov; sheri.lacro@va.gov; lynee.joyner@va.gov; david.billups@va.gov;
elizabeth.mcdonald@va.gov; sue.hollis@va.gov; susan.hollis@va.gov
Subject: Mid-Term Review Question From Friday's Mediation
Date: Tue, 8 Nov 2011 12:53:33 -0800

You've asked during the November 4, 2011 mediation what my mid-term review was, and though I
hadn't looked at it while compiling my perponderence of evidence, and doing my legal research, I found
it.  Here is what Allison Gill said to me in writing about my mid-term review, April 21, 2011, at 12:00 pm:

Mid-term evaluation was:
Average calls per day:  84
Average call length:  3:00

"This means you are fully successful at the half way point.  Official evaluations will be done in
September.  I will drop off your mid-term evaluation at your desk for you to sign and return to me.
Thank you!  Awesome job!"  by Allison Gill

This contradicts the termination letter that she wrote about me.

Also, you've asked what my termination letter dated September 28, 2011, states as a reason for
termination.  Here's what it says:

"Your supervisors have recommended your termination based on poor customer service, wasting time,
and failure to follow instructions.  There continue to be customer complaints of incidents occurring on
June 20, 2011, August 4, 2011, regarding your lack of professionalism as evidenced by reports of contact
of the phone conversations (contained in the evidence file taped to the inside of the evidence folder
which also captures the conversations on a CD).  You fail to read emails as instructed to do so."

What this fails to recognize are the weekly reviews, the kudos from veterans, and so much more.  This
also fails to recognize that the report submitted to HR, by Allison and Elizabeth, was recrated by Adam
Doyle, someone who Allison trained on the VASDH computers, prior to his being officially employed with
the VA; someone who Allison has played favoritism to; and, someone there's so much more.

Simply The Best,

Carmen Matthews
Quoted by Oprah, on the "Oprah Show"
Quoted by Mike V., Smooth Jazz, 98.1 Radio Station
Publisher of "Tri-Mesa Community Newsletter" (Clairemont, Kearny Mesa & Serra Mesa)
**www.serenesamurai.com**
Facebook Friend
My Letter to the Editor, "Los Angeles Times", Saturday, December 5, 2009, about a need for a new women's healthcare movement
Book Reviews: www.amazon.com/gp/cdp/member-reviews/A99CILDQPTRTZ/ref=cm_cr_dp_auth_rev?ie=UTF8&sort%5Fby=MostRecentReview
Phone:  (858) 750-9824

# FW: Mid-Term Review Question From Friday's Mediation

From: **carmen matthews** (vjudo@hotmail.com)
Sent: Tue 11/22/11 6:32 PM
To:    Claudia Torres (claudia.torres@va.gov); Carolyn Patterson (carolyn.patterson@va.gov)


Hi, again.

I'm forwarding to you the Mid-Term Review email sent to mediation attendees:

From: vjudo@hotmail.com
To: bridget.reinhold@va.gov; marlene.carvajal@va.gov
CC: lynne.woods-hurd@va.gov; sheri.lacro@va.gov; lynee.joyner@va.gov; david.billups@va.gov;
elizabeth.mcdonald@va.gov; sue.hollis@va.gov; susan.hollis@va.gov
Subject: Mid-Term Review Question From Friday's Mediation
Date: Tue, 8 Nov 2011 12:53:33 -0800


You've asked during the November 4, 2011 mediation what my mid-term review was, and though I
hadn't looked at it while compiling my perponderence of evidence, and doing my legal research, I found
it. Here is what Allison Gill said to me in writing about my mid-term review, April 21, 2011, at 12:00 pm:

Mid-term evaluation was:
Average calls per day: 84
Average call length: 3:00

"This means you are fully successful at the half way point. Official evaluations will be done in
September. I will drop off your mid-term evaluation at your desk for you to sign and return to me.
Thank you! Awesome job!" by Allison Gill

This contradicts the termination letter that she wrote about me.

Also, you've asked what my termination letter dated September 28, 2011, states as a reason for
termination. Here's what it says:

"Your supervisors have recommended your termination based on poor customer service, wasting time,
and failure to follow instructions. There continue to be customer complaints of incidents occurring on
June 20, 2011, August 4, 2011, regarding your lack of professionalism as evidenced by reports of contact
of the phone conversations (contained in the evidence file taped to the inside of the evidence folder
which also captures the conversations on a CD). You fail to read emails as instructed to do so."

What this fails to recognize are the weekly reviews, the kudos from veterans, and so much more. This
also fails to recognize that the report submitted to HR, by Allison and Elizabeth, was recrated by Adam
Doyle, someone who Allison trained on the VASDH computers, prior to his being officially employed with
the VA; someone who Allison has played favoritism to; and, someone there's so much more.

Simply The Best,

Carmen Matthews
Quoted by Oprah, on the "Oprah Show"
Quoted by Mike V., Smooth Jazz, 98.1 Radio Station
Publisher of "Tri-Mesa Community Newsletter" (Clairemont, Kearny Mesa & Serra Mesa)
**www.serenesamurai.com**
Facebook Friend
My Letter to the Editor, "Los Angeles Times", Saturday, December 5, 2009, about a need for a new women's healthcare movement
Book Reviews:  www.amazon.com/gp/cdp/member-
reviews/A99CILDQPTRTZ/ref=cm_cr_dp_auth_rev?ie=UTF8&sort%5Fby=MostRecentReview
Phone:  (858) 750-9824



# Report of Contact

## Department of Veterans Affairs

**Date:**   09/02/2011

**From:**   Carmen Matthews

**Sub:**   August 30, 2011, at 10:31 am Call

**To:**   Allison Gill

Thank you for asking me what happened with this call.

As I have explained the distraction of perpetual loud voices in the Call Center, with rage in their tones, coupled with your perpetual threats, have created a problem for me.

My doctor and employee health have discussed this with me.

Also, why is it that you can't celebrate my having gotten calls from vets, because of the Patient Advocate call, but you can focus upon this call?

Carmen Matthews, MSA                September 2, 2011
                                                     Date

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1378   Page 317 of 432

--------------------------------------------------------------------------

Mail Message From: MATTHEWS,CARMEN L  Dated: 08/30/2011 10:51
Subject: Renew/Imhoff 0533/Sin

Pt would like to pick up hard copy scripts, to be taken to Camp
Pendleton for these:

Tests strips
Lancets
Alcohol wipes

Which I don't see listed in cprs.
Pt also states he received a ltr dated 08/10/11 by Dr. Sin about his
lab results being abnormal.

I talked to this pt for a long time, as he vented about not having
been notified that his pcp is no longer with the VA - amongst other
topics.


Contact;  760-722-4032

thx
clm

Response: 1) VAZQUEZ,MARIA Y  09/01/2011 09:47

Dr Wayne, can you please help this?

Case 3:14-cv-01340-MMA-BLM Document 77 Filed 10/22/15 PageID.1379 Page 318 of 432

**Adam Doyle**
Dr. Sin:

Patient Mr. Imoff J 0533 requests a hand
written Rx for his diabetic test strips,
lancets and alcohol wipes.

A1c is worse than it was in April.

Patient requests a call when hand written
script is ready for pickup.

Patient phone number:(760)722-4032

Thank you,
Adam
[ Sep 01, 2011 12:51 PM ]



# Report of Contact

## Department of
## Veterans Affairs

**Date:**   09/02/2011

**From:**   Carmen Matthews

**Sub:**   August 30, 2011, at 10:31 am Call

**To:**   Allison Gill

Thank you for asking me what happened with this call.

As I have explained the distraction of perpetual loud voices in the Call Center, with rage in their tones, coupled with your perpetual threats, have created a problem for me.

My doctor and employee health have discussed this with me.

Also, why is it that you can't celebrate my having gotten calls from vets, because of the Patient Advocate call, but you can focus upon this call?

Carmen Matthews, MSA                September 2, 2011
                                     Date

-----------------------------------------------------------------------

Mail Message From: MATTHEWS,CARMEN L  Dated: 08/30/2011 10:51
Subject: Renew/Imhoff 0533/Sin

Pt would like to pick up hard copy scripts, to be taken to Camp
Pendleton for these:

Tests strips
Lancets
Alcohol wipes

Which I don't see listed in cprs.
Pt also states he received a ltr dated 08/10/11 by Dr. Sin about his
lab results being abnormal.

I talked to this pt for a long time, as he vented about not having
been notified that his pcp is no longer with the VA - amongst other
topics.


Contact;  760-722-4032

thx
clm

Response: 1) VAZQUEZ,MARIA Y  09/01/2011 09:47

Dr Wayne, can you please help this?

**Adam Doyle**
Dr. Sin:

Patient Mr. Imoff J 0533 requests a hand written Rx for his diabetic test strips, lancets and alcohol wipes.

A1c is worse than it was in April.

Patient requests a call when hand written script is ready for pickup.

Patient phone number:(760)722-4032

Thank you,
Adam
[ Sep 01, 2011 12:51 PM ]

- ## FW: Noise Level Results

  To see messages related to this one, group messages by conversation.

  Carmen Matthews (Carmen.Matthews@va.gov)
  8/30/11

  •

  From: **Matthews, Carmen L.** (Carmen.Matthews@va.gov)You moved this message to its current location.
  Sent: Tue 8/30/11 11:14 AM
  To:   vjudo@hotmail.com
  **From:** Gill, Allison M.
  **Sent:** Tuesday, August 30, 2011 11:04 AM
  **To:** Matthews, Carmen L.
  **Cc:** McDonald, Elizabeth P. (VHASDC)
  **Subject:** RE: Noise Level Results

  Carmen,

  In response to your question below, I have taken several steps to decrease the noise in the call center, including requisitioning an entire office re-model for new workstations 7 months ago, I have spoken to each employee individually about the noise level, and I have also addressed the issue with everyone during our staff meeting.

  I do not know the results at this time of the noise level tests that were conducted in the call center. I don't know if they will share those results with me, but I have put the question to my supervisors.

  In the future, refrain from sending messages to the entire staff regarding individual questions you may have for me as this is not an appropriate use of email.

  Thank you,

  *Allison Gill, MBA*

  **Supervisory Medical Administration Specialist**
  **Patient Care Call Center**
  O: 858-642-6466
  F: 619-296-1769
  E: allison.gill@va.gov

  The Call Center would like your anonymous feedback!

  PCCC Feedback Survey

**From:** Matthews, Carmen L.
**Sent:** Tuesday, August 30, 2011 10:53 AM
**To:** Gill, Allison M.; Adams, April P.; Aleman, Evelyn E.; Bridgeforth, Ronald L.; Camp, Donna R.; Chavez, Manuel A.; Doyle, Adam S.; Gray, Cheryl A. (VHASDC); Hibbert, Mary I.; Holmes, Sarah M; Horsley-Watts, Katrina; Johnson, Tina M. (VHASDC); LaSalle, Elise R. (VHASDC); McDevitt, Aaron R.; Mitchell, Anita L.; Moore, Brenda J; Nolan, David (VHASDC); Rice, Christopher G.; Romano, Arthur; Sutton, Nathaniel (VHASDC); Yazzie, Yolanda J.; Zavala, Rigoberto M.
**Subject:** Noise Level Results

Hey, Allison.

You spoke during the month end meeting, on Friday, about the tech having measured the noise level in the Call Center. And, you didn't say what the results were. I'm curious what they were, and what this means to you.

**From:** Gill, Allison M.
**Sent:** Tuesday, August 30, 2011 9:22 AM
**To:** Adams, April P.; Aleman, Evelyn E.; Bridgeforth, Ronald L.; Camp, Donna R.; Chavez, Manuel A.; Doyle, Adam S.; Gray, Cheryl A. (VHASDC); Hibbert, Mary I.; Holmes, Sarah M; Horsley-Watts, Katrina; Johnson, Tina M. (VHASDC); LaSalle, Elise R. (VHASDC); Matthews, Carmen L.; McDevitt, Aaron R.; Mitchell, Anita L.; Moore, Brenda J; Nolan, David (VHASDC); Rice, Christopher G.; Romano, Arthur; Sutton, Nathaniel (VHASDC); Yazzie, Yolanda J.; Zavala, Rigoberto M.
**Subject:** FW: Writing an Effective Self-Assessment

We are approaching the end of the evaluation cycle and I would ask all of you to turn in an optional self assessment reminding me of all the fabulous things you do above and beyond your job description so that I can take them into account when assessing your annual performance. I have attached a guide on how to write an effective self-assessment. Please don't hesitate to ask if you have any questions.

Remember, this is optional ☺

*Allison Gill, MBA*
**Supervisory Medical Administration Specialist**
**Patient Care Call Center**
O: 858-642-6466
F: 619-296-1769
E: allison.gill@va.gov

The Call Center would like your anonymous feedback!

PCCC Feedback Survey

**From:** Adam, Suzanne F.
**Sent:** Tuesday, August 30, 2011 9:17 AM
**To:** SDCVAMC SUPEXMAN
**Cc:** SDCVAMC HRM_LRER; Flores, Kathryn D.; Duenas, Terri C.; Baker, Linette L.
**Subject:** Writing an Effective Self-Assessment

We are approaching the end of the performance cycle for 2011 (September 30, 2011). It is a good time to begin to assembling information to complete the required documentation. One way to assist in this effort is to request a self-assessment or accomplishment report from your employees. These documents are not required documents, but are a valuable tool for your reference and it is an appropriate way to get your employees involved in the process.

Last year, we received several questions related to writing self-assessments and we provide the attached information The attachment is still a good reference which describes what it is and how to write an effective self-assessment.

**Please pass this on to your employees.**

If you or your employees have any questions, please contact your supporting Employee & Labor Relations Specialist: Sheri Lacro x7857, Dave Billups x1197, Bertha Grijalva (Lead) x7864 or Bridget Reinhold (Supervisor) x7231.

*Suzanne F. E. Adam*
Assistant Director, Human Resources Management
VA San Diego Healthcare System
(858) 552-8585 x 3133
*How was your HR Service Today? Let us know by completing our:*

*HR CUSTOMER SERVICE SURVEY*

## • FW: Noise Level Results

To see messages related to this one, group messages by conversation.

Carmen Matthews (Carmen.Matthews@va.gov)
8/30/11

•

From: **Matthews, Carmen L.** (Carmen.Matthews@va.gov)You moved this message to its current
location.
Sent: Tue 8/30/11 11:14 AM
To:   vjudo@hotmail.com
**From:** Gill, Allison M.
**Sent:** Tuesday, August 30, 2011 11:04 AM
**To:** Matthews, Carmen L.
**Cc:** McDonald, Elizabeth P. (VHASDC)
**Subject:** RE: Noise Level Results

Carmen,

In response to your question below, I have taken several steps to decrease the noise in the call
center, including requisitioning an entire office re-model for new workstations 7 months ago, I have
spoken to each employee individually about the noise level, and I have also addressed the issue with
everyone during our staff meeting.

I do not know the results at this time of the noise level tests that were conducted in the call center. I
don't know if they will share those results with me, but I have put the question to my supervisors.

In the future, refrain from sending messages to the entire staff regarding individual questions you
may have for me as this is not an appropriate use of email.

Thank you,

*Allison Gill, MBA*

**Supervisory Medical Administration Specialist**
**Patient Care Call Center**
O: 858-642-6466
F: 619-296-1769
E: allison.gill@va.gov

The Call Center would like your anonymous feedback!

PCCC Feedback Survey

**From:** Matthews, Carmen L.
**Sent:** Tuesday, August 30, 2011 10:53 AM
**To:** Gill, Allison M.; Adams, April P.; Aleman, Evelyn E.; Bridgeforth, Ronald L.; Camp, Donna R.; Chavez, Manuel A.; Doyle, Adam S.; Gray, Cheryl A. (VHASDC); Hibbert, Mary I.; Holmes, Sarah M; Horsley-Watts, Katrina; Johnson, Tina M. (VHASDC); LaSalle, Elise R. (VHASDC); McDevitt, Aaron R.; Mitchell, Anita L.; Moore, Brenda J; Nolan, David (VHASDC); Rice, Christopher G.; Romano, Arthur; Sutton, Nathaniel (VHASDC); Yazzie, Yolanda J.; Zavala, Rigoberto M.
**Subject:** Noise Level Results

Hey, Allison.

You spoke during the month end meeting, on Friday, about the tech having measured the noise level in the Call Center. And, you didn't say what the results were. I'm curious what they were, and what this means to you.

**From:** Gill, Allison M.
**Sent:** Tuesday, August 30, 2011 9:22 AM
**To:** Adams, April P.; Aleman, Evelyn E.; Bridgeforth, Ronald L.; Camp, Donna R.; Chavez, Manuel A.; Doyle, Adam S.; Gray, Cheryl A. (VHASDC); Hibbert, Mary I.; Holmes, Sarah M; Horsley-Watts, Katrina; Johnson, Tina M. (VHASDC); LaSalle, Elise R. (VHASDC); Matthews, Carmen L.; McDevitt, Aaron R.; Mitchell, Anita L.; Moore, Brenda J; Nolan, David (VHASDC); Rice, Christopher G.; Romano, Arthur; Sutton, Nathaniel (VHASDC); Yazzie, Yolanda J.; Zavala, Rigoberto M.
**Subject:** FW: Writing an Effective Self-Assessment

We are approaching the end of the evaluation cycle and I would ask all of you to turn in an optional self assessment reminding me of all the fabulous things you do above and beyond your job description so that I can take them into account when assessing your annual performance. I have attached a guide on how to write an effective self-assessment. Please don't hesitate to ask if you have any questions.

Remember, this is optional ☺

*Allison Gill, MBA*
**Supervisory Medical Administration Specialist**
**Patient Care Call Center**
O: 858-642-6466
F: 619-296-1769
E: allison.gill@va.gov

The Call Center would like your anonymous feedback!

PCCC Feedback Survey

**From:** Adam, Suzanne F.
**Sent:** Tuesday, August 30, 2011 9:17 AM
**To:** SDCVAMC SUPEXMAN
**Cc:** SDCVAMC HRM_LRER; Flores, Kathryn D.; Duenas, Terri C.; Baker, Linette L.
**Subject:** Writing an Effective Self-Assessment

We are approaching the end of the performance cycle for 2011 (September 30, 2011). It is a good time to begin to assembling information to complete the required documentation. One way to assist in this effort is to request a self-assessment or accomplishment report from your employees. These documents are not required documents, but are a valuable tool for your reference and it is an appropriate way to get your employees involved in the process.

Last year, we received several questions related to writing self-assessments and we provide the attached information The attachment is still a good reference which describes what it is and how to write an effective self-assessment.

**Please pass this on to your employees.**

If you or your employees have any questions, please contact your supporting Employee & Labor Relations Specialist: Sheri Lacro x7857, Dave Billups x1197, Bertha Grijalva (Lead) x7864 or Bridget Reinhold (Supervisor) x7231.

*Suzanne F. E. Adam*
Assistant Director, Human Resources Management
VA San Diego Healthcare System
(858) 552-8585 x 3133
*How was your HR Service Today? Let us know by completing our:*

*HR CUSTOMER SERVICE SURVEY*

Carmen Matthews
P. O. Box 232313
San Diego, CA   92193
(858) 750-9824
URL: www.serenesamurai.com
Email: vjudo@hotmail.com

April 25, 2013

David Moon
Manager, Regional Office
Region IX
OSHA
90 7th Street, Suite 18100
San Francisco, California 94103

Dear Mr. Moon,

Thank you for taking the time to discuss with me how the process works for a federal employee to file a complaint against their employer.

As I've shared with you, while working for the VA San Diego Healthcare, I reported to my supervisor, and to others in the chain of command about how the noise level in the Call Center was effecting my breathing.  I even went to Employee Health, then to my primary physician to assess this.

This was followed by my completing a request for a reasonable accommodation change.  My request was sat on for some time, and I was even told that although I sent it originally to our Labor Relations Manager, who is on the reasonable accommodation committee, I was told that I need to resend my request to the head of the committee.

In the meantime, my supervisor said she had brought someone in to assess the noise level.  And, it wasn't until many months later, in the process of discovery on my EEOC claims against the VA San Diego that my supervisor claims to have contacted OSHA.

On the OSHA federal website, I don't see a complaint for the VA San Diego.  That's why I called your office.

And, my understanding of what you shared with me, not only has VA San Diego  not filed an OSHA complaint on my behalf, this is not the way it is usually done – it's the employee who files the complaint.

While it may be too late to lodge an OSHA complaint against VA San Diego, I intend to use this information for some of my EEOC claims against VA San Diego, because although Allison Gill,

1

my former supervisor swore under oath in her affidavit to have had OSHA assess this issue, it appears from talking to you, and from looking up complaints on the OSHA website, that Allison Gill did not tell the truth.

Again, I appreciate your diligence in helping me.  I also appreciate your sending me to 29 C.F.R. 1910.95.


