LAURA E DUFFY
United States Attorney
BETH A. CLUKEY
Assistant U.S. Attorney
California Bar No. 228116
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7344
Fax: (619) 546-7751
Email: Beth.Clukey@usdoj.gov

Attorneys for Secretary McDonald

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEN MATTHEWS, | Case No.: 14cv1340-MMA (BLM) |
| Plaintiff, | |
| v. | **DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |
| ROBERT McDONALD, Secretary of Veterans Affairs, Agency, | DATE:  TBA |
| Defendant. | TIME:  TBA |
| | CTRM:  3A (3rd Floor – Schwartz) |
| | 221 West Broadway |
| | THE HON. MICHAEL M. ANELLO |
| | NO ORAL ARGUMENT REQUESTED PER LOCAL RULE |

## I.  INTRODUCTION

Plaintiff was terminated from the VA when she was a probationary employee. Under the Civil Service Reform Act, the VA could terminate Plaintiff for any reason, so long as it was not a reason based on illegal criteria.  <u>See</u> 5 U.S.C. § 7511(a)(1)(A)(i) (employee under CSRA defined as an individual who is not serving a probationary period); <u>Jenkins v. United States Post Office</u>, 475 F.2d 1256, 1257 (9th Cir. 1973) (civil service probationary employees have no right to continued employment).  The Call Center's supervisor at the time, Allison Gill, gave three

reasons as to why Gill recommended Plaintiff's termination: (1) poor customer service; (2) wasting time; and, (3) insubordination.   Plaintiff has submitted over two hundred pages of what Plaintiff contends are "facts" that show she was harassed during her employment and terminated because of her race and gender.   With few exceptions, Plaintiff's "facts" are actually unreasonable inferences Plaintiff draws from routine employment situations.

Regardless of the defects in Plaintiff's version of the facts, the legal barriers to Plaintiff's claims are insurmountable.   Many of the incidences about which Plaintiff complains are time-barred or do not involve anything adverse.   Plaintiff's   retaliation claim is legally defective for the simple reason that management did not perceive Plaintiff to have engaged in Title VII protected activity.   If management is unaware of protected activity, it cannot act with retaliatory intent.   Plaintiff's disability claim is also fatally flawed: Plaintiff is not disabled.

## II.  ANALYSIS

**A.     Only Admissible Evidence And Reasonable Inferences Drawn Therefrom Should Be Considered In Ruling on Defendant's Motion**

A significant portion of Plaintiff's responses to Defendant's facts are based on inadmissible evidence or no evidence.[1]   Plaintiff repeatedly states her interpretation of statements made or actions taken.   But the facts do not support Plaintiff's beliefs. When analyzing Defendant's motion, the Court looks to all of the evidence and draws *reasonable* inferences in favor of Plaintiff.   Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (emphasis added).   Such reasonable inferences are limited to those that a jury might rely on in reaching a verdict.   Craig v. M&O Agencies, Inc., 496 F.3d 1047, 1053 (9th Cir. 2007).   The Court considers only admissible evidence in ruling on a summary judgment motion.   Orr v. Bank of Am., 285 F.3d 764, 773 (9th

---

[1]   For the reasons stated in Defendant's Motion to Strike, Defendant's Reply brief addresses Plaintiff's Statement of Disputed Facts filed on October 22, 2015 (ECF No. 77, pp.1-220) , and the exhibits filed on October 28, 2015 (ECF No. 83).

Cir. 2002).    The Court does not have an obligation to comb through a voluminous record searching for the admissible evidence or evidentiary bases in support.  <u>In re Oracle Corp. Sec. Litigation</u>, 627 F.3d 376, 386 (9th Cir. 2010) ("It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles.").[2]

## B.   Plaintiff Does Not Challenge The Facts Underlying Her Termination

In Plaintiff's memorandum in support of her Opposition brief, Plaintiff does not challenge Defendant's contention that Plaintiff cannot establish a <u>prima</u> <u>facie</u> case of discrimination.  Plaintiff has not pointed to any non-protected, probationary employee who had many complaints filed against her, whose work performance was as bad, and who was insubordinate, but was not terminated.  Because Plaintiff cannot establish even a <u>prima</u> <u>facie</u> case, judgment should be entered in Defendant's favor with respect to Plaintiff's termination.

Even if the Court considers Defendant's stated reasons for terminating Plaintiff, Plaintiff has produced no persuasive evidence of pretext.  Defendant has articulated three reasons why Plaintiff was terminated– poor customer service, wasting time, and failure to follow instructions.  The tapes prove the poor customer service.

As for the issue of wasting time, Brenda Moore, the interim supervisor, had issues with Plaintiff wasting time.  (<u>See</u> Def. SOF ¶ 71.)  Plaintiff points out that Moore provided Plaintiff with a letter of recommendation.  (Plf.'s Resp., p. 219:10-21.)  Plaintiff reasons that, if Moore were truly unhappy with Plaintiff's performance, Moore would not have written the letter.  However, Moore signed the letter on February 16, 2011.  (ECF 83-1, p. 119 of 307.)  Moore had been working with Plaintiff for approximately one month.  (Def. Ex. AB, Moore Decl., ¶ 3.)  At the time Moore signed the letter, she agreed with its contents.  Moore left the Call Center that month.  (<u>Id.</u>)  When Moore returned to the Call Center in May 2011 as the Acting

---

[2] The remainder of Defendant's reply will address only facts that are based on admissible evidence and any reasonable inferences to be drawn therefrom.