Respectfully,



Carmen Matthews

2

Carmen Matthews
P. O.  Box 232313
San Diego, CA   92193
(858) 750-9824
URL: www.serenesamurai.com
Email: vjudo@hotmail.com

April 25, 2013

David Moon
Manager, Regional Office
Region IX
OSHA
90 7th Street, Suite 18100
San Francisco, California 94103

Dear Mr. Moon,

Thank you for taking the time to discuss with me how the process works for a federal employee to file a complaint against their employer.

As I've shared with you, while working for the VA San Diego Healthcare, I reported to my supervisor, and to others in the chain of command about how the noise level in the Call Center was effecting my breathing.  I even went to Employee Health, then to my primary physician to assess this.

This was followed by my completing a request for a reasonable accommodation change.  My request was sat on for some time, and I was even told that although I sent it originally to our Labor Relations Manager, who is on the reasonable accommodation committee, I was told that I need to resend my request to the head of the committee.

In the meantime, my supervisor said she had brought someone in to assess the noise level.  And, it wasn't until many months later, in the process of discovery on my EEOC claims against the VA San Diego that my supervisor claims to have contacted OSHA.

On the OSHA federal website, I don't see a complaint for the VA San Diego.  That's why I called your office.

And, my understanding of what you shared with me, not only has VA San Diego  not filed an OSHA complaint on my behalf, this is not the way it is usually done – it's the employee who files the complaint.

While it may be too late to lodge an OSHA complaint against VA San Diego, I intend to use this information for some of my EEOC claims against VA San Diego, because although Allison Gill,

my former supervisor swore under oath in her affidavit to have had OSHA assess this issue, it appears from talking to you, and from looking up complaints on the OSHA website, that Allison Gill did not tell the truth.

Again, I appreciate your diligence in helping me.  I also appreciate your sending me to 29 C.F.R. 1910.95.


Respectfully,



Carmen Matthews

2

*# 2011 — 0048*

**EMPLOYEE HEALTH SERVICES**

## INFORMATION REGARDING OCCUPATIONAL INJURIES/ILLNESS

### What is a work-related injury?

*# 2011 — 00419*
*environmental exposure*

Any injury sustained while in the performance of work by a VASDHS employee, except for non-appropriated fund employees is covered by Federal Employees Compensation ACT (FECA). Occupational injuries and illnesses covered by FECA are reported to Department of Labor (DOL), Office of Workers Compensation (OWCP).

### (1) Is it necessary to report all injuries that occur at work, even minor injuries such as a scratched finger or bumped knee?

All injuries should be reported since a seemingly minor injury may develop into a more serious condition. For protection, the employee should file a report of the injury with the immediate supervisor when it occurs. Benefits cannot be paid unless an injury is reported.

### (2) How is a "Traumatic Injury" defined?

A traumatic injury is defined as a wound or other condition of the body caused by external force, including stress or strain. The injury must be identifiable as to time and place of occurrence and member or function of the body affected. The injury must be caused by a specific event or incident, or series of events or incidents within a single work shift. Traumatic injuries include damage to, or destruction of prosthetic devices or appliances, if damaged incidental to a personal injury requiring medical services.

### (3) Is an injured employee entitled to medical care?

If an employee requires medical treatment because of a work related injury or traumatic illness, the employee should obtain a <u>CA-16, "Authorization for Examination and/or Treatment"</u>. At VASDHS a CA-16 **will not be issued after 7 days from the date of the injury**. In an emergency, HRM can authorize medical treatment by telephone or fax the completed CA-16 to the treating facility. A CA-16 can only be issued for injury or traumatic illnesses reported on a CA-1, and are not issued for work-related illnesses reported on a CA-2.

### (4) What is the definition of an "Occupational Illness" (also called a nontraumatic injury)?

An occupational disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from systemic infection, repeated stress or strain, exposure to toxins, poisons, fumes or other continuing conditions of the work environment.

### (5) Can a toxic exposure be considered a traumatic injury?

Yes, if the injury/illness is the result of one day's exposure. If the injury is the result of an exposure beyond one day or shift it is an occupational illness.

### (6) How is a work related injury reported?

Whenever a work-related injury or illness occurs an OWCP Form must be completed as soon as possible. At VASDHS the supervisor must be notified immediately if an injury requires medical

attention or leaving the work area. During regular administrative hours injured employees must report to Employee Health for First Aid and injury documentation. On weekends, holidays or after hours the injured employee should inform the supervisor of the injury and if medical attention is needed, be directed to the Urgent Care Clinic. It is the responsibility of the Supervisor to provide a CA-1 or CA-2 to the injured employee, and assure it is returned as soon as possible for completion by the supervisor. The injured employee should be directed to EHS the next working day after the injury for documentation and referral. When an employee reports a work related illness the employee must also inform the supervisor who must complete a 2162 for any work related injury or illness, and a CA-1 or CA-2, whichever is appropriate.

Form CA-1, Federal Employee's notice of Traumatic Injury and Claim for Continuation of Pay/Compensation" is the form to be completed when reporting a traumatic injury.

Form CA-2, "Federal Employee's Notice of Occupational Disease and Claim for Compensation" is the form used to report an occupational disease. In addition, there are specific checklists, Form CA-35A-H that may be needed depending upon the type of injury or illness. These are available in Employee Health Services (EHS) or through Human Resources Management.

(7) What is an Occupational Disease or Illness (also called a non-traumatic Illness)?

An Occupational Disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from a systemic infection, repeated stress or strain, exposure to toxins, poisons, fumes or other continuing conditions of the work environment.

(8) Can someone other than the injured employee complete the report of injury forms?

Yes. Another person, including the supervisor can complete forms, when an employee is incapacitated and unable to complete a form.

(9) Is a recurrence of an employment-related disability covered by FECA?

Yes, If an injured employee is disabled as a result of the original injury or occupational disease, there is coverage under FECA. The recurrence should be promptly reported by completing the CA-2a "Notice of Employee's Recurrence of Disability and Claim for Pay/Compensation". This form should be returned to the supervisor.

(10) Is a pre-existing condition that is aggravated by conditions of employment covered?

Diseases and illnesses aggravated, accelerated or precipitated by conditions of employment are covered. The employee must submit medical evidence and factual evidence that establishes that the condition was aggravated, accelerated or precipitated by conditions of employment. Charges for initial medical treatment received without authorization by a CA-16 may still be paid by OWCP when it has been determined that the treatment resulted from the work-related injury. A CA-16 guarantees payment tot he original treating physician (or any employee to whom the injured employee is referred from the original treating physician) for 60 days from the date of issuance unless OWCP terminates the authorization earlier. Treatment may continue at OWCP expense when authorized, if the claim is approved. At VASDHS the OWCP Specialist issues the CA-16 in Human Resource Management.

**(11) Can the injured employee choose the physician who will provide treatment?**

An injured employee is entitled to initial selection of a treating physician of facility for treatment of an injury. A first aid visit for immediate evaluation and /or treatment of an injury is not considered as election of a treating physician. Employee Health Services may provide initial evaluation and treatment of the injury, but the employee is entitled to select the treating physician of their choice, and treatment must not be delayed by the employing agency.

**(12) How does FECA define "physician"?**

The term "physician" includes surgeons, podiatrists, dentists, clinical psychologists, optometrists, osteopaths and chiropractors within the scope of their practice as defined by State Law. Under FECA the services of chiropractors may only be reimbursed for treatment consisting of manual manipulation of the spine to correct a subluxation. "Subluxation" is defined as a incomplete dislocation, off-centering, misalignment, fixation or abnormal spacing of the vertebrae which must be demonstrable on a radiograph to individuals trained in radiology.

**(13) Will OWCP pay the entire bill?**

OWCP uses a schedule of maximum allowable medical charges for services rendered by a treating physicians, surgeons, podiatrists, dentists, clinical psychologists, optometrists, osteopaths and chiropractors, including services rendered in a medical facility. The employee is not responsible for amounts charged is excess of maximum allowable charges for OWCP covered treatment.

**(14) Can an employee change the Treating Physician?**

Once a treating physician has been elected the employee must contact OWCP and request authorization to change the physician, otherwise, OWCP will not be liable for the expenses of treatment.

**(15) Will an employee's health benefit plan pay medical expenses resulting from work related injury or disease?**

Health benefits have an exclusion clause regarding treatment of workers' compensation injuries, and a plan will not pay medical expenses if the insurance carrier is aware that a workers' compensation injury is involved. If the insurance carrier provides medical care for a injury or illness that is later determined to be work-related, OWCP will reimburse the insurance carrier at the allowable rate.

**(16) When OWCP denies a claim, who pays for medical expenses?**

When an OWCP claim is denied the employee is responsible for any medical expenses incurred. However, the employees Health Care Plan may cover the expenses as a non-work-related condition. For this reason, when an employee is uncertain concerning the relationship of the condition to work, it may be advisable for treatment to be provided by a physician authorized under the employee's insurance plan. Employees will be also billed for physician visits at VASDHS when OWCP denies a claim.

**(17)  What are the responsibilities of the employee who is injured at work?**

The injured employee is responsible for the following:

- Reporting the injury to the supervisor immediately
- Reporting to Employee Health Services (EHS) at the time of the injury during normal working hours, or on the next working day to specify the election of a treating physician
- Obtaining a notification letter regarding Modified Duty availability from EHS for completion by the Treating Physician.
- Assuring the return of the Modified Duty availability letter to EH after evaluation by the treating physician (by fax or in person).
- Complying with requests to obtain information concerning limitations and ability to work
- Informing the supervisor of work status
- Working within the limitations specified by the treating physician
- Reporting any aggravation of symptoms to EHS or the treating physician, should they occur.
- Prompting responding to OWCP requests for additional information (including contacting the treating physician when necessary to answer such requests.

**(18)  When must an injured employee return to work?**

Unless the treating physician indicates the employee is "totally disabled", the employee must report to work for "modified duty" within the limitations specified by the treating physician when an assignment can be provided within the specified physical limitations.

**(19)  What is "modified duty"?**

Modified duty is an assignment to work that is within the specified physical abilities of the injured employee based on the recommendations of the treating physician.  A modified duty assignment may involve doing work that is different from the usual work performed by an employee, or may involve having an employee work less than 8 hours a day or less than full time. Whenever possible an attempt will be made to assign the injured employee to modified duty within their Service. In some cases, an employee may be assigned to modified duty outside of their usually assigned work area or Service?

**(20)  Must an employee accept a modified duty assignment?**

An employee is required by law to return to work or as soon as the employer identifies a job suitable to the medical limitations specified by the treating physician. If your employing agency gives you a written description of a modified duty assignment you must provide a copy to your physician and ask when you can perform modified duty. If you are offered modified duty you must provide this information to your physician and ask for written specification of your limitations. In any case, you must advise your supervisor immediately of your physicians instructions concerning return to work, and provide written verification of this information. Refusal of a suitable modified duty assignment by an employee will result in a termination of compensation for lost time. OWCP will not compensate an employee who is able to work but refuses a suitable modified duty assignment due to transportation difficulties.

For further information about OWCP benefits and forms please contact your supervisor or ~~Maria~~ ~~Renata~~ in HRM @ Extension ~~3851~~ 3912 ( ~~illegible~~ )  .

VA cell – (855) – 336 – 3742

Carvajal
X3912

*# 2011 — 0048*
*other claim*

# EMPLOYEE HEALTH SERVICES
## INFORMATION REGARDING OCCUPATIONAL INJURIES/ILLNESSES

### What is a work-related injury?

*# 2011 — 00419*
*environmental exposure*

Any injury sustained while in the performance of work by a VASDHS employee, except for non-appropriated fund employees is covered by Federal Employees Compensation ACT (FECA). Occupational injuries and illnesses covered by FECA are reported to Department of Labor (DOL), Office of Workers Compensation (OWCP).

### (1) Is it necessary to report all injuries that occur at work, even minor injuries such as a scratched finger or bumped knee?

All injuries should be reported since a seemingly minor injury may develop into a more serious condition. For protection, the employee should file a report of the injury with the immediate supervisor when it occurs. Benefits cannot be paid unless an injury is reported.

### (2) How is a "Traumatic Injury" defined?

A traumatic injury is defined as a wound or other condition of the body caused by external force, including stress or strain. The injury must be identifiable as to time and place of occurrence and member or function of the body affected. The injury must be caused by a specific event or incident, or series of events or incidents within a single work shift. Traumatic injuries include damage to, or destruction of prosthetic devices or appliances, if damaged incidental to a personal injury requiring medical services.

### (3) Is an injured employee entitled to medical care?

If an employee requires medical treatment because of a work related injury or traumatic illness, the employee should obtain a CA-16, "Authorization for Examination and/or Treatment". At VASDHS a CA-16 will not be issued after 7 days from the date of the injury. In an emergency, HRM can authorize medical treatment by telephone or fax the completed CA-16 to the treating facility. A CA-16 can only be issued for injury or traumatic illnesses reported on a CA-1, and are not issued for work-related illnesses reported on a CA-2.

### (4) What is the definition of an "Occupational Illness" (also called a nontraumatic injury)?

An occupational disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from systemic infection, repeated stress or strain, exposure to toxins, poisons, fumes or other continuing conditions of the work environment.

### (5) Can a toxic exposure be considered a traumatic injury?

Yes, if the injury/illness is the result of one day's exposure. If the injury is the result of an exposure beyond one day or shift it is an occupational illness.

### (6) How is a work related injury reported?

Whenever a work-related injury or illness occurs an OWCP Form must be completed as soon as possible. At VASDHS the supervisor must be notified immediately if an injury requires medical

attention or leaving the work area. During regular administrative hours injured employees must report to Employee Health for First Aid and injury documentation. On weekends, holidays or after hours the injured employee should inform the supervisor of the injury and if medical attention is needed, be directed to the Urgent Care Clinic. It is the responsibility of the Supervisor to provide a CA-1 or CA-2 to the injured employee, and assure it is returned as soon as possible for completion by the supervisor. The injured employee should be directed to EHS the next working day after the injury for documentation and referral. When an employee reports a work related illness the employee must also inform the supervisor who must complete a 2162 for any work related injury or illness, and a CA-1 or CA-2, whichever is appropriate.

Form CA-1, Federal Employee's notice of Traumatic Injury and Claim for Continuation of Pay/Compensation" is the form to be completed when reporting a traumatic injury.

Form CA-2, "Federal Employee's Notice of Occupational Disease and Claim for Compensation" is the form used to report an occupational disease. In addition, there are specific checklists, Form CA-35A-H that may be needed depending upon the type of injury or illness. These are available in Employee Health Services (EHS) or through Human Resources Management.

(7) What is an Occupational Disease or Illness (also called a non-traumatic Illness)?

An Occupational Disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from a systemic infection, repeated stress or strain, exposure to toxins, poisons, fumes or other continuing conditions of the work environment.

(8) Can someone other than the injured employee complete the report of injury forms?

Yes. Another person, including the supervisor can complete forms, when an employee is incapacitated and unable to complete a form.

(9) Is a recurrence of an employment-related disability covered by FECA?

Yes, If an injured employee is disabled as a result of the original injury or occupational disease, there is coverage under FECA. The recurrence should be promptly reported by completing the CA-2a "Notice of Employee's Recurrence of Disability and Claim for Pay/Compensation". This form should be returned to the supervisor.

(10) Is a pre-existing condition that is aggravated by conditions of employment covered?

Diseases and illnesses aggravated, accelerated or precipitated by conditions of employment are covered. The employee must submit medical evidence and factual evidence that establishes that the condition was aggravated, accelerated or precipitated by conditions of employment. Charges for initial medical treatment received without authorization by a CA-16 may still be paid by OWCP when it has been determined that the treatment resulted from the work-related injury. A CA-16 guarantees payment tot he original treating physician (or any employee to whom the injured employee is referred from the original treating physician) for 60 days from the date of issuance unless OWCP terminates the authorization earlier. Treatment may continue at OWCP expense when authorized, if the claim is approved. At VASDHS the OWCP Specialist issues the CA-16 in Human Resource Management.

**(11)  Can the injured employee choose the physician who will provide treatment?**

An injured employee is entitled to initial selection of a treating physician of facility for treatment of an injury.  A first aid visit for immediate evaluation and /or treatment of an injury is not considered as election of a treating physician. Employee Health Services may provide initial evaluation and treatment of the injury, but the employee is entitled to select the treating physician of their choice, and treatment must not be delayed by the employing agency.

**(12)  How does FECA define "physician"?**

The term "physician" includes surgeons, podiatrists, dentists, clinical psychologists, optometrists, osteopaths and chiropractors within the scope of their practice as defined by State Law. Under FECA the services of chiropractors may only be reimbursed for treatment consisting of manual manipulation of the spine to correct a subluxation. "Subluxation" is defined as a incomplete dislocation, off-centering, misalignment, fixation or abnormal spacing of the vertebrae which must be demonstrable on a radiograph to individuals trained in radiology.

**(13)  Will OWCP pay the entire bill?**

OWCP uses a schedule of maximum allowable medical charges for services rendered by a treating physicians, surgeons, podiatrists, dentists, clinical psychologists, optometrists, osteopaths and chiropractors, including services rendered in a medical facility. The employee is not responsible for amounts charged is excess of maximum allowable charges for OWCP covered treatment.

**(14)  Can an employee change the Treating Physician?**

Once a treating physician has been elected the employee must contact OWCP and request authorization to change the physician, otherwise, OWCP will not be liable for the expenses of treatment.

**(15)  Will an employee's health benefit plan pay medical expenses resulting from work related injury or disease?**

Health benefits have an exclusion clause regarding treatment of workers' compensation injuries, and a plan will not pay medical expenses if the insurance carrier is aware that a workers' compensation injury is involved. If the insurance carrier provides medical care for a injury or illness that is later determined to be work-related, OWCP will reimburse the insurance carrier at the allowable rate.

**(16)  When OWCP denies a claim, who pays for medical expenses?**

When an OWCP claim is denied the employee is responsible for any medical expenses incurred. However, the employees Health Care Plan may cover the expenses as a non-work-related condition. For this reason, when an employee is uncertain concerning the relationship of the condition to work, it may be advisable for treatment to be provided by a physician authorized under the employee's insurance plan. Employees will be also billed for physician visits at VASDHS when OWCP denies a claim.

**(17) What are the responsibilities of the employee who is injured at work?**

The injured employee is responsible for the following:

- Reporting the injury to the supervisor immediately
- Reporting to Employee Health Services (EHS) at the time of the injury during normal working hours, or on the next working day to specify the election of a treating physician
- Obtaining a notification letter regarding Modified Duty availability from EHS for completion by the Treating Physician.
- Assuring the return of the Modified Duty availability letter to EH after evaluation by the treating physician (by fax or in person).
- Complying with requests to obtain information concerning limitations and ability to work
- Informing the supervisor of work status
- Working within the limitations specified by the treating physician
- Reporting any aggravation of symptoms to EHS or the treating physician, should they occur.
- Prompting responding to OWCP requests for additional information (including contacting the treating physician when necessary to answer such requests.

**(18) When must an injured employee return to work?**

Unless the treating physician indicates the employee is "totally disabled", the employee must report to work for "modified duty" within the limitations specified by the treating physician when an assignment can be provided within the specified physical limitations.

**(19) What is "modified duty"?**

Modified duty is an assignment to work that is within the specified physical abilities of the injured employee based on the recommendations of the treating physician. A modified duty assignment may involve doing work that is different from the usual work performed by an employee, or may involve having an employee work less than 8 hours a day or less than full time. Whenever possible an attempt will be made to assign the injured employee to modified duty within their Service. In some cases, an employee may be assigned to modified duty outside of their usually assigned work area or Service?

**(20) Must an employee accept a modified duty assignment?**

An employee is required by law to return to work or as soon as the employer identifies a job suitable to the medical limitations specified by the treating physician. If your employing agency gives you a written description of a modified duty assignment you must provide a copy to your physician and ask when you can perform modified duty. If you are offered modified duty you must provide this information to your physician and ask for written specification of your limitations. In any case, you must advise your supervisor immediately of your physicians instructions concerning return to work, and provide written verification of this information. Refusal of a suitable modified duty assignment by an employee will result in a termination of compensation for lost time. OWCP will not compensate an employee who is able to work but refuses a suitable modified duty assignment due to transportation difficulties.

For further information about OWCP benefits and forms please contact your supervisor or ~~them~~ ~~Ruth~~ in HRM @ Extension ~~3351~~ 3912 ( ~~Christabel~~ ) .

*Christabel*
*X3912*

VA cell → (855) — 336 — 3742

| VA | Department of Veterans Affairs | REPORT OF CONTACT |
|---|---|---|

NOTE: *As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE<br>HAS/Primary Care Call Center | IDENTIFICATION NOS. (C,XC,SS,XSS, V,K, etc.) |
|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)*<br>MATTHEWS, CARMEN L. | DATE OF CONTACT<br>5/12/11 |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

This report details my work environment experiences, primarily with Allison Gill, the Primary Care Call Center.