Supervisor, Moore discovered Plaintiff's attitude had changed.   Consequently, her opinion of Plaintiff changed.   Thus, the letter of recommendation does not refute Moore's contention that Plaintiff was wasting time when Moore returned to the Call Center in May.   Other than pointing to the letter of recommendation, Plaintiff does not address her logged in and logged out time.   The amount of time Moore observed Plaintiff to be logged out of the system and unable to answer the phone is unrefuted.

Aaron McDevitt also discovered information that showed Plaintiff was wasting time. (Def. SOF ¶ 72-73.)  Although Plaintiff's numbers looked good on the surface, a tracking report showed Plaintiff, in reality, was cheating the system.  (Id.)  Plaintiff does not address this fact.  It is unrefuted a tracking report showed the number of calls Plaintiff took were far below the standard.

In support of the charge of failure to follow instructions, Plaintiff's termination letter specifically references Plaintiff's failure to read emails as instructed to do so. (Def. Ex. I.)   The emails were from McDevitt and in a report of insubordination, McDevitt documents Plaintiff's repeated, stated refusal to read McDevitt's emails. (Def. SOF ¶ 74.)  Plaintiff now argues she did not refuse to read the emails, she just did not read them as quickly as McDevitt would have liked.  (Plf.'s Resp., pp. 206:20-207:13, 219:21-220:7.)   Plaintiff's statements in her response to Defendant's statement of facts is a drastic departure from Plaintiff's previous admissions.  Plaintiff has previously admitted she did not read McDevitt's email.  (ECF No. 58-4, Def. Ex. J, Plf.'s EEO Compl., ECF p. 60 of 128.)   In Plaintiff's attachment to her EEO Complaint, Plaintiff states she told McDevitt on August 4, 2011, that she was not reading his email because they were difficult to read and redundant.  As to this fact, Plaintiff's response is akin to a sham affidavit and should be disregarded.  See Van Asdale v. International Game Tech., 577 F.3d 989, 998-999 (9th Cir. 2009) (explaining the sham affidavit rule).

Rather than directly confront Defendant's facts, Plaintiff argues she received satisfactory performance reviews.  (Plf.'s Memo. of P.&A. In Opp'n to Def.'s Summ.

J. Mot. ("Plf.'s Memo.), p. 41:1-2.)  Plaintiff was terminated for conduct issues, not performance issues.   Thus, the performance reviews are not evidence of pretext. Plaintiff also argues she received positive feedback ("kudos") from veterans.  (Id. p. 41:3-5.)  The positive feedback does not cancel the calls during which Plaintiff was rude and disrespectful.   In Plaintiff's responses to Defendant's statement of facts, Plaintiff gives excuses for her behavior.  (Plf.'s Resp. pp. 209:9-217:25.)  Plaintiff's attempts to explain her behavior does not negate her behavior or nulliff management's interpretation of her voice and treatment of the veterans.

Plaintiff also argues the ruling from the California Unemployment Insurance Appeals Board ("the Board") shows Defendant's stated reasons are false.  (Id. p. 41:21-24.)   Plaintiff claims the Administrative Judge found Plaintiff was not terminated for the reasons stated.  This is not true.  As stated in the Board's award, the Board uses a different standard and criteria than that used by employers.  Thus, the Board's award is not evidence of pretext.

**C.** **Plaintiff's Termination Is The Only Timely, Discrete Act That Can Form The Basis Of Plaintiff's Sex and Race Discrimination and Retaliation Claims**

**1.** **Plaintiff Did Not Exhaust Her Administrative Remedies As To Claims Based On Events Occurring Prior to June 19, 2011**

Plaintiff did not exhaust her administrative remedies as to the overwhelming majority of events about which Plaintiff complains.   According to Plaintiff's administrative complaint, Plaintiff first contacted an EEO Counselor on August 16, 2011. (Def. Ex. J.)  Plaintiff now claims she first contacted an EEO Counselor on August 3, 2011, based on advice she received from a Patient Advocate employee, Tanisha Jackson.  (Plf.'s Stmt. of Disputed Facts ("Plf.'s Stmt.") p. 118:9-19.)[3]

---

[3] Plaintiff cites a series of emails to support her assertion that she first contacted an EEO Counselor on August 3rd.  (Plf. Ex. 82.)  Assuming Plaintiff could establish foundation for the emails, the emails do not support the August 3 date.  Plaintiff states she received the contact information from employee Jackson; the only email between Ms. Jackson and Plaintiff is dated August 17, 2011.