Because the details span into several pages, I've attached a detailed descripton of the adverse condition that I've been working under.

Other information:
1. Email to HR (Dana Sweeney & Jeanette Cortez
   "Questions (April 5 - april 19, 2011)
2. Fraud
   - Doing her homework at the office, for several hours then disappearing for blocks of hours, without leaving a contact, except for Adam Doyle
   - Some literally watching movies, Rather than answering calls.
   - ... Cheng

| DIVISION OR SECTION<br>HAS Primary Care Call Center | EXECUTED BY (Signature and Title)<br>Carmen L. Matthews |
|---|---|

# Report of Contact by Carmen L. Matthews (May 10, 2011)

## What's at Issue

Allison Gill, Primary Care Call Center Supervisor has created, nourished and preserved a hostile, undesirable, and offensive work environment.

Her conduct and the conduct of those whom she has appointed as leaders in this Call Center is habitually unwelcome, hostile and offensive.

I've demonstrated in this document that there is also gender harassment.

Each scenario captured in the document has a heading in bold print, to help those in the position to solve this problem.

With the Call Center being away from the hospital and clinics, and employees limited to this pervasive environment, as there is no outlet on the premises, I feel that my chances of working at the level and in the environment that I deserve to be in are next to impossible.

## Supervisor Requiring Staff to Pay for Call Center Refrigerator

Towards the end of our Call Center monthly meeting, April 29, 2011, led by Call Center Supervisor, Allison Gill, Barbara Harvey came into the Call Center, unnoticed by most, to clean out her refrigerator.

It was lunch time, and when Allison asked if there were any comments, I asked if anyone had any food in the fridge, and told that Barbara and the other nurses were cleaning out their fridge.

At that moment, Allison asked me why Barbara hadn't announced this prior, as though I was responsible for Barbara's actions.

I explained that Barbara had posted a flyer more than a week ago, announcing that she would be cleaning out and moving her refrigerator, by close of business, April 22, 2011.

Please note that the refrigerator clean out date listed in this may not be exactly correct, but she had announced this to everyone.

Allison asked whose refrigerator it was, and I explained that Barbara had bought that fridge with her own money, years ago; and that she was moving it to her new office location.

Thursday, May 5, 2011, Allison Gill sent an email to everyone in the Call Center, stating that she can buy a refrigerator if everyone can throw in $20. She went on to say in this email, "...but it would have to be every single person chipping in." She also said that she would pick up the balance and pay it on her Lowes' credit card. In this same email, Allison did ask if there was anyone who couldn't chip in.

Friday, April 29, 2011, Allison sent April Adams, one of the new Call Center Leads to go one-by-one to collect $20 from each Call Center employee working that day. Some declined.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

Monday, May 9, 2011, Allison emailed everyone in the Call Center, stating that she was able to talk down the $400 price to $200, plus tax, and that only eleven people, including her have either paid, or agree to pay $20 for this refrigerator.

There are 21 people now working in the Call Center.

In this email, she further stated, "People who did not pay may not use the fridge without donating into our group party fund, $1 per week's use. .. If you want to participate in a pot luck for our monthly meeting and you did not contribute to the fridge fund, you would need to bring food or give money for the food part AND donate $ for use of the fridge."

After Allison sent this email, she came out of her office, stopping everyone from doing their work, to get their attention on her. And, she repeated what she had already put in the email to all of us. *[handwritten: minutes before this, Adam Doyle asked me if I know how to fix the problem he was having with his phone. I said "No", and walked away.]* *[handwritten: Then Allison told everyone to get off the phones, as]*

She added "I got that big discount because I was really nice. ... And, of course it was a man who I negotiated with."

This seemed to be over the top, and unnecessary.

### *More Conflict Post-Refrigerator*

05/10/11, 1:10, Allison Gill came to me telling me to come to her office. She asked me to close the door. And, after I closed the door, she said, I'm hearing from more than one person that you are unhappy working here.

I replied with, "I'm not sure who you're talking to, because I am very positive. And, I don't want to have this conversation with you."

She said, "Well, I care about your well-being. And, as the manager here, I am responsible for things being positive around here. You have never come to me to discuss any issues. I've been told that I need to do more one-on-one training, and that that will help things."

I said, "I'm not having this conversation with you.

She said, "Well you are welcome to coming to me, or to any of the 2 leads, to discuss things; or, would you like to have your union representative here with you."

I said, "Four months into my being here, you want to have a conversation about my interests? I'm not interested in having a conversation about this work environment with you, this week."

She said, "Well, I just want to say that I have expressed my interest in improving things for you. And, if this continues, I will have to do a conduct (then she paused)."

I said, "I'm very positive, not defined by this Call Center, and being involved in motivational things, I wouldn't allow this to get to me. I'm going now."

## Report of Contact by Carmen L. Matthews (May 10, 2011)

May 11, 2011, at 10:40 am, April Adams, one of the new Call Center Leads came to my workstation, telling me that Allison wants me to come to her office.

I said, "Ah, no.  I'd like to wait until at least my meeting tomorrow morning."

May 11, 2011, 10:44 am, Allison came to ask me if April told me to come to Allison's office and if I refused to come to the office.

I said, "I told her that I'd like to wait until after my meeting tomorrow morning."

Allison then walked away, and I called Marlene at EEO, to confirm our appointment and to tell her about this latest invitation.

Marlene advised me to recall that decision and go to the meeting with Allison, April and Aaron.

I immediately emailed Allison to say that Marlene had advised that I attend the meeting.

April came to invite me to stop by Allison's office, after I finish lunch.

May 11, 2011, 11:40, I stopped by Allison's office, with April and Aaron attending.

Allison was the only one of the three to speak.  She said, "I'm trying once again to see what it is you are so unhappy about the Call Center.  You are free to share it with me, or the two leads here."

I looked at April and Aaron as I said, "Yeah, I've also said what I needed to say to you guys."

Allison said, "But you have never come to me with any problems. And, whatever it is, you know you are welcome to go to my boss, Liz McDonald.  You know?"

I said, "Again, I'm not having this conversation right now.  I am positive here.

Allison interjected, "Okay.  I tried here to solve the problem.  Yes.  Thank you for being so positive in the Call Center." *before you go to complain to wh ever it is that you are complainin to, to more*

This last statement made by Allison, in the presence of April and Aaron, contradicts what she told me in her office, May 10, 2011.

Then I left that office, with the 3 of them still meeting.

## Conflict Between Head Nurse for Call Center and Call Center Supervisor of MSA's

# Report of Contact by Carmen L. Matthews (May 10, 2011)

When I received a call from Barbara Harvey, Monday, April 25, 2011, asking me why they, the nurses who had moved out of the Call Center, the previous week was not getting calls, I was surprised that she was calling me.

I explained as best that I could, and Barbara seemed to need more than what I was in the position to tell her. *by her pressing questions,*

So, I captured my telephone conversation in an email to Allison Gill, the Call Center Supervisor. The essence or intent of this email was for Allison to talk to Barbara about the emergency and non-emergency calls. I wanted Allison to tell Barbara where the calls were going, as the nurses' transition from being in the Call Center to their setting up in their new Mission Valley VA, first Floor location. *Quite frankly, I was sure what we were supposed to do with the RN Emergent calls, during this transition.*

And, rather than calling Barbara, or emailing an answer, Allison used my email to answer the question, and cc'd it to Barbara.

## From Screaming at Me to Lies and Threats

When I first started at the Call Center, I came with experience in VASDH software, leadership, and healthcare from UCSD, Sharp, Alvarado and more.

However, as could be expected, learning to use all 7 software tools that are necessary in the Call Center; combined with the noise-level, there could be some errors, as I experienced during my first 3 weeks.

But, I did not expect to be approached as I had been approached by Allison.

She would come to me, irate, with a hard copy of a message that I sent to the clinical teams, which either had something missing, or inaccurate.

There was no quiet, supportive instruction or time to find out what happened.

I did everything I could to stay focus and remind myself of my intention. So, that I am not torn down by her lack of emotional control.

To counter the volume of noise and other distractions, I made a commitment to write out the processes, gather information relevant to the job, and extend my connections with other VA employees. So that I always had a source of information.

And this worked.

But, I believe that even though she no longer screamed at me, the scenarios that I've captured in this document show a continued level of unwarranted hostility. *An example of this was demonstrated during the Leads interviews, where Allison snapped at me, when she asked Why I was forced . . . How to . . . in the Call Cen . . .*

## Diggi-Logger Not Available to Me From Early February to Well Into April, 2011

# Report of Contact by Carmen L. Matthews (May 10, 2011)

When Brenda Moore, our former Call Center Lead suggested that I move from my workstation to her cubicle, after she moves, she also suggested that I email a request to Allison, the Call Center Supervisor, to request this action.

Allison invited another Call Center employee to flip a coin with me, to see who would get this cubicle. And I won.

But, from the moment that I moved to that new, less noisy location, I was unable to have access to the Diggi-logger.

The Diggi-Logger is a tool used in evaluating each scheduler's calls (time, voice, and more). It is also used to track status of a patient's request for prescription changes, made through the Call Center, and other requests.

Without this tool, and when a veteran tries to follow up on his or requests, staff in the Call Center, have to do more running around, trying to track down if a message was created and where it is.

On more than four occasions, I told Allison that I didn't have Diggi-Logger. She always either asked me why I didn't have it, or she told me "We are working on getting that fixed for you."

So, I called Brenda Moore, to ask her if she could help in this. She advised me to call Nam Ho, from IT. I also sought the support from Jonathan Conway, who works in IT.

Both had done as much as they could, and sent an email to Allison, ccing me, but I still never got that tool back, until I emailed Elizabeth McDonald.

I asked Elizabeth, in an email if my upcoming evaluation, and my application for the open Lead position would be impacted by my not having Diggi-Logger.

Days later, using Microsoft Instant Messaging. Allison Gill asked everyone in the Call Center if their Diggi-Logger were down. One of the four part time staff responded with, "I never had it."

I responded by saying that I didn't have Diggi-Logger. This led to several messages from Allison, one of which Adam Doyle responded, even though he wasn't on the distribution. He said, "Did you mean this message for me?" *This means that Adam Doyle Received copies of our Instant messages without our knowing this.*

Allison had said that she thought Adam had taken care of my Diggi-Logger problem. She also stated in *∧ whom she has publicly touted as "our computer expert"* one of these messages that she has been calling the Diggi-Logger people for the past 10 months, trying to solve Diggi-Logger problems, but that she couldn't get them to return her calls.

That day, within 10 minutes of approaching my workstation, Adam Doyle gave me access to Diggi-Logger.

## Whenever I email valuable information to the Call Center, Allison attacks it

***MOVE Program & Dietary:***

# Report of Contact by Carmen L. Matthews (May 10, 2011)

March 21, 2011, I emailed the Call Center team, because a question kept coming up about what the MOVE Program was, and what Dietary meant.

I announced in this email that I talked to Erlinda Rowe, a friend of mine in Food & Nutrition Services, who explained the differences to me, which I listed in this email. I also listed the names and numbers of the outpatient dieticians. And I ended this by saying to not give the patients the extensions to this dieticians.

Allison emailed in response to this email, "W e do not schedule the classes. We schedule the one-on-one consults. If you click on the consults, it will tell you what to schedule."

Allison then came to me saying, "I can't believe you put that information out there. They won't know what to do with that information."

Then, the rules on what to do with Dietary appointments changed.

### Our Former Lead's Messages to Us:

March 23, 2011, after speaking to Brenda Moore, our former Lead, who was promoted to a position at the VA Hospital, she asked me to email everyone.

In her message, which I emailed to all, she shared that she wished that she had learned from the Leads at the La Jolla VA what one can really do with VistA and CPRS.

March 24, 2011, Allison Gill responded to this email with and email to everyone in the Call Center, and to Brenda, who no longer works in the Call Center, "I'm one step ahead. I am working on a cross-training program for us."

### Allison emailed me to not email anyone outside of the Call Center, unless I run it by her first:

May 5, 2011, when Mike V, of 98.1 KiFM Smooth Jazz Radio sent me a message to listen to his show at 8:30 am show, where he was going to quote me from an empowering quote that I posted on my Facebook page, I waited until the end of the day to email everyone in the Call Center, along with others in the VASDH, about this.

The quote was, "When you react, you're being controlled by the situation. When you respond, you're dealing with it." By George J. Thompson, Ph.d., author of "Verbal Judo."

for everyone.

I put in this email that 98.1 is the same radio station that the Welcome Center at VA LJ plays Monday through Friday.

Prior to receiving this email, and shortly after my having sent this message out to everyone, one of the Call Center employees whose workstation is next to Allison's office, sent me an email asking me what the connection was. I gave him a polite, succinct explanation.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

The April 25, 2011, email from Allison Gill said, "Please do not send emails to folks outside of our call center unless you run them by me first."

### Not Knowing What Our Work Schedule Was:

After Allison's March 30, 2011 email stating that our new work schedule would start Monday, April 25, 2011, there was no further mention of this,

So, when no further mention of this was made, and I was getting questions from people who were on vacation Friday, April 22, 2011, I emailed the team, asking if there were other changes to our schedule.

The acting leads responded with, "I don't know of a change.  Do you?"

And, because Allison was not in the Call Center, and not available to anyone of, as is often the case, I didn't get an answer from Allison, until Monday morning, April 25, 2011.

Here's how she reacted in an email to me, "I do not have a date for shift changes yet as the redesign team has not given them to me.  Once I know, I'll let you know."

Yet, If someone, or myself honored what her emailed schedule was, not knowing that this was up in the air again, we might have been held at fault.

## Acting Lead, Aaron McDevitt Tries to Bully My Media Connections On Behalf of the Team

March 10, 2011, Acting Primary Care Call Center Lead, Aaron McDevitt sent an email out to everyone in the Call Center, including the nurses, who used to be in the Call Center.  This message asked who might be interested in participating in "The Navy's 25[th] Original Bay Bridge Run/Walk, for Sunday, May 15, 2011.

This same email said, "I know money is tight for all of us in this economy ..."

That same day, I responded to Aaron's email with this message, "I will do it.  Yeah!"

The next day, while in the Call Center break room, with no one around but Aaron and I, Aaron told me, "Man it would really nice to do that, but, even Allison doesn't have the money to do it, and we want the team to be represented in this."

I said, "I signed up."  He asked me what I meant.  And I told him, "When I said I would be doing I had that event already paid my money online to attend."

Aaron asked me if I could use my connections to get corporate donations so that about 15 people in the Call Center could attend.  He went on to say, "Some of the people can't because of their health, but most of them want to do this.  It would be really good if you could do this."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said to Aaron, "If I do this, whose gonna pay me, because I've already paid?" Aaron said, "Maybe we can get enough donations to pay you, while we get enough to let others attend."

I responded with, "I don't even have the contact information. To secure corporate support, you would need the who, what, when, where, why, how, 501c(3) #, and an event contact person. And, if I did this, it would be on VA time, while in this Call Center."

Aaron said, "That would be no problem. Allison would fully support you in this."

After this conversation, in passing, Aaron mentioned this 2 more times, to me. And, each time, I asked if he gathered the necessary information.

April 8, 2011, Aaron forwarded an email to me from Kim Hansen, MWR Bridge Run Coordinator. Attached to this email Aaron included an email sent to Kim Hansen, stating that he is trying to get business sponsorship for our team. This email went on to ask for a point of contact to discuss logistics.

Later that day, April 8th, Aaron came to my workstation, with a hand-written note, telling me to call Kim Hansen, to discuss sponsorship details.

I said to Aaron, "I don't know how I would be paid for doing this."

Aaron reacted, not responded with, "Gee I didn't know you were trying to get money out of this." He sneered at me, as he balled up the note, and rushed away.

Last week, Allison forwarded the email originally sent by Aaron about the MWR Bridge Run, asking who was attending, and telling us all that she would be attending.

I didn't respond to this, and I didn't see response from others. But, by sending this email again, stating that she is attending, after the team has already seen this, seems to be a bit much. *from the Call Center.*
NOTE: *It's interesting to note on this date that no one, but myself attended this event.*

## Leadership Harassment

Monday, May 2, 2011, after Allison Gill, the Call Center Supervisor sent an email to all in the Call Center, which announced Kudos that I received from a Veteran, and which is posted on the VA HAS Sharepoint website, I received an email from April Adams, one of the Team Leads.

This is what it said, "How much cash are you paying the vet so I can jump on the band wagon lol" I responded with "Not worth a true response."

April then sent another message, which said, "Come and tell me. I will not tell."

I didn't respond to this, and about 30 minutes later, she came to my cubicle, asking me "What's wrong? I've said this to you other times when you get those Kudos."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said, "Yes. You and Aaron have said that, and I'm hoping that this is the last time, because I feel that this is disrespect. Please do stop that, from this moment. I have absolutely no hard feelings."

She then just walked away.

## Demand of My Attention, and Wrongfully Accused

April 29, 2011, Allison sent me one Instant Message after another, demanding my attention over why I sent a patient to the hospital.

I tried to reply to her messages, but was involved with problem-solving a situation for another veteran on the phone.

One of Allison's IM messages said, "When I tell you to come to my office, it's not when you feel like it!"

This didn't stop until I said, "I'm working with a vet right now."

In the end, as Allison came to my workstation, and I wrapped up the call, I showed her what I had done, and told her the rationale behind my decision.

Metaphorically, she came down 20 notches.

But, had I been an insecure person, the outcome would not have been okay.

## Inappropriate Questions, Inappropriate Expectations, & Harassment  by Call Center Leadership

Friday, April 29, 2011, I sent an email to Allison, stating that I am way overdue upon seeing my VA Mentor and that I need to take off time to go see him. I emailed a request for administrative leave to do this, and was approved of for Thursday, May 5, 2011, 7:30 am to 10:30. I also stated that I was combining my need to pick up my identification from Richard Garcia.

Tuesday morning, May 3, 2011, with a strained voice, I called in sick, to Allison's office phone #. I also emailed her, using her VA Outlook address. And, I cc'd Evelyn Aleman, the person who keeps the time for Call Center employees.

Wednesday, May 4, 2011, since I was still sick, I emailed, Evelyn and Allison, to let them know that I have food poisoning, and that the CVS Pharmacist helped me.

This same day, at approximately 2:15 pm, I received a call from Aaron McDevitt, asking me: if I was still sick; how I got sick; where and what I ate; and how things were going.

He stated that Allison wasn't in the office all day; that she hadn't heard from me; and that Evelyn said she hadn't heard from me. When I told him that I emailed both of them, he said Allison didn't have access to her email and that Evelyn said she didn't get my message.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said I would be in Thursday, after visiting with my VA mentor, and that I should be okay by then.

Thursday, May 5, 2011, I received another call from Aaron, asking me if I was coming in. I said that I would be in at 11:30, which is after my meeting and after my lunch time.

He said, "Oh no, Allison only approved of your being out until 10:30, if you have to take longer, you need to call her on her cell phone. Let me give it to you.

May 5, 2011, I arrived back at the Call Center at 10: 25 am.

Evelyn approached me, asking me if I was okay, and she said she got my emails.

After this, I checked my emails.

Allison sent me an email dated May 5, 2011, Thursday, that said, "In order to call in sick, you must call me on my mobile phone or send a text and leave a message. This email is insufficient and could have led to you being marked AWOL. I will allow it this once, but next time you must follow the instructions you were given when you started here, okay?"

This email, and the calls, show me that Allison is looking for the worst in me, and is being unfair.

## Preferential Treatment to Adam Doyle

Several occasions, I've witnessed, along with others, Adam Doyle, the newest full-time employee, arrive at work, getting out of the car with the Call Center Supervisor.

The first time that I saw this, there were 3 others from the center around me, who said, "Did you see that?" Not much else was said. We entered the elevator, and went on about our business.

Prior to this, some, including myself noticed that the first few days of his coming on board, when he was given one-on-one training, he seemed to know the VistA and CPRS. Even the former lead mentioned that out loud. And, she asked him, "What's your health care experience?" To which he said none. She then asked, "What about call center." He said, "None."

After I moved my workstation from where I was to where the former lead was, Adam walked in the next morning and assumed my former workstation. And to the best of my knowledge, this was not handled like other moves, where persons with seniority would be given the opportunity to be considered for that spot.

This spot put Adam's workstation close to mine.

And, I noticed that he tended to copy many of my ideas and resources as his own.

This bothered me.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

During my computer, telephone and Diggi-logger problems, when Allison called outside tech support to come in, to support these problems, she went out of her way to say to one tech support, "Adam is our computer expert, as she leaned towards him.