Regardless of which date is used, Plaintiff had an affirmative duty to contact an EEO Counselor within 45 days of the alleged discrimination.  Assuming the August 3 date is used, any discrete act that occurred prior to June 19, 2011, is untimely and cannot form the basis of a race or sex discrimination claim.

The first 70 pages of Plaintiff's responses to Defendant's statement of facts involve alleged events that occurred between September 2010 and June 8, 2011.  See also Plf.'s Stmt. of Disputed Facts, pp. 77:16-78:17, 123:23-136:27, 152:15-156:11, 158:1-166:5, 167:9-169:10.[4]  Plaintiff did not exhaust her administrative remedies for all discrete acts that occurred during this time period.  Consequently, Plaintiff is barred from basing claims on the following:

| DATE | DISCRETE ACT | CITATION |
|---|---|---|
| Between October or November and December 2010 | Robert Earnest allegedly sexually harassed Plaintiff | Def.'s SOF ¶2 & Plf.'s Resp., pp. 2:12, 3:8 |
| The end of October or early November 2010 | Non-selection by manager Eva Schulz for a position | Def.'s SOF ¶21 & Plf.'s Resp., p. 132:23-24 |
| December 13, 2010 | What Plaintiff contends was a sexist application of the dress code | Plf.'s Resp., p. 7:1 |
| January 14, 2011 | Non-selection by manager Harry Klemfuss for the Program Support Assistant position | Def.'s SOF ¶37(3) & Plf.'s Resp. pp. 8:24, 155:19 |
| January 2011 | Gill's failure to acknowledge Plaintiff's contributions to a potential newsletter | Def.'s SOF ¶37(2) & Plf.'s Resp. pp. 9:13-10:19, 154:15- |

_____

[4] All cites are to ECF 77, Plaintiff's Statement of Disputed Facts.

| | | 155:17 |
|---|---|---|
| Between February 5, 2011, and April 2011 | Gill's failure to fix Plaintiff's phone | Plf.'s Resp., pp. 13:7-13:8, 163:23-25 |
| May 2011 | Non-selection for the Lead MSA promotion | Def.'s SOF ¶ 26 & Plf.'s Resp. pp. 44:10-16 |
| June 2011 | Management's discontinuance of Plaintiff's role on the Call Center Morale Team | Def.'s SOF ¶ 137 & Plf.'s Resp. p. 153:16-26 |

### 2. Between June 19, 2011, and September 28, 2011, Plaintiff Experienced One Adverse Employment Action:  Her Termination

To defeat Defendant's summary judgment motion with respect to Plaintiff's race and sex discrimination claims, Plaintiff has the initial burden of showing she suffered an adverse employment action.  Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000).  In proving her retaliation claim, Plaintiff must show the VA engaged in action that was reasonably likely to deter employees from engaging in protected activity.  Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003); Ray, 217 F.3d at 1243.  There must be a decision or employment action that has a material, negative impact on Plaintiff.  Burlington Northern and Santa Fey Ry. Co. v. White, 548 U.S. 53, 67 (2006) (the alleged retaliation must produce an injury or harm).  Plaintiff must show a reasonable employee would have found a challenged action was materially adverse.  Id. at 68.

In her response, Plaintiff gives an almost daily recital of events or discussions that occurred between mid-June and the end of September.  When the inadmissible statements and beliefs are excluded, the evidence and reasonable inferences show

/ / /

/ / /

*Def. Reply In Support of SJ Mot.*      *14cv1340-MMA (BLM)*

nothing <u>happened</u> to Plaintiff until her termination.  Without an adverse or materially negative employment action, Plaintiff cannot maintain Title VII discrimination or retaliatory claims.

Plaintiff complains of three policy or procedural changes:

-- On August 7, 2011, Gill implemented a sign in/sign out log procedure that applied to all the employees.  (Plf.'s Resp., pp. 94:5-96:3.)  Since everyone was treated the same, the new procedure is not evidence of discrimination.  Plaintiff claims she was treated unfairly on one occasion but Plaintiff was not disciplined for this infraction.

-- On August 16, 2011, Gill announced a new policy regarding the publishing of compliments ("kudos") the VA received from veterans about Call Center employees.  Plaintiff complained about this new policy and it was ultimately rescinded.  (Plf.'s Resp., pp. 97:21-99:8.)  The policy applied to all the employees and, therefore, is not evidence of discrimination.

-- On August 16, 2011, Gill told the Call Center employees that weekly performance audits were to be face-to-face and mandatory.  (Plf.'s Resp., pp. 99:9-100:4.)  Plaintiff believes not all employees were required to have these audits, but she has no personal knowledge of this.

For all events other than Plaintiff's termination, Plaintiff cannot establish she suffered an adverse employment action or a material, negative harm.  This is a necessary element to a Title VII discrimination and retaliation claim.  Therefore, judgment should be entered in Defendant's favor as to claims based on events that occurred between June 19, 2011, and the date of Plaintiff's termination.