While Adam, April and Aaron were given acting-Lead, after Brenda Moore left, and I didn't ask for this position, because when it was *initially* offered to the team for consideration, Allison said that this position would still be a G-5, and that by holding this position the leader would look good on their resume.
*I considered how hard Brenda worked in the call center and was there for 6 years. I didn't want to repeat that.*
Only Adam, Aaron and April applied and got the position.
*Allison*
Later, when it was announced that she was creating two lead positions, where the people holding this position will become GS-6, after 12 months in the Call Center, Sarah Holmes, one of the longest-standing employees asked, in the presence of all of us, "Can anyone of us apply?"
*during a month-end call center meeting,*
While listening to Allison's "Yes," I noticed Adam and Aaron' facial expression look outraged, particularly Adams.

After that, Allison emailed a "what to put on your resume list" to all in the Call Center.  And she announced that that job was posted on the web.  Then she went from workstation to workstation, handing out hard copies of the job announcement.   *I wondered if she was going out of her way to make it look like she was being fair, while she does whatever she wants.*
I applied submitted my application for this position and was selected amongst 7 others, including Adam, Aaron and April to be considered for this position.
*an interview for*
In the meantime, given that part of my evaluation would be what is on the Diggi-Logger, and given that I didn't have access to that tool for quite a while, I emailed Allison's supervisor, Liz McDonald, asking her how not having this tool might impact my evaluation and my interview for the lead.

I didn't get a response from her, but this did lead to Call Center emails and instant messages about the Diggi-Logger, and ultimately it led to mine being fixed.

During the Lead Position interview, Allison conducted the interview, based upon pre-determined questions.  There were 2 others, Iona Gutierrez and Donna Ponds, who sat in on this interview, but
*Iona*
never asked me any questions.  *Ionalla and Donna's communication was all facial expression during this interview*
One of the questions that was asked of me was," How much supervisory experience have you had in the past 5 years?"

My answer was all five years I've been a supervisor.  Allison reacted to this with, "Not here in the Call Center you don't."

There was another question, involving dealing with difficult people, and how I handle it, I said that I tend to ask questions that lead to the answers that I am looking for.

Allison responded to this with, "Yeah.  I do that with my boyfriend.  I just lead him where I want him to go."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I noticed the shock and question on the faces of both of the 2 observing us, during this interview. And, these comments from Allison's came right after she said to them, "Carmen hasn't had the Diggi-Logger for over two months now. But Adam, he's our expert on Diggli-Logger. I called the company for Diggi-Logger for 10 months, and they never answered me. Adam came in here and fixed it just like that."

Later in the interview, Allison said, "Well you know how to communicate, but you don't know how to do the Error Reports, assign doctors and myhealthyvet, do ya?"

There was an angry tone in her voice and in her body language. And, in retrospect those tasks are ones that if she had shown me, I'd know how to do them. When Allison asked me during this interview why I document the processes of what I do, I responded with, "When I came to this Call Center there were many notes in one big binder, but there was no flow of information, I organized what I needed to do, so that I would be efficient."

Allison's body language seemed to dislike this response. She practically slid out of her seat.

And, during this interview, when I described an example of my leadership, where I built a 3-location community healthcare center, with UCSD's Health Information Technology, Ionnara looked impressed. Donna looked impressed. But Allison looked angry.

When Allison asked me, during this interview what I do with all the kudos that I've received from veterans who call into the Call Center, I simply said, "Network."

And Ionara chuckled.

May 5, 2011, after our Lead Position interviews, and after Adam Doyle took his hard copy employee review in with him to the interview, I was emailed from Allison my review.

Given that this was after the fact, and given that Adam, Aaron and April compiled and monitored our work, yet were competing with us for the promotion, I don't believe that my review is accurate.

Note: I believe that Adam Doyle was given the questions to the interview, prepped and positioned for favoritism, long before the interview.

After the interview, it was announced that Aaron McDevitt and April Adams got the position. However, Adam signed the body of his email as "Assistant Lead." And, he is was still being given projects and tasks that could very well be done by others.

I have years of IT and of healthcare. I also have years of leadership and recent training at UCSD in Health Information Technology. And there are others with considerably more relevant experiences that could add value to the Call Center.

The questions that are still on my mind are, Why didn't the others Ionnara and Donna ask questions? How is it that the recent, short term Interim lead position prepares an applicant to be better equipped for the position than someone with more experience that was not provided by this one supervisor, but instead by many others? Why was Aaron considered lead worthy where he had no prior call center, or healthcare experience. And, when I came on board, I distinctly remember asking

Brenda if I should train with Aaron, and she diplomatically said No, because he didn't have enough experience.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

*Related Scenario Demonstrating Allison's Involvement with Adam*

At the end of Brenda Moore's off site going away, Allison told me to ride with her, as we needed to hurry back to the Call Center.

Adam Doyle was in a car directly in front of us.

Allison said, "See that butterfly on that car (talking about the car that Adam Doyle was driving in front of us). She said that that was my band. I gave it up and decided to do standup comic. This way I don't have to divide my pay with 4 other players.

Then, out of the blue, Allison said, "Men can be such babies. I'm in a relationship now. Things are different. I mean, guys can be such wimps when they are sick, but, no, we have to be stronger."

I changed the subject by saying, "Yeah, relationships can be a challenge. Are you still doing stand up comedy, along with your schooling?"

Allison said, "Yeah, but what I'd really like to do is create a consulting business where I help people to get a job at the VA. I got that down pat."

Quite frankly, I was uncomfortable in this conversation with Allison.

I also look at what appears to being going on between Allison Gill and Adam Doyle as a form of "quid pro quo" between the two of them.

## Allison Telling Me That I can't Apply for the GS-9 HAS Position

After Allison bragged to the team, during the month-end-team meeting that she started at the VA, in this department, as a GS-5, and was promoted within 1 year to GS-9, a GS-9, HAS position came out, and was sent to me, along with all HAS employees.

When Allison walked past my workstation, I asked her some questions about this position. She reacted with, "As long as you are in HAS, you can't get uh, I mean, are you trying to use your education to get that position? That won't work.

I'm tending to believe that Allison stated this in reaction to what was told to me by another HAS supervisor, when I was a VASDH volunteer.

He had directly told me after a great deal of gender-based harassment, that "I would never get a job at the VA." He even prevented me from getting a GS-5 job that I interviewed for and did well in, September 2010.

I reported this to Sheri Locro and to Elizabeth McDonald.

Elizabeth McDonald's email to Sheri Locro, which was forwarded to me, stated, "Hi, Sheri, I did my fact finding regarding the issues that Carmen Matthews has raised. I am taking appropriate action with

---

# Report of Contact by Carmen L. Matthews (May 10, 2011)

Robert Earnest based on my findings. Please let Carmen know that this is being addressed. If there are any other issues, please have her contact Brian Pellar at x1144."

No one said, "Let's reward her for the 3 months of income that she should have gotten."

## Treatment of Gender Differences

During my second week working at the Call Center, we had a Call Center meeting with all schedulers, Allison and Sheri Locro in attendance.

There was discussion about changes in hours and redesign of the Call Center.

For the first and only time, I wore blue jeans that day, as it seemed to me that the "No jeans allowed' were for the clinics and hospital, because many Call Center staff wear them every day.

During this meeting, after I asked Allison a question, which Allison's face didn't seem to encourage, and after she answered my question, she said while had just wrapped up what she had to present to us, "Carmen, you are not allowed to wear blue jeans, except on Friday.

And as I looked around, I noticed at least 3 men in the Call Center wearing blue jeans.

Since then, I've never worn blue jeans, except on some Fridays. However, every day, I notice the men in the Call Center wearing blue jeans.

Allison has either never said anything to them, or doesn't care if they wear jeans.

But, I've never seen the women wearing blue jeans in the Call Center, except on Fridays. I've even noticed on more than one occasion these guys wearing t-shirts with big holes in them, as though they just don't care.

This doesn't seem right.

And, as I review these notes, thinking back to the connection between what Allison said to me during this meeting, and the fact that Sheri Locro was the one who sent me the email that I reference about later in this document about the situation with Robert Earnest and Liz McDonalds' findings.

## KUDOs Posted on the HAS Sharepoint website

March 2011, after Allison sent an email to everyone in the Call Center trying to identify who the employee was who received a kudos from a veteran, it was obvious because I was the only one whose Diggi-Logger was down.

Allison gave credit for that Kudo to Cheryl, a part time employee. Our only similarities are that some in the center say we look alike. Then two employees asked me why she did that.

So, I approached Allison, stating that others in the Call Center wanted to know why Cheryl was given my kudos.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

Her response was, "Oh, yeah. Oops!.

Then see sent out a new message, replacing Cheryl's name with mine.

## What Others Say About Me

Not only have a I received many Kudos from Veterans whom I've served in the Call Center, I've also received a great letter of Recommendation from Brenda Moore, Former Long-time Call Center Lead, and one from Ted Napolitano, in Patient Advocate's Office.

## What I Would Like To See Out of This

Given this short history that has escalated, and given that Allison Gill has created, condoned and encouraged an offensive work environment that includes a level of retaliation, I would like to be moved out of this environment and into an appropriate level position, at the hospital, where my talents and commitment to the VASD H mission are both appreciated and expressed.

I would also like to be protected from my experiences being carried over to other parts of VASDH. And, I'd like Allison Gill to not associate with me.

| ![VA logo] **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE <br> HAS/Primary Care Call Center | IDENTIFICATION NOS. (C,XC,SS,XSS, V,K, etc.) |
|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* <br> MATTHEWS, CARMEN L. | DATE OF CONTACT <br> 5/12/11 |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

This report details my work environment experiences, primarily with Allison Gill, the Primary Care Call Center.

Because the details span into several pages, I've attached a detailed descripton of the adverse condition that I've been working under.

Other information:

1. Email to HR (Dana Sweeney & Jeanethe Cortez)
   - Questions (april 5 - april 19, 2011)

2. Fraud
   - Doing her homework at the office, for several hours then disappearing for blocks of hours, without leaving a contact, except for Adam Doyle
   - Some literally watching movies, Rather than answering calls.
     - eg. Chris

| DIVISION OR SECTION <br> HAS Primary Care Call Center | EXECUTED BY (Signature and Title) <br> Carmen L. Matthews |
|---|---|

# Report of Contact by Carmen L. Matthews (May 10, 2011)

## What's at Issue

Allison Gill, Primary Care Call Center Supervisor has created, nourished and preserved a hostile, undesirable, and offensive work environment.

Her conduct and the conduct of those whom she has appointed as leaders in this Call Center is habitually unwelcome, hostile and offensive.

I've demonstrated in this document that there is also gender harassment.

Each scenario captured in the document has a heading in bold print, to help those in the position to solve this problem.

With the Call Center being away from the hospital and clinics, and employees limited to this pervasive environment, as there is no outlet on the premises, I feel that my chances of working at the level and in the environment that I deserve to be in are next to impossible.

### Supervisor Requiring Staff to Pay for Call Center Refrigerator

Towards the end of our Call Center monthly meeting, April 29, 2011, led by Call Center Supervisor, Allison Gill, Barbara Harvey came into the Call Center, unnoticed by most, to clean out her refrigerator.

It was lunch time, and when Allison asked if there were any comments, I asked if anyone had any food in the fridge, and told that Barbara and the other nurses were cleaning out their fridge.

At that moment, Allison asked me why Barbara hadn't announced this prior, as though I was responsible for Barbara's actions.

I explained that Barbara had posted a flyer more than a week ago, announcing that she would be cleaning out and moving her refrigerator, by close of business, April 22, 2011.

Please note that the refrigerator clean out date listed in this may not be exactly correct, but she had announced this to everyone.

Allison asked whose refrigerator it was, and I explained that Barbara had bought that fridge with her own money, years ago; and that she was moving it to her new office location.

Thursday, May 5, 2011, Allison Gill sent an email to everyone in the Call Center, stating that she can buy a refrigerator if everyone can throw in $20. She went on to say in this email, "...but it would have to be every single person chipping in." She also said that she would pick up the balance and pay it on her Lowes' credit card. In this same email, Allison did ask if there was anyone who couldn't chip in.

Friday, April 29, 2011, Allison sent April Adams, one of the new Call Center Leads to go one-by-one to collect $20 from each Call Center employee working that day. Some declined.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

Monday, May 9, 2011, Allison emailed everyone in the Call Center, stating that she was able to talk down the $400 price to $200, plus tax, and that only eleven people, including her have either paid, or agree to pay $20 for this refrigerator.

There are 21 people now working in the Call Center.

In this email, she further stated, "People who did not pay may not use the fridge without donating into our group party fund, $1 per week's use. .. If you want to participate in a pot luck for our monthly meeting and you did not contribute to the fridge fund, you would need to bring food or give money for the food part AND donate $ for use of the fridge."

After Allison sent this email, she came out of her office, stopping everyone from doing their work, to get their attention on her. And, she repeated what she had already put in the email to all of us. _minutes before this, Adam Doyle, asked me if I know how to fix the problem he_ _Then Allison told everyone to get off the phones, as_ _was having_ _with his_ She added "I got that big discount because I was really nice. ... And, of course it was a man who I _and_ _phone,_ negotiated with." _I said "No,"_ _and walked_ This seemed to be over the top, and unnecessary. _away_

### *More Conflict Post-Refrigerator*

05/10/11, 1:10, Allison Gill came to me telling me to come to her office. She asked me to close the door. And, after I closed the door, she said, I'm hearing from more than one person that you are unhappy working here.

I replied with, "I'm not sure who you're talking to, because I am very positive. And, I don't want to have this conversation with you."

She said, "Well, I care about your well-being. And, as the manager here, I am responsible for things being positive around here. You have never come to me to discuss any issues. I've been told that I need to do more one-on-one training, and that that will help things."

I said, "I'm not having this conversation with you.

She said, "Well you are welcome to coming to me, or to any of the 2 leads, to discuss things; or, would you like to have your union representative here with you."

I said, "Four months into my being here, you want to have a conversation about my interests? I'm not interested in having a conversation about this work environment with you, this week."

She said, "Well, I just want to say that I have expressed my interest in improving things for you. And, if this continues, I will have to do a conduct (then she paused)."

I said, "I'm very positive, not defined by this Call Center, and being involved in motivational things, I wouldn't allow this to get to me. I'm going now."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

May 11, 2011, at 10:40 am, April Adams, one of the new Call Center Leads came to my workstation, telling me that Allison wants me to come to her office.

I said, "Ah, no.  I'd like to wait until at least my meeting tomorrow morning."

May 11, 2011, 10:44 am, Allison came to ask me if April told me to come to Allison's office and if I refused to come to the office.

I said, "I told her that I'd like to wait until after my meeting tomorrow morning."

Allison then walked away, and I called Marlene at EEO, to confirm our appointment and to tell her about this latest invitation.

Marlene advised me to recall that decision and go to the meeting with Allison, April and Aaron.

I immediately emailed Allison to say that Marlene had advised that I attend the meeting.

April came to invite me to stop by Allison's office, after I finish lunch.

May 11, 2011, 11:40, I stopped by Allison's office, with April and Aaron attending.

Allison was the only one of the three to speak.  She said, "I'm trying once again to see what it is you are so unhappy about the Call Center.  You are free to share it with me, or the two leads here."

I looked at April and Aaron as I said, "Yeah, I've also said what I needed to say to you guys."

Allison said, "But you have never come to me with any problems. And, whatever it is, you know you are welcome to go to my boss, Liz McDonald.  You know?"

I said, "Again, I'm not having this conversation right now.  I am positive here.

Allison interjected, "Okay.  I tried here to solve the problem.  Yes. Thank you for being so positive in the Call Center."

This last statement made by Allison, in the presence of April and Aaron, contradicts what she told me in her office, May 10, 2011.

[handwritten: before you go to complain to who ever it is that you are complaining to, to morrow]

Then I left that office, with the 3 of them still meeting.

## Conflict Between Head Nurse for Call Center and Call Center Supervisor of MSA's

# Report of Contact by Carmen L. Matthews (May 10, 2011)

When I received a call from Barbara Harvey, Monday, April 25, 2011, asking me why they, the nurses who had moved out of the Call Center, the previous week was not getting calls, I was surprised that she was calling me.

*by her pressing questions,*

I explained as best that I could, and Barbara seemed to need more than what I was in the position to tell her.

*with Barbara*

So, I captured my telephone conversation in an email to Allison Gill, the Call Center Supervisor. The essence or intent of this email was for Allison to talk to Barbara about the emergency and non-emergency calls. I wanted Allison to tell Barbara where the calls were going, during the nurses' transition from being in the Call Center to their setting up in their new Mission Valley VA, first Floor location. *Quite frankly, I was sure what we were supposed to do with the RN Emergent calls, during this transition.*

And, rather than calling Barbara, or emailing an answer, Allison used my email to answer the question, and cc'd it to Barbara.

## From Screaming at Me to Lies and Threats

When I first started at the Call Center, I came with experience in VASDH software, leadership, and healthcare from UCSD, Sharp, Alvarado and more.

However, as could be expected, learning to use all 7 software tools that are necessary in the Call Center; combined with the noise-level, there could be some errors, as I experienced during my first 3 weeks.

But, I did not expect to be approached as I had been approached by Allison.

She would come to me, irate, with a hard copy of a message that I sent to the clinical teams, which either had something missing, or inaccurate.

There was no quiet, supportive instruction or time to find out what happened.

I did everything I could to stay focus and remind myself of my intention. So, that I am not torn down by her lack of emotional control.

To counter the volume of noise and other distractions, I made a commitment to write out the processes, gather information relevant to the job, and extend my connections with other VA employees. So that I always had a source of information.

And this worked.

But, I believe that even though she no longer screamed at me, the scenarios that I've captured in this document show a continued level of unwarranted hostility. *An example of this was demonstrated during the Leads interview, where Allison sneered at me, when*

## Diggi-Logger Not Available to Me From Early February to Well Into April, 2011 *she asked*

*why I would prefer How to? to the Call Center*

# Report of Contact by Carmen L. Matthews (May 10, 2011)

When Brenda Moore, our former Call Center Lead suggested that I move from my workstation to her cubicle, after she moves, she also suggested that I email a request to Allison, the Call Center Supervisor, to request this action.

Allison invited another Call Center employee to flip a coin with me, to see who would get this cubicle. And I won.

But, from the moment that I moved to that new, less noisy location, I was unable to have access to the Diggi-logger.

The Diggi-Logger is a tool used in evaluating each scheduler's calls (time, voice, and more). It is also used to track status of a patient's request for prescription changes, made through the Call Center, and other requests.

Without this tool, and when a veteran tries to follow up on his or requests, staff in the Call Center, have to do more running around, trying to track down if a message was created and where it is.

On more than four occasions, I told Allison that I didn't have Diggi-Logger. She always either asked me why I didn't have it, or she told me "We are working on getting that fixed for you."

So, I called Brenda Moore, to ask her if she could help in this. She advised me to call Nam Ho, from IT. I also sought the support from Jonathan Conway, who works in IT.

Both had done as much as they could, and sent an email to Allison, ccing me, but I still never got that tool back, until I emailed Elizabeth McDonald.

I asked Elizabeth, in an email if my upcoming evaluation, and my application for the open Lead position would be impacted by my not having Diggi-Logger.

Days later, using Microsoft Instant Messaging. Allison Gill asked everyone in the Call Center if their Diggi-Logger were down. One of the four part time staff responded with, "I never had it."

I responded by saying that I didn't have Diggi-Logger. This led to several messages from Allison, one of which Adam Doyle responded, even though he wasn't on the distribution. He said, "Did you mean this message for me?" *This means that Adam Doyle Received copies of our Instant messages without our knowing this.*

Allison had said that she thought Adam had taken care of my Diggi-Logger problem. She also stated in one of these messages that she has been calling the Diggi-Logger people for the past 10 months, trying *whom she has publicly touted as "our computer expert"* to solve Diggi-Logger problems, but that she couldn't get them to return her calls.

That day, within 10 minutes of approaching my workstation, Adam Doyle gave me access to Diggi-Logger.

## Whenever I email valuable information to the Call Center, Allison attacks it

***MOVE Program & Dietary:***

# Report of Contact by Carmen L. Matthews (May 10, 2011)

March 21, 2011, I emailed the Call Center team, because a question kept coming up about what the MOVE Program was, and what Dietary meant.

I announced in this email that I talked to Erlinda Rowe, a friend of mine in Food & Nutrition Services, who explained the differences to me, which I listed in this email. I also listed the names and numbers of the outpatient dieticians. And I ended this by saying to not give the patients the extensions to this dieticians.

Allison emailed in response to this email, "W e do not schedule the classes. We schedule the one-on-one consults. If you click on the consults, it will tell you what to schedule."

Allison then came to me saying, "I can't believe you put that information out there. They won't know what to do with that information."

Then, the rules on what to do with Dietary appointments changed.

### Our Former Lead's Messages to Us:

March 23, 2011, after speaking to Brenda Moore, our former Lead, who was promoted to a position at the VA Hospital, she asked me to email everyone.

In her message, which I emailed to all, she shared that she wished that she had learned from the Leads at the La Jolla VA what one can really do with VistA and CPRS.