/ / /

/ / /

/ / /

/ / /

/ / /

**D.    The Facts Do Not Support Plaintiff's Contention That Plaintiff Was Harassed Such That The Terms and Conditions of Plaintiff's Employment Were Altered**

Attached as Appendix A are the non-discrete acts[5] which form the basis of Plaintiff's claim.  During one conversation – when Gill and Plaintiff were returning to the Call Center after the off-site luncheon – Gill talked about dating and Gill's relationship with men.  In one situation, Gill stood within one inch of Plaintiff at her work station.  None of Gill's statements were physically threatening or humiliating. No racist or sexist remarks were ever made.  Adams, on one occasion in an email asked Plaintiff if she had paid veterans to say nice things about her.  Adams was clearly joking, since the question ended with "lol."  On two occasions Adams spoke "Black English" or "Ebonics" with Plaintiff.  This is not the type of environment that a reasonable person would find so offensive that the individual's terms and conditions of employment were altered.

**E.    Judgment Should Be Entered In Defendant's Favor As A Matter of Law On Plaintiff's Retaliatory Discrimination Claim**

Plaintiff's retaliation claim is fatally defective for two reasons.  First, Plaintiff claims Gill, McDevitt and Adams knew Plaintiff had engaged in EEO activity as of May 10, 2011, when Plaintiff requested time to meet with Carvajal, the EEO Manager.  (Plf.'s Resp., pp. 52:5-54:14.)   Accepting this as true for purposes of Defendant's pending motion, their knowledge is only one component of Plaintiff's claim.  To survive Defendant's motion, Plaintiff must establish a causal connection between the meeting with Carvajal and Plaintiff's termination.  The meeting occurred in May 2011 and Plaintiff was terminated in September.  During that period of time,

---

[5] In listing Plaintiff's complaints, Defendant omits episodes based on no evidence or inadmissible evidence.  For example, Plaintiff claims that, during Plaintiff's first Call Center team meeting, Sheri Lacro, an employee in Human Resources looked at Gill.  Plaintiff interprets this look to mean "Lacro and Gill had not only spoken of the Plaintiff's complaint against Robert Ernest, but also that they were annoyed and bothered by the complaint."  (Plf.'s Resp., p.7:13-20.)  Because Plaintiff's belief is not based on facts, there is nothing to list.

*Def. Reply In Support of SJ Mot.*                                      *14cv1340-MMA (BLM)*

three supervisors experienced a variety of problems with Plaintiff's performance. And, Gill left the Call Center from mid-May until early August.  The intervening problems with Plaintiff's performance break any sort of causal connection between the meeting and Plaintiff's termination.

Second, even if Plaintiff can establish a causal connection, Plaintiff cannot show the termination would not have occurred but for the alleged unlawful retaliation.  See University of Texas SW Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) (a Title VII retaliation claim requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer). Plaintiff will have to show her termination would not have occurred in the absence of the VA's alleged wrongful action.  To meet this burden, Plaintiff must either show all three articulated reasons are false, or if less than three reasons are false, the truthful reason(s) would not have independently carried the day.  As stated above, Plaintiff has failed to refute the facts that support the decision to terminate Plaintiff, and she will not be able to meet the "but for" standard of causation.

## G.  Plaintiff Has Not Shown She Is Disabled Within the Meaning of The Rehabilitation Act

Plaintiff claims her disability is anxiety and panic attacks.  The only medical documents Plaintiff has submitted in support of her claimed disability are the letters she submitted to the VA in September 2011.  In Plaintiff's deposition, Plaintiff stated her anxiety and panic attacks do not prevent her from doing any daily activities.  (See Def. SOF ¶ 49.)  Now, Plaintiff is claiming her panic attacks prevent her from sleeping, concentrating, breathing "fully," taking standardized employment tests, and sometimes speaking.  Plaintiff's current statements are inconsistent with her deposition testimony and, under the sham affidavit rule, the Court should consider Plaintiff's deposition testimony.  Regardless of which version the Court considers, Plaintiff has not shown her panic attacks and anxiety substantially limit a major life activity.  Plaintiff claims being underemployed is an example of a circumstance that

triggers her anxiety and panic attacks.  Being underemployed is not a major life activity.

Plaintiff also argues the VA should have understood Plaintiff possibly had a disability in August, when Plaintiff complained about the noise level in the Call Center.  This was not enough information for the VA to understand it was supposed to inquire further about any possible medical problem.   The VA tried to address Plaintiff's concerns.  Plaintiff admits Gill told Plaintiff she could not reduce the noise level until new "build arounds" were installed.  (Plf. Resp., p. 183:1-6.)  Plaintiff also admits the VA measured the noise level in the Call Center, and the noise levels were found to be within normal limits.  Defendant was not aware of a possible disability until September 2011.

## III.  CONCLUSION

For the reasons set forth above and in Defendant's memorandum of points and authorities filed previously, Defendant requests the Court to enter judgment in Defendant's favor.