March 24, 2011, Allison Gill responded to this email with and email to everyone in the Call Center, and to Brenda, who no longer works in the Call Center, "I'm one step ahead. I am working on a cross-training program for us."

### Allison emailed me to not email anyone outside of the Call Center, unless I run it by her first:

May 5, 2011, when Mike V, of 98.1 KiFM Smooth Jazz Radio sent me a message to listen to his show at 8:30 am show, where he was going to quote me from an empowering quote that I posted on my Facebook page, I waited until the end of the day to email everyone in the Call Center, along with others in the VASDH, about this.

The quote was, "When you react, you're being controlled by the situation. When you respond, you're dealing with it." By George J. Thompson, Ph.d., author of "Verbal Judo."

I put in this email that 98.1 is the same radio station that the Welcome Center at VA LJ plays Monday *for everyone* through Friday.

Prior to receiving this email, and shortly after my having sent this message out to everyone, one of the Call Center employees whose workstation is next to Allison's office, sent me an email asking me what the connection was. I gave him a polite, succinct explanation.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

The April 25, 2011, email from Allison Gill said, "Please do not send emails to folks outside of our call center unless you run them by me first."

**Not Knowing What Our Work Schedule Was:**

After Allison's March 30, 2011 email stating that our new work schedule would start Monday, April 25, 2011, there was no further mention of this,

So, when no further mention of this was made, and I was getting questions from people who were on vacation Friday, April 22, 2011, I emailed the team, asking if there were other changes to our schedule.

The acting leads responded with, "I don't know of a change. Do you?"

And, because Allison was not in the Call Center, and not available to anyone of, as is often the case, I didn't get an answer from Allison, until Monday morning, April 25, 2011.

Here's how she reacted in an email to me, "I do not have a date for shift changes yet as the redesign team has not given them to me. Once I know, I'll let you know."

Yet, If someone, or myself honored what her emailed schedule was, not knowing that this was up in the air again, we might have been held at fault.

## Acting Lead, Aaron McDevitt Tries to Bully My Media Connections On Behalf of the Team

March 10, 2011, Acting Primary Care Call Center Lead, Aaron McDevitt sent an email out to everyone in the Call Center, including the nurses, who used to be in the Call Center. This message asked who might be interested in participating in "The Navy's 25th Original Bay Bridge Run/Walk, for Sunday, May 15, 2011.

This same email said, "I know money is tight for all of us in this economy ..."

That same day, I responded to Aaron's email with this message, "I will do it. Yeah!"

The next day, while in the Call Center break room, with no one around but Aaron and I, Aaron told me, "Man it would really nice to do that, but, even Allison doesn't have the money to do it, and we want the team to be represented in this."

I said, "I signed up." He asked me what I meant. And I told him, "When I said I would be doing that even I had already paid my money online to attend."

Aaron asked me if I could use my connections to get corporate donations so that about 15 people in the Call Center could attend. He went on to say, "Some of the people can't because of their health, but most of them want to do this. It would be really good if you could do this."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said to Aaron, "If I do this, whose gonna pay me, because I've already paid?" Aaron said, "Maybe we can get enough donations to pay you, while we get enough to let others attend."

I responded with, "I don't even have the contact information. To secure corporate support, you would need the who, what, when, where, why, how, 501c(3) #, and an event contact person. And, if I did this, it would be on VA time, while in this Call Center."

Aaron said, "That would be no problem. Allison would fully support you in this."

After this conversation, in passing, Aaron mentioned this 2 more times, to me. And, each time, I asked if he gathered the necessary information.

April 8, 2011, Aaron forwarded an email to me from Kim Hansen, MWR Bridge Run Coordinator. Attached to this email Aaron included an email sent to Kim Hansen, stating that he is trying to get business sponsorship for our team. This email went on to ask for a point of contact to discuss logistics.

Later that day, April 8th, Aaron came to my workstation, with a hand-written note, telling me to call Kim Hansen, to discuss sponsorship details.

I said to Aaron, "I don't know how I would be paid for doing this."

Aaron reacted, not responded with, "Gee I didn't know you were trying to get money out of this." He sneered at me, as he balled up the note, and rushed away.

Last week, Allison forwarded the email originally sent by Aaron about the MWR Bridge Run, asking who was attending, and telling us all that she would be attending.

I didn't respond to this, and I didn't see response from others. But, by sending this email again, stating that she is attending, after the team has already seen this, seems to be a bit much. _from the Call Center._
NOTE: It's interesting to Note on this date that no one, but myself attended this event.

## Leadership Harassment

Monday, May 2, 2011, after Allison Gill, the Call Center Supervisor sent an email to all in the Call Center, which announced Kudos that I received from a Veteran, and which is posted on the VA HAS Sharepoint website, I received an email from April Adams, one of the Team Leads.

This is what it said, "How much cash are you paying the vet so I can jump on the band wagon lol" I responded with "Not worth a true response."

April then sent another message, which said, "Come and tell me. I will not tell."

I didn't respond to this, and about 30 minutes later, she came to my cubicle, asking me "What's wrong? I've said this to you other times when you get those Kudos."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said, "Yes. You and Aaron have said that, and I'm hoping that this is the last time, because I feel that this is disrespect. Please do stop that, from this moment. I have absolutely no hard feelings."

She then just walked away.

## Demand of My Attention, and Wrongfully Accused

April 29, 2011, Allison sent me one Instant Message after another, demanding my attention over why I sent a patient to the hospital.

I tried to reply to her messages, but was involved with problem-solving a situation for another veteran on the phone.

One of Allison's IM messages said, "When I tell you to come to my office, it's not when you feel like it!"

This didn't stop until I said, "I'm working with a vet right now."

In the end, as Allison came to my workstation, and I wrapped up the call, I showed her what I had done, and told her the rationale behind my decision.

Metaphorically, she came down 20 notches.

But, had I been an insecure person, the outcome would not have been okay.

## Inappropriate Questions, Inappropriate Expectations, & Harassment by Call Center Leadership

Friday, April 29, 2011, I sent an email to Allison, stating that I am way overdue upon seeing my VA Mentor and that I need to take off time to go see him. I emailed a request for administrative leave to do this, and was approved of for Thursday, May 5, 2011, 7:30 am to 10:30. I also stated that I was combining my need to pick up my identification from Richard Garcia.

Tuesday morning, May 3, 2011, with a strained voice, I called in sick, to Allison's office phone #. I also emailed her, using her VA Outlook address. And, I cc'd Evelyn Aleman, the person who keeps the time for Call Center employees.

Wednesday, May 4, 2011, since I was still sick, I emailed, Evelyn and Allison, to let them know that I have food poisoning, and that the CVS Pharmacist helped me.

This same day, at approximately 2:15 pm, I received a call from Aaron McDevitt, asking me: if I was still sick; how I got sick; where and what I ate; and how things were going.

He stated that Allison wasn't in the office all day; that she hadn't heard from me; and that Evelyn said she hadn't heard from me. When I told him that I emailed both of them, he said Allison didn't have access to her email and that Evelyn said she didn't get my message.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I said I would be in Thursday, after visiting with my VA mentor, and that I should be okay by then.

Thursday, May 5, 2011, I received another call from Aaron, asking me if I was coming in. I said that I would be in at 11:30, which is after my meeting and after my lunch time.

He said, "Oh no, Allison only approved of your being out until 10:30, if you have to take longer, you need to call her on her cell phone. Let me give it to you.

May 5, 2011, I arrived back at the Call Center at 10: 25 am.

Evelyn approached me, asking me if I was okay, and she said she got my emails.

After this, I checked my emails.

Allison sent me an email dated May 5, 2011, Thursday, that said, "In order to call in sick, you must call me on my mobile phone or send a text and leave a message. This email is insufficient and could have led to you being marked AWOL. I will allow it this once, but next time you must follow the instructions you were given when you started here, okay?"

This email, and the calls, show me that Allison is looking for the worst in me, and is being unfair.

## Preferential Treatment to Adam Doyle

5everal occasions, I've witnessed, along with others, Adam Doyle, the newest full-time employee, arrive at work, getting out of the car with the Call Center Supervisor.

The first time that I saw this, there were 3 others from the center around me, who said, "Did you see that?" Not much else was said. We entered the elevator, and went on about our business.

Prior to this, some, including myself noticed that the first few days of his coming on board, when he was given one-on-one training, he seemed to know the VistA and CPRS. Even the former lead mentioned that out loud. And, she asked him, "What's your health care experience?" To which he said none. She then asked, "What about call center." He said, "None."

After I moved my workstation from where I was to where the former lead was, Adam walked in the next morning and assumed my former workstation. And to the best of my knowledge, this was not handled like other moves, where persons with seniority would be given the opportunity to be considered for that spot.

This spot put Adam's workstation close to mine.

And, I noticed that he tended to copy many of my ideas and resources as his own.

This bothered me.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

During my computer, telephone and Diggi-logger problems, when Allison called outside tech support to come in, to support these problems, she went out of her way to say to one tech support, "Adam is our computer expert, as she leaned towards him.

While Adam, April and Aaron were given acting-Lead, after Brenda Moore left, and I didn't ask for this position, because when it was *initially* offered to the team for consideration, Allison said that this position would still be a G-5, and that by holding this position the leader would look good on their resume. *I considered how hard Brenda worked in the call center and was there for 6 years. I didn't want to repeat that.* Only Adam, Aaron and April applied and got the position.

*Allison*

Later, when it was announced that she was creating two lead positions, where the people holding this position will become GS-6, after 12 months in the Call Center, Sarah Holmes, one of the longest-standing employees asked, in the presence of all of us, "Can anyone of us apply?" *during a month-end call center meeting,*

While listening to Allison's "Yes," I noticed Adam and Aaron' facial expression look outraged, particularly Adams.

After that, Allison emailed a "what to put on your resume list" to all in the Call Center. And she announced that that job was posted in on the web. Then she went from workstation to workstation, handing out hard copies of the job announcement. *I wondered if she was going out of her way to make it look like she was being fair, while she does what she wants.*

I applied submitted my application for this position and was selected amongst 7 others, including Adam, Aaron and April to be considered for *an interview for* this position.

In the meantime, given that part of my evaluation would be what is on the Diggi-Logger, and given that I didn't have access to that tool for quite a while, I emailed Allison's supervisor, Liz McDonald, asking her how not having this tool might impact my evaluation and my interview for the lead.

I didn't get a response from her, but this did lead to Call Center emails and instant messages about the Diggi-Logger, and ultimately it led to mine being fixed.

During the Lead Position interview, Allison conducted the interview, based upon pre-determined questions. There were 2 others, Iona Gutierrez and Donna Ponds, who sat in on this interview, but never asked me any questions. *Iona and Donna's communication was all facial expression during this interview*

One of the questions that was asked of me was," How much supervisory experience have you had in the past 5 years?"

My answer was all five years I've been a supervisor. Allison reacted to this with, "Not here in the Call Center you don't."

There was another question, involving dealing with difficult people, and how I handle it, I said that I tend to ask questions that lead to the answers that I am looking for.

Allison responded to this with, "Yeah. I do that with my boyfriend. I just lead him where I want him to go."

# Report of Contact by Carmen L. Matthews (May 10, 2011)

I noticed the shock and question on the faces of both of the 2 observing us, during this interview. And, these comments from Allison came right after she said to them, "Carmen hasn't had the Diggi-Logger for over two months now. But Adam, he's our expert on Diggli-Logger. I called the company for Diggi-Logger for 10 months, and they never answered me. Adam came in here and fixed it just like that."

Later in the interview, Allison said, "Well you know how to communicate, but you don't know how to do the Error Reports, assign doctors and myhealthyvet, do ya?"

There was an angry tone in her voice and in her body language. And, in retrospect those tasks are ones that if she had shown me, I'd know how to do them.

When Allison asked me during this interview why I document the processes of what I do, I responded with, "When I came to this Call Center there were many notes in one big binder, but there was no flow of information, I organized what I needed to do, so that I would be efficient."

Allison's body language seemed to dislike this response. She practically slid out of her seat.

And, during this interview, when I describe an example of my leadership, where I built a 3-location community healthcare center, with UCSD's Health Information Technology, Ionnara looked impressed. Donna looked impressed. But Allison looked angry.

When Allison asked me, during this interview what I do with all the kudos that I've received from veterans who call into the Call Center, I simply said, "Network."

And Ionara chuckled.

May 5, 2011, after our Lead Position interviews, and after Adam Doyle took his hard copy employee review in with him to the interview, I was emailed from Allison my review.

Given that this was after the fact, and given that Adam, Aaron and April compiled and monitored our work, yet were competing with us for the promotion, I don't believe that my review is accurate.

Note: I believe that Adam Doyle was given the questions to the interview, prepped and positioned for favoritism, long before the interview.

After the interview, it was announced that Aaron McDevitt and April Adams got the position. However, Adam signed the body of his email as "Assistant Lead." was still And, he is being given projects and tasks that could very well be done by others.

I have years of IT and of healthcare. I also have years of leadership and recent training at UCSD in Health Information Technology. And there are others with considerably more relevant experiences that could add value to the Call Center.

The questions that are still on my mind are, Why didn't the others Ionnara and Donna ask questions? How is it that the recent, short term Interim lead position prepares an applicant to be better equipped for the position than someone with more experience that was not provided by this one supervisor, but instead by many others? Why was Aaron considered lead worthy where he had no prior call center, or healthcare experience. And, when I came on board, I distinctly remember ask-

Brenda if I should train with Aaron, and she diplomatically said No, because he didn't have enough experience.

# Report of Contact by Carmen L. Matthews (May 10, 2011)

*Related Scenario Demonstrating Allison's Involvement with Adam*

At the end of Brenda Moore's off site going away, Allison told me to ride with her, as we needed to hurry back to the Call Center.

Adam Doyle was in a car directly in front of us.

Allison said, "See that butterfly on that car (talking about the car that Adam Doyle was driving in front of us). She said that that was my band. I gave it up and decided to do standup comic. This way I don't have to divide my pay with 4 other players.

Then, out of the blue, Allison said, "Men can be such babies. I'm in a relationship now. Things are different. I mean, guys can be such wimps when they are sick, but, no, we have to be stronger."

I changed the subject by saying, "Yeah, relationships can be a challenge. Are you still doing stand up comedy, along with your schooling?"

Allison said, "Yeah, but what I'd really like to do is create a consulting business where I help people to get a job at the VA. I got that down pat."

Quite frankly, I was uncomfortable in this conversation with Allison.

I also look at what appears to being going on between Allison Gill and Adam Doyle as a form of "quid pro quo" between the two of them.

## Allison Telling Me That I can't Apply for the GS-9 HAS Position

After Allison bragged to the team, during the month-end-team meeting that she started at the VA, in this department, as a GS-5, and was promoted within 1 year to GS-9, a GS-9, HAS position came out, and was sent to me, along with all HAS employees.

When Allison walked past my workstation, I asked her some questions about this position. She reacted with, "As long as you are in HAS, you can't get uh, I mean, are you trying to use your education to get that position? That won't work.

I'm tending to believe that Allison stated this in reaction to what was told to me by another HAS supervisor, when I was a VASDH volunteer.

He had directly told me after a great deal of gender-based harassment, that "I would never get a job at the VA." He even prevented me from getting a GS-5 job that I interviewed for and did well in, September 2010.

I reported this to Sheri Locro and to Elizabeth McDonald.

Elizabeth McDonald's email to Sheri Locro, which was forwarded to me, stated, "Hi, Sheri, I did my fact finding regarding the issues that Carmen Matthews has raised. I am taking appropriate action with

# Report of Contact by Carmen L. Matthews (May 10, 2011)

Robert Earnest based on my findings. Please let Carmen know that this is being addressed. If there are any other issues, please have her contact Brian Pellar at x1144."

No one said, "Let's reward her for the 3 months of income that she should have gotten."

## Treatment of Gender Differences

During my second week working at the Call Center, we had a Call Center meeting with all schedulers, Allison and Sheri Locro in attendance.

There was discussion about changes in hours and redesign of the Call Center.

For the first and only time, I wore blue jeans that day, as it seemed to me that the "No jeans allowed' were for the clinics and hospital, because many Call Center staff wear them every day.

During this meeting, after I asked Allison a question, which Allison's face didn't seem to encourage, and after she answered my question, she said while had just wrapped up what she had to present to us, "Carmen, you are not allowed to wear blue jeans, except on Friday.

And as I looked around, I noticed at least 3 men in the Call Center wearing blue jeans.

Since then, I've never worn blue jeans, except on some Fridays. However, every day, I notice the men in the Call Center wearing blue jeans.

Allison has either never said anything to them, or doesn't care if they wear jeans.

But, I've never seen the women wearing blue jeans in the Call Center, except on Fridays. I've even noticed on more than one occasion these guys wearing t-shirts with big holes in them, as though they just don't care.

This doesn't seem right.

And, as I review these notes, thinking back to the connection between what Allison said to me during this meeting, and the fact that Sheri Locro was the one who sent me the email that I reference about later in this document about the situation with Robert Earnest and Liz McDonalds' findings.

## KUDOs Posted on the HAS Sharepoint website

March 2011, after Allison sent an email to everyone in the Call Center trying to identify who the employee was who received a kudos from a veteran, it was obvious because I was the only one whose Diggi-Logger was down.

Allison gave credit for that Kudo to Cheryl, a part time employee. Our only similarities are that some in the center say we look alike. Then two employees asked me why she did that.

So, I approached Allison, stating that others in the Call Center wanted to know why Cheryl was given my kudos.

## Report of Contact by Carmen L. Matthews (May 10, 2011)

Her response was, "Oh, yeah.  Oops!.

Then see sent out a new message, replacing Cheryl's name with mine.

## What Others Say About Me

Not only have a I received many Kudos from Veterans whom I've served in the Call Center, I've also received a great letter of Recommendation from Brenda Moore, Former Long-time Call Center Lead, and one from Ted Napolitano, in Patient Advocate's Office.

## What I Would Like To See Out of This

Given this short history that has escalated, and given that Allison Gill has created, condoned and encouraged an offensive work environment that includes a level of retaliation, I would like to be moved out of this environment and into an appropriate level position, at the hospital, where my talents and commitment to the VASD H mission are both appreciated and expressed.

I would also like to be protected from my experiences being carried over to other parts of VASDH. And, I'd like Allison Gill to not associate with me.

**Department of
Veterans Affairs**

# Memorandum

Date: June 2, 2011

From: Chair, AIB

Subj: Administrative Investigation Board

To: Carmen Matthews, Medical Support Assistant, Health Administration Service

1. Pursuant to 38 CFR 0.735-12(b), you are required to appear before an Administrative Investigation Board (AIB) on Wednesday June 8, 2011 at 8:30 a.m. in Room 355B, next door to the Call Center in Mission Valley. The Board has been convened for the purpose of investigating the facts and circumstances surrounding allegations of fraud, waste and/or abuse and inappropriate behavior by the supervisor at the Call Center.

2. Your testimony will be taken under oath and transcribed by a Court Reporter. At the end of the interview, you will be asked if there is anything that you would like to add to your testimony. The Board will accept any relevant written or oral information that you may wish to provide at that time. Please be advised that this letter and your testimony/transcript are considered confidential and that any unauthorized disclosure is a violation of law.

3. A copy of NOTICE OF WITNESS OBLIGATIONS, PROTECTIONS AND PRIVACY ACT MATTERS is attached. Please read this notice, sign it and bring to your interview. You will be asked to submit it to the Board at the beginning of your interview.

4. This inquiry is of a confidential matter and is not to be discussed with anyone other than those described in the attached Notice of Witness Obligations, Protections, and Privacy Act Matter.

5. If you have any questions, please contact Sheri Lacro, AIB Technical Advisor, in the Human Resources Management Services at extension 7857.

6. Thank you for your assistance in this matter.

Brian Plowman

Attachment

NOTICE OF WITNESS OBLIGATIONS, PROTECTIONS, AND PRIVACY ACT MATTERS

1. VA Regulation 38 CFR 0.735-12(b) states, "Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be grounds for disciplinary action. An employee, however, will not be required to give testimony against himself or herself in any matter in which there is indication that he or she may be or is involved in a violation of law wherein there is a possibility of self-incrimination". In addition, VA Directive 0700 requires all employees to cooperate with administrative investigations to the extent permitted by governing laws, regulations, policies, and collective bargaining agreements.

2. For individuals who are not VA employees, participation and testimony in this investigation is generally voluntary unless it is obtained by subpoena.

3. You may refuse to answer a question if you believe the answer could be used to convict you of a crime. If you refuse to answer on this basis, you must inform the investigator that you are asserting this right. No adverse action may be taken against you for such a refusal unless you have been assured that your answer will not be used against you in a criminal prosecution. You do not have the right to refuse to answer a question based on a belief that your response may incriminate a person other than yourself, or that it may result in adverse administrative action against you.