DATED:     November 12, 2015               Respectfully submitted,

LAURA E. DUFFY
United States Attorney


 s/ Beth A. Clukey
BETH A. CLUKEY
Assistant United States Attorney
Attorneys for Defendant

LAURA E DUFFY
United States Attorney
BETH A. CLUKEY
Assistant U.S. Attorney
California Bar No. 228116
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7344
Fax: (619) 546-7751
Email: Beth.Clukey@usdoj.gov

Attorneys for Secretary McDonald

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEN MATTHEWS,<br><br>                    Plaintiff,<br><br>     v.<br><br>ROBERT McDONALD, Secretary of Veterans Affairs, Agency,<br><br>                    Defendant. | Case No.: 14cv1340-MMA (BLM)<br><br>**APPENDIX A TO DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:  TBA<br>TIME:  TBA<br>CTRM:  3A (3rd Floor – Schwartz)<br>           221 West Broadway<br><br>THE HON. MICHAEL M. ANELLO<br><br>NO ORAL ARGUMENT REQUESTED PER LOCAL RULE |

## ALL NON-DISCRETE ACTS

| | |
|---|---|
| January 17, 2011 | Plaintiff wrote an article for a newsletter which Gill never acknowledged.  (Plf.'s Resp., p. 9:13-10:19.) |
| January 23, 2011 | Gill made Plaintiff knit her a ski cap. (Id. pp. 10:20-11:4.) |
| February 2011 | Gill ordered all Call Center employees to attend an off-site luncheon.  Gill ordered Plaintiff to ride with Gill back to work. |

|  |  |
|---|---|
|  | During the car ride, Gill talked about dating, Gill's relationships with men, how Gill had quickly navigated the VA's hiring system, and that Adam Doyle was driving a car she previously owned. (<u>Id.</u> pp. 12:4-13:7.) |
| February 5, 2011 | Gill spoke highly of Doyle, stating he could fix Plaintiff's phone. Gall called Doyle "Mighty Mouse."  Plaintiff perceives this to mean Gill was "metaphorically sexually stroking Adam Doyle." (<u>Id.</u> pp. 13:8-14:27.)  Gill also yelled at Plaintiff. |
| March 8, 2011 | Gill gave kudos that should have gone to Plaintiff to another African-American female. (<u>Id.</u> pp. 15:1-16:4.) |
| March    10-11, April  4,  2011, April 8, 2011 | Lead MSA Aaron McDevitt pressured Plaintiff to get corporate donations for a run in which employees were going to participate. (<u>Id.</u> pp. 16:5-20:16, 21:21-23:24.) |
| April 2011 | When Plaintiff told Gill Plaintiff had applied for a GS-9 position, Gill stated she was not qualified. (<u>Id.</u> pp. 25:5-27:5.) |
|  | Gill asked all employees to contribute towards the purchase of a new refrigerator and said to all the employees that it was "the right thing to do."  (<u>Id.</u> pp. 32:1-34:5, 96:4-97:5.) |
| April 29, 2011 | Gill sent several emails to Plaintiff, demanding Plaintiff's attention.  When Plaintiff did not respond, Gill stated via email, "When I tell you to come to my office, it's not when you feel like it."  She then came to Plaintiff's workstation and stood less than an inch from Plaintiff.  (<u>Id.</u> p. 34:6-26.) |
| May 2, 2011 | After Gill emailed the team a kudos about Plaintiff, April Adams, a Lead MSA and African American, emailed Plaintiff: "How much cash are you paying the vets so I can jump on the band wagon? lol"  (<u>Id.</u> pp. 35:17-36:25.) |

| | | |
|---|---|---|
| 1 2 3 4 5 | May 3, 2011 | Plaintiff called in sick but did not personally speak with Gill; on May 4 and 5, McDevitt called Plaintiff at home and quizzed her about the nature of her illness.  McDevitt and Gill instructed Plaintiff as to the proper procedure to follow when calling in sick. (Id. pp. 37:1-39:26.) |
| 6 7 8 9 | May 5, 2011 | Plaintiff emailed Call Center employees and other departments that she had been quoted on a radio station; Gill told Plaintiff to let Gill see her emails before they went to other departments.  (Id. pp. 40:1-41:25.) |
| 10 11 12 | June 2011 | During a monthly team meeting, McDevitt told the Call Center employees everyone wanted Gill to return to the Call Center, and sneered at Plaintiff.  (Id. pp. 77:16-78:16.) |
| 13 14 15 | June 23, 2011, and July 12, 2011 | Adams spoke Black English/ Ebonics to Plaintiff.  (Id. pp. 78:17-79:11, 80:23-81:22.) |
| 16 17 18 | August 5, 2011 | During a team meeting, Gill told the employees present that she had the authority to do what she wanted and could write up anyone she wanted to.  (Id. pp. 93:8-94:4.) |
| 19 20 21 | September 1, 2011 | During Plaintiff's weekly audit, Gill lowered Plaintiff's score by four points because Plaintiff complained about a co-worker to persons outside the Call Center.  (Id. pp. 105:26-106:26.) |
| 22 23 24 25 26 | September 5, 2011 | Gill asked Plaintiff for a report containing Plaintiff's version of why she exhibited poor customer skills during a call with a veteran.  When Plaintiff subsequently submitted a revised report, Gill told Plaintiff she was not authorized to spend work time editing her report.  (Id. pp. 109:13-110:5.) |