4. VA Directive 0700 requires you to refrain from disclosing any information developed in the course of the investigation, including the substance of your testimony, with others, if so directed by the Convening Authority or by a member of the administrative investigative board. This is to protect the integrity and fairness of the investigative process. You may, however, discuss such matters with federal investigators, with the Office of the Inspector General, the Office of Special Counsel, or with your designated personal advisors or representatives (if any). In addition, you will not be reprised against for any disclosures protected by the Whistleblower Protection Act or other law.

5. You will be protected from reprisal for providing truthful testimony or otherwise cooperating lawfully with this investigation. If you feel that you are being treated adversely for such actions, please advise a Board member immediately so that we can ensure that effective corrective and remedial action is taken. You may also contact other appropriate officials, including the U.S. Office of Special Counsel or the VA Inspector General, if you feel you are being retaliated against for your cooperation with this investigation.

1. Other Information:
   AUTHORITY TO COLLECT INFORMATION: 38 USC 5711
   PRINCIPAL PURPOSES FOR WHICH INFORMATION IS REQUESTED: To determine the facts of the matters investigated and any corrective action needed.
   ROUTINE USES: The information obtained from you may be included in systems of records, including, but not limited to, "Veteran, Employee, and Citizen Health Care Facility Investigation Records," 32VAOO, and is subject to routine uses of such systems. These uses may include internal administration of the Department of Veterans Affairs, correction of systemic problems, determination of liability for claims and benefits, administrative or disciplinary action, actions affecting professional licenses and employment, and provision of information about the matter investigated to other federal and state agencies, Congress, and the public.

| **Department of Veterans Affairs** | **Memorandum** |
|---|---|

Date: June 2, 2011

From: Chair, AIB

Subj: Administrative Investigation Board

To: Carmen Matthews, Medical Support Assistant, Health Administration Service

1. Pursuant to 38 CFR 0.735-12(b), you are required to appear before an Administrative Investigation Board (AIB) on Wednesday June 8, 2011 at 8:30 a.m. in Room 355B, next door to the Call Center in Mission Valley. The Board has been convened for the purpose of investigating the facts and circumstances surrounding allegations of fraud, waste and/or abuse and inappropriate behavior by the supervisor at the Call Center.

2. Your testimony will be taken under oath and transcribed by a Court Reporter. At the end of the interview, you will be asked if there is anything that you would like to add to your testimony. The Board will accept any relevant written or oral information that you may wish to provide at that time. Please be advised that this letter and your testimony/transcript are considered confidential and that any unauthorized disclosure is a violation of law.

3. A copy of NOTICE OF WITNESS OBLIGATIONS, PROTECTIONS AND PRIVACY ACT MATTERS is attached. Please read this notice, sign it and bring to your interview. You will be asked to submit it to the Board at the beginning of your interview.

4. This inquiry is of a confidential matter and is not to be discussed with anyone other than those described in the attached Notice of Witness Obligations, Protections, and Privacy Act Matter.

5. If you have any questions, please contact Sheri Lacro, AIB Technical Advisor, in the Human Resources Management Services at extension 7857.

6. Thank you for your assistance in this matter.

Brian Plowman

Attachment

NOTICE OF WITNESS OBLIGATIONS, PROTECTIONS, AND PRIVACY ACT MATTERS

1. VA Regulation 38 CFR 0.735-12(b) states, "Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be grounds for disciplinary action. An employee, however, will not be required to give testimony against himself or herself in any matter in which there is indication that he or she may be or is involved in a violation of law wherein there is a possibility of self-incrimination". In addition, VA Directive 0700 requires all employees to cooperate with administrative investigations to the extent permitted by governing laws, regulations, policies, and collective bargaining agreements.

2. For individuals who are not VA employees, participation and testimony in this investigation is generally voluntary unless it is obtained by subpoena.

3. You may refuse to answer a question if you believe the answer could be used to convict you of a crime. If you refuse to answer on this basis, you must inform the investigator that you are asserting this right. No adverse action may be taken against you for such a refusal unless you have been assured that your answer will not be used against you in a criminal prosecution. You do not have the right to refuse to answer a question based on a belief that your response may incriminate a person other than yourself, or that it may result in adverse administrative action against you.

4. VA Directive 0700 requires you to refrain from disclosing any information developed in the course of the investigation, including the substance of your testimony, with others, if so directed by the Convening Authority or by a member of the administrative investigative board. This is to protect the integrity and fairness of the investigative process. You may, however, discuss such matters with federal investigators, with the Office of the Inspector General, the Office of Special Counsel, or with your designated personal advisors or representatives (if any). In addition, you will not be reprised against for any disclosures protected by the Whistleblower Protection Act or other law.

5. You will be protected from reprisal for providing truthful testimony or otherwise cooperating lawfully with this investigation. If you feel that you are being treated adversely for such actions, please advise a Board member immediately so that we can ensure that effective corrective and remedial action is taken. You may also contact other appropriate officials, including the U.S. Office of Special Counsel or the VA Inspector General, if you feel you are being retaliated against for your cooperation with this investigation.

1. Other Information:
AUTHORITY TO COLLECT INFORMATION: 38 USC 5711
PRINCIPAL PURPOSES FOR WHICH INFORMATION IS REQUESTED: To determine the facts of the matters investigated and any corrective action needed.
ROUTINE USES: The information obtained from you may be included in systems of records, including, but not limited to, "Veteran, Employee, and Citizen Health Care Facility Investigation Records," 32VAOO, and is subject to routine uses of such systems. These uses may include internal administration of the Department of Veterans Affairs, correction of systemic problems, determination of liability for claims and benefits, administrative or disciplinary action, actions affecting professional licenses and employment, and provision of information about the matter investigated to other federal and state agencies, Congress, and the public.

| VA Department of Veterans Affairs | EEO COMPLAINT & WORKPLACE DISPUTE TRACKING REPORT |
|---|---|

1. Complainant's Name, Job Title and Grade
*Carmen Matthews*

2. Complainant's Service & Unit to Include Supervisor's Name and Phone Number.
*HAS/PCCC*

3. Case Number

4. Responsible Management Official(s)
*Alison Gill*

**5. Basis of the Complaint** · (Check one or more as appropriate <u>and</u> specify)

- [ ] Age      (DOB: _____)
- [ ] Color    (_____)
- [ ] Disability (_____)
- [ ] Gender   (_____)
- [ ] Nat'l Origin (_____)
- [ ] Race     (_____)
- [ ] Religion (_____)
- [ ] Reprisal for prior EEO activity.
- [ ] Sexual Orientation –
  Note: Not covered by Title VII

**6. Claim(s) of the Complaint** (Check one or more as appropriate, which reflect the personnel action and/or event the complainant is alleging as disparate treatment/impact. The complainant must provide a date for each issue checked.)

| Claim | Date Occurred | Claim | Date Occurred |
|---|---|---|---|
| [ ] Admonishment | | [ ] Harassment (sexual) | |
| [ ] Assignment of Duties | | [ ] Performance Appraisal / Proficiency Rpt | |
| [ ] Award | | [ ] Reassignment | |
| [ ] Constructive Discharge | | [ ] Reprimand | |
| [ ] Demotion | | [ ] Suspension | |
| [ ] Duty Hours | | [ ] Termination / Removal | |
| [ ] Failure to Hire / Select | | [ ] Time & Attendance | |
| [ ] Failure to Promote | | [x] Working Conditions | |
| [ ] Harassment (non-sexual) | | [ ] Other: *harassment / hostile environment* | |

**Complaint Processing Timeline**

| Stage | Date | Stage | Date |
|---|---|---|---|
| Initial contact with ORM counselor | | Complaint forwarded to EEOC | |
| Request for information received | | Agency representative assigned | |
| Request for information mailed | | EEOC Decision received | |
| | | EEOC Remand to OEDCA | |
| Formal complaint filed | | **- and/or -** | |
| Request for additional information received | | Complaint/Decision forwarded to OEDCA | |
| Request for additional information mailed | | OEDCA FAD received | |
| ORM: [ ] accepted [ ] dismissed complaint | | | |
| | | Complaint settled | |
| Notice of assignment of investigator | | Complaint withdrawn by complainant | |
| Investigation commenced | | | |
| Request for additional information received | | Comments: | |
| Request for additional information mailed | | | |
| Investigation completed | | | |

**Note:** On this date, <u>5/12/11</u>, you discussed the above Bases & Claims with me. <u>However, please be advised that I am not an ORM EEO Counselor.</u> If you feel that you have been discriminated against & wish to file an EEO complaint, **you must contact an ORM Counselor within 45-calendar days of the alleged incident in order to preserve your EEO rights!.** If you feel that your rights as a bargaining unit employee have been violated, you should contact your Union Office within 30-calendar days of the alleged violation. I am the EEO/ADR Consultant for this facility and I will do everything within my power to resolve the issues we have discussed today. On the date shown below, this form was shown to me.

Signature of Complainant/Disputant: *Carmen L Matthews*   Date: 5/12/2011

5/12/11    Started working Dec 30 ?

Supervisor

Falls pattern of harassment / pattern of gender bias
favoritism toward men can
Why are you going to see CEO?    Wear everyday. T-Shirt w holes
Why are you going to complain.

Tues. 5/10 said she heard          Alison said to staff she
negative statements from staff.  purchased a refrigerator. X 20
Then yesterday when she questioned  expected everyone to pay $
Why are you seeing CEO? Yes, you $$ each. She actually stopped the
are so positive.            mayor everyone from working in a
                    demanding zone + said get off your phone
                                                           now.
Called a mtg to specifically to ask why are you complaining
                                                        to me,
    April Adams + Aaron McDevitt,
Asked what was her issue to complain about the call center.
When she called in sick (Aaron) leads
Asked her what did she eat when she found out she
said she got food poison. — Said you don't look
like you were sick —
                Run 5 this weekend
Aaron asked her to get funding from Organizations for
    the call center staff to run 5k or event this weekend
for $40.00 per person. Can use VA time to find Vendors +
they will pay her $45.00 entry fee for trying to find —
She refused verbally to find Vendors — He got
upset, then changed story to say he will pay
your entry fee, stating I didn't know you wanted
to get reimbursed for her entry fee,

Told not allowed to email anyone without her permission.
Due to incident Carmen innocently sent to email
group about 98.1 being at La Jolla - She did not get
permission —

Diggi-Jogger ————————— Tied & took phones off-line — Allison
says she always does that.

As early as Feb Carmen has witnessed Adam Doyle
& Allison Gill got out of the same car in the
parking. Brenda Moore's party off station, road
back c Allison to work    On the Border M.V.
based on her insisting —
She said ~~~~ in the parking lot to Carmen - Did you
See that logo on that car? The logo was a
pr le butterfly - Adam Doyle was driving that car.
That was the band I used to be in. Switched topic to
relationships — Said now I have a boyfriend — It can
be difficult — They want to take off work They
are such wimps. Staff aware of relationship — Did you see
that?
When someone's looking for ~~~ Allison, you go to
Adam & he will text her. This occurred up to the
time when I bads were announced →
2 wks ago April 29th training partially c liz in the
ginning. 1/2 hr into trng - everyone left 1½-2h
left facility. 4 left trying to move PC's. Remainder
of staff returned. Carmen also helping people Allison told
go back to her job. Allison granted 59 min. for
P.edos a month — plus you have almost 3hrs —
no chrg to leave

Does home work?  2 sweaters, dress, socks
Read
During down time — watch movies —    Texting
or shut off phones — Dbl chck to male busy —
Chris Rice  Watch movies
Aaron —
    Mc Devott — 40 calls to her 80.

Adam portrays himself with the attitude
Im protected by Allison so as I say
staff comment.

10:10 Am aware = termination
aw —

Eliz Mc Donald x6331

| VA Department of Veterans Affairs | EEO COMPLAINT & WORKPLACE DISPUTE TRACKING REPORT |
|---|---|

| 1. Complainant's Name, Job Title and Grade | 2. Complainant's Service & Unit to Include Supervisor's Name and Phone Number. |
|---|---|
| *Carmen Matthews* | *HAS/PCC* |
| 3. Case Number | 4. Responsible Management Official(s) |
| | *Alissa Hill* |

**5.** Basis of the Complaint · (Check one or more as appropriate and specify)

- ☐ Age (DOB: _____)
- ☐ Color (_____)
- ☐ Disability (_____)
- ☐ Gender (_____)
- ☐ Nat'l Origin (_____)
- ☐ Race (_____)
- ☐ Religion (_____)
- ☐ Reprisal for prior EEO activity.
- ☐ Sexual Orientation – Note: Not covered by Title VII

**6.** Claim(s) of the Complaint (Check one or more as appropriate, which reflect the personnel action and/or event the complainant is alleging as disparate treatment/impact. The complainant must provide a date for each issue checked.)

| | Claim | Date Occurred | | Claim | Date Occurred |
|---|---|---|---|---|---|
| ☐ | Admonishment | | ☐ | Harassment (sexual) | |
| ☐ | Assignment of Duties | | ☐ | Performance Appraisal / Proficiency Rpt | |
| ☐ | Award | | ☐ | Reassignment | |
| ☐ | Constructive Discharge | | ☐ | Reprimand | |
| ☐ | Demotion | | ☐ | Suspension | |
| ☐ | Duty Hours | | ☐ | Termination / Removal | |
| ☐ | Failure to Hire / Select | | ☐ | Time & Attendance | |
| ☐ | Failure to Promote | | ☒ | Working Conditions | |
| ☐ | Harassment (non-sexual) | | | Other: *declaration / Hostile environment* | |

Complaint Processing Timeline

| Stage | Date | Stage | Date |
|---|---|---|---|
| Initial contact with ORM counselor | | Complaint forwarded to EEOC | |
| Request for information received | | Agency representative assigned | |
| Request for information mailed | | EEOC Decision received | |
| | | EEOC Remand to OEDCA | |
| Formal complaint filed | | - and/or - | |
| Request for additional information received | | Complaint/Decision forwarded to OEDCA | |
| Request for additional information mailed | | OEDCA FAD received | |
| ORM: ☐ accepted ☐ dismissed complaint | | | |
| | | Complaint settled | |
| Notice of assignment of investigator | | Complaint withdrawn by complainant | |
| Investigation commenced | | | |
| Request for additional information received | | Comments: | |
| Request for additional information mailed | | | |
| Investigation completed | | | |

**Note:** On this date, **5/12/11**, you discussed the above Bases & Claims with me. **However, please be advised that I am not an ORM EEO Counselor.** If you feel that you have been discriminated against & wish to file an EEO complaint, **you must contact an ORM Counselor within 45-calendar days of the alleged incident in order to preserve your EEO rights!** If you feel that your rights as a bargaining unit employee have been violated, you should contact your Union Office within 30-calendar days of the alleged violation. I am the EEO/ADR Consultant for this facility and I will do everything within my power to resolve the issues we have discussed today. On the date shown below, this form was shown to me.

Signature of Complainant/Disputant: *Carmen L Matthews*   ·Date: **5/12/2011**

5/12/11   Stir ed working Dec 30 ?

Supervisor

Feels pattern of harassment / pattern of gender bias
                              favoritism toward men can
Why are you going to see EEO?  wear everyday / T-shirt c holes
Why are you going to complain.
                              Alison said to staff she
Tues. 5/10 said she heard
negative statements from staff.  purchased a refrigerator. $20
Then yesterday when she question expected everyone to pay
why are you seeing EEO? Yes, you   each,  She actually stopped
are so positive.      maybe everyone from working in a phone
                    demanding zone + said get off your phone
Called a mtg to specifically to ask why are you complaining
                              to me.
     April Adams + Aaron McDevitt.
Asked what was her issue to complain about the call center.
When she called in sick leads (Aaron)
Asked her what did she eat when she found out she
said she got food poison. — Said you don't look
like you were sick —
                Run's this weekend
Aaron asked her to get funding from Organization for
the call center staff to run on an event this weekend
for $40.00 per person. Can use VA time to find vendors +
they will pay her $41.00 entry fee for trying to find —
She refused verbally to find vendors — He got
upset, then changed story to say he will pay
your entry fee, stating I didn't know you wanted
to get reimbursed for her entry fee.

- Told not allowed to email anyone without her permission.
Due to incident Carmen innocently sent to email
group about 98.1 being at La Jolla - She did not get
permission —

Diggi-Jogger          Tied & took phones off-line — Allison
                                      say she always does that.
As early as Feb Carmen has witnessed Adam Doyle
& Allison Hill got out of the same car in the
parking. Brenda Moore's party off station, road
back c Allison to work    On the Border MV.
                     based on her insistence —
She said ___ in the parking lot to Carmen - did you
See that logo on that car? The logo was a
p__ le butterfly — Adam Doyle was driving that car.
That was the band I used to be in. Switched topic to
relationships — Sid now I have a boyfriend — It can
be difficult — they want to take off work Okay
are such wimps. Staff aware of relationship   Did you see
                                              that?
When someone's looking for ___ Allison, you go to
Adam & he will text her. This occurred up to the
time when I loads were announced

2 wks ago April 29th training partially c ___ in the
beginning 16 hrs into trng — everyone left ___ 1½-2hr
                                            no chair to leave
left facility. 4 left trying to move PC's. Remainder
of staff returned. Carmen also helping people Allison told
         OP back to her job. Allison granted 59 min. for
         Kudos a month — plus you have almost 3HRS —

Does home work) | 2 sweaters, brews, socks
Read
During down time — watch movies — Texting
or Shut off phones — Dbl check to make busy —
Chris Rice Watch movies
Aaron —
    Mc Devott — 40 calls to her 80.

Adam portrays himself with the attitude
Im protected by Allison do as I say
staff comment.

10:10 Am aware — termination
aw —

Eliz Mc Donald x6331

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1445   Page 384 of 432

# San Diego Reader



- News Ticker

## V.A. Inspector General Says Problems at Call Center Risk Veterans' Lives

1 0

By Matt Potter, February 15, 2012

- Facebook

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1446   Page 385 of 432

- Twitter
- News Ticker alerts
- Google+
- 
    Share
- Email

The Inspector General of the U.S. Veterans Affairs Department has issued a report highly critical of emergency call handling by the Department of Veterans Affairs Healthcare System in San Diego.

The report says 20 agents are employed by the healthcare system in a Mission Valley office to "answer calls from patients who may want to renew medications, leave messages for primary care providers, discuss symptoms with advice nurses, schedule primary care appointments, obtain laboratory results, or request transfer of care."

Emergency calls are supposed to be referred by the agents for evaluation by healalth care professionals, but according to the report, an unidentified whistleblower charged last May that "patients reporting emergency symptoms on the call line were at risk for delays in care and poor clinical outcomes."

The complaint included allegations that a "supervisor instructed an agent to bypass the advice nurses, causing a serious delay in care that could have lead to death," and that "Inexperienced and poorly trained... agents, without clinical knowledge or an understanding of basic medical terminology, were managing clinical calls."

According to the audit: "We substantiated the allegation that ... agents were inexperienced and lacked appropriate training.

"Failure to provide training on the basic competencies such as symptomatic and emergent call documentation and routing, and medical terminology put patients at risk."

Subsequent to the investigation, the report says, VA's San Diego managers "concurred with the findings and recommendations and provided an acceptable action plan.

"We will follow up on the planned actions until they are completed," the audit says.

- Facebook
- Twitter
- News Ticker alerts
- Google+
- 
    Share
- Email

## More like this:

- **VA Hospital Audit Finds Fire Risks, Cancer Test Delays** — *Jan. 12, 2012*
- **That's ok, sir, I am authorized to offer a 50% discount** — *July 7, 2010*
- **Go Directly to Jail...and Die** — *Dec. 10, 2008*
- **Veteran's hang-up hell** — *July 16, 2008*
- **Red, white, and drugged** — *Feb. 24, 2005*

## Comments

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1447   Page 386 of 432

# San Diego Reader



- News Ticker

## V.A. Inspector General Says Problems at Call Center Risk Veterans' Lives

0

By Matt Potter, February 15, 2012

- Facebook

**AGENT**: ___Carmen Matthews___   **DATE**: ___09/22/11___

**SCORES:**

VETERAN SERVICE: ___100%___ (improvement!)