27
28

1    DATED:      November 12, 2015                    Respectfully submitted,

2                                                      LAURA E. DUFFY
                                                       United States Attorney
3

4                                                       s/ Beth A. Clukey
                                                       BETH A. CLUKEY
5                                                      Assistant United States Attorney
                                                       Attorneys for Defendant
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended

# Exhibit G

In the matter of:

CARMEN MATTHEWS

v.                                                    )          Docket Number
                                                      )
                                                      )          200P-0664-2011104467
ERIC K. SHINSEKI, Secretary,                          )
Department of Veterans Affairs                        )
                                                      )

---

AFFIDAVIT:    ELIZABETH MC DONALD

Pursuant to the investigation of the subject complaint in accordance with
29 CFR 1614.108 on March 1, 2012, telephonically, at Denver, Colorado.


BEFORE:       MAURICE W. BABBY


On behalf of the United States Department of Veterans Affairs


SIERRA TAHOE INVESTIGATIONS
5299 Netherland Street
Denver, Colorado 80249

362

USA000762

1  VA 104467

2  Affiant is sworn to an oath by the Investigator.

3  BY MR. BABBY:  Ms. McDonald, my name is Maurice Babby, I'm an EEO Investigator

4  assigned by the Department of Veterans Affairs to investigate a complaint of discrimination

5  filed by Carmen Matthews in which she makes a number of claims, two of which were

6  accepted for investigation.  In Claim 35, she alleges that on September 12, 2011, she

7  submitted medical documentation and a request for reasonable accommodation which was

8  ignored, and in Claim 36, she alleges that on September 28, 2011, AG, Ms. Gill, presented

9  her with a termination letter.  Ms. McDonald, would you please state your name, your

10  official mailing address and your daytime telephone number?

11  A:  My name is Elizabeth McDonald and my official mailing address is 3350 La Jolla

12  Village Drive, San Diego, California 92161, phone number is 858-642-6331.

13  Q:  Ms. McDonald, what is your current position with the Department of Veterans Affairs?

14  A:  Assistant Chief, Health Administration Service.

15  Q:  How long have you held that position?

16  A:  I think I've held it for about two and a half years, maybe three years.

17  Q:  And, what is your racial background?

18  A:  My racial background?

19  Q:  Yes?

20  A:  Caucasian.

21  Q:  And, you are female?

22  A:  Yes.

1  Q: Did you at any time observe that she was impaired in any major life activities, such as

2  caring for herself or performing manual tasks?

3  A: No.

4  Q: Impaired in her ability to walk, see, hear … … …

5  A: Please keep in mind, though, that my interaction with her was extremely limited, you

6  know.

7  Q: Yes, did you observe she was in anyway impaired in her ability to walk, see, hear,

8  speak?

9  A: Not that I could see.

10  Q: In anyway impaired in her ability to learn or work?

11  A: No.

12  Q: Were you aware of any record of any physical or mental disability that she may have

13  submitted to the VA?

14  A: No.

15  Q: In your working with Ms. Matthews did you in anyway regard her as impaired?

16  A: No.

17  Q: Did you have any understanding of prior Equal Employment Opportunity participation

18  by Ms. Matthews as a complainant or as a witness?

19  A: No.

20  Q: Did you become aware in May of 2011 that Ms. Matthews had met with Ms. Marlene

21  Carvajal, the EEO specialist there?

22  A: Yes.



1   Q: And, did you have any understanding that the purpose of that meeting may have been to

2   discuss concerns Ms. Matthews may have had related to discrimination or disability issues?

3   A: No, actually.

4   Q: Did you have any understanding of the purpose of that meeting?

5   A: Yes.

6   Q: And, what was your understanding?

7   A: My understanding was that the purpose of that meeting was that she had an allegation for

8   ... ... ... she was alleging that her supervisor was ... ... ... she made allegations of fraud,

9   waste and abuse against her supervisor.

10   Q: Ms. Gill?

11   A: Um hum.

12   Q: And, were there any allegations of discrimination issues by Ms. Gill?

13   A: Not that I am aware of.

14   Q: So, what was the nature of the allegations, do you know?

15   A: No.

16   Q: With regard to Claim Number 35, in which Ms. Matthews alleges that on September 12,

17   2011, she submitted medical documentation and a request for reasonable accommodation

18   which was ignored, I understand that Ms. Matthews submitted this request and

19   documentation to Ms. Carvajal, the EEO specialist, and to Ms. Sheri Lacro, the HR

20   specialist there, did you have any understanding of this request?

21   A: Yes, my understanding is that she was concerned about the noise level and she felt that

22   her job was made more difficult by the level of noise in the area.  We immediately had

23   someone from our engineering team go out and measure the noise level to see that if it was

1    within the acceptable standards, our engineering team did go out there, and they sent in a

2    written report stating that they felt that the noise level in the call center was within

3    acceptable standards for people to perform their work.

4    Q:  Did you have any understanding that Ms. Matthews believed that she was being

5    physically or mentally impaired because of those working conditions?