INTERNAL CUSTOMER SERVICE: ___96%___

APPOINTMENT ACCURACY: ___86%___

CUMULATIVE CALLS TAKEN: ___91%___

CUMULATIVE TALK TIME PERFORMANCE: ___90%___

DAYS NOT LOGGED IN 6 HOURS IN THE PAST WEEK: ___0___

**VETERAN SERVICE:**

Choose a random patient call from the previous week. Award up to ten points for each of the following and record the percentage above:

PATIENT: ___Ostrander___   LAST FOUR: ___9710___   DATE OF CALL: _9/16/11_

___10___   Agent used patient or caller's name

___10___   Agent verified the primary care provider

___10___   Agent closed the encounter to the best of his or her ability, eliminating the need for patient call-back

___10___   Agent was polite, genuinely respectful, and friendly; not robotic or rude

___10___   Agent was efficient with time, but addressed all the issues with patience (Checked for consult, was thorough)

REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week. Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

  10      Agent was polite in the communication

  10      Agent provided helpful information (excessive information about teammate)

  10      Agent effectively communicated (provided the correct information in a timely manner)

  8       Agent used the proper message standardization and followed all SOPs (PCP?)

  10      Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week. Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time. Divide the number of calls offered by the FTE to get the benchmark. Next, run a report showing how many calls the agent being audited took that day. Enter the percentage (agent's number divided by the benchmark) and record it on page 1. Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

**APPENDIX A**

*Assumptions for calculating benchmarks for talk time and average calls per hour:*

Where X = average calls per **SHIFT** for the time period under review (we are going to have to calculate per shift as opposed to per day because of the unequal distribution of calls throughout the day when we expand hours)
Where Y = average FTEE per **SHIFT** for the time period under review
And 3 is the average call time in minutes (this is a constant)

The FTEE per SHIFT is when we are fully staffed is as follows:

6:30 – 3:00 = 13.81 FTEE
8:00 – 4:30 = 17 FTEE
9:30 – 6:00 = 15.6 FTEE
10:00 – 6:30 = 14.88 FTEE
9:00 – 5:30 = 16 FTEE
11:00 – 7:30 = 13.6 FTEE

(FTEE is calculated as follows:  1 FTEE = 30(15 minute blocks of time on the phone). Subsequently, 1 FTEE / 30 blocks = .033.  Therefore, one block of 15 minutes of work is .033 FTEE.  Therefore, the number of 15 minute blocks worked by the number of employees on the phones during a shift multiplied by .033 gives you the FTEE for a given shift.)

**To calculate talk time:**

$$\frac{X(3)}{Y} = Z$$

(where Z = the average talk time per agent in minutes required to answer all calls)

*The standard:  (Z - 30 minutes) to Z = Fully Successful, > Z is outstanding, < (Z -30 minutes) is less than successful

*Divide Z by 2 for Part time employees.*

**EXAMPLE FOR CALCULATING TALK TIME:**

Contact center manager reports say that the 6:30 – 3:00 shift takes an average of 795 calls per day from July 2011 – September 2011, and there are 13.81 FTEE during that shift.  Therefore X = 795 and Y = 13.81:

REVISED JUNE 26, 2011

$\frac{795.(3)}{13.81}$ = 172.7 minutes of talk time

Therefore, in order to be fully successful, agents with the $6:30 - 3:00$ shift during this time period will have to have $142.7 - 172.7$ minutes of talk time on average per day. You can divide by 60 to get the number in hours. If the agent has more than 172.7 minutes of talk time per day, that is outstanding. Less than 142.7 would be less than fully successful.

**To calculate average calls per hour:**

$$\left(\frac{x}{y}\right)(.16) = Z$$

(where $Z$ = the average calls per hour per agent required to answer all calls, and multiplying by .16 is the same as dividing by 6, which is the number of hours each agent is working on phones per shift)

*The standard: $Z \pm 1$ = fully successful, $> Z + 1$ = outstanding, $< Z + 1$ = less than successful

*Divide X by 2 for part time employees*

**EXAMPLE FOR CALCULATING AVERAGE CALLS PER HOUR:**

Contact Center Manager reports say that the $1100 - 7:30$ shift takes an average of 703 calls per shift from July 2011 – September 2011. The late shift has an average of 13.6 FTEE. Therefore, $X = 703$ and $Y = 13.6$.

$\frac{703}{13.6}(.16) = 8.3$ Calls Per Hour

Therefore, $7.3 - 9.3$ calls per hour is fully successful, $< 7.3$ is less than fully successful, and $> 9.3$ is outstanding for the agents on the late shift during this particular time period.

REVISED JUNE 26, 2011

Mail Message From: MATTHEWS,CARMEN L  Dated: 09/19/2011 09:32
Subject: Msg/Taylor 4011/Julianne, Awtrey, Karen

This pt would like to know if you are set up for walk-in Flu shots.

Contact:  619-690-5988

Response: 1) LONG,KAREN  09/19/2011 10:05

We will begin on Thursday, 9/29 from 2p-4p.

**AGENT:** ____Carmen Matthews_____   **DATE:** _____09/1/11_____

**SCORES:**

VETERAN SERVICE: _____98%_____

INTERNAL CUSTOMER SERVICE: ___80%____

CUMULATIVE APPOINTMENT ACCURACY: __83%__

CUMULATIVE CALLS TAKEN: __89%___

CUMULATIVE TALK TIME PERFORMANCE: __85%__

DAYS NOT LOGGED IN 6.5 HOURS IN THE PAST WEEK: ___3____

**VETERAN SERVICE:**

Choose a random patient call from the previous week.  Award up to ten points for each of the following and record the percentage above:

PATIENT: __SMART_____   LAST FOUR: ___1087___ DATE OF CALL: _08/24/11____


_10_         Agent used patient or caller's name


_10_         Agent verified the primary care provider


_10_         Agent closed the encounter to the best of his or her ability, eliminating the need
             for patient call-back


_9_          Agent was polite, genuinely respectful, and friendly; not robotic or rude


_10_         Agent was efficient with time, but addressed all the issues with patience
             (Checked for consult, was thorough)


REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week. Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

_9_          Agent was polite in the communication

_7_          Agent provided helpful information (excessive information about teammate)

_10_         Agent effectively communicated (provided the correct information in a timely manner)

_9_          Agent used the proper message standardization and followed all SOPs (no caps)

_5_          Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week. Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time. Divide the number of calls offered by the FTE to get the benchmark. Next, run a report showing how many calls the agent being audited took that day. Enter the percentage (agent's number divided by the benchmark) and record it on page 1. Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

**APPENDIX A**

*Assumptions for calculating benchmarks for talk time and average calls per hour:*

Where X = average calls per **SHIFT** for the time period under review (we are going to have to calculate per shift as opposed to per day because of the unequal distribution of calls throughout the day when we expand hours)
Where Y = average FTEE per **SHIFT** for the time period under review
And 3 is the average call time in minutes (this is a constant)

The FTEE per SHIFT is when we are fully staffed is as follows:

6:30 – 3:00 = 13.81 FTEE
8:00 – 4:30 = 17 FTEE
9:30 – 6:00 = 15.6 FTEE
10:00 – 6:30 = 14.88 FTEE
9:00 – 5:30 = 16 FTEE
11:00 – 7:30 = 13.6 FTEE

(FTEE is calculated as follows:  1 FTEE = 30(15 minute blocks of time on the phone). Subsequently, 1 FTEE / 30 blocks = .033.  Therefore, one block of 15 minutes of work is .033 FTEE.  Therefore, the number of 15 minute blocks worked by the number of employees on the phones during a shift multiplied by .033 gives you the FTEE for a given shift.)

**To calculate talk time:**

$$\frac{X(3)}{Y} = Z$$

(where Z = the average talk time per agent in minutes required to answer all calls)

*The standard:  (Z - 30 minutes) to Z = Fully Successful. > Z is outstanding, < (Z -30 minutes) is less than successful

*Divide Z by 2 for Part time employees.*

**EXAMPLE FOR CALCULATING TALK TIME:**

Contact center manager reports say that the 6:30 – 3:00 shift takes an average of 795 calls per day from July 2011 – September 2011, and there are 13.81 FTEE during that shift.  Therefore X = 795 and Y = 13.81:

REVISED JUNE 26, 2011

$\frac{795(3)}{13.81}$ = 172.7 minutes of talk time

Therefore, in order to be fully successful, agents with the 6:30 – 3:00 shift during this time period will have to have 142.7 – 172.7 minutes of talk time on average per day.  You can divide by 60 to get the number in hours.  If the agent has more than 172.7 minutes of talk time per day, that is outstanding.  Less than 142.7 would be less than fully successful.

**To calculate average calls per hour:**

$$\left(\frac{X}{Y}\right)(.16) = Z$$

(where Z = the average calls per hour per agent required to answer all calls, and multiplying by .16 is the same as dividing by 6, which is the number of hours each agent is working on phones per shift)

*The standard:  Z ± 1 = fully successful, > Z + 1 = outstanding, < Z + 1 = less than successful

*Divide X by 2 for part time employees*

**EXAMPLE FOR CALCULATING AVERAGE CALLS PER HOUR:**

Contact Center Manager reports say that the 1100 – 7:30 shift takes an average of 703 calls per shift from July 2011 – September 2011.  The late shift has an average of 13.6 FTEE.  Therefore, X = 703 and Y = 13.6.

$\frac{703}{13.6}$ (.16) =  8.3 Calls Per Hour

Therefore, 7.3 – 9.3 calls per hour is fully successful, < 7.3 is less than fully successful, and > 9.3 is outstanding for the agents on the late shift during this particular time period.

REVISED JUNE 26, 2011

Mail Message From: MATTHEWS,CARMEN L  Dated: 08/26/2011 08:48
Subject: Msg/Southern 0668/Simon

Pt states he is having anxiety attacks, to the point that he is almost
having a seizure.

Pt complained that another agent, named Ron, whom he just spoke to was
huffing and not patient with him.

Pt states that this is not a psychological problem.

Pt asks why it was a burdeon to Ron, and why he was bothered by his,
the pt's call.

Pt has an appt, with pcp 08/29/11, at 16:00.

He had called back, stating that he wanted to make to be listened to
and understood.

He thanked me for being a compassionate listener.

And he emphasized that he wanted his pcp's help.

Contact:  858-2201254

thx
clm

Response: 1) RIVERA,JUANITA  08/26/2011 09:47

Doc? Can we get RN triage please we do have available openings today if
needed not sure? Although concerned with "anxiety attacks to the point of
seizures"

Response: 2) RIVERA,JUANITA  08/26/2011 09:48

Elaine can you help out with this one?

Response: 3) ROBSON,AUDREY E  08/26/2011 09:51

I will call him after my HTN visit. I do believe he needs to be seen by
psych for his anxiety attacks, but the part about seizures worries me.
I'll review his record and see what I can find out before I call him.

Response: 4) ROBSON,AUDREY E  08/26/2011 09:53

Looks like has h/o multiple issues which could exacerbate this, including
bipolar and panic attack along with substance abuse. Also has dx of
anxiety. He has rx for lorazepam. Will try to find out what has triggered
these. He has an appt on Monday with Dr. Simon at 1600.

Patient Advocate Tracking System (PATS) appv1 - 1.0.0.29                                    Page : 22

## View Report of Contact

< Back     Reopen

**Cover Sheet**

| | |
|---|---|
| **ROC Number:** | 664.201101979 |
| **Date of Contact:** | 09/23/2011 |
| **Information Taken By:** | NAPOLITANO, THEODORE F |
| **Contact Phone/Fax:** | NONE |
| **Contacting Entities:** | Patient |
| **Congressional Contact:** | NONE |

**Methods of Contact:** Phone

**Patient**

| | | | |
|---|---|---|---|
| **Patient:** | SOUTHERN, BRETT LEIGH | **Treatment Status:** | Outpatient |

**Issue**

**Issue Description:** I just spoke to one of your reps named Carmen and she is a fantastic rep. She is alert, she is awake, she is not asleep on her feet. I have a lot of issues, but every time I speak to Carmen she gets the job done, time after time. I got fantastic service and she needs to be acknowledged.

**Resolution**

| | | |
|---|---|---|
| **Clinical Appeal :** | NONE | **Comp:** NONE |

**ROC Issue Details:**

| Issue Code | Location | Facility Service or Section | Employee Involved |
|---|---|---|---|
| CP01 | PRIMARY CARE CALL CENTER | HEALTH ADMINISTRATION SERVICE | |

**Resolution Text:** Carmen Matthews provides excellent customer service support to Veterans from the Primary Care Call Center.

Main
Help

New ROC
Edit ROC
List ROCs
Delete ROC
Reopen ROC

Maintenance

Reports
  Employee
  Facility Service Section
  Issue Code
  Patient
  Report of Contact

Ad Hoc
  Private
  Public

Switch Division
User Settings

Log Off

*Patient Advocate Report of Contact 9/23/2011 from a Veteran*

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Patient Kudos!

# Announcements: Patient Kudos!

| | |
|---|---|
| Alert Me | |
| **Title** | Patient Kudos! |
| **Body** | "I just wanted to comment on the young lady who just helped me at the call center.  Her name was Carmen.  I've had an ongoing unresolved problem that she was able to take care of for me.  I was having a bad day, but she was caring and helpful and just made my day."<br><br>Awesome job, Carmen!!  Thank you for your dedication to helping our veteran patients! |
| **Expires** | 3/23/2012 |

Created at 3/9/2011 7:27 AM  by Gill, Allison M.
Last modified at 3/23/2011 9:26 AM  by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

| Alert Me | |
|---|---|
| **Title** | Kudos! |
| **Body** | Here is what one of our vets had to say about Carmen Matthews in the call center! |
| | "Carmen helped me today on the phone.  Typically, I get good service, but this was exceptional!  I couldnt have asked for anything more.  So many thanks!" |
| | Keep up the great work, Carmen! |
| **Expires** | 3/23/2012 |

Created at 3/16/2011 7:20 AM  by Gill, Allison M. 👤
Last modified at 3/23/2011 9:25 AM  by Gill, Allison M. 👤

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1461   Page 400 of 432

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

| Alert Me | |
|---|---|
| **Title** | Kudos! |
| **Body** | "I just spoke with Carmen Matthews and she is without a doubt the most efficient clerk I've spoken to since using the VA.  She was not only professional, she was thorough.  I just wanted you to know what a wonderful job she is doing.  She was patient with all my needs, and I give her a double A plus!"<br><br>Amazing!! |
| **Expires** | 8/25/2011 |

Created at 3/25/2011 1:03 PM by Gill, Allison M.
Last modified at 3/25/2011 1:03 PM by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

| | |
|---|---|
| Alert Me | |
| **Title** | Kudos! |
| **Body** | "I just talked to Carmen Matthews and she was very, very helpful in trying to arrange something with my husband who has Alzheimer's. I have spoken to people at the VA and I haven't gotten the courtesy I got from your call center. Carmen has really helped me a lot and I do appreciate everything she did for me. Thank you!"<br><br>Nice work, Carmen!! |
| **Expires** | 3/23/2012 |

Created at 3/23/2011 10:58 AM by Gill, Allison M.
Last modified at 3/23/2011 10:58 AM by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Patient Kudos!

# Announcements: Patient Kudos!

| Alert Me | |
|---|---|
| **Title** | Patient Kudos! |
| **Body** | "I just wanted to comment on the young lady who just helped me at the call center. Her name was Carmen. I've had an ongoing unresolved problem that she was able to take care of for me. I was having a bad day, but she was caring and helpful and just made my day." |
| | Awesome job, Carmen!!  Thank you for your dedication to helping our veteran patients! |
| **Expires** | |

Created at 3/9/2011 7:27 AM  by Gill, Allison M.
Last modified at 3/9/2011 8:32 AM  by Gill, Allison M.

Announcements - Kudos for Carmen                                           Page 1 of 1

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos for Carmen

# Announcements: Kudos for Carmen

Alert Me

| Title | Kudos for Carmen |
|---|---|
| **Body** | Good morning. Here is a lovely message I received from a veteran about Carmen Matthews service:<br><br>"Good morning. I just spoke to one of your reps named Carmen and she is a fantastic rep. She's alert, she's awake, she's not asleep on her feet. I have a lot of issues, but every time I speak to Carmen she gets the job done time after time. I got fantastic service and she needs to be acknowledged. Have a great weekend!!"<br><br>Awesome job!! |
| **Expires** | 3/23/2012 |

Created at 9/23/2011 9:07 AM by Gill, Allison M.
Last modified at 9/23/2011 9:07 AM by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos for Carmen!

# Announcements: Kudos for Carmen!

Alert Me

| | |
|---|---|
| **Title** | Kudos for Carmen! |
| **Body** | |

"I just spoke to a miss Carmen Matthews. She was a pleasure. She untangled something for me that I thought was going to be a nightmare, but she took care of me. Thank you!"

Great job, Carmen!

| | |
|---|---|
| **Expires** | 3/20/2012 |

Created at 9/20/2011 1:27 PM  by Gill, Allison M.
Last modified at 9/20/2011 1:27 PM  by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos

# Announcements: Kudos

Alert Me

| Title | Kudos |
|-------|-------|
| **Body** | Veteran called with "I want to let you know Carmen was great! I called to schedule a primary care appointment. She noticed I had another appointment. She scheduled the primary care on the day of the other appointment saving me a trip and gas. I felt she went above and beyond. |
| **Expires** | |

Created at 6/17/2011 3:54 PM by Moore, Brenda J
Last modified at 6/17/2011 3:54 PM by Moore, Brenda J

Case 3:14-cv-01340-MMA-BLM   Document 77   Filed 10/22/15   PageID.1467   Page 406 of 432

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > More Kudos!

# Announcements: More Kudos!

| | |
|---|---|
| Alert Me | |
| **Title** | More Kudos! |
| **Body** | "Good afternoon!  I just spoke with your employee Carmen and she was just wonderful!  She's a lovely person, and she helped me with my husband's appointments and medications.  She made my afternoon, so thank you all for your help!" |
| | Great job, Carmen!! |
| **Expires** | |

Created at 5/2/2011 8:15 AM  by Gill, Allison M.
Last modified at 5/2/2011 8:15 AM  by Gill, Allison M.

Announcements - Kudos For Carmen!    Page 1 of 1

Case 3:14-cv-01340-MMA-BLM    Document 77    Filed 10/22/15    PageID.1468    Page 407 of 432

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos For Carmen!

# Announcements: Kudos For Carmen!

Alert Me

| | |
|---|---|
| **Title** | Kudos For Carmen! |
| **Body** | "I'm just calling to say that I spoke to Carmen today who was very helpful and knowledgeable about everything I asked about. She was able to tell me when all my appointments were, and she was very kind and patient. I appreciate her and thank you for hiring such capable people!" |
| | Great Job, Carmen! |
| **Expires** | 3/28/2012 |

Created at 9/15/2011 9:05 AM by Gill, Allison M.
Last modified at 9/15/2011 9:05 AM by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

Alert Me

| Title | Kudos! |
|---|---|
| Body | "I just spoke with Carmen Matthews and she is without a doubt the most efficient clerk I've spoken to since using the VA.   She was not only professional, she was thorough.  I just wanted you to know what a wonderful job she is doing.  She was patient with all my needs, and I give her a double A plus!"

Amazing!! |
| Expires | 8/25/2011 |

Created at 3/25/2011 1:03 PM  by Gill, Allison M.
Last modified at 3/25/2011 1:03 PM  by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

| Alert Me | |
|---|---|
| **Title** | Kudos! |
| **Body** | Here is what one of our vets had to say about Carmen Matthews in the call center! |
| | "Carmen helped me today on the phone. Typically, I get good service, but this was exceptional! I couldnt have asked for anything more. So many thanks!" |
| | Keep up the great work, Carmen! |
| **Expires** | |

Created at 3/16/2011 7:20 AM  by Gill, Allison M.
Last modified at 3/16/2011 7:20 AM  by Gill, Allison M.

```
Vista Mail Message for: MATTHEWS,CARMEN L
```
```
Local DHCP Message #: 60042098
--------------------------------------------------------------------------------

Mail Message From: MATTHEWS,CARMEN L  Dated: 03/10/2011 08:09
Subject: Pt Issue/Drummond 9340/Chao


Response: 2) MATTHEWS,CARMEN L  03/16/2011 08:31

Okay.  I've just called the pt on this.  While on the line, pt asked for a refill
of METFORMIN TAB,ORAL  1000MG, last filled 12/02/10

mail

Contact:  619-823-0060

Thx
clm

Response: 3) CHAO,EDWARD C  03/16/2011 14:22

done; thx so much for your help with this, Carmen!
```

 **PCCC**

This Site: PCCC                                                    🔍

Health Administration Service > PCCC > Announcements > Patient Kudos!

# Announcements: Patient Kudos!

Alert Me

| | |
|---|---|
| **Title** | Patient Kudos! |
| **Body** | "I just wanted to comment on the young lady who just helped me at the call center. Her name was Carmen. I've had an ongoing unresolved problem that she was able to take care of for me. I was having a bad day, but she was caring and helpful and just made my day." |
| | Awesome job, Carmen!!  Thank you for your dedication to helping our veteran patients! |
| **Expires** | 3/23/2012 |

Created at 3/9/2011 7:27 AM  by Gill, Allison M.
Last modified at 3/23/2011 9:26 AM  by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Patient Kudos!

# Announcements: Patient Kudos!

Alert Me

| | |
|---|---|
| **Title** | Patient Kudos! |
| **Body** | "I just wanted to comment on the young lady who just helped me at the call center.  Her name was Carmen.  I've had an ongoing unresolved problem that she was able to take care of for me.  I was having a bad day, but she was caring and helpful and just made my day."