6    A:  I think that she thought that, she may have found it difficult, which is why we went out

7    and assessed the situation to see if there was a problem and our findings were that they

8    weren't.

9    Q:  My understanding is that this initial concern was presented by Ms. Matthews to Ms. Gill,

10    or to someone else, in late July 2011 and that perhaps the evaluation of the noise level

11    occurred during August.  I'm sorry, I understand that the request was actually submitted to

12    the safety staff.

13    Did you have any understanding that in September, however, of 2011, that Ms. Matthews

14    submitted medical documentation in which she indicated that her working conditions created

15    a medical condition which was being exacerbated by stress?

16    A:  A medical condition exacerbated by stress?

17    Q:  Yes?

18    A:  I don't know, I don't remember that, but let me look in my notes … … … oh, I kind of

19    think that there was something about how she….. yes, she went to the employee health

20    person because she said that she was stressed, yeah, she felt like she was stressed.

21    Q:  And, did you have any understanding that a physician had submitted To Whom It May

22    Concern letters indicating that it was their medical opinion that she should continue to

23    receive counseling and that she should be outside the harmful work environment?

Page 5 of 13 pages.  Initials _____            367

00394                                        USA000767

1  Q: And, that "…you failed to read e-mails as instructed to do so." Did you have any

2  involvement over time related any conclusions by Ms. Gill or, I understand, an interim

3  supervisor, Ms. Moore?

4  A: Yes, I did.

5  Q: And, what do you recall about that?

6  A: What I recall is that both of them independently said that they felt that … … … or they

7  had observed Ms. Matthews not taking as many calls as other people, not doing her work

8  when she should be, and also, being rude to customers. I mean, they had customer

9  complaints about her where they didn't have them from other people and these weren't

10  customer complaints that they sought out, these were things referred to them by the Patient

11  Advocate. So, my advice was, you know, you have to tell Ms. Matthews what your

12  expectations are, you have to give her a performance bench mark, you have to tell her, for

13  instance, if she is logged out of her phone all day, you have to tell her it is expected that

14  since you are a telephone service rep it is expected that you are logged in to your phone able

15  to take calls when they come in. I also said that you just can't … … … you have to

16  document the fact that you provided Ms. Matthews the information she needed to do her job,

17  you have to make sure that Ms. Matthews has the training to do her job, you have to make

18  sure that her performance standards reflect what you expect of her in her job and, if you

19  don't feel her conduct is appropriate, you have to explain why it's not appropriate and then

20  give her a chance to fix it. So, my advie to them was to make sure that … … … make sure

21  that they document their conversations with Ms. Matthews, and, make sure that they

22  provided Ms. Matthews the training and the tools, the information she needed to succeed

23  before taking any action to remove her. I would also add that Ms. Matthews was a…. she is

Page 9 of 13 pages.  Initials _____

USA000749

1    a probationary employee and the purpose of giving someone a one-year probationary, is for

2    management to assess whether it is a good fit or not. And, in this case, they had advised me

3    that they didn't feel that Ms. Matthews was a good fit for the position. Again, like I told

4    you, I said, they still probably needed to give her a chance by explaining their expectations

5    and letting her fix the problem before completely terminating her.

6    Q: Did you understand that Ms. Gill and Ms. Moore both did that?

7    A: My understanding is, yes.

8    Q: And, so even having done that and completing that kind of counseling with Ms.

9    Matthews, did Ms. Moore and Ms. Gill both conclude that she was not performing up to

10    expectations ... ... ...

11    A: Expectations, yes.

12    Q: Or that her conduct was not acceptable?

13    A: Correct.

14    Q: So, who actually came to you with any conclusions about whether Ms. Matthews should

15    be terminated during her probationary period?

16    A: Ms. Gill did first, and, then Brenda Moore did.

17    Q: So, they both indicated to you that they felt that Ms. Matthews' performance and

18    conduct were not meeting standards?

19    A: Correct.

20    Q: Now, I understand that Ms. Gill was there as a supervisor for Ms. Matthews from the

21    time that she was employed in January of 2011, up to about early June and that Ms. Moore

22    was there for a portion of June and July and that Ms. Gill then returned in early August, is

23    that correct?



1   A: I don't remember, I don't remember when Ms. Gill got back, but it was either August or

2   September.

3   Q: So, she returned and at that point you already had the recommendation from Ms. Moore?

4   A: Yes, that's correct.

5   Q: And, so, when Ms. Gill returned, did Ms. Gill then come to you in August with any

6   recommendations or conclusions that she had drawn that Ms. Matthews should be

7   terminated during her probationary period, is that when Ms. Gill came to you?

8   A: I don't know, I don't remember, I just remember that at this time … … … by that time,

9   once Brenda, you know, sought out advice on how to handle the fact that Ms. Matthews

10   wasn't living up to conduct or performance expectations, I think the decision to terminate

11   Ms. Matthews was in process, and, like I told you before, I didn't remember whether it was

12   Ms. Moore or Ms. Gill that submitted the documentation.

13   Q: So, do you recall advising Ms. Gill to proceed with the termination?

14   A: I am sure that I did.

15   Q: So, was it the decision of Ms. Gill to terminate Ms. Matthews or was it your decision?

16   A: I think it was a decision of Ms. Gill and I supported her decision based on the fact that

17   Ms. Moore had come to the same conclusion herself.

18   Q: So, was your action, then, one of concurring in a decision by Ms. Gill?

19   A: Yes, that's how … … … either her or Brenda Moore, I just concurred. Whether it was

20   Brenda Moore who turned in the paperwork or Ms. Gill, I would have concurred because I

21   was aware of the situation and I had felt that we had, you know, sufficiently given Ms.

22   Matthews the opportunity to correct her behavior and her performance.

Page 11 of 13 pages.  Initials $\mathcal{GM}$

373

00400

USA000753

## CERTIFICATION

I have read the attached affidavit in 200P-0664-2011104467 consisting of 13 pages, and it is true and complete to the best of my knowledge and belief. In making this affidavit, I understand Section 1001, Title 18 of the U. S. Code which states:

> Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up any trick, scheme or device a material fact, or makes false, fictitious or fraudulent statements or representation, or make or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination. As a routine use, this information may be disclosed to persons involved in the processing and/or adjudication of this complaint; to the Equal Employment Opportunity Commission or to the Merit Systems Protection Board, as appropriate, to adjudicate complaints of alleged discrimination; to a court party or counsel for a party in judicial or administrative litigation; to a congressional office at your request; to a labor organization as may be required by the NLRA. Provision of the information requested is mandatory for the complainant, U. S. Department of Veterans Affairs employees and other Federal employee witnesses. Failure of the U. S. Department of Veterans Affairs or other Federal employees to provide the requested information could result in disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct.

ELIZABETH MC DONALD
(Date)  3/6/12

(Address)  3350 La Jolla Village Dr. (136 B)
(City, State, ZIP)  San Diego CA 92161

376

USA000752

## <u>DECLARATION OF TRANSCRIBER</u>

STATE OF COLORADO      )
                                     )
County of Denver               )

I, Maurice W. Babby, of SIERRA TAHOE INVESTIGATIONS, hereby certify that the foregoing pages, consisting of pages 1 through 13, represent an accurate and complete transcription of the entire record of the proceedings of a statement by ELIZABETH MC DONALD, personally recorded by the Investigator, Maurice W. Babby, at the time and place hereinbefore set forth.

WITNESS my hand at Denver, Colorado this date of March 4, 2012.

_____
Maurice W. Babby

# EXHIBIT AB

1  LAURA E DUFFY
   United States Attorney
2  BETH A. CLUKEY
   Assistant U.S. Attorney
3  California Bar No. 228116
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, CA 92101
5  Tel: (619) 546-7344
   Fax: (619) 546-7751
6  Email: Beth.Clukey@usdoj.gov

7  Attorneys for Secretary McDonald

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  CARMEN MATTHEWS,                    Case No.: 14cv1340-MMA (BLM)

12            Plaintiff,

13       v.                            **DECLARATION OF BRENDA
                                       MOORE**
14  ROBERT McDONALD, Secretary of
    Veterans Affairs, Agency,
15
              Defendant.
16                                     THE HON. MICHAEL M. ANELLO

17

18       I, Brenda Moore, hereby declare under penalty of perjury, the following:

19       1.    I am currently an employee for the U.S. Department of Veterans Affairs

20  ("the VA"). The facts in this declaration are based on my personal knowledge. My

21  actions described herein were taken in the course and scope of my duties as a VA

22  employee.

23       2.    I started working for the VA in approximately November 2004. I started

24  as a Medical Support Assistant ("MSA") in the Call Center on December 2004. On

25  February 2011, I was promoted to the position of Supervisory MSA in charge of

26  Specialty Outpatient Clinics at La Jolla site. Between May 13, 2011, and August 1,

27  2011, I was the Acting Supervisor of the Call Center.

28       3.    I trained Ms. Carmen Matthews when she started working at the Call

Center as an MSA in January 2011 until I left the Call Center in February 2011.  I trained Ms. Matthews about the procedures to following in answering calls.  During that time I also listened to Ms. Matthews' calls and found her to have very good customer service skills with the veterans.  Attached to my declaration as Exhibit A is a recommendation letter I signed, dated February 16, 2011, for Ms. Matthews.  Ms. Matthews drafted the letter.  At the time I signed the letter, I agreed with its contents.

4.     When I returned to the Call Center in May 2011 as the Acting Supervisor, I found Ms. Matthews' attitude with the veterans during calls had changed.  Ms. Matthews was no longer as understanding with the veterans as she had been when I trained her.  I discussed the issues I had with Ms. Matthews' conduct and performance with the EEO investigator during the administrative process.  My discussion is in my EEO affidavit, attached to this declaration as Exhibit B.  By August 2011, I no longer agreed with the contents of the recommendation letter I had signed for Ms. Matthews.

SO SAYETH THE DECLARANT.

DATE:        November 4, 2015

Brenda Moore