Awesome Job, Carmen!!  Thank you for your dedication to helping our veteran patients! |
| **Expires** | 3/23/2012 |

Created at 3/9/2011 7:27 AM  by Gill, Allison M.
Last modified at 3/23/2011 9:26 AM  by Gill, Allison M.

 **PCCC**

This Site: PCCC

Health Administration Service > PCCC > Announcements > Kudos!

# Announcements: Kudos!

Alert Me

| Title | Kudos! |
|-------|--------|
| Body | Here is what one of our vets had to say about Carmen Matthews in the call center! |
| | "Carmen helped me today on the phone. Typically, I get good service, but this was exceptional! I couldnt have asked for anything more. So many thanks!" |
| | Keep up the great work, Carmen! |
| Expires | 3/23/2012 |

Created at 3/16/2011 7:20 AM  by Gill, Allison M.
Last modified at 3/23/2011 9:25 AM  by Gill, Allison M.

Tanisha Jackson
Patient Advocate
Veterans Affairs San Diego Healthcare System
3350 La Jolla Village Drive
San Diego, CA  92161
Phone:  858-642-1561

October 4, 2011

Carmen Matthews
P. O. Box 232313
San Diego, CA  92193

To Whom It May Concern:

I first met Carmen after she graduated from the UCSD Health Information Technology Program. She had made up her mind to combine her medical, business systems and journalism into her commitment to work with Veterans.  And in so doing, Carmen volunteered with us in the Patient Advocate's Office.

As a volunteer, Carmen demonstrated her ability to learn with little to know guidance, and she received many compliments.  She always honored her word to the veterans, and to her co-employees.

Even after Carmen secured a full time position, in another department, the Primary Care Call Center, she continued to work with the Patient Advocates by quickly researching appointments and medication issues that came through our office.

We here at the Patient Advocates Office appreciate her professionalism, timeliness and thorough approach to each call or email that we placed to her.  In fact, she has been our main contact since she took that position.

Should you have any other questions, please do call me.  I am more than  happy to sing her praises.

Sincerely,

Tanisha Jackson
Patient Advocate
Office of the Director
858-552-4392

Michael Hosey
Veterans Affairs San Diego Healthcare System
3350 La Jolla Village Drive
San Diego, CA  92161
Cell Phone:  619-502-0769

September 28, 2011

Carmen Matthews
P. O. Box 232313
San Diego, CA  92193

To Whom It May Concern:

I have known Carmen Matthews since she began working at the VA.  Carmen is articulate, motivated and trustworthy.  She also has high expectations of herself, no matter what is going on, or where she is.   At the same time, Carmen has a knack for unconditionally accepting people, veterans, co-employees and others, as they are.

Carmen is also a hard worker and critical worker.  She takes what is required of her and molds it into something that is even better.  I've even seen her remain calm, when one irate veteran lost control in her presence.  She was able to show that veteran, by her being fully present and compassionate, that he matters.

In closing, I genuinely believe that while she's been an asset to the VA, Carmen would be an asset to any organization.

Sincerely,

Michael Hosey

Patient Effects
VA. San Diego
EXT 3236

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF RESOLUTION MANAGEMENT

| | |
|---|---|
| In the matter of: | ) Complaint No: |
| | ) |
| CARMEN MATTHEWS, | ) 200P-0664-2011104467 |
| | ) |
| Complainant, | ) |
| | ) |
| vs. | ) |
| | ) |
| DEPARTMENT OF VETERANS AFFAIRS, | ) |
| VA San Diego Healthcare System, | ) |
| San Diego, California, | ) |
| | ) |
| Respondent. | ) |

AFFIDAVIT

TRANSCRIPT OF PROCEEDINGS in the above-entitled cause of the

examination of ELIZABETH MCDONALD before EEO Investigator

Barbara Walter, on Monday, November 19, 2012.

Transcribed by: Vanita Tildon

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

1                        PROCEEDINGS

2          INVESTIGATOR WALTER:  All right, this is a brief statement

3    to the record.  My name is Barbara Walter.  I am the EEO

4    Specialist assigned the supplemental investigation for the EEO

5    complaint of Carmen Matthews, Complaint Number 200P-0664-

6    2011104467, which she has filed against the San Diego VA.

7          While we were off the record, we discussed some of the

8    ground rules.  All right, Ms. McDonald, I'd like to administer

9    the oath.  If you could please raise your right hand?

10         THE WITNESS:  Okay.

11         INVESTIGATOR WALTER:  Do you solemnly swear the statements

12   you're about to give are true and complete to the best of your

13   knowledge and belief, or affirm, so help you God?

14         THE WITNESS:  Yes.

15         INVESTIGATOR WALTER:  Okay.

16   Whereupon,

17                      ELIZABETH MCDONALD

18   a witness, called for examination, after having been first duly

19   sworn or affirmed, was examined and testified as follows:

20                        EXAMINATION

21   **BY INVESTIGATOR WALTER:**

22   **Q    Could you please state and spell your name for the record?**

23   A    Oh, Elizabeth McDonald, E-L-I-Z-A-B-E-T-H, M-C-D-O-N-A-L-D.

1   Q    All right, thank you for that.  And what position -- what

2   is your position?

3   A    Assistant Chief of Health Administration Service.

4   Q    Okay.  And, so, you would be the Complainant's second-level

5   Supervisor?

6   A    Yeah.

7   Q    Okay, thank you for that.  All right, there's -- before we

8   go into the Claims, I'm going to talk to you about a couple of

9   things.  One of them is that the Complainant testified that

10  there was an internal investigation conducted within the unit.

11  Are you aware of an Administrative Board of Investigation that

12  was conducted in the unit?

13  A    Yes.

14  Q    Okay, can you tell me, what was that about?

15  A    Yeah.  Somebody, actually, I think it was Carmen, made a

16  complaint against the Supervisor for a number, quite a few

17  issues, and so, the Supervisor was taken out of the Call Center

18  Service so that they could investigate the charges against the

19  supervisor. *This ignores the fact that come after the Complainant's EEO comp meeting it was decided that Allison would be terminated effective immediately, and that something changed that instead lead to Allison being transfered across the street*

20  Q    Okay.  And did Ms. Gill know who the complaints came from,

21  to your knowledge?

22  A    No.  Actually, I don't know but I know that the -- I'm

23  trying to remember the time.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

-238-

*This also ignores the other, many employee and medical staff complaints against Allison.*

4

1    Q      **May 2011?**

2    A      Yeah.  I don't know if she knew actually.

3    Q      **Okay.  But you knew, and how did you know?  You said you**

4    **believe it was Carmen, how did you know that?**

5    A      Because when they had the Board and because they told me.

6    I don't know, I don't know how I know -- because they said it

7    was Carmen.  *This looks like she is looking for the best answer*

*to give the investigator, and that she is not*

*certain of what that might be.*

8    Q      **When you say, "they", who is "they"?**

9    A      Gosh, I'm trying to remember here.  I think that there was

10   a -- I think I saw the document in which -- I just don't

11   remember; I really don't know, I'm sorry.  *This ignores the history*

*of complaints against*

12   Q      **Okay.  All right.  So let's go back to that, what took**  *Allison by*

13   **place with that?**  *a wide range*

*of VASDH*

14   A      What took place?  *employees.*

*This is also*

15   Q      **With the internal investigation?**  *a convenient*

*answer to*

16   A      They took Allison out of the Call Center and then they  *attempt to*

17   interviewed a bunch of people to assess what the charges were  *cover up*

18   and then they found that it was -- a couple of the charges were  *the fact*

*that Lie*

19   correct in that she had taken some people -- she had allowed  *Retaliated*

20   some staff to go offsite to celebrate something during business  *against*

*the*

21   hours.  *complainant*

*after her*

22   Q      **Um-hum.  Is that all you can remember?**  *May 12,*

*2011*

23   A      And also, there was something about how she had been doing  *EEO complaint*

1   her homework during work.  And Allison's response was, whatever

2   work she was doing as part of getting her Degree was, like,

3   integrally related to her work at the Call Center.

*[handwritten: This still means she used a job as a place to do her homework]*

4   Q    Okay.

5   A    Because the work she was doing for her Degree was for

6   Health Administration, which is what she was doing at the Call

7   Center.

*[handwritten: Is Liz saying that if an employee does homework on the job, and that homework is the subject of her job, that's okay?]*

8   Q    Okay.  All right, anything else?

9   A    Um-hum.

10  Q    Okay.  So then, what happened?  Was she returned to the

11  department?

12  A    She was returned to the department briefly and I think

13  that -- God, I'm trying to -- and I think she -- she was

14  returned to the department very briefly and then she was removed

15  again.

*[handwritten: How can Liz not assert this, without hesitation given that the VA OIG reported that Allison's leadership was putting the health of the veteran at Risk.]*

16  Q    Removed again, permanently?

17  A    Yes, she was permanently removed.

18  Q    And sent where?

19  A    She was sent to -- first, she was sent to the Clinic

20  Administration area and then she was sent to Health Benefits &

21  Enrollment.

*[handwritten: When Allison was sent to Clinic Administration, working with Employee Health, the manager emphatically insisted that Allison be removed from this area for various reasons. Prior to this, she worked in the basement, then the 5th floor where Employee Health had ...]*

22  Q    At the San Diego VA?

23  A    Um-hum, yeah.

1    Q    Okay.  And why was she removed permanently from the area,

2    from the Call Center?

3    A    She was removed permanently from the Call Center because --

4    let's see.  Gosh, I just -- I don't really know.  I think it was

5    because -- I think -- it wasn't my decision.  So the way it was

6    said to me was that she -- they were just worried -- they

7    thought -- oh, okay.

8         They just thought that her supervisory skills needed a

9    little more beefing up and, so, they wanted to have her here at

10   the main facility where she was, kind of, around more people and

11   she could get more oversight from management here at the main

12   facility, because the Call Center's offsite, you know.

13   Q    Okay.

14   A    It's kind of off on its own.

15   Q    Okay.

16   A    And they just sort of didn't think that she was a solid

17   enough Manager to be off on her own.

18   Q    Okay, thank you for that.  When was she permanently removed

19   from the Call Center?

20   A    I think in August.

21   Q    So she came back in August and was removed in August again?

22   A    I think, and I'm not -- like I said, I'm not entirely sure

23   on the month, but about that, yeah.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

-247-

[Handwritten annotations:]
VA OIG This ignores the fact that the Reporter that how Allison ran the Call Center was putting the health of vets at Risk

This ignores the fact that Christopher Rice, an employee in the Call Center, one who had anger management problems, threatened to bring a gun to work and to shoot her Allison's head off, for the way she runs the Call Center.

This Removes Lie. from her Responsibilities.

Local police group had Probable Cause to issue a warrant.

Regardless of what month it was, and August is not the Right month, it is evident here that Allison was inept and given considerable opportunity.

with there already being a pattern of hostility and Retaliation coupled with this...

1    Q    Okay.  It could have been September?

2    A    Yeah.

3    Q    Okay, but in that area?

4    A,   Yeah.

5    Q    All right, thank you for that.  All right, with regard to

6    the equal pay, the Complainant says that there was a GS-9 that

7    opened up in the -- I'm not sure if she said it was in the Call

8    Center but that there was a GS-9 position that opened up.  Are

9    you aware of a GS-9 position that opened up that the Complainant

10   was interested in?

11   A    Yeah.  To my knowledge, it was a Clinic -- it's called

12   Profiler, and the position works for the Office of the Chief so

13   it's not in the Call Center.  It's not even in the physical

14   vicinity of the Call Center, the Call Center is in Mission

15   Valley, this position is in La Jolla.  And the position is to

16   basically set up Clinic templates, and I don't know how else to

17   describe it but that's what it is.  *This has nothing to do with Complainant's qualifications, nor the selection process.*

18   Q    Okay.

19   A    And I can tell you that people -- it requires a very

20   specific specialized knowledge.  *Complainant had & just Received training at the university of sampling. in*

21   Q    Okay.  All right.  And then there was a GS-6, a couple of

22   Lead positions that opened up, were you aware of that?  *Health Information Technology where she was Responsible for the*

23   A    Yes.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

*blue for the training and the*

-242-      *of Communication portion*

Department of Veterans Affairs | 1
**WEEKLY PERFORMANCE AUDIT FORM 2011-1**

**AGENT:** _Matthews, C._   **DATE:** _8/18/11_

**SCORES:**

VETERAN SERVICE: _100%_

INTERNAL CUSTOMER SERVICE: _94%_

APPOINTMENT ACCURACY: _100%_

CALL PERFORMANCE: _93%_

TALK TIME PERFORMANCE: _94%_

**VETERAN SERVICE:**

Choose a random patient call from the previous week.  Award up to ten points for each of the following and record the percentage above:

PATIENT: _DUTSON_   LAST FOUR: _2328_ DATE OF CALL: _8-5-11_

_10_     Agent used patient or caller's name

_10_     Agent verified the primary care provider

_10_     Agent closed the encounter to the best of his or her ability, eliminating the need for patient call-back

_10_     Agent was polite, genuinely respectful, and friendly; not robotic or rude

_10_     Agent was efficient with time

REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week. Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

 Agent was polite in the communication

 Agent provided helpful information

 Agent effectively communicated (provided the correct information in a timely manner)

9  Agent used the proper message standardization

 Agent handled the problem or issue skillfully

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week. Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time. Divide the number of calls offered by the FTE to get the benchmark. Next, run a report showing how many calls the agent being audited took that day. Enter the percentage (agent's number divided by the benchmark) and record it on page 1. Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

Department of Veterans Affairs | 1
**WEEKLY PERFORMANCE AUDIT FORM 2011-1**

**AGENT:**   Carmen Matthews   **DATE:**   8/25/11

**SCORES:**

VETERAN SERVICE:   94%

INTERNAL CUSTOMER SERVICE:   92%

APPOINTMENT ACCURACY:   88%

CALL PERFORMANCE:   77%

TALK TIME PERFORMANCE:   74%

**VETERAN SERVICE:**

Choose a random patient call from the previous week.  Award up to ten points for each of the following and record the percentage above:

PATIENT:   Bribienca   LAST FOUR:   1169   DATE OF CALL:  08/16/11

  10        Agent used patient or caller's name

  10        Agent verified the primary care provider

  10        Agent closed the encounter to the best of his or her ability, eliminating the need for patient call-back

  9        Agent was polite, genuinely respectful, and friendly; not robotic or rude

  8        Agent was efficient with time, but addressed all the issues with patience
             (Did not mention when the recall is or when Dr. Simon wants to see him)

REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week.  Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

___10___     Agent was polite in the communication

___9___     Agent provided helpful information (if rtc info was not in CPRS, mention that)

___10___     Agent effectively communicated (provided the correct information in a timely manner)

___9___     Agent used the proper message standardization and followed all SOPs (no caps)

___8___     Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week.  Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time.  Divide the number of calls offered by the FTE to get the benchmark.  Next, run a report showing how many calls the agent being audited took that day.  Enter the percentage (agent's number divided by the benchmark) and record it on page 1.  Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011

**AGENT:** ___Carmen Matthews___   **DATE:** ___09/1/11___

**SCORES:**

VETERAN SERVICE: ___98%___

INTERNAL CUSTOMER SERVICE: ___80%___

CUMULATIVE APPOINTMENT ACCURACY: __83%__

CUMULATIVE CALLS TAKEN: __89%__

CUMULATIVE TALK TIME PERFORMANCE: __85%__

DAYS NOT LOGGED IN 6.5 HOURS IN THE PAST WEEK: ___3___

**VETERAN SERVICE:**

Choose a random patient call from the previous week. Award up to ten points for each of the following and record the percentage above:

PATIENT: __SMART__   LAST FOUR: __1087__  DATE OF CALL: _08/24/11_

| | |
|---|---|
| __10__ | Agent used patient or caller's name |
| __10__ | Agent verified the primary care provider |
| __10__ | Agent closed the encounter to the best of his or her ability, eliminating the need for patient call-back |
| __9__ | Agent was polite, genuinely respectful, and friendly; not robotic or rude |
| __10__ | Agent was efficient with time, but addressed all the issues with patience (Checked for consult, was thorough) |

REVISED JUNE 26, 2011

276

**DATA ENTRY:**

Run the weekly error report for the previous week. Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

9      Agent was polite in the communication

7      Agent provided helpful information (excessive information about teammate)

10      Agent effectively communicated (provided the correct information in a timely manner)

9      Agent used the proper message standardization and followed all SOPs (no caps)

5      Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week. Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time. Divide the number of calls offered by the FTE to get the benchmark. Next, run a report showing how many calls the agent being audited took that day. Enter the percentage (agent's number divided by the benchmark) and record it on page 1. Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.



REVISED JUNE 26, 2011

277



Department of Veterans Affairs | 1
**WEEKLY PERFORMANCE AUDIT FORM 2011-1** |

**AGENT:**____Carmen Matthews____**DATE:**____09/8/11____

**SCORES:**

VETERAN SERVICE:____100%____

INTERNAL CUSTOMER SERVICE:____100%____

CUMULATIVE APPOINTMENT ACCURACY:___83%___

CUMULATIVE CALLS TAKEN:___92%___

CUMULATIVE TALK TIME PERFORMANCE:___88%___

DAYS NOT LOGGED IN 6.5 HOURS IN THE PAST WEEK:____1____
(spoke to Carmen about being logged in)

**VETERAN SERVICE:**

Choose a random patient call from the previous week. Award up to ten points for each of the
following and record the percentage above:

PATIENT:___WAGNER____LAST FOUR:___3418___DATE OF CALL:__08/29/11___


___10___     Agent used patient or caller's name


___10___     Agent verified the primary care provider


___10___     Agent closed the encounter to the best of his or her ability, eliminating the need
              for patient call-back


___10___     Agent was polite, genuinely respectful, and friendly; not robotic or rude


___10___     Agent was efficient with time, but addressed all the issues with patience
              (Checked for consult, was thorough)

REVISED JUNE 26, 2011

279

**DATA ENTRY:**

Run the weekly error report for the previous week. Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

___10___   Agent was polite in the communication

___10___   Agent provided helpful information (excessive information about teammate)

___10___   Agent effectively communicated (provided the correct information in a timely manner)

___8___   Agent used the proper message standardization and followed all SOPs (PCP?)

___10___   Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week. Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time, Divide the number of calls offered by the FTE to get the benchmark. Next, run a report showing how many calls the agent being audited took that day. Enter the percentage (agent's number divided by the benchmark) and record it on page 1. Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

280

REVISED JUNE 26, 2011

Department of Veterans Affairs | 1
**WEEKLY PERFORMANCE AUDIT FORM 2011-1**

**AGENT**: ____Carmen Matthews____   **DATE**: ____09/15/11____

**SCORES:**

VETERAN SERVICE: ____80%____

INTERNAL CUSTOMER SERVICE: ____100%____

APPOINTMENT ACCURACY: __91%__

CUMULATIVE CALLS TAKEN: __90%__

CUMULATIVE TALK TIME PERFORMANCE: __88%__

DAYS NOT LOGGED IN 6 HOURS IN THE PAST WEEK: ____0____

**VETERAN SERVICE:**

Choose a random patient call from the previous week.  Award up to ten points for each of the following and record the percentage above:

PATIENT: __Russell__   LAST FOUR: __2598__ DATE OF CALL: _9/7/11__


__0__        Agent used patient or caller's name


__10__       Agent verified the primary care provider


__10__       Agent closed the encounter to the best of his or her ability, eliminating the need
             for patient call-back


__10__       Agent was polite, genuinely respectful, and friendly; not robotic or rude


__10__       Agent was efficient with time, but addressed all the issues with patience
             (Checked for consult, was thorough)


REVISED JUNE 26, 2011

**DATA ENTRY:**

Run the weekly error report for the previous week.  Record the percentage of correct appointments on page 1.

**INTERNAL CUSTOMER SERVICE:**

Check and attach a random communication between the agent and an external customer (provider, RN, agent in another department, etc...) and give up to ten points for each of the following and record the percentage on page 1:

  _10__        Agent was polite in the communication

  _10__        Agent provided helpful information (excessive information about teammate)

  _10__        Agent effectively communicated (provided the correct information in a timely manner)

  _10__        Agent used the proper message standardization and followed all SOPs (no caps)

  _10__        Agent handled the problem or issue skillfully (rtc info and caps, otherwise good)

**CALL AND TALK TIME PERFORMANCE:**

Pick a day worked during the previous week.  Run a Contact Center Manager report for that day to find the number of calls offered during the tour of duty of the agent being audited. Then calculate the FTE that worked during that period of time.  Divide the number of calls offered by the FTE to get the benchmark.  Next, run a report showing how many calls the agent being audited took that day.  Enter the percentage (agent's number divided by the benchmark) and record it on page 1.  Do the same for calculations for average talk time. Details for calculating benchmarks are in APPENDIX A.

REVISED JUNE 26, 2